UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

GLENCORE INTERNATIONAL A.G.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JUDGE SCHOFIELD

**INFORMATION**

22 Cr. _____ ( _ )

22 CRIM 297

ORIGINAL

The United States charges:

## GENERAL ALLEGATIONS

### Relevant Statutory Background

1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

### Glencore and Other Relevant Entities and Individuals

2.    GLENCORE INTERNATIONAL A.G. ("GLENCORE"), the defendant, was a multinational commodity trading and mining company headquartered in Baar, Switzerland. GLENCORE had operations and subsidiaries in various locations around the world, including the United States, the United Kingdom, Africa, and South America.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 2 4 2022

1

3.      Glencore UK Ltd. was a direct subsidiary of GLENCORE and the direct owner of Glencore Energy UK Ltd.  Glencore UK Ltd. and Glencore Energy UK Ltd. (collectively, the "Glencore UK Subsidiaries") were located in London, United Kingdom, and served as GLENCORE's head offices for oil and gas trading.  The Glencore UK Subsidiaries and their employees were agents of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—in buying and selling oil worldwide.

4.      Glencore Ltd. was a subsidiary of GLENCORE that was located in Stamford, Connecticut and later relocated to New York, New York.

5.      Glencore do Brasil Comércio e Exportação Ltda. ("Glencore Brazil") was a subsidiary of GLENCORE, located in Rio de Janeiro, Brazil.

6.      Glencore de Mexico S.A. de C.V. ("Glencore Mexico") was a subsidiary of GLENCORE, located in Cancun, Mexico.

7.      "Glencore Mining Company 1" and its subsidiary "Glencore Mining Company 2" held interests in copper and cobalt mining operations located in the Democratic Republic of the Congo ("DRC").  From in or about 2010 to in or about 2013, Glencore Mining Company 1 and Glencore Mining Company 2 were direct or indirect subsidiaries of GLENCORE.

8.      "Executive 1" was a United Kingdom citizen and resident who held several senior roles at Glencore entities from at least in or about 1995 to in or about 2019.  From at least in or about 2007 to in or about 2019, Executive 1 was a high-ranking executive at the Glencore UK Subsidiaries who acted on behalf of GLENCORE and had responsibility over GLENCORE's sale and purchase of oil worldwide.  Executive 1 reported directly to a high-ranking GLENCORE executive.  Executive 1 was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

9.     "Executive 2" was a United Kingdom citizen and resident who held multiple executive roles at GLENCORE entities and GLENCORE's predecessor, Marc Rich & Co., from in or about 1987 to in or about 2018, including as a senior executive in GLENCORE's oil and gas business from at least in or about 2007 to in or about 2018.  Executive 2 was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

10.     "Executive 3" was a Greek and United Kingdom citizen and a resident of Switzerland, and a senior executive who was employed by GLENCORE's copper and zinc department from in or about 1993 to in or about 2018.  From at least in or about 2007 to in or about 2018, Executive 3 was based in Switzerland.  Executive 3 was an employee and agent of GLENCORE as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3.

11.     Anthony Stimler was a United Kingdom citizen and resident who held several roles at Glencore Energy UK Ltd. from in or about 2002 to in or about 2009 and from in or about June 2011 to in or about August 2019.  During the later time period, Stimler was a senior trader in charge, along with Trader Z below, of GLENCORE's West Africa desk for the crude oil business. Stimler had responsibility for crude oil purchases from, among other places, Nigeria.  Stimler was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

12.     "Trader Y" was a United Kingdom citizen and resident who was a trader at Glencore Energy UK Ltd. from in or about 1993 to 2009, and a consultant for Glencore Energy UK Ltd. from in or about 2010 to in or about 2012, and from in or about 2015 to in or about 2017. Trader Y was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

13.     "Trader Z" was a United Kingdom citizen and resident who was a trader at Glencore

Energy UK Ltd. from in or about 2011 to in or about 2019.  Trader Z was an agent of GLENCORE

as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

14.     "Employee X" was a Brazilian citizen and resident who, from at least in or about

2004 to at least in or about 2018, was a business development employee at Glencore Brazil.

Employee X was an agent of GLENCORE as that term is used in the FCPA, Title 15, United

States Code, Section 78dd-3.

15.     "Employee Y" was a Mexican citizen and resident who held a role as a senior

employee at Glencore Mexico from in or about 2006 to in or about 2016.  Employee Y was an

agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section

78dd-3.

16.     "Employee Z" was a senior executive at Glencore Mining Company 1.  Employee Z

was an agent of GLENCORE as that term is used in the FCPA, Title15, United States Code,

Section 78dd-3.

### Foreign Government Entities and Officials

17.     The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian state-

owned and state-controlled oil company headquartered in Abuja, Nigeria, and performed a

function that Nigeria treated as its own.  NNPC was an "instrumentality" of a foreign government,

as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A), and

employees of NNPC were "foreign official[s]," as that term is defined in the FCPA, Title 15,

United States Code, Section 78dd-3(f)(2)(A).

18.     "Nigeria Official X" was a high-ranking official in the Nigerian Ministry of

Petroleum Resources from at least in or about 2010 up to and including in or about 2015.  Nigeria

4

Official X was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

19.    "Nigeria Official Y" was a high-ranking Nigerian government official.  From at least in or about 2011 up to and including in or about 2015, Nigeria Official Y was a close associate of Nigeria Official X and a senior official in the Pipelines and Product Marketing Company ("PPMC"), a wholly-owned subsidiary of NNPC and an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).  Nigeria Official Y was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

20.    Petróleo Brasileiro S.A. ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that refined, produced, and distributed oil, oil products, gas, biofuels, and energy.  Through voting rights, the Brazilian government directly owned more than 50 percent of Petrobras's common shares, while an additional 10 percent of Petrobras's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund.  Petrobras was controlled by the Brazilian government and performed government functions.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

21.    "Brazil Official 1" was a Brazilian citizen and an oil trader for Petrobras.  From at least in or about 2010 up to and including in or about 2014, Brazil Official 1 was based in Houston, Texas.  Brazil Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

22.    "Brazil Official 2" was a Brazilian citizen and a trading manager for Petrobras. Brazil Official 2 was based in Rio de Janeiro, Brazil, from at least in or about 2010 up to and including in or about 2014. Brazil Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

23.    "Brazil Official 3" was a Brazilian citizen and a fuel oil trader for Petrobras. Brazil Official 3 was based in Rio de Janeiro, Brazil, from at least in or about 2010 up to and including in or about 2014. Brazil Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

24.    Institut National de Préparation Professionnelle ("INPP") was a government entity in the Democratic Republic of the Congo that provided vocational and professional training to DRC residents. INPP was supervised by the Ministry of Employment, Labor, and Social Welfare. INPP was an "instrumentality" of a foreign government, and its officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

25.    Petróleos de Venezuela S.A. ("PDVSA") was Venezuela's state-owned and state-controlled oil company. PDVSA and its subsidiaries and affiliates were responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries, were owned and controlled by, and performed functions of, the Venezuelan government. PDVSA and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and their officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

### Third Party Agents and Consultants

26.     "West Africa Intermediary Company" was a Nigerian company used by GLENCORE and its subsidiaries to pay bribes to government officials in Nigeria and other countries in West Africa, in order to obtain oil cargoes and other business advantages for GLENCORE. West Africa Intermediary Company contracted with GLENCORE from at least in or about 2007 up to and including in or about 2011, and with Glencore Energy UK Ltd. from at least in or about 2011 up to and including in or about 2014. West Africa Intermediary Company was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria and other countries in West Africa.

27.     "West Africa Agent," a citizen and resident of Nigeria and the United Kingdom, was the owner, operator, and principal employee of West Africa Intermediary Company from at least in or about 2006 up to and including in or about 2014. West Africa Agent was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3— and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria and other countries in West Africa.

28.     "Nigeria Intermediary Company" was a Cyprus-incorporated intermediary used by GLENCORE and its subsidiaries to pay bribes to Nigerian government officials in order to obtain oil cargoes from NNPC for GLENCORE. Nigeria Intermediary Company was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3— and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria.

29.     "Brazil Consultant" was a Brazilian citizen and an intermediary who facilitated bribe payments to Brazilian government officials, including Brazil Official 1, Brazil Official 2,

and Brazil Official 3, on behalf of GLENCORE and others.  Brazil Consultant was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3— and acted on behalf of GLENCORE and Glencore Brazil in Brazil.

30.     "Venezuela Intermediary Company" was an entity that assisted GLENCORE in obtaining payment priority on payments due from PDVSA, among other business advantages, by making bribe payments to a PDVSA official.  From at least in or about 2009 up to at least in or about 2016, Venezuela Intermediary Company and other related companies had business operations in the United States that assisted Glencore.

## The Bribery Scheme

31.     From at least in or about 2007 up to and including in or about 2018, GLENCORE, through certain of its employees and agents, while acting on behalf of GLENCORE, together with its co-conspirators, knowingly and willfully conspired and agreed with others to corruptly provide more than $100 million in payments and other things of value to various intermediaries with the intent that a significant portion of these payments would be used to pay bribes to and for the benefit of foreign officials to secure an improper advantage and to influence those foreign officials in order to obtain and retain business in Nigeria, Cameroon, Ivory Coast, Equatorial Guinea, Brazil, Venezuela, and the Democratic Republic of the Congo.

## A. Bribes Paid to Officials in West Africa

### *Overview*

32.     Beginning at least as early as in or about 2007 and continuing through in or about 2018, GLENCORE, through certain of its employees and agents, including the Glencore UK Subsidiaries, Stimler, Executive 1, Executive 2,  Trader Y, Trader Z, and others, caused approximately $79.6 million in payments to be made to West Africa Intermediary Company and Nigeria Intermediary Company with the intent that a significant portion of the payments would be used to pay bribes to and for the benefit of foreign officials in order to secure improper advantages to obtain and retain business with state-owned and state-controlled entities in Nigeria, Cameroon, Ivory Coast, and Equatorial Guinea.

33.     To conceal the bribe payments, GLENCORE and the Glencore UK Subsidiaries, together with their co-conspirators, entered into sham consulting agreements, paid inflated invoices, and used West Africa Intermediary Company and Nigeria Intermediary Company to make corrupt payments to numerous foreign officials.   GLENCORE, the Glencore UK Subsidiaries, and others agreed to use, and did use, purported "commissions" for oil cargoes, at least in part, to conceal bribe payments to government officials in exchange for obtaining and retaining business on behalf of GLENCORE and its affiliates.

34.     GLENCORE and the Glencore UK Subsidiaries' employees and agents, including Stimler and Executive 2, facilitated and approved bribe payments, and engaged in other acts in furtherance of the bribery scheme, while in the United States.

35.     In addition, GLENCORE made and caused to be made at least approximately $39,900,000 of the payments using correspondent bank accounts held at financial institutions in the Southern District of New York, to West Africa Intermediary Company and Nigeria

9

Intermediary Company with the intent that a significant portion of the payments would be used to pay bribes to and for the benefit of foreign officials.

### *Bribe Payments to Nigerian Officials*

36.     From at least in or about 2007 up to and including in or about 2018, GLENCORE and the Glencore UK Subsidiaries entered into multiple agreements to purchase crude oil and refined petroleum products from the NNPC and its subsidiaries.  During that period, both GLENCORE and the Glencore UK Subsidiaries engaged West Africa Intermediary Company and Nigeria Intermediary Company to pursue business opportunities and other improper business advantages, while knowing that the intermediaries would make bribe payments to Nigerian government officials to obtain those business opportunities and advantages.  In total, GLENCORE and the Glencore UK Subsidiaries—acting on GLENCORE's behalf—paid more than $52 million through intermediaries, intending that those funds be used, at least in part, to pay bribes.  Senior executives of the Glencore UK Subsidiaries, including Executive 1 and Executive 2, approved most of the illicit bribe payments.  As a result of these payments, GLENCORE earned profits of approximately $124 million.

### *West Africa Intermediary Company*

37.     From at least in or about 2007 up to and including in or about 2014, GLENCORE engaged West Africa Intermediary Company as an agent to help identify business opportunities and to act as a conduit for bribe payments to Nigerian government officials in order to obtain and retain business for GLENCORE and the Glencore UK Subsidiaries, and to secure other improper business advantages.

38.     When communicating with West Africa Intermediary Company, employees at the Glencore UK Subsidiaries used coded language to conceal their discussion of bribe payments,

referring to bribe payments as "newspapers" or "journals" or "pages." In one instance, on or about November 17, 2008, Trader Y exchanged emails with West Africa Agent, noting that the Glencore UK Subsidiaries needed to make a $90,000 payment to be used, at least in part, to pay bribes to officials of PPMC, an NNPC subsidiary, in order to falsely undervalue a cargo of fuel oil for the benefit of GLENCORE. Later in the same email thread, on or about November 17, 2008, Trader Y told West Africa Agent that this payment was the "amount they needed to cover ppmc in newspapers reading material." In response, West Africa Agent wrote that "the newspapers will be delivered" by himself personally.

39.     GLENCORE agents, including Stimler and Executive 2, while in the territory of the United States, approved bribe payments to be made through West Africa Intermediary Company. For example, on or about January 18, 2011, while in the territory of the United States, Executive 2 approved a payment of $325,000 to West Africa Intermediary Company, intending that all or part of those funds would be used to bribe Nigerian officials in connection with the purchase of fuel oil from an NNPC subsidiary.

### Crude Oil Term Contracts

40.     From at least in or about 2007 up to and including in or about 2014, GLENCORE entered into multiple contracts to purchase crude oil from the NNPC. GLENCORE designated Glencore UK Ltd., via a services agreement, to administer the contracts. Employees of both Glencore UK Subsidiaries administered and performed work under the NNPC contracts on behalf of GLENCORE.

41.     In order to obtain these crude oil contracts, the Glencore UK Subsidiaries—acting on GLENCORE's behalf—arranged to pay bribes through West Africa Intermediary Company to NNPC officials. For example, on or about February 9, 2012, in an email to Stimler, Trader Z, and

another Glencore Energy UK Ltd. employee, West Africa Agent used the code word "filings" to refer to bribe payments that were needed to secure a new crude oil contract, writing that it was "very VERY urgent re our filings have to have meeting monday." In response to this email, Trader Z obtained approval from Executive 2 to pay West Africa Agent $1,050,981, knowing that at least part of the payment would be used to bribe Nigerian officials to award a crude oil contract to GLENCORE. Glencore Energy UK Ltd. made the payment to West Africa Intermediary Company (*i.e.*, West Africa Agent's company) on or about February 13, 2012.

42.     Similarly, on or about March 27, 2014, Executive 1 and Executive 2 approved Trader Y's request for Glencore Energy UK Ltd. to make a $500,000 payment from Glencore Energy UK Ltd. to West Africa Intermediary Company, upon receipt of which West Africa Agent withdrew a portion of the payment and passed it to Nigeria Official Y as a bribe to assist GLENCORE and its subsidiaries in winning an annual contract for the purchase of crude oil cargoes.

<em>Swap Agreement</em>

43.     In or about March 2011, employees of the Glencore UK Subsidiaries agreed to pay West Africa Intermediary Company $14 million that was intended, at least in part, to be passed on to NNPC officials to secure an agreement with NNPC subsidiary PPMC for refined crude oil petroleum products (the "Swap Agreement").

44.     Prior to the bribe payment, in or about 2011, Executive 1 met with West Africa Agent and Nigeria Official Y in London to discuss the Swap Agreement, and Executive 1 agreed to make the $14 million payment through West Africa Intermediary Company, knowing that the money would be used, at least in part, to pay bribes to Nigerian officials.

45.     On or about March 1, 2011, the Glencore UK Subsidiaries wired $14 million to West Africa Intermediary Company from Switzerland to Nigeria, through a correspondent bank account held at a financial institution located in the Southern District of New York.

46.     On or about March 2, 2011, West Africa Agent withdrew $1,020,000 in cash from a West Africa Intermediary Company bank account and gave the cash in Nigeria to Nigeria Official Y as a bribe payment in connection with the Swap Agreement. Subsequently, after the Glencore UK Subsidiaries opted not to pursue the Swap Agreement, West Africa Agent returned approximately $8 million of the $14 million to the Glencore UK Subsidiaries.

### Nigeria Intermediary Company

47.     From at least in or about 2007 up to and including in or about 2018, the Glencore UK Subsidiaries entered into multiple agreements with Nigeria Intermediary Company. Under the terms of the agreements, Nigeria Intermediary Company received a fee for: (a) acting as an intermediary for the Glencore UK Subsidiaries in obtaining refined petroleum products from NNPC; and (b) acting as a front for the Glencore UK Subsidiaries by purchasing crude oil cargoes from NNPC and immediately re-selling them to the Glencore UK Subsidiaries. The Glencore UK Subsidiaries employees knew that Nigeria Intermediary Company would use the fees it obtained through these agreements, at least in part, to pay bribes to, or for the benefit of, Nigerian government officials in exchange for the improper business advantages GLENCORE and the Glencore UK Subsidiaries obtained.

48.     For example, on or about September 25, 2014, an employee of Nigeria Intermediary Company ("NIC Employee 1") sent an email to Stimler stating that Nigeria Official X had asked that all companies or "customers" of NNPC give an "advance" of $300,000 to the re-election campaign of a senior Nigerian official in exchange for receiving crude oil cargoes.

49.     On or about October 3, 2014, in response to information communicated by another employee of Nigeria Intermediary Company ("NIC Employee 2," together with NIC Employee 1, the "NIC Employees"), Stimler caused Glencore Energy UK Ltd. to send a wire transfer of approximately $300,000 from Glencore Energy UK Ltd.'s bank account in Switzerland, through a correspondent bank account held at a financial institution located in the Southern District of New York, to a Nigeria Intermediary Company bank account in Cyprus.

50.     On or about October 5, 2014, Stimler emailed the NIC Employees that Glencore Energy UK Ltd.'s management had approved the $300,000 payment and that Nigeria Intermediary Company should make sure that "NNPC perform[s]," *i.e.*, provides the expected crude oil cargoes to the Glencore UK Subsidiaries in exchange for the bribe payment.

51.     On or about April 20, 2015, while in the United States, Stimler received an email from NIC Employee 1 in which Nigeria Intermediary Company offered to make a payment for the benefit of a Nigerian official of approximately $50,000 per oil cargo for four cargoes of NNPC oil to be delivered to Glencore Energy UK Ltd. in May and June 2015. On or about April 20, 2015, while in the United States, Stimler replied to Nigeria Intermediary Company's email, expressing interest on behalf of GLENCORE in receiving one of the June 2015 NNPC oil cargoes. On or about May 5, 2015, Stimler received an invoice from Nigeria Intermediary Company for $50,000 as an "Advance Payment" against the June 2015 cargo.

52.     Subsequently, on or about May 5, 2015, Glencore Energy UK Ltd. sent a wire transfer of $50,000 to Nigeria Intermediary Company from a bank account in Switzerland, through a correspondent bank account held at a financial institution located in the Southern District of New York, to Nigeria Intermediary Company's bank account in Cyprus. As per the April email

exchange between Stimler and NIC Employee 1, the funds were intended to be paid, at least in part, to Nigerian government officials in exchange for the June 2015 oil cargo from NNPC.

53.     As a result of GLENCORE and the Glencore UK Subsidiaries' dozens of agreements to make corrupt payments to Nigerian officials through West Africa Intermediary Company and Nigeria Intermediary Company, on behalf of and for the benefit of GLENCORE, GLENCORE earned profits of approximately $124 million.

*Cameroon, Ivory Coast, and Equatorial Guinea*

54.     From at least in or about 2006 up to and including in or about 2014, GLENCORE and its subsidiaries and affiliates made, and caused to be made, approximately $27 million in payments to West Africa Intermediary Company knowing that the funds would be used, at least in part, to make corrupt payments to foreign officials in Cameroon, Ivory Coast, and Equatorial Guinea.  GLENCORE used West Africa Intermediary Company to make corrupt payments to government officials of those countries in order to secure an improper advantage for GLENCORE in obtaining and retaining business, including, for example, to receive crude oil cargoes from state-owned and state-controlled oil companies.  As a result of these payments, GLENCORE obtained more than $92 million in profits.

55.     From at least in or about 2006 up to and including in or about 2014, GLENCORE made more than $21 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Cameroon in connection with transactions associated with state-owned and state-controlled entities.  As a result of these payments, GLENCORE made a profit of more than $67 million.

56.     From at least in or about 2007 up to and including in or about 2010, GLENCORE made over $4 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Ivory Coast in connection with

transactions associated with state-owned and state-controlled entities. As a result of these payments, GLENCORE made a profit of more than $30 million.

57.     From at least in or about 2007 up to and including in or about 2010, GLENCORE made over $1.5 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Equatorial Guinea in connection with transactions associated with state-owned and state-controlled entities. As a result of these payments, GLENCORE made a profit of more than $3 million.

58.     Some of these corrupt payments were paid in cash that was dispensed from GLENCORE's offices in Baar, Switzerland, or from the Glencore UK Subsidiaries' offices in London, United Kingdom. GLENCORE maintained a "cash desk" in London until in or about 2011, and maintained a "cash desk" in Baar until in or about 2016.

**B.  Bribes Paid to Officials in Brazil**

59.     In or about July 2011, GLENCORE, through certain of its employees and agents, including Employee X, Employee Y, Brazil Consultant, and others, caused approximately $147,202 to be used, at least in part, as corrupt payments to be made to, and for the benefit of, Brazilian officials, in order to secure improper business advantages. Specifically, Employee X negotiated with Brazil Consultant to pay approximately $147,202 to Brazil Consultant, knowing that a portion of the funds would be paid in bribes to Petrobras officials in exchange for Glencore Ltd. having the opportunity to buy an oil cargo from Petrobras. Specifically, on or about April 30, 2011, Employee X emailed Brazil Consultant in connection with purchasing the oil cargo at a price that included a built-in "delta," which represented the bribe amount.

60.     To conceal discussions of the bribery scheme, Employee X used a personal email address to communicate with Brazil Consultant and arranged with Brazil Consultant to disguise

the "delta" or bribe payment as an inflated service fee of $0.50 per barrel of the purchased cargo. On or about July 13, 2011, Employee Y executed a sham services agreement between Glencore Mexico and Brazil Consultant to disguise the "delta" as a $0.50 per barrel commission payment to Brazil Consultant.

61.     Subsequently, on or about July 20, 2011, Glencore Energy UK Ltd.—one of the Glencore UK Subsidiaries—wired approximately $147,202 from an account in Switzerland to an account held by Brazil Consultant at a bank in Houston, Texas, which represented Brazil Consultant's previously agreed upon "delta" of $0.50 per barrel. From this payment, Brazil Consultant subsequently paid bribes in the following approximate amounts: (a) $40,000 to Brazil Official 1; (b) $31,000 to Brazil Official 2; and (c) $40,000 to Brazil Official 3.

**C. Bribes Paid to an Official in Venezuela**

62.     Beginning in or around 2011 and continuing through approximately 2014, GLENCORE, through certain of its employees and agents, including Venezuela Intermediary Company and others, caused corrupt payments to be made to, and for the benefit of, a Venezuelan official, in order to secure improper business advantages.

63.     As part of its business dealings in Venezuela, GLENCORE and its subsidiaries sold oil products to, and purchased them from, PDVSA. If PDVSA did not pay GLENCORE's invoices on time, PDVSA incurred interest that was owed to GLENCORE because of late payments. Additionally, if PDVSA did not load or discharge a GLENCORE vessel within an agreed upon time frame, PDVSA incurred demurrage (*i.e.*, a charge payable to GLENCORE for the delay).

64.     By in or about 2011, PDVSA owed millions of dollars to GLENCORE and its subsidiaries related to late payments for accrued interest and demurrage. Due to difficulties in obtaining payment from PDVSA, GLENCORE used intermediaries, including Venezuela

Intermediary Company, to assist in obtaining payment priority from PDVSA over other similarly situated companies. GLENCORE paid the intermediaries a percentage fee based on the total amount of money obtained from PDVSA.

65.     For example, on or about December 11, 2012, Glencore Energy UK Ltd. paid Venezuela Intermediary Company's invoice in the amount of $18,605.19 as a fee for recovering a late interest payment from PDVSA.

66.     In total, from at least in or about 2012 up to and including in or about 2014, GLENCORE paid at least approximately $1,286,057 to Venezuela Intermediary Company, with the intent that a portion of the payments be used as bribes to, and for the benefit of, a PDVSA official, in order to obtain payment priority from PDVSA. GLENCORE and its subsidiaries obtained a total of approximately $11,981,164 in payments from PDVSA through Venezuela Intermediary Company.

**D. Bribes Paid to Officials in the Democratic Republic of the Congo**

*Overview*

67.     From at least in or about 2010 up to and including in or about 2013, GLENCORE, through certain of its employees and agents, including Executive 3, Employee Z, Glencore Mining Company 1, Glencore Mining Company 2, and others, knowingly and willfully conspired and agreed to corruptly offer and pay more than approximately $27,500,000 to third parties with the intent that a portion of the payments be used as bribes to, and for the benefit of, DRC officials, in order to secure improper business advantages by reducing liabilities related to government audits and litigation costs. GLENCORE and its affiliated companies obtained at least $43 million in benefits related to their mining operations from the corrupt resolutions with the DRC government and its agencies.

*DRC Bribe Payments Related to Government Audits*

68.     As part of their official duties, DRC government officials and agencies conducted audits of mining operations within the country. These audits included, for example, investigations related to taxes and mandatory employer contributions for companies located in the DRC. These audits frequently resulted in significant fines and costs to GLENCORE and its subsidiaries.

69.     From at least in or about 2010 up to and including in or about 2013, Glencore Mining Company 1 and Glencore Mining Company 2, through Employee Z and others, used an agent in the DRC ("DRC Agent") to pay a tax consultant ("DRC Agent's Tax Consultant"), knowing that the payments would be used, at least in part, to bribe DRC officials. In furtherance of the scheme, DRC Agent's Tax Consultant created fraudulent invoices that billed Glencore Mining Company 2 for purported professional services, disguising that such payments were in fact intended to be bribes to benefit DRC officials. In total, Glencore Mining Company 2 and affiliated companies paid DRC Agent's Tax Consultant and his company approximately $27,084,851 with the intent that a portion of the payments be used to bribe DRC officials for advantages related to various government audits.

70.     For example, on or about May 16, 2012, Glencore Mining Company 2 received notice that the INPP, a DRC government agency, would be auditing Glencore Mining Company 2's mandatory employer financial contributions with projected fines to cost Glencore Mining Company 2 approximately $700,000. To reduce Glencore Mining Company 2's potential fine, Employee Z and DRC Agent engaged in a chat message exchange about bribing local officials by creating an invoice that would cover "250 official" for the INPP and "450 grat" for the "gratuity" or bribe for the DRC official.

71.     DRC Agent's Tax Consultant subsequently emailed Employee Z and others an invoice for the INPP matter, billing Glencore Mining Company 2 in the amount of $454,000. This

amount reflected the "grat," or gratuity, referenced in the chat messages between Employee Z and DRC Agent. After paying the $454,000 invoice, Glencore Mining Company 2's remaining official liability for the audit was reduced from the projected amount of $700,000 to approximately $180,000.

### DRC Bribe Payments Relating to a Litigation Dispute

72.     In or about January 2010, a medical services company sued Glencore Mining Company 2 for breach of contract in the amount of more than $16 million.  GLENCORE employees, overseeing Glencore Mining Company 2's operations, approved a $500,000 invoice that was used as a bribe payment to have the lawsuit dismissed.

73.     Specifically, on or about November 3, 2010, emails between DRC Agent and Executive 3 stated, in substance and in part, that DRC Agent talked with a DRC official who was meeting with DRC Agent and a judge presiding over the contract dispute and that, "[w]ithout [the DRC official's] help we will be screwed big time, I believe.  We need political pressure." DRC Agent suggested that GLENCORE could ensure that Glencore Mining Company 2 would prevail in the contract dispute if DRC Agent had a "reasonable amount of ammunition to make it happen," and further indicated that the attorney for the third-party plaintiff "is ready to play along for the good cause."

74.     On or about November 4, 2010, DRC Agent emailed an employee for GLENCORE and copied Employee Z, asking whether to prepare an invoice for $500,000 in the name of an accountant or lawyer.  The next day, DRC Agent forwarded Employee Z and others a fake invoice in the amount of $500,000, purportedly from DRC Agent's attorney for work relating to the contract dispute.  On or about November 9, 2010, Glencore Mining Company 2 paid a $500,000 invoice via wire transfer through a correspondent bank account held at a financial institution located in the Southern District of New York.

75.    On or about November 17, 2010, DRC Agent emailed Employee Z and Executive 3, explaining that DRC Agent had attended a "personal meeting" with the judge for the contract dispute, stating the meeting was "in front of [a public official]" and that "[e]verything is under control . . . [I]ts [sic] thanks to [the public official] that [Glencore Mining Company 2] will win that case . . . ."

76.    In or about January 2011, the contract dispute was decided in Glencore Mining Company 2's favor.  Accordingly, GLENCORE avoided paying approximately $16,084,000 to settle the claim.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Violate the Anti-bribery Provisions of the FCPA)

77.    Paragraphs 1 through 76 of this Information are realleged and incorporated by reference as if fully set forth herein.

78.    From at least in or about 2007 up to and including in or about 2018, in the Southern District of New York and elsewhere, GLENCORE, the defendant, together with others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, to violate the FCPA, Title 15, United States Code, Section 78dd-3.

79.    It was a part and an object of the conspiracy that GLENCORE, the defendant, and agents acting on its behalf, along with others known and unknown, would and did, while in the territory of the United States, willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce and commit an act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing

that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing an act and decision of such foreign official in that foreign official's official capacity; (ii) inducing such foreign official to do and omit to do an act in violation of the lawful duty of such foreign official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use that foreign official's influence with a foreign government and agency and instrumentality thereof to affect and influence an act and decision of such government and agency and instrumentality; in order to assist GLENCORE in obtaining and retaining business for and with, and directing business to, GLENCORE and others, in violation of Title 15, United States Code, Section 78dd-3, to wit, GLENCORE and others agreed to pay and offer money and other things of value to foreign officials in Nigeria (through West Africa Intermediary Company from at least in or about 2007 up to and including in or about February 2012, and through Nigeria Intermediary Company from at least in or about 2007 up to and including 2018), Cameroon (from at least in or about 2007 up to and including in or about February 2012), Ivory Coast (from at least in or about 2007 up to and including in or about 2010), Equatorial Guinea, Brazil, Venezuela, and the Democratic Republic of Congo, to assist GLENCORE in obtaining and retaining business for, and directing business to, GLENCORE, and its subsidiaries and affiliates, and others.

### **Manner and Means of the Conspiracy**

80.    The manner and means by which GLENCORE, the defendant, and its co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.    GLENCORE, through is employees and agents, used and paid inflated and fraudulent invoices submitted to GLENCORE and its subsidiaries and affiliates by intermediaries

to disguise the nature and purpose of bribe payments made to government officials in order to secure improper business advantages and to obtain and retain business for GLENCORE, its subsidiaries, affiliates and others.

        b.     In furtherance of the corrupt scheme, GLENCORE, through its agents, among other things, engaged in acts while in the territory of the United States.

### Overt Acts

81.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

        a.     On or about November 17, 2008, Trader Y exchanged emails with the West Africa Agent, noting that the Glencore U.K. subsidiaries needed to make a $90,000 payment to be used, at least in part, to pay bribes to officials of PPMC, an NNPC subsidiary, in order to falsely undervalue a cargo of fuel oil for the benefit of GLENCORE.

        b.     On or about January 18, 2011, while in the territory of the United States, Executive 2 approved a payment of $325,000 to West Africa Intermediary Company, intending that all or part of those funds would be used to bribe Nigerian officials in connection with the purchase of fuel oil from an NNPC subsidiary.

        c.     On or about April 30, 2011, Employee X emailed Brazil Consultant in connection with purchasing an oil cargo at a price that included the built-in "delta," which represented the bribe amount.

        d.     On or about July 13, 2011, Employee Y executed a sham services agreement between Glencore Mexico and Brazil Consultant to disguise the "delta" as a $0.50 per barrel commission payment to Brazil Consultant.

e.    On or about July 20, 2011, Glencore Energy UK Ltd.—one of the Glencore UK subsidiaries—wired approximately $147,202 from an account in Switzerland to an account held by Brazil Consultant at a bank in Houston, Texas, which represented Brazil Consultant's previously agreed upon "delta" of $0.50 per barrel.

f.    On or about February 9, 2012, in an email to Stimler, Trader Z, and another Glencore Energy UK Ltd. employee, West Africa Agent used the code word "filings" to refer to bribe payments that were needed to secure a new crude oil contract, writing that it was "very VERY urgent re our filings have to have meeting monday."

g.    On or about March 27, 2014, Executive 1 and Executive 2 approved Trader Y's request for Glencore Energy UK Ltd. to make a $500,000 payment from Glencore Energy UK Ltd. to West Africa Intermediary Company, upon receipt of which West Africa Agent withdrew a portion of the payment and passed it to Nigeria Official Y as a bribe to assist GLENCORE and its subsidiaries in winning an annual contract for the purchase of crude oil cargoes.

h.    On or about September 25, 2014, NIC Employee 1 sent an email to Stimler stating that Nigeria Official X had asked that all companies or "customers" of NNPC give an "advance" $300,000 to the re-election campaign of a senior Nigerian official in exchange for receiving crude oil cargoes.

i.    On or about October 3, 2014, in response to information communicated by NIC Employee 2, Stimler caused Glencore Energy UK Ltd. to send a wire transfer of approximately $300,000 from Glencore Energy UK Ltd.'s bank account in Switzerland, through a correspondent bank account held at a financial institution in the Southern District of New York, to a Nigeria Intermediary Company bank account in Cyprus.

j.      On or about April 20, 2015, while in the United States, Stimler received an email from NIC Employee 1 in which Nigeria Intermediary Company offered to make a payment for the benefit of a Nigerian official of approximately $50,000 per oil cargo for four cargoes of NNPC oil to be delivered to Glencore Energy UK Ltd. in May and June 2015.

k.      On or about April 20, 2015, while in the United States, Stimler replied to Nigeria Intermediary Company's email, expressing interest on behalf of GLENCORE in receiving one of the June 2015 NNPC oil cargoes.

l.      On or about May 5, 2015, Stimler received an invoice from Nigeria Intermediary Company for $50,000 as an "Advance Payment" against the June 2015 cargo.

m.      On or about May 5, 2015, Glencore Energy UK Ltd. sent a wire transfer of $50,000 to Nigeria Intermediary Company from a bank account in Switzerland, through a correspondent bank account held at a financial institution located in the Southern District of New York, to Nigeria Intermediary Company's bank account in Cyprus.

n.      On or about November 9, 2010, Glencore Mining Company 2 paid a $500,000 invoice via wire transfer through a correspondent bank account held at a financial institution located in the Southern District of New York.

o.      On or about December 11, 2012, Glencore Energy UK Ltd. paid Venezuela Intermediary Company's invoice in the amount of $18,605.19 as a fee for recovering a late interest payment from PDVSA.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

82.     As a result of committing the offense alleged in Count One of this Information, GLENCORE, the defendant, shall forfeit to the United States pursuant to Title 18, United States

Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Asset Provision

83.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
United States Department
of Justice

DAMIAN WILLIAMS
United States Attorney
for the Southern District of
New York


DEBORAH CONNOR
Chief, Money Laundering and
Asset Recovery Section
Criminal Division
United States Department
of Justice