WILMERHALE

October 21, 2022

**By Hand and ECF**

Howard M. Shapiro

+1 202 663 6606 (t)
+1 202 663 6363 (f)
howard.shapiro@wilmerhale.com

The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

Re:  United States v. Glencore International AG (22 Cr. 00297 (LGS))

Dear Judge Schofield:

On behalf of our client, Glencore International AG ("Glencore" or the "Company"), we write to address the Court's questions from the May 24, 2022, plea hearing (the "Plea Hearing") regarding the parties' plea agreement in the matter referenced in the caption of this letter (the "Plea Agreement"), and to set forth our position with respect to sentencing, in advance of the sentencing scheduled for November 21, 2022.

The Company respectfully requests that the Court approve the Plea Agreement and impose the recommended sentence.  The Plea Agreement provides for a fine of $428,521,173, which reflects a 15 percent discount off the bottom of the U.S. Sentencing Guidelines (the "Guidelines" or the "USSG").  The proposed sentence, which also includes the imposition of forfeiture, is consistent with the Department of Justice ("DOJ") Foreign Corrupt Practices Act ("FCPA") Corporate Enforcement Policy (the "FCPA Corporate Enforcement Policy"), which sets out a framework for rewarding companies that cooperate with DOJ investigations and timely remediate any identified misconduct.  The proposed sentence is also consistent with prior FCPA corporate fines, most of which have involved similar or higher discounts for cooperation.

Most importantly, the proposed fine appropriately reflects the Company's extensive cooperation and remediation, which is precisely the type of conduct that FCPA Corporate Enforcement Policy seeks to incentivize.  The Company's cooperation spanned four years and included the production of over a million documents, most of which were beyond the subpoena power of the DOJ, and regular and vital disclosures to the government of the findings of the Company's internal investigation.  Moreover, since even before the government's investigation, the Company has engaged in an iterative remediation process that has resulted in the departure of all the employees involved in the identified misconduct and a complete overhaul of the Company's compliance program.  The FCPA Corporate Enforcement Policy rewards companies for their cooperation and remediation and the Company relied on the consistent application of that policy in devoting extraordinary resources to this investigation.  For these reasons, the Court should approve the Plea Agreement and impose the recommended sentence.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing    Berlin    Boston    Brussels    Denver    Frankfurt    London    Los Angeles    New York    Palo Alto    San Francisco    Washington

Hon. Lorna G. Schofield
October 21, 2022
Page 2

## I. Overview of Plea Agreement

The Plea Agreement's proposed sentence is both substantial and fair. It appropriately balances the seriousness of the offense with the Company's extensive cooperation and remedial measures. Specifically, the proposed sentence includes, among other things:

- A criminal fine of $428,521,173;[1]
- A total forfeiture amount of $272,189,792;[2] and
- Five years of probation.

At the Plea Hearing, the Court indicated that it agreed with the Plea Agreement's calculation of the recommended sentencing range under the Guidelines, while raising questions about the 15 percent discount off the bottom of the applicable sentencing guidelines fine range. As the Plea Agreement makes clear, that discount (1) was imposed pursuant to the DOJ's FCPA Corporate Enforcement Policy and (2) reflects the Company's extensive cooperation and remediation.

Moreover, as the Company explained to the Court at the Plea Hearing, this Plea Agreement and the proposed sentence are one part of a suite of cross-border enforcement actions spanning three jurisdictions (the United States, the United Kingdom, and Brazil) and five separate resolutions. While the criminal fine imposed by the proposed sentence is itself substantial to the Company, taken together, the fine, forfeiture, and additional resolutions with the other jurisdictions represent a steep, significant monetary penalty. In total, the Company expects to pay approximately $1.5 billion across all of these resolutions.

We respectfully submit that the criminal penalty the Company has agreed to pay under the Plea Agreement should be accepted by the Court for those same reasons.

## II. DOJ's FCPA Corporate Enforcement Policy

The 15 percent discount off the bottom of the Guidelines is consistent with the FCPA Corporate Enforcement Policy, which is intended to reward precisely the type of extensive cooperation that took place in this case to incentivize companies like Glencore to assist in government investigations that would, because of their inherently international nature, be particularly difficult and time-consuming for the government to pursue on its own. Companies rely on this published policy in providing crucial cooperation in these government investigations and the policy explicitly states that it "is aimed at providing additional benefits to companies based on

---

[1] The Company agrees to pay $262,590,214 (60 percent) of this fine to the United States. Up to $136,236,140 of the fine may be credited against the amount the Company pays to authorities in the United Kingdom, and up to $29,694,819 of the fine will may be credited against the amount the Company pays to authorities in Switzerland.

[2] The Company's payments made to the Commodity Futures Trading Commission in connection with a concurrent settlement will be credited against the total forfeiture amount in the amount of $90,728,597.

Hon. Lorna G. Schofield
October 21, 2022
Page 3

their corporate behavior once they learn of misconduct."[3] The policy, which has been in place since it was first introduced as a pilot program in April 2016,[4] states that the DOJ will agree to seek a reduction in any fine *up to* 25 percent off the bottom of the range stipulated by the Guidelines for companies that (1) cooperate and (2) timely and appropriately remediate.[5] The policy describes a number of factors for the DOJ to consider in making its assessment of the Company's cooperation.

The Guidelines establish a sentencing range based on a defendant's criminal history and the nature of the offense and provide for the possibility of negotiated departures from the Guidelines. In particular, if prosecutors enter into plea agreements with corporations, "any negotiated departures or recommended variances from the advisory Guidelines must be justifiable under the Guidelines or 18 U.S.C. § 3553 and must be disclosed to the sentencing court" as outlined in the U.S. Department of Justice's Justice Manual ("JM"), Principles of Federal Prosecution of Business Organizations.[6] As the Court noted at the Plea Hearing, U.S.S.G. § 8C4.1. states that a "defendant [who] has provided substantial assistance in the investigation or prosecution of another organization that has committed an offense or in the investigation or prosecution of an individual not directly affiliated with the defendant who has committed the offense" may be sentenced to a term of supervised release that is less than any minimum required by statute or the guidelines."[7]

Although there is no statutory minimum applicable here, the Company's extensive cooperation supports a fine below the Guidelines range pursuant to the DOJ's FCPA Corporate Enforcement Policy. This publicly enunciated policy provides that, when a company cooperates and timely and appropriately remediates, there will be a presumption that the DOJ will agree to seek a reduction in any fine up to 25 percent off the bottom of the range set forth in the Guidelines. And indeed, as described further below, since the FCPA Corporate Enforcement Policy was published in 2016, numerous corporations have received discounts off the bottom of the Guidelines range in their resolutions with the DOJ, including in the context of plea agreements.

In assessing a company's cooperation pursuant to the FCPA Corporate Enforcement Policy, the DOJ considers (i) disclosure on a timely basis of all facts relevant to the wrongdoing at issue, (ii) proactive cooperation, (iii) timely preservation, collection, and disclosure of relevant documents and information relating to their provenance, (iv) where requested and appropriate, de-

---

[3] U.S. Dep't of Just., Just. Manual ("JM") § 9-47.120(1) - FCPA Corporate Enforcement Policy, https://www.justice.gov/jm/jm-9-47000-foreign-corrupt-practices-act-1977#9-47.120.

[4] Press Release, Leslie R. Caldwell, Assistant Att'y Gen., U.S. Dep't of Just., Criminal Division Launches New FCPA Pilot Program (Apr. 5, 2016), https://www.justice.gov/archives/opa/blog/criminal-division-launches-new-fcpa-pilot-program (last visited on Oct. 19, 2022).

[5] JM § 9-47.120(2).

[6] JM § 9-28.1600(B) - Plea Agreement with Corporations, Comment, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.1600.

[7] May 24, 2022 Plea Hr'g Tr. 35:19-36:3.

Hon. Lorna G. Schofield
October 21, 2022
Page 4

confliction of witness interviews and other investigative steps that a company intends to take part of its investigation; and (v) where requested, making available for interviews by the DOJ those company officers and employees who possess relevant information. With respect to remediation, the DOJ looks for (i) a demonstration of a thorough analysis of causes of underlying conduct (root cause analysis) and, where appropriate remediation to address the root causes, (ii) an implementation of an effective compliance program comprising the elements set out in the FCPA Corporate Enforcement Policy, (iii) appropriate discipline of employees, (iv) appropriate retention of business records and prohibiting the improper destruction or deletion of business records, and (v) any additional steps that demonstrate recognition of the seriousness of the company's misconduct. Under the FCPA Corporate Enforcement Policy, the DOJ will recommend up to a 25 percent reduction off the bottom end of the Guideline range when a company fully cooperates and carries out remedial measures in a timely and appropriate manner (where a company brought the matter to DOJ's attention in the first instance, even greater downward departures from the Guidelines are available).[8]

The FCPA Corporate Enforcement Policy was introduced "[d]ue to the unique issues presented in FCPA matters."[9] In particular, the FCPA Corporate Enforcement Policy seeks to enable "the Department to efficiently identify and punish criminal conduct, and it provides guidance and greater certainty for companies struggling with the question of whether to make voluntary disclosures of wrongdoing."[10] Indeed, as Senior Counsel Leila Babaeva noted during the Plea Hearing, "FCPA cases rely on witnesses, documents, evidence that are mostly abroad."[11] That was the case here where "many of the witnesses and documents were abroad," requiring the DOJ to "rely on companies and defendants to cooperate in this way."[12] Ms. Babaeva further explained that, for this reason, "the sentencing guidelines are often lower" in FCPA cases.[13] As described in more detail in Section III below, these factors were particularly applicable in this case, where virtually all of the activity set forth in the Plea Agreement occurred outside of the United States.

\*   \*   \*

Based on the facts and circumstances laid out in the Plea Agreement and the cooperation and remediation described in more detail below, the proposed 15 percent discount off the bottom of the Guidelines is entirely appropriate in this case.

---

[8] JM § 9-47.120(2).

[9] JM § 9-47.120(1).

[10] Rod J. Rosenstein, Deputy Att'y Gen., U.S. Dep't of Just., Remarks at the 34th International Conference on the Foreign Corrupt Practices Act (Nov. 29, 2017), https://www.justice.gov/opa/speech/deputy-attorney-general-rosenstein-delivers-remarks-34th-international-conference-foreign (last visited Oct. 19, 2022).

[11] May 24, 2022 Plea Hr'g Tr. 33:2-4.

[12] May 24, 2022 Plea Hr'g Tr. 33:4-8.

[13] May 24, 2022 Plea Hr'g Tr. 33: 8-9.

Hon. Lorna G. Schofield
October 21, 2022
Page 5

### III.   The Company's Cooperation

Glencore cooperated from the moment it learned of the government's investigation, and that cooperation was crucial to the identification of much of the misconduct that underlies the Statement of Facts and the Information, almost all of which took place outside the United States. Indeed, the Company believes that its cooperation warrants the full 25 percent discount that is available under the FCPA Corporate Enforcement Policy. The 15 percent discount included in the Plea Agreement is the result of a negotiated resolution with the government.

The Plea Agreement describes some of the Company's cooperation in Paragraph 7(c). It notes that the Company:

> provid[ed] information obtained through its internal investigation, which allowed the government to preserve and obtain evidence as part of its own independent investigation, ma[de] regular and detailed factual presentations to the Offices, produc[ed] a significant amount of documents located outside the United States to the Offices in ways that did not implicate foreign data privacy laws, collect[ed] and produc[ed] voluminous evidence and information to the Offices, accompanied by translations of documents, and produc[ed] an analysis of complex trading activity conducted by the company's outside forensic accounting firm.[14]

The Plea Agreement also states that the Company "provided to the Offices all relevant facts known to it, including information about the individuals involved" in the misconduct.[15]

The government lawyers who observed the Company's cooperation over the course of this four-year investigation also described some of the Company's cooperation at the Plea Hearing. For example, Ms. Babaeva noted that "the company's cooperation included providing information obtained through its internal investigation, . . . making regular and detailed factual presentations to the government, producing a significant amount of documents located outside of the United States to the government . . . , collecting and producing voluminous evidence and information to the government accompanied by translation, among other things."[16] And Mr. Khoo described the company as very cooperative and said that "there was sufficient cooperation to at least get to the 15 percent mark."[17]

If anything, the government's off-the-cuff statements at the Plea Hearing understate the Company's cooperation. The Company made a decision to cooperate with the DOJ's investigation within days of receiving the first subpoena in July 2018, and it continued to cooperate over the course of the nearly four-year investigation. The Company's cooperation

---

[14] Plea Agreement ¶ 7 (c).

[15] Plea Agreement ¶ 7(c).

[16] May 24, 2022 Plea Hr'g Tr. 32:1-10.

[17] May 24, 2022 Plea Hr'g Tr. 30:4-10.

Hon. Lorna G. Schofield
October 21, 2022
Page 6

included the disclosure of the facts that form the backbone of any DOJ case against individuals, the production of more than a million documents, most of which were located outside the United States and in the custody of entities beyond the reach of DOJ's subpoenas, and regular updates on the findings of the investigation including on matters outside the scope of the subpoenas served on the Company. The Company's cooperation was essential to the government's ability to pursue the full scope of this sprawling investigation and to complete it in such a relatively short time.

### A. Disclosure of Relevant Facts

DOJ guidance states that "the government's key measure of cooperation" and the "operative question in assigning cooperation credit" is whether a company has "timely disclosed the relevant facts about the putative misconduct."[18] The guidance notes that, "when the government investigates potential corporate wrongdoing, it seeks the relevant facts. For example, how and when did the alleged misconduct occur? Who promoted or approved it? Who was responsible for committing it?"[19] It further states that, "[i]f a corporation wishes to receive credit for such cooperation, which then can be considered with all other cooperative efforts and circumstances in evaluating how fairly to proceed, then the corporation, like any person, must disclose the relevant facts of which it has knowledge."[20] There is no question that the Company satisfied this standard.

The Company affirmatively disclosed and provided detailed factual presentations on the misconduct it found, identifying numerous culpable individuals, without regard to their seniority at the Company. Indeed, at our very first substantive meeting in November 2018—just four months after receiving the government's first subpoena—the Company presented on several of the most damning documents pertaining to the core of the oil department case, which constitutes the bulk of the misconduct. Just a few months later, in February 2019, the Company disclosed key additional findings on which the government's case now rests. With respect to the Democratic Republic of the Congo ("DRC") misconduct, the case is even starker. All of the evidence that forms the basis of the DRC-related case was discovered by the Company during the course of its investigation and then presented to DOJ by the Company. All that evidence was

---

[18] JM § 9-28.720(a) - Cooperation: Disclosing the Relevant Facts, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.720.

[19] JM § 9-28.720.

[20] JM § 9-28.720.

located outside the United States, and much of it was not encompassed even by the Department's later DRC-related request for material maintained in Switzerland.[21]

The Company also retained forensic accountants to support the investigation. Those accountants extracted and reviewed tens of thousands of trades and transactions over a decade-long period from more than half a dozen different systems. They provided extensive financial analysis to the government in regular and detailed presentations; that analysis assisted in the identification of the underlying misconduct and supported the calculation of illicit proceeds. The forensic assistance alone saved the government months of work that would have been required to sift through and reconcile the data in numerous incompatible financial and trading systems and platforms—assuming that the Department could have completed such analyses at all without the Company's guidance and assistance.

The facts disclosed and the documents voluntarily produced by the Company form the core of the conduct alleged in the Information, and much of this material simply would not have been available to the government without the Company's cooperation.[22]

### B. Identification of Wrongdoers

The DOJ's guidance also states that "[t]he company must identify all individuals substantially involved in or responsible for the misconduct at issue, regardless of their position, status or seniority, and provide to the Department all relevant facts relating to that misconduct."[23]

Throughout the investigation, the Company brought to the government's attention information it learned about the Glencore Group's employees, including some of the most senior employees in the Group.

In meetings with the government, the Company presented on facts relevant to individual wrongdoers to assist in their potential prosecution. In particular, the first presentation in November 2018 described the involvement of senior executives in the misconduct, several of whom are referenced in the Information. The next presentation in February 2019 focused on the

---

[21] Because of Swiss criminal blocking statutes, the Company was not permitted to produced material voluntarily from Switzerland. The Company therefore worked with the Department to craft requests that the Department then put to the Swiss Federal Office of Justice ("FOJ") pursuant to the U.S.-Swiss Mutual Legal Assistance Treaty. The Swiss then issued production instructions to the Company, with which the Company complied by producing material to the FOJ for delivery on to the Department. The Company helped to considerably expedite the subsequent, rolling productions to the Department by consenting to a simplified execution of the MLAT request (waiver of rights).

[22] In addition to providing timely disclosures of facts learned over the course of our investigation to respond to the Department's subpoenas, the Company also brought to the government's attention facts relevant to potential misconduct entirely outside the scope of the subpoenas received. For example, the Company notified the DOJ of potential Brazil-related issues in November 2018, months before receiving a subpoena covering Brazil.

[23] JM § 9-28.700(A) - The Value of Cooperation, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.700.

facts learned pertaining to one then-current employee, who, not long after the presentation, began cooperating with the government's investigation. The Company's investigation and the evidence the Company developed and provided to the Department prompted that employee to cooperate in the DOJ's investigation, leading ultimately to his prosecution and plea.

The Company has never shied from identifying the individuals involved in the misconduct identified, regardless of those individuals' seniority.

\* \* \*

These are just some of examples of the Company's cooperation throughout this investigation. That cooperation more than satisfies the standards set out in the DOJ FCPA Corporate Enforcement Policy and warrants the 15 percent discount off the bottom of the Guidelines.

### IV. The Company's Remedial Measures

In addition to the Company's exemplary cooperation, the Company's remediation is another factor strongly supporting the 15 percent discount on the criminal fine. In assessing a company's remediation, the DOJ considers "the corporation's remedial actions, including, but not limited to, any efforts to implement an adequate and effective corporate compliance program or to improve an existing one, to replace responsible management, to discipline or terminate wrongdoers, or to pay restitution," and to cooperate with the relevant government agencies "the corporation's willingness to cooperate, including as to potential wrongdoing by its agents."[24] The Company has undertaken extensive remediation as demonstrated by (1) the termination of individuals involved in the misconduct and (2) the substantial efforts the Company has taken to enhance its compliance program. The Plea Agreement describes some of this remediation in Paragraphs 7(e) and (f), noting that the company "terminat[ed] and separate[ed] certain employees who were involved in the conduct" and highlighting the extensive improvements to the Company's compliance program.[25]

#### A. A Different Company

The Company today is far different than the Company at the time of the conduct at issue. The vast majority of the misconduct described in the Statement of Facts and the Information occurred more than eight years ago, between 2007 and 2014. The relationship with the West Africa Intermediary Company, which is referenced throughout the Information and is responsible for the majority of the illicit gains, ended in 2014. The Venezuela-related misconduct occurred

---

[24] JM § 9-28.300(A)(4), (7) - Factors to be Considered, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.300; JM § 9-28.700 – The Value of Cooperation, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.700; JM § 9-28.1000 – Restitution and Remediation, https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations#9-28.1000.

[25] Plea Agreement ¶¶ 7(e) and (f).

Hon. Lorna G. Schofield
October 21, 2022
Page 9

between 2011 and 2014. The Brazil-related misconduct took place even earlier, in 2011, and the DRC misconduct occurred between 2010 and 2013. The only misconduct that continued past 2014 is the relationship with the Nigeria Intermediary Company, which continued until 2018; that later conduct accounts for a small portion of the overall relevant profits (approximately $5 million).

The turnover in leadership at the Company also demonstrates the Company's extensive remediation. Two of the three executives referenced in the Information (Executives 2 and 3) left the Company in 2018. The other referenced executive (Executive 1) left in 2019 as a result of the investigation. Many of the employees involved in the misconduct were long gone by the time of the investigation, and as a result of the investigation the Company separated all those who remained.

Specifically, since the start of the investigation, the Company has moved swiftly to discipline and terminate the employees involved in the misconduct identified in the investigation. None of the employees referenced in the Information remain at the Company today, and the number of employees disciplined extends far beyond those employees referenced in the resolution papers. Indeed, the complete turnover of the business leadership of the Company since the start of the investigation, as well as the fact that the Company brought in five new independent directors since 2018, further demonstrates that the Company today is not the same Company that was involved in the misconduct.

### B. Compliance Enhancements

The Company has also made, and is continuing to make, substantial efforts to enhance its compliance program and foster a culture of compliance.

Starting before the DOJ initiated an investigation and continuing over the past five years, the Company has invested substantial resources to build and implement a top-tier ethics and compliance program designed to identify and mitigate the diverse risks the Company faces, as well as to detect and remediate any deficiencies in its compliance controls on an ongoing basis. In this period, the Company has appointed a dedicated Head of Compliance, who now runs a centralized independent compliance function with a total of 77 full-time members (compared with 15 in 2016). The group compliance function is supported by 124 employees across the group, including 20 full-time local compliance officers, 51 part-time compliance coordinators, and 53 compliance support personnel. It has also launched several new and updated Company-wide compliance policies and procedures, supplemented existing procedures for risk-based due diligence for intermediaries,[26] and revised processes and procedures for its Raising Concerns Program to strengthen the process for managing and investigating employee concerns regarding potential breaches of the Company's code or policies. These efforts, among others, have been

---

[26] As noted to the Court at the May 24, 2022, plea hearing, the Company has substantially reduced the number of intermediaries used throughout the Company. The Company now uses only four marketing sales and purchase agents, none of which operate in the Oil Department.

Hon. Lorna G. Schofield
October 21, 2022
Page 10

publicly presented on its website, in its Annual Reports and its 2022 Ethics and Compliance Report and underscore the importance the Company places on ethics on compliance.

The result of these efforts is a multi-faceted, risk-based program that uses a variety of sophisticated tools and systems designed to ensure that its core controls are entrenched and working in every corner of the Glencore's complex operations around the world. These systems and tools, which remain under continuous review and development, allow Glencore to analyze and iterate its controls as needed to maximize effectiveness and address changes in the Company's risk footprint over time.

The Court should consider the substantial effort and resources it has devoted to its compliance program over the past five years as a significant mitigating factor that contributes to the discount on the criminal fine.

\*   \*   \*

Taken together and viewed in the context of the FCPA Corporate Enforcement Policy upon which the Company relied—and all similarly situated companies rely—the Company's cooperation and remediation provide ample support for the 15 percent discount off the bottom of the Guidelines.

### V. FCPA Case Precedent Supports That the Proposed Sentence Is Appropriate

Prior FCPA cases also support the proposed 15 percent discount off the bottom of the applicable Guidelines fine range. Since the announcement of the FCPA Corporate Enforcement Policy's pilot program in April 2016, the majority of matters in which at least one corporate entity has pleaded guilty in an FCPA-related settlement have resulted in financial penalties that represent similar or greater discounts off the bottom of the applicable Guidelines fine ranges, including in cases with equal or even more serious misconduct and higher financial penalties.[27] Furthermore, matters in which the discount off the bottom of the applicable Guidelines fine range was less than the 15 percent discount proposed in this matter are distinguishable from this case. Approving the 15 percent discount off the bottom of the Guidelines is in line with precedent and

---

[27] In fact, the practice of providing substantial discounts off the bottom of the Guidelines range pre-dates the FCPA Corporate Enforcement Policy and goes back to at least the 2008 Siemens AG ("Siemens") matter, one of the ten largest FCPA-related settlements of all time. That resolution included an approximately 67 percent discount off the bottom of the applicable fine range with Siemens agreeing to pay a criminal fine of $448,500,000, with the bottom of the applicable fine range being $1.35 billion. The misconduct in the Siemens matter involved more than $1.4 billion paid in bribes in more than ten countries. In announcing the resolution, the government stated that "this pattern of bribery by Siemens was unprecedented in scale and geographic reach." Moreover, the misconduct involved many of the most senior employees of the parent company. The information explained that the Siemens AG's CEO, CFO, and General Counsel were all aware of legal concerns with the accounts used to make the bribe payments and potential systemic corruption issues. Nevertheless, a substantial discount was applied to the Siemens fine in the plea agreement accepted by the Court.

Hon. Lorna G. Schofield
October 21, 2022
Page 11

avoids unwarranted sentencing disparities with other similarly situated defendants pursuant to 18 U.S.C. § 3553(a)(6).

### A. Matters with Greater or Equal Discounts Off the Bottom of the Applicable Guidelines Fine Ranges

Many of the largest FCPA settlements have included similar and sometimes larger discounts than the Plea Agreement in this case, including in cases with extensive misconduct where at least one entity has pleaded guilty.

For example, the 2016 related settlements with Odebrecht S.A. ("Odebrecht") and its subsidiary, Braskem S.A. ("Braskem"), (the "Odebrecht and Braskem matters") included a 25 percent and a 15 percent discount off the bottom of the applicable fine ranges, respectively.[28] The Odebrecht and Braskem matters involved much larger bribe amounts (approximately $788 million).[29] According to the plea agreement, Odebrecht engaged in a "massive and unparalleled bribery and bid-rigging scheme" involving a complex financial system to process bribe payments, which included a network of shell companies, off-book transactions, and off-shore bank accounts, for the bribes, and a department at Odebrecht, the "Division of Structured Operations," whose principal purpose was funneling bribes and which "effectively functioned as a stand-alone bribe department within Odebrecht and its related entities."[30] The Odebrecht and Braskem misconduct also involved a senior executive at the Odebrecht parent company, who was a director at Braskem as well. Significantly, when the Brazilian authorities' Operation Car Wash began, that employee and others took steps to conceal and destroy evidence to hinder the government investigation, and the plea papers included a section on obstruction of justice.[31] Nonetheless, the company received a discount off the bottom of the Guidelines that matches the discount proposed for this case.

That same year, VimpelCom Ltd. ("VimpelCom") and a VimpelCom subsidiary, Unitel LLC, entered into a Deferred Prosecution Agreement ("DPA") and a guilty plea, respectively, for FCPA-related conduct (together, the "VimpelCom matter"). As a part of the settlements, VimpelCom agreed to pay a criminal penalty of slightly over $460,326,000, which represented

---

[28] *United States v. Odebrecht S.A.*, No. 16-CR-643 (E.D.N.Y. Dec. 21, 2016), ECF No. 10 (Plea Agreement ¶ 2(i), p. 4); *United States v. Braskem S.A.*, No. 16-CR-644 (E.D.N.Y. Dec. 21, 2016), ECF No. 8 (Plea Agreement ¶ 2(i), p. 5).

[29] *United States v. Odebrecht S.A.*, No. 16-CR-643 (E.D.N.Y. Dec. 21, 2016), ECF No. 10 (Plea Agreement, Attach. B ¶ 20, B-7).

[30] Press Release No. 16-1515, U.S. Dep't of Just., Odebrecht and Braskem Plead Guilty and Agree to Pay at Least $3.5 Billion in Global Penalties to Resolve Largest Foreign Bribery Case in History (Dec. 21, 2016), https://www.justice.gov/opa/pr/odebrecht-and-braskem-plead-guilty-and-agree-pay-least-35-billion-global-penalties-resolve.

[31] *United States v. Odebrecht S.A.*, No. 16-CR-643 (E.D.N.Y. Dec. 21, 2016), ECF No. 10 (Plea Agreement, Attach. B ¶ 71, B-22).

Hon. Lorna G. Schofield
October 21, 2022
Page 12

an approximately 45 percent discount off the bottom of the applicable fine range.[32] The VimpelCom matter involved VimpelCom and Unitel conspiring to pay over $114 million in bribes to foreign officials.[33] Additionally, according to the government, "when the [VimpelCom] board of directors sought an FCPA legal opinion assessing corruption risks involved in the transactions" at issue, "certain [members of] VimpelCom management withheld crucial information from outside counsel performing the review that restricted the scope of FCPA opinions … ."[34] The government also noted that "[r]ather than implement and enforce a strong anti-corruption ethic, certain VimpelCom executives sought ways to give the company plausible deniability of illegality while knowingly proceeding with corrupt business transactions."[35]

As another example, in 2019, Telefonaktiebolaget LM Ericsson ("Ericsson") and an Ericsson subsidiary reached related settlements (the "Ericsson matter"), which included a 15 percent discount off the bottom of the applicable fine range.[36] This matter involved a larger amount of bribes paid (approximately $150 million).[37] Still, Ericsson received the same discount proposed in this case, notwithstanding that Ericsson "did not disclose allegations of corruption with respect to two relevant matters" while cooperating with the DOJ's investigation.[38]

More recently, in 2021, Credit Suisse Group AG ("Credit Suisse") and its subsidiary (Credit Suisse Securities (Europe) Limited), entered into related settlements with the DOJ (the "Credit Suisse matter"). This matter, which also involved a larger amount of bribes paid (also

---

[32] *United States v. VimpelCom Ltd.*, No. 16-CR-137 (S.D.N.Y. Feb. 22, 2016), ECF No. 6 (Deferred Prosecution Agreement ¶ 7, p. 8).

[33] *United States v. VimpelCom Ltd.*, No. 16-CR-137 (S.D.N.Y. Feb. 22, 2016), ECF No. 6 (Deferred Prosecution Agreement attach. A ¶ 11, p. A-3).

[34] Press Release No. 16-0194, U.S. Dep't of Just., VimpelCom Limited and Unitel LLC Enter into Global Foreign Bribery Resolution of More Than $795 Million; United States Seeks $850 Million Forfeiture in Corrupt Proceeds of Bribery Scheme (Feb. 18, 2016), https://www.justice.gov/opa/pr/vimpelcom-limited-and-unitel-llc-enter-global-foreign-bribery-resolution-more-795-million.

[35] Press Release No. 16-0194, U.S. Dep't of Just., VimpelCom Limited and Unitel LLC Enter into Global Foreign Bribery Resolution of More Than $795 Million; United States Seeks $850 Million Forfeiture in Corrupt Proceeds of Bribery Scheme (Feb. 18, 2016), https://www.justice.gov/opa/pr/vimpelcom-limited-and-unitel-llc-enter-global-foreign-bribery-resolution-more-795-million.

[36] *United States v. Telefonaktiebolaget LM Ericsson*, No. 19-CR-884 (S.D.N.Y. Dec. 6, 2019), ECF No. 6 (Deferred Prosecution Agreement ¶ 4(j), p. 5-6).

[37] Press Release No. 19-1360, U.S. Dep't of Just., Ericsson Agrees to Pay Over $1 Billion to Resolve FCPA Case: Ericsson Subsidiary Pleads Guilty to FCPA Violations (Dec. 6, 2019), https://www.justice.gov/opa/pr/ericsson-agrees-pay-over-1-billion-resolve-fcpa-case.

[38] *United States v. Telefonaktiebolaget LM Ericsson*, No. 19-CR-884 (S.D.N.Y. Dec. 6, 2019), ECF No. 6 (Deferred Prosecution Agreement ¶ 4(c), p. 4).

Hon. Lorna G. Schofield
October 21, 2022
Page 13

approximately $150 million),[39] included a 15 percent discount off the bottom of the applicable fine range.[40] The Credit Suisse DPA noted that Credit Suisse did not receive "full credit for its cooperation because [it] significantly delayed producing relevant evidence," including key evidence such as "recorded phone calls in which [Credit Suisse's] employees discussed concerns relating to" the conduct at issue in the matter.[41]

These are just a few examples that demonstrate the implementation of the FCPA Corporate Enforcement Policy and the practice of holding out the prospect for companies to receive significant discounts off the bottom of the Guidelines range in order to encourage cooperation in these large, cross-border investigations where much of the evidence would not be accessible to the government without companies' cooperation.

      **B.    Matters with Lesser or No Discounts Off the Bottom of the Applicable Guidelines Fine Ranges**

Since the implementation of the FCPA Corporate Enforcement Policy's pilot program in April 2016, only five matters involving a corporate guilty plea have also involved criminal financial penalties that represent a lesser or no discount off the bottom of the applicable Guidelines fine range: (1) the related 2017 settlements with Zimmer Biomet Holdings, Inc. and a Zimmer Biomet subsidiary; (2) the related 2019 settlements with TechnipFMC plc and a TechnipFMC; (3) the related 2019 settlements with Mobile Telesystems PJSC ("MTS") and its subsidiary; (4) the related 2020 settlements with Goldman Sachs Group, Inc. and a Goldman Sachs subsidiary (the "2020 Goldman Sachs matter"); and (5) the 2020 settlement with J&F Investimentos SA. All of these cases are distinguishable from the present case.

Two of these five matters—the 2017 Zimmer Biomet matter and the 2019 TechnipFMC matter—involved corporate entities whose predecessor entities had previously entered into FCPA-related settlements with the DOJ. Per the settlement papers in each of these matters, the recidivism factored into Zimmer Biomet and its subsidiary receiving a corporate financial penalty in the middle of the Guidelines[42] and Technip FMC and its subsidiary receiving only what equals to an approximately five percent and an approximately nine percent discount off the

---

[39] *United States v. Credit Suisse Grp. AG*, No. 21-CR-521 (E.D.N.Y. Oct. 19, 2021), ECF No. 11 (Deferred Prosecution Agreement, Attach. A ¶ 20, p. A-5).

[40] *United States v. Credit Suisse Grp. AG*, No. 21-CR-521 (E.D.N.Y. Oct. 19, 2021), ECF No. 11 (Deferred Prosecution Agreement ¶ 4(l), p. 6).

[41] *United States v. Credit Suisse Grp. AG*, No. 21-CR-521 (E.D.N.Y. Oct. 19, 2021), ECF No. 11 (Deferred Prosecution Agreement ¶ 4(c), p. 4).

[42] *See United States v. Zimmer Biomet Holdings, Inc.*, No. 12-CR-00080, Deferred Prosecution Agreement (D.D.C. Jan. 13, 2017), ECF No. 18 (Deferred Prosecution Agreement ¶ 4(m), p. 6).

Hon. Lorna G. Schofield
October 21, 2022
Page 14

bottom of the applicable Guidelines fine ranges, respectively.[43] As the plea agreement in the instant matter notes, Glencore "has no prior criminal history" and its only "prior enforcement actions" occurred outside the United States.[44]

The 2019 MTS matter, which involved a plea by a subsidiary entity and a fine approximately 25 percent above the bottom of the applicable Guidelines range (but still within the range), is also distinguishable from the instant matter for a number of reasons. The MTS DPA and the subsidiary's plea agreement noted that the entities "significantly delayed production of certain relevant materials," "refused to support interviews with current employees during certain periods of the investigation," and did not appropriately remediate, including by failing to take adequate disciplinary measures with respect to executives and other employees involved in the misconduct."[45] While Glencore "did not receive full [cooperation] credit" in part due to "delay[s] in producing some relevant evidence,"[46] its partial cooperation credit did not relate to any issues of a similar magnitude. Additionally, the bribe payment amounts at issue in the instant case are much smaller than the over $420 million in bribe payments involved in the 2019 MTS matter.[47]

The 2020 Goldman Sachs matter, which involved a 10 percent discount off the bottom of the applicable Guidelines fine range, is also distinguishable from the instant case for a number of reasons. First, the conduct underlying the Goldman Sachs matter involved over $1.6 billion in bribes paid,[48] which is an order of magnitude more than those involved in the instant matter. Additionally, when it came to cooperation, Goldman Sachs received only 10 percent cooperation credit because the company "significantly delayed in producing relevant evidence," including key evidence such as "recorded phone calls in which [Goldman Sachs'] bankers, executives, and

---

[43] *See United States v. TechnipFMC plc*, No. 19-CR-278 (E.D.N.Y. June 25, 2019), (Deferred Prosecution Agreement ¶ 4(k), p. 5), https://www.justice.gov/criminal-fraud/file/1225061/download ("[B]ecause Technip S.A. is a recidivist, the 25 percent reduction for cooperation and remediation was deducted from a point near the midpoint of the applicable United States Sentencing Guidelines ('USSG' or 'Sentencing Guidelines') fine range."); *United States v. Technip USA, Inc.*, Plea Agreement (June 25, 2019), at p. 6 ("[B]ecause Technip S.A. is a recidivist, the 25 percent reduction for cooperation and remediation was deducted from a point near the midpoint of the applicable United States Sentencing Guidelines ('USSG' or 'Sentencing Guidelines') fine range.").

[44] Plea Agreement ¶ 7(h), p. 7.

[45] *United States v. Mobile TeleSystems PJSC*, No. 19-CR-167 (S.D.N.Y. Mar. 18, 2019), ECF No. 10 (Deferred Prosecution Agreement ¶ 4(c), p. 4) (emphasis added).

[46] Plea Agreement ¶ 7(d), p. 6 (emphases added).

[47] *United States v. Mobile TeleSystems PJSC*, No. 19-CR-167 (S.D.N.Y. Mar. 18, 2019), ECF No. 10 (Deferred Prosecution Agreement ¶ 4(f), p. 5).

[48] *United States v. The Goldman Sachs GroupGrp., Inc.*, No. 20-CR-437 (E.D.N.Y. Oct. 22, 2020) (Deferred Prosecution Agreement, Attach. A ¶ 23, p. 8), https://www.justice.gov/criminal-fraud/file/1329926/download.

control functions personnel discussed allegations of bribery and misconduct relating to the conduct" at issue in the matter.[49]

Finally, the 2020 J&F Investimentos matter, in which J&F Investimentos received a 10 percent discount off the bottom of the applicable Guidelines fine range, is similarly distinguishable from this case. In that matter, the bribes were paid by individuals who were not only executives of the parent entity but also among its co-owners.[50] Additionally, J&F Investimentos' cooperation is not comparable to Glencore's, as J&F Investimentos "initially declined to produce all relevant materials and failed to produce all relevant documents and information in a timely manner."[51]

\* \* \*

Aside from the distinguishing facts in the various cases, the crucial point is that with the exception of MTS, the fine imposed in each of these cases was a downward departure from the bottom of the Guidelines range, in reliance upon the DOJ's Corporate Enforcement Policy, notwithstanding concerns of recidivism or the extent of the cooperation. The DOJ and the Company agreed to this discount after a robust discussion and assessment of the Company's cooperation and an evaluation of the DOJ's application of its FCPA Corporate Enforcement Policy in other cases. FCPA precedent amply supports the conclusion that the 15 percent discount off the bottom of the Guidelines is appropriate in this case. Indeed, the 15 percent discount is necessary to avoid unwarranted sentencing disparities with other similarly situated defendants pursuant to 18 U.S.C. § 3553(a)(6).

## VI. Conclusion

For the reasons stated above, the Company respectfully requests that the Court approve the Plea Agreement and impose the recommended sentence.

Respectfully submitted,

Howard M. Shapiro

---

[49] *United States v. The Goldman Sachs Grp., Inc.*, No. 20-CR-437 (E.D.N.Y. Oct. 22, 2020) (Deferred Prosecution Agreement ¶ 4(c), p. 4), https://www.justice.gov/criminal-fraud/file/1329926/download (emphasis added).

[50] *United States v. J&F Investimentos SA*, No. 20-CR-365-MKB (E.D.N.Y. Oct. 13, 2020), ECF No. 3 (Information ¶ 2).

[51] *United States v. J&F Investimentos SA*, No. 20-CR-365-MKB (E.D.N.Y. Oct. 13, 2020) (Plea Agreement ¶ 7(c), p. 5), https://www.justice.gov/criminal-fraud/file/1334241/download (emphasis added).