UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

:

UNITED STATES OF AMERICA

:     22 Cr. 297 (LGS)

v.

:

GLENCORE INTERNATIONAL A.G.,

:

Defendant.

:

——————————————————————— x


### VICTIM IMPACT STATEMENT AND REQUEST FOR RESTITUTION BY DR. IAN AND LAURETHÉ HAGEN


**COHEN & GRESSER LLP**
Mark S. Cohen
Chris R. Everdell
Shannon A. Daugherty
800 Third Avenue
New York, NY 10022
Tel:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sdaugherty@cohengresser.com

*Attorneys for Ian and Laurethé Hagen*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 5

I.      The Hagens' Business in Africa ............................................................................ 5

II.     MSI and Crusader DRC Grow in the DRC ........................................................... 6

III.    KCC's Retaliatory Termination of Crusader DRC's Contracts .............................. 8

IV.     Crusader DRC's Lawsuit .................................................................................... 10

V.      Glencore's Plea Agreement ................................................................................ 12

VI.     Glencore Obtains Profitable Mining Assets From Its Conspiracy ...................... 15

VII.    The 2018 Lawsuit and the Restitution Claim ...................................................... 17

REQUEST FOR RESTITUTION .......................................................................................... 19

I.      Crusader DRC and the Hagens May Seek Restitution From This Court ............. 19

II.     Crusader and the Hagens Are Entitled to Mandatory Restitution Under the MVRA ....... 21

        A.      Glencore Pled Guilty to a Qualifying Offense Under the MVRA ...................... 22

        B.      Crusader DRC and the Hagens Are Victims Under the MVRA ...................... 24

                1.      Definition of Victim ............................................................................ 24

                2.      Crusader DRC and the Hagens Were Directly and Proximately
                        Harmed by Glencore's Conspiracy ...................................................... 26

III.    Crusader DRC and the Hagens Are Entitled to Restitution for the Full Amount of
        Their Loss ............................................................................................................ 27

        A.      Damages Claimed in the 2010 Crusader DRC Lawsuit ............................ 28

        B.      Foreseeable Losses for Retrenchment ................................................ 32

        C.      Prejudgment Interest ............................................................................ 33

        D.      Incurred Legal Fees ............................................................................. 38

        E.      Loss of Crusader DRC's Residual Business ....................................... 39

CONCLUSION .................................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfano v. Cigna Life Ins. Co. of NY*,
  No. 07 CIV. 9661 (GEL), 2009 WL 890626 (S.D.N.Y. Apr. 2, 2009) ...................................35

*Garden City Boxing Club, Inc. v. Morales*,
  No. 05-CV-0064 (FB)(KAM), 2005 WL 2476264 (E.D.N.Y. Oct. 7, 2005) ........................36

*Robers v. United States*,
  572 U.S. 639 (2014)...........................................................................................................25, 26

*SEIU, Loc. 32BJ v. Dayton Beach Park No. 1 Corp.*,
  No. 18 CIV. 3887 (LGS), 2019 WL 120998 (S.D.N.Y. Jan. 4, 2019) ...................................36

*United States v. Abdelbary*,
  746 F.3d 570 (5th Cir. 2014) ................................................................................................38

*United States v. Bailey*,
  975 F.2d 1028 (4th Cir. 1992) ..............................................................................................26

*United States v. Bengis*,
  631 F.3d 33 (2d Cir. 2011)....................................................................................................24

*United States v. Bergstein*,
  No. 16-CR-746, 2018 WL 9539768 (S.D.N.Y. Sept. 20, 2018), *aff'd*, 788 F.
  App'x 742 (2d Cir. 2019)......................................................................................................20

*United States v. Blackburn*,
  9 F.3d 353 (5th Cir. 1993) ....................................................................................................38

*United States v. Boccagna*,
  450 F.3d 107 (2d Cir. 2006)..................................................................................................32

*United States v. Boyd*,
  222 F.3d 47 (2d Cir. 2000)....................................................................................................25

*United States v. Brennan*,
  526 F. Supp. 2d 378 (E.D.N.Y. 2007) ...................................................................................23

*United States v. Cohan*,
  988 F. Supp. 2d 323 (E.D.N.Y. 2013) ...................................................................................43

*United States v. DeGeorge*,
  380 F.3d 1203 (9th Cir. 2004) ..............................................................................................38

*United States v. Donaghy*,
　570 F. Supp. 2d 411 (E.D.N.Y. 2008) ................................................................28

*United States v. Elson*,
　577 F.3d 713 (6th Cir. 2009), *abrogated on other grounds by Lagos v. United*
　*States*, 138 S. Ct. 1684 (2018) ........................................................................25

*United States v. Green*,
　722 F.3d 1146 (9th Cir. 2013) .........................................................................23

*United States v. Gushlak*,
　728 F.3d 184 (2d Cir. 2013)..............................................................................27

*United States v. Hankins*,
　858 F.3d 1273 (9th Cir. 2017) ...........................................................................20

*United States v. Hastings*,
　No. 1:20-CR-534-GHW, 2022 WL 1785579 (S.D.N.Y. May 31, 2022)..........................25, 32

*United States v. Hatfield*,
　No. 06-CR-0550, 2015 WL 13385926 (E.D.N.Y. Mar. 27, 2015) ........................................39

*United States v. Havens*,
　424 F.3d 535 (7th Cir. 2005) ............................................................................30

*United States v. Jaffe*,
　314 F. Supp. 2d 216 (S.D.N.Y. 2004).......................................................34, 35, 36

*United States v. Lebedev*,
　932 F.3d 40 (2d Cir. 2019)..............................................................................39, 40

*United States v. Marino*,
　654 F.3d 310 (2d Cir. 2011)...................................................................... *passim*

*United States v. Ng*,
　934 F.3d 110 (2d Cir. 2019)................................................................................23

*United States v. Okun*,
　No. 3:08-CR-132, 2009 WL 2762620 (E.D. Va. Aug. 27, 2009)...........................................20

*United States v. OZ Africa Mgmt. GP, LLC*,
　No. 16-CR-515, 2019 WL 4199904 (E.D.N.Y. Aug. 29, 2019)..........................21, 23, 24, 25

*United States v. Qurashi*,
　634 F.3d 699 (2d Cir. 2011)........................................................................21, 33, 34

*United States v. Qurashi*,
　No. 05-CR-498, 2009 WL 10677000 (E.D.N.Y. Sept. 1, 2009) ..............................34, 35, 38

*United States v. Qurashi*,
  No. 05-CR-498 (SJF)(AKT), 2009 WL 10677129 (E.D.N.Y. Sept. 30, 2009)......................34

*United States v. Schwamborn*,
  542 F. App'x 87 (2d Cir. 2013) .................................................................26, 27, 32, 39

*United States v. Scott*,
  321 F. App'x 71 (2d Cir. 2009) ...................................................................21, 41

*United States v. Smerling*,
  No. 21-CR-317 (DLC), 2022 WL 1806300 (S.D.N.Y. June 1, 2022)........................33, 34, 35

*United States v. Steel*,
  No. 11-CR-244 (NGG), 2012 WL 5879143 (E.D.N.Y. Nov. 21, 2012) ...............................43

*United States v. Stephens*,
  374 F.3d 867 (9th Cir. 2004) ...........................................................................20

*United States v. Swenson*,
  No. 1:13-CR-00091, 2014 WL 6453984 (D. Idaho Nov. 17, 2014).......................................20

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013).................................................................................36

*United States v. Zhou*,
  838 F.3d 1007 (9th Cir. 2016) ..........................................................................26

## Statutes & Rules

18 U.S.C. § 3612 .........................................................................................34

18 U.S.C. § 3663A ...................................................................................*passim*

N.Y. C.P.L.R. § 5001 ...................................................................................34

N.Y. C.P.L.R. § 5004 ...................................................................................34

## Other Authorities

Ben Doherty, Petra Blum, and Oliver Zihlmann, *The inside story of Glencore's hidden dealings in DRC*...............................................................................16

*Final Prospectus*, Glencore (May 4, 2011),
  https://www.glencore.com/dam/jcr:0a37358d-8528-4389-a12a-
  90d1feed0688/Final-Prospectus-3-May-201-low-res.pdf.......................................17

*Glencore Buys Out Billionaire With $1 Billion Congo Mining Deal*, Bloomberg
  (February 13, 2017), https://www.bloomberg.com/news/articles/2017-02-
  13/glencore-said-to-agree-on-gertler-buyout-in-960-million-deal#xj4y7vzkg ....................17

*Glencore Half-Yearly Report*, Glencore (2013),
https://www.glencore.com/.rest/api/v1/documents/42a2ade47b4db40372123cf
3bd0deacd/GLEN-Half-Yearly-Report-2013.pdf ....................................................17

*Glencore Sustainability Report*, Glencore (2011),
https://www.glencore.com/.rest/api/v1/documents/fc87106eb343ae2f8011b24
6c01c7320/Sustainability-Report-2011.pdf ...........................................................9

*Investigative Journalists*, Int'l Consortium of Investigative Journalists, Oct. 27,
2017, https://www.icij.org/investigations/paradise-papers/glencore-responds-
icijs-questions/ ...................................................................................................16

Michael J. Kavanagh and Franz Wild, *IMF Asks Congo for Explanation on State
Mining Assets Sale*, Bloomberg (Sept. 28, 2011) ...............................................17

Dr. Ian and Laurethé Hagen (the "Hagens") respectfully submit this victim impact statement and request for restitution pursuant to the Mandatory Victims Restitution Act ("MVRA") and the Crime Victims' Rights Act ("CVRA") in connection with the upcoming sentencing of Defendant Glencore International A.G. ("Glencore") in *United States v. Glencore International A.G.*, 22 Cr. 297 (LGS).  The Hagens are the 90% shareholders of Crusader Health RDC SARL ("Crusader DRC"), a Congolese company, and have been duly assigned the right to pursue Crusader DRC's claim for restitution against Glencore.  Crusader DRC and the Hagens were directly and proximately harmed by the crime to which Glencore has pled guilty, a conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") involving various bribe payments.  They are therefore victims entitled to mandatory restitution under the MVRA.  For the reasons discussed further below, the Court should grant Crusader DRC and the Hagens restitution in an amount between **$48,417,568** to **$50,351,356**.  This amount consists of several categories of loss to the Hagens, which are described more fully below.

## PRELIMINARY STATEMENT[1]

Ian and Laurethé Hagen have devoted their lives to providing medical care to mining communities in Africa, which are some of the poorest and most underserved in the region and the world.  The Hagens are people of deep religious faith, who have chosen to serve others less fortunate than themselves out of an abiding commitment to charity and good works.  They come before this Court as victims of Glencore, seeking restitution.

In contrast, Glencore stands before the Court as a convicted felon, having pled guilty to a broad conspiracy to violate the FCPA by bribing public officials in seven different countries in

---

[1] Bold references to "**Exhibit __**" refer to exhibits to this Victim Impact Statement and Request for Restitution.  A citation to "Ex. __" refers to exhibits to the declarations and other sources attached to this Victim Impact Statement and Request for Restitution.

Africa and South America over the course of more than a decade.  The statement of facts appended to Glencore's plea agreement, which Glencore has fully admitted to, lays out a conspiracy in which, over the course of nearly a decade, Glencore paid over $100 million in bribes to obtain and control valuable mining assets and reap massive profits from countries rich in minerals, oil, and other natural resources.

Glencore's ability to obtain and retain mining business in the Democratic Republic of Congo (the "DRC") depended on the person described in the statement of facts as the "DRC Agent."  The DRC Agent had extremely close relationships with senior DRC officials (including its President) who controlled access to the mining industry.  The DRC Agent was the gatekeeper for many of the mining contracts awarded in the DRC.  As a result, he held immense power in the DRC.  To use the DRC Agent's own words: "The DRC landscape is in the making and I am shaping it – like no one else…. What this bigger picture exactly looks like, is yet to be determined, but it is [me] who is holding the pen."[2]  The road to riches went through the DRC Agent and Glencore knew that if they did not stay in his good graces, they would lose out on hundreds of millions of dollars in mining assets and related profits in the DRC.

Crusader DRC and the Hagens are here because they got in the way of Glencore's plans. In 2007 and 2008, Crusader DRC executed contracts with two mining companies operating near the city of Kolwezi that were later taken over by Glencore.  Under the contracts, Crusader DRC provided medical services to the mining communities and agreed to build three medical facilities to service the mine workers and their dependents.  In 2009, the mining company referred to as Glencore Mining Company 2 in Glencore's plea agreement, Kamoto Copper Company SARL ("KCC"), began managing Crusader DRC's contracts.  That same year KCC appointed as its

---

[2] *United States v. Och-Ziff Cap. Mgmt. Grp. LLC*, No. 16-516 (NGG), Deferred Prosecution Agreement, Att. A ¶31, attached hereto as **Exhibit 1**.

medical manager to oversee the Crusader DRC contracts a man whose medical credentials could not be verified, but who nevertheless had the backing of Glencore and, as importantly, the DRC Agent.  After becoming suspicious of the manager's apparent lack of clinical competence and medical credentials, Crusader DRC began a thorough investigation out of concern for patient care and safety as well as ethical standards.  A senior KCC executive told the Hagens that if they did not turn a blind eye to this issue, they would never work in the DRC again.  When the Hagens stood their ground, KCC responded with threats and intimidation and ultimately terminated its contracts with Crusader DRC without justification in January 2010, thereby preserving Glencore's favor with the DRC Agent.

But the Hagens refused to back down.  The Hagens attempted in good faith to resolve the dispute with KCC, explaining to them the devastating economic consequences to Crusader DRC that would result if it were not compensated for its lost business and the expenses it incurred under the contracts.  When those efforts fell on deaf ears, Crusader DRC sued KCC in the DRC in October 2010 for damages totaling $16,084,556.

Crusader DRC's lawsuit posed an even bigger problem for Glencore.  It threatened to derail a contemporaneous $110 million loan to the DRC Agent, which was secured by shares he owned in Katanga Mining Limited, the ultimate parent company of KCC.  The DRC Agent intended to use a portion of the loan to pay back $45 million that he owed to Glencore on a prior loan, and then use a substantial portion of the remaining funds to bribe DRC officials to obtain lucrative mining rights and then sell those rights to Glencore.  Crusader DRC's lawsuit, along with the attendant negative publicity it would bring for Glencore, the DRC Agent, and the prospective lender, created issues for their transaction.  As the DRC Agent explained in an email quoted in the statement of facts of Glencore's plea agreement, the bribe payment was critical

because if Crusader DRC's lawsuit continued, Glencore and the DRC Agent "will be screwed big time."[3]  And so, as it had done so many times before, Glencore paid a bribe to get its way— this time paying a bribe to ensure that the DRC judge would make the lawsuit disappear.  The dismissal of the lawsuit accomplished everything that Glencore wanted: (1) it eliminated Crusader DRC's lawsuit and allowed Glencore to avoid paying $16 million to Crusader DRC for having terminated the contracts in bad faith, (2) it destroyed Crusader DRC's business and ultimately caused it to end active operations, and (3) it preserved Glencore's relationship with the DRC Agent so that it could later obtain mining contracts worth hundreds of millions of dollars.

The Hagens and Crusader DRC are the victims of Glencore's crime.  Because they stood up to Glencore, the Hagens and the people close to them suffered years of pressure, threats, and intimidation.  In the end, the Hagens lost millions of dollars and their entire business as a direct result of Glencore's criminal conduct.  At its sentencing, Glencore now seeks recognition and leniency from the Court for paying roughly $1.5 billion to resolve this matter across several jurisdictions and for purportedly disclosing all of the evidence underlying the DRC-related conduct.[4]  Yet, Glencore continued to litigate against the Hagens in the DRC as late as 2019 and refused to make them whole, even after discovering the bribe payment as part of its investigation.

The Hagens have waited a long time for this moment.  They have been fighting for over a decade.  Having been denied justice in the DRC because of Glencore's corruption, they now seek it before this Court.  This restitution claim would make them whole for the losses they suffered at Glencore's hands.  They are more than willing to come to court to testify if the Court wishes.

---

[3] Plea Agreement, Att. A ¶ 72, attached hereto as **Exhibit 6**.
[4] *See* Glencore Sentencing Submission, ECF No. 17 at 2, 6.

For the reasons set forth below, we respectfully ask the Court to award Crusader DRC and the Hagens restitution in an amount between **$48,417,568** to **$50,351,356**, which is comprised of the following categories of losses:

- **$16,084,556** for the full value of the claims asserted in Crusader DRC's lawsuit against KCC that was dismissed due to Glencore's bribe, as admitted in the statement of facts.

- **$57,294** for the retrenchment/severance costs paid to numerous employees whom Crusader DRC was forced to terminate, which could not be recouped after the dismissal of the lawsuit.

- **$15,315,337** to **$17,229,754** in prejudgment interest on the two categories of loss above, based on a simple interest rate of between 8%-9% per annum, to compensate Crusader DRC for not being able to make productive use of those funds for more than eleven years.

- **$3,198,800** in legal fees incurred to pursue the lawsuit against KCC in the DRC.

- **$13,761,581** to **$13,780,952** for the loss of the value of Crusader DRC's remaining business, which ended active operations as a direct result of Glencore's criminal conduct.

## BACKGROUND

### I.     The Hagens' Business in Africa

Dr. Ian Hagen is a South African doctor with multiple professional degrees and qualifications.  Declaration of Dr. Ian Hagen ¶ 5 ("Hagen Decl.").  His wife, Laurethé Hagen, is also South African.  She has an honors degree in biokinetics and completed her master's thesis research on the impact of HIV/AIDS on underground mine workers.  *Id.* ¶ 6.  Early in their professional careers they began working in mining communities—Ian as a doctor and Laurethé as a teacher.  *Id.* ¶ 7.  They were called by their strong religious faith to improve healthcare options in often-neglected mining communities in Africa.  *Id.* ¶¶ 10-11.  In the late 1990s, the Hagens founded Medical Services International ("MSI").  *Id.* ¶ 8.  MSI partnered with local

medical services companies that the Hagens themselves created and ran, under the name Crusader Health and the motto "*Deo Gloria*: To God be the Glory." *Id.* ¶¶ 8-9.

MSI and Crusader Health operated in nearly a dozen African countries. *Id.* ¶ 15. Their businesses provided a range of health care-related services, including, among others, designing, building and operating hospitals, insurance, pharmaceutical manufacturing, sanitation, and medical evacuations. *Id.* ¶ 11. MSI and the Crusader Health companies were very successful and expanded quickly based on their strong reputation. *Id.* ¶ 12. For example, MSI's and Crusader Health's work in Ghana began with a contract at a single mine and over the course of several years expanded to service virtually all the mines in Ghana. *Id.*

The Hagens' mission was not only to provide quality care to miners and their dependents, but also to offer affordable care to the surrounding community. MSI and its Crusader Health entities achieved this by contracting with international mining companies to pay Crusader Health's overhead. *Id.* ¶ 12. The mining companies also paid a per-capita rate for the care of mine workers and their dependents. *Id.* This allowed Crusader Health to charge affordable prices to walk-in patients. *Id.* ¶ 13. The Hagens paid their employees above-standard wages, partnered with public health providers to elevate the level of training and care available in mining communities, and took great pride in the quality of medical care their companies provided. *Id.* ¶ 14.

## II.    MSI and Crusader DRC Grow in the DRC

The Hagens expanded their MSI and Crusader Health business to the DRC in late 2006. *Id.* ¶ 16. At the beginning of 2007, the Hagens founded Crusader DRC to provide local medical services in the DRC. *Id.* ¶ 17. The Hagens are the 90% shareholders of Crusader DRC. Dr. Peniel Kasongo, a doctor residing in the DRC, is the Hagens' local medical partner and the remaining 10% shareholder of Crusader DRC. *Id.* ¶ 18.

6

In 2007 and 2008, MSI and Crusader DRC executed contracts with two different DRC mining companies operating near the city of Kolwezi in Katanga Province—Kamoto Operating Limited ("KOL") and DRC Copper and Cobalt Project SARL ("DCP")—to provide medical care to their respective mining communities and to build three medical facilities. *Id.* ¶¶ 19-20, 22. Glencore later acquired interests in both companies. Crusader DRC was responsible for providing medical services and building and operating the facilities, while MSI was responsible for international services like insurance, medivacs, management of expatriate staff, and equipment expenses. *Id.* ¶ 17. While the medical facilities were under construction, Crusader DRC signed a five-year contract to use the nearby Methodist Hospital to provide services to both KOL and DCP. *Id.* ¶ 21.

MSI and Crusader DRC's future in the DRC looked very bright. In 2008, Crusader DRC was providing medical services for more than 40,000 people in the DRC. *Id.* ¶ 23. Due to the success of MSI and Crusader DRC's relationship with KOL and DCP, MSI and Crusader DRC entered into contracts with approximately eight other mining-related companies in and around the Katanga Province. These contracts made up approximately one quarter of Crusader DRC's income. *Id.* ¶ 24.

In 2009, Crusader DRC learned that KCC, the Glencore subsidiary referred to as Glencore Mining Company 2, would be taking over KOL and DCP's contracts with Crusader DRC. *Id.* ¶ 25. MSI and Crusader DRC negotiated new three-year contracts with KCC. *Id.* ¶ 26. By that time, Crusader DRC had completed one of the three medical facilities and the construction of the others was on schedule. *Id.* ¶¶ 29-30. Pursuant to negotiations with KCC, the two remaining facilities were combined into a hospital in the city of Kolwezi that could provide a high level of patient care. *Id.* ¶ 27. The hospital was structurally complete and close to

operational by the end of 2009.  *Id.* ¶ 30.  With the significant cost of construction for the clinics nearly behind MSI and Crusader DRC, from a business perspective, the next several years were projected to be very profitable.

### III.    KCC's Retaliatory Termination of Crusader DRC's Contracts

In September 2009, KCC appointed a new medical/health manager (the "Medical Manager") to oversee Crusader DRC's contracts with KOL and DCP.  *Id.* ¶ 32.  The Medical Manager had been treating patients at Mutanda, another Glencore mine, approximately 40 kilometers from where KOL and DCP operated.  *Id.*  After standard diligence prompted in part by observations that the Medical Manager lacked fundamental clinical competence, Crusader DRC was not able to verify the Medical Manager's medical credentials.  *Id.* ¶¶ 34, 36.  At the time, the Hagens' colleague, Dr. Kasongo, served as the president of the local medical council. *Id.* ¶ 35.  The council opened an investigation into the Medical Manager ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  *Id.*  This raised concerns about patient care and ethical standards.

The Hagens did not realize at the time that the Medical Manager had a close relationship with Glencore, which held an interest in KCC.  *Id.* ¶ 33.  Around the time of Crusader DRC's investigation of the Medical Manager, plans were under way for the Medical Manager to help Glencore construct a new hospital in Kisangani that was ultimately funded by the foundation of the DRC Agent referred to in Glencore's plea agreement.  *Id.* ¶ 63.[5]  Following the Kisangani

---

[5]   *See* Jobnet Africa, https://www.jobnetafrica.com/jobseeker/24878 (last visited Oct. 21, 2022) ("During my 9 years in the DRC, I designed, and brought to life 4 modern first world Hospitals….[including,] Hopital du Cinquantenaire de Kisangani in Kisangani….  This Hospitals [sic] was donated to the Congolese Government by Glencor [sic] in Switzerland, its construction, furnishing and complete stocking was funded by Glencore and later on its operation was funded by the [DRC Agent] Family Foundation based in Tel Aviv….").

hospital's completion in 2011, the Medical Manager served as its medical director and chief surgeon. *Id.* ¶ 63.[6]

In light of the above, it was perhaps no surprise that Crusader DRC's investigation of the Medical Manager created problems with KCC. Around November or December 2009, a KCC executive called Dr. Hagen and told him that the issue with the Medical Manager must be "swept under the carpet" or he would make sure that Crusader DRC "will never operate in the DRC again." *Id.* ¶ 39. On the same phone call, he also threatened Dr. Hagen's physical safety and that of his family. *Id.*

Dr. Kasongo, the Hagens' local partner, reported additional pressure and threats he faced and bribes he was offered because of the investigation:

- DRC prosecutors and the DRC's national intelligence agency interrogated Dr. Kasongo for three hours based on unfounded allegations that he set fire to the Medical Manager's house despite Dr. Kasongo being in Kinshasa—far from Kolwezi—at the time of the fire. *Id.* ¶ 37.

- The head of Group Bazano, a company that along with Glencore had an interest in the Mutanda mine, told Dr. Kasongo to stop investigating the Medical Manager or else he would "have [his] head" and "use[] his power to creat[e] [] problems." *Id.*

- The same man also tried to bribe Dr. Kasongo to end the investigation. He told Dr. Kasongo his Group had an interest in Katanga and there was a potential job opening for Dr. Kasongo if he stopped his investigation. *Id.*

The Hagens took these threats seriously. *Id.* ¶ 40. As a result of KCC's threats towards Crusader DRC, Crusader DRC moved its office to neighboring Zambia in the beginning of 2010 to ensure the safety and well-being of Crusader DRC's staff. *Id.* ¶ 41. Despite the significant

---

[6] *Mutanda Mining Sarl*, Glencore (Nov. 2013), https://www.glencore.com/.rest/api/v1/documents/8bda0235ae1bc3e530b88a08a4983a7d/Glencore-Sell-Side-Analyst-Visit-Mutanda-201311.pdf, attached hereto as **Exhibit 3**; *Glencore Sustainability Report*, Glencore (2011), https://www.glencore.com/.rest/api/v1/documents/fc87106eb343ae2f8011b246c01c7320/Sustainability-Report-2011.pdf, attached hereto as **Exhibit 4**.

pressure, Crusader DRC refused to look the other way and continued its investigation of the Medical Manager. *Id.* ¶ 40.

On January 11, 2010, shortly after these events, the same KCC executive who threatened the Hagens sent Crusader DRC and MSI letters unexpectedly terminating their contracts with KOL and DCP, effective April 10, 2010. *Id.* ¶ 43. The letters did not provide a reason for the termination, but it was clear to the Hagens that the termination was in retaliation for Crusader DRC's investigation of the Medical Manager. *Id.*

**IV.    Crusader DRC's Lawsuit**

After receiving the termination letters from KCC, for months Crusader DRC tried in good faith to resolve the dispute with KCC. *Id.* ¶ 44. Crusader DRC's letters to KCC made clear how a failure to compensate Crusader DRC for its losses would inflict significant loss on its business as a whole. In a letter dated January 28, 2010, Crusader DRC informed KCC that because of the "significant capital investment" Crusader DRC had made in reliance on its new three-year contracts with KCC, Crusader DRC "as a whole will suffer from future loss of profits and income." *Id.* Crusader DRC also informed KCC that the termination of the contracts would "inevitably lead to retrenchment of staff," among other losses to Crusader DRC. *Id.*

Despite Crusader DRC's efforts, the discussions made no progress. In a meeting on March 1, 2010, a KCC employee warned Crusader DRC that the legal costs of proceeding with the dispute would be exorbitant. *Id.* ¶ 45. In a letter dated March 15, 2010, Crusader DRC explained each component of loss it would seek from KCC because of the termination of the contracts. *Id.* ¶ 46. Crusader DRC also notified KCC of its request that KCC take over the clinic and hospital and the responsibility for the retrenchment/severance costs associated with transferring Crusader DRC's staff of 92 employees to KCC. *Id.* KCC refused to reimburse Crusader DRC for any amounts due under the contracts. *Id.* ¶ 47.

Lacking any good faith engagement from KCC, Crusader DRC was forced to litigate.  In October 2010, Crusader DRC sued KCC in the DRC for $16,084,556.  *Id.* ¶¶ 48, 51.  Crusader DRC's financial director prepared all the documentation for the amounts Crusader DRC sought in the lawsuit.  *Id.* ¶ 50.  The amount Crusader DRC sought included $11,084,556 in principal and $5 million in additional damages recoverable under DRC law.  *Id.* ¶ 49.  The principal amount included:

- $2,500,000 for the construction costs of the medical facilities and the restoration of a Methodist Hospital;

- $4,364,556 for the lost profits for the twelve-month period remaining on the contracts;

- $2,500,000 for the reimbursement of all medical equipment, including three ambulances, two pick-up trucks, radiology equipment, and staff; and

- $1,720,000 for the reimbursement of operating costs for six months.  *Id.*

As set forth in the Declaration of Herman Lemaire, an attorney and expert on DRC law, KCC did not challenge the merits of the Crusader DRC's claims, but presented several procedural defenses, including that the Court lacked jurisdiction because the contracts contained an arbitration clause.  Declaration of Herman Lemaire ¶ 34 ("Lemaire Decl.").  The Court did not rule on the arbitration clause issue or any of the other procedural defenses raised by KCC.  *Id.*  Instead, the Court dismissed the action on an entirely unrelated procedural ground that had not been raised by KCC.  *Id.*  According to the Court, Crusader DRC did not have the appropriate corporate formation documents on file and therefore could not proceed with the lawsuit.  *Id.*  As admitted years later in the statement of facts, this ruling was bought and paid for by Glencore.

On February 1, 2011, the Hagens received an email from Dr. Kasongo explaining that the Court had ruled against Crusader DRC on January 10, 2011. *Id.* ¶ 52. At the time, the Hagens did not know that the case was dismissed because of Glencore's bribe. *Id.* ¶ 53.

While the lawsuit was pending, the Hagens and their company MSI loaned money to Crusader DRC to fill the void left by KCC's termination of the DCP and KOL contracts, which accounted for approximately three-quarters of Crusader DRC's income, and to allow it to fulfill its other contractual obligations. Hagen Decl. ¶ 56. Despite MSI's and the Hagen's funding efforts, by 2011, Crusader DRC had to retrench numerous employees working under the DCP and KOL contracts. *Id.* ¶ 57. As a result, Crusader DRC had to pay the employees a total of $57,294.22 in severance costs. *Id.* By the time Glencore procured the fraudulent judgment in January 2011, Crusader DRC was in desperate need of cash flow and was operating at a significant loss. *Id.* ¶ 55.

Crusader DRC continued its downward spiral in the years that followed. In 2011 and 2012, Crusader DRC's books reflected significant losses. *Id.* ¶ 59. By the end of 2012, Crusader DRC had honored all its contracts in the DRC and Crusader DRC retrenched a significant number of its remaining professional staff. *Id.* ¶ 60. The only reason Crusader DRC was not liquidated in 2012 was because of its pending appeal of the January 2011 judgment. *Id.* ¶ 61.

V.      **Glencore's Plea Agreement**

It was only because of Glencore's guilty plea that the story of Glencore's wrongful conduct became public and known to the Hagens. On May 24, 2022, Glencore pled guilty to conspiring to violate the FCPA from approximately 2007 until 2018 by paying more than $100 million in bribes to foreign officials to secure an improper advantage and to obtain or retain business in Nigeria, Cameroon, Ivory Coast, Equatorial Guinea, Brazil, Venezuela and the DRC. *See* **Exhibit 6** Att. A ¶ 30; May 24, 2022 Plea Hr'g Tr. at 25:15-26:2. Glencore admitted that the

nearly decade-long conspiracy involved senior Glencore executives, including Executive 3 who participated in the conspiracy in the DRC.  *See* **Exhibit 6**, Att. A ¶¶ 7-9, 66.  In the DRC alone, Glencore paid approximately $27.5 million to third parties to be used as bribes and received "at least $43 million in benefits related to [Glencore's] mining operations."  *See id.* ¶ 66.

As part of the plea agreement, Glencore agreed to pay "any…restitution imposed by the Court."  *See id.* ¶ 14.  Glencore admitted full responsibility for the acts of its employees and agents described in the statement of facts and the criminal information and acknowledged that the government would have been able to prove all the facts set forth in the statement of facts and the criminal information beyond a reasonable doubt.  *See id.* ¶ 16; *id.,* Att. A, Preamble. Glencore expressly stipulated "to the admissibility of the statement of facts in any proceeding by the [U.S. Attorney for the Southern District of New York], including any … sentencing proceeding, and [Glencore] will not contradict anything in the attached Statement of Facts at any such proceeding."  *See id.* ¶ 16.

In paragraphs 71-75 of the statement of facts, Glencore admitted that it paid a bribe in November 2010 to avoid paying Crusader DRC approximately $16,084,000 million to settle a lawsuit relating to the KOL and DCP contracts (the "medical services company" referenced in paragraph 71 is Crusader DRC, and Glencore Mining Company 2 is KCC).  Based on its admissions in the statement of facts, Glencore cannot reasonably dispute that the FCPA conspiracy to which it pled guilty, which included paying a bribe to buy the judge in charge of Crusader DRC's lawsuit, directly and proximately harmed Crusader DRC in the amount of more than $16 million.

Glencore's admitted conduct unequivocally shows that on November 3, 2010, the DRC Agent emailed Executive 3, stating that "the DRC Agent talked with a DRC official who was

meeting with DRC Agent and a judge presiding over the contract dispute and that, '*[w]ithout [the DRC official's] help we will be screwed big time, I believe.  We need political pressure*.'" *See id.*, Att. A ¶ 72 (emphasis added).  During the same conversation, the DRC Agent suggested that Glencore "could ensure that [KCC] would prevail in the contract dispute if DRC agent had a 'reasonable amount of ammunition to make it happen,'" and further indicated that Crusader DRC's attorney "is ready to play along for the good cause." *Id.*  On November 9, 2010, KCC paid a fraudulent $500,000 invoice made out to the DRC Agent's attorney purportedly for work related to Crusader DRC's lawsuit. *Id.* ¶ 73.  On November 17, 2010, the DRC Agent confirmed that he had attended a "personal meeting" with the judge and that "[e]verything is under control … [I]ts [sic] thanks to [the public official] that [KCC] will win that case…." *Id.* ¶ 74.  In January 2011, the contract dispute was decided in KCC's favor and Glencore "avoided paying approximately $16,084,000 to [Crusader DRC to] settle the claim." *Id.* ¶ 75.[7]

At the time Glencore paid the bribe, it knew that Crusader DRC would suffer additional losses above the $16 million claim.  Crusader DRC had warned KCC in January 2010 that it would have to retrench its staff if the dispute were not resolved.  Hagen Decl. ¶ 44.  It was also entirely foreseeable to Glencore that Crusader DRC would fight the fraudulent judgment and thereby incur significant attorneys' fees.  Indeed, KCC executives tried to use the high cost of litigation to intimidate Crusader DRC from pursuing the lawsuit during discussions to resolve the dispute. *Id.* ¶ 45.  Finally, during those same discussions, Crusader DRC told KCC that because

---

[7] Based on several public filings from the recent prosecution of Och-Ziff Capital Management LP and its affiliates (together "Och-Ziff") for conspiracy to violate the FCPA, we understand that the "DRC Agent" is the "DRC Partner" described in Och-Ziff's plea agreement as an "Israeli businessman whose identity is known to the United States…[who] had significant interest in the diamond and mineral mining industries in the DRC." *See United States v. Oz Africa Mgmt. GP, LLC*, 16-CR-515, Plea Agreement, Ex. 3 ¶13, attached hereto as **Exhibit 7**.  We also understand that the "DRC official," described in the statement of facts is the "DRC Official 2" described in the Och-Ziff plea agreement as "an individual whose identity is known to the United States…, was a senior official in the DRC and close advisor to DRC Official 1," who it is widely understood was the DRC's former president, Joseph Kabila. *See id.* ¶¶ 14-15.

of the "significant capital investment" Crusader DRC had made in reliance on its new three-year

contracts with KCC, Crusader DRC "as a whole will suffer from future loss of profits and

income." *Id.* ¶ 44.  Sadly, this is exactly what happened—after struggling to survive following

KCC's unjust termination of the contracts and Glencore's bribe payment, Crusader DRC

effectively ended active operations in 2013.  *Id.* ¶ 60.

**VI.**     **Glencore Obtains Profitable Mining Assets From Its Conspiracy**

In contrast to Crusader DRC's misfortune, Glencore stood to gain much more than "at

least $43 million in benefits related to their mining operations," **Exhibit 6**, Att. A ¶ 66, if it could

eliminate Crusader DRC's pending $16 million claim and maintain its relationship with the DRC

Agent.  As the Och-Ziff Deferred Prosecution Agreement makes clear, the DRC Agent was a key

broker and middleman in the DRC who was involved in a number of schemes relating to the

region's mining and mineral resources.  In an email message quoted by the government, the

DRC Agent wrote:

> The DRC landscape is in the making and I am shaping it – like no
> one else.  […]  What th[e] bigger picture exactly looks like, is yet to
> be determined, but it is your partner who is holding the pen – I just
> need flexibility on the drawing board to create full value for our
> partnership."

**Exhibit 1,** Att. A ¶ 31.  As part of the FCPA scheme, the DRC Agent had a plan to acquire

lucrative mining rights in the DRC and then sell them to Glencore but needed to secure a $110

million margin loan in November 2010 from Och-Ziff to fulfill the plan.

On November 11, 2010, two days after Glencore paid the fraudulent invoice to the DRC

Agent to get rid of Crusader DRC's case, the DRC Agent requested a $110 million margin loan

from an Och-Ziff affiliate secured by shares in Katanga Mining Limited, a part owner of KCC.

*See* **Exhibit 7**, Ex. 3 ¶ 49.  The shares were owned by Lora Enterprises Limited ("Lora"), a

company controlled by the DRC Agent.  *Id.* ¶ 52.  In connection with the loan, Och-Ziff

conducted due diligence on Katanga Mining Limited's publicly traded stock that secured the margin loan. *See In re Matter of Och-Ziff Cap. Mgmt. LP*, File No. 3-17595, Cease-And-Desist Order, ¶ 64, attached hereto as **Exhibit 8**. This was the extent of Och-Ziff's due diligence; it did not examine "the corruption risk or the intended use of proceeds." *Id*. Any adverse information affecting Katanga Mining Limited's share price in or around November 2010—like Crusader DRC's lawsuit against KCC for more than $16 million and any attendant scrutiny or publicity about the treatment of Crusader DRC and the Hagens by Glencore and the DRC Agent—could have jeopardized the margin loan.

On November 24, 2010, a week after the DRC Agent and the DRC official met with the DRC judge and received assurance that KCC would win the case, Lora received the $110 million margin loan. *See* **Exhibit 7**, Ex. 3 ¶ 52. Glencore ultimately benefited from the margin loan. The DRC Agent used $45 million of the loan funds to repay Glencore, which had previously loaned Lora $45 million that was also secured by Lora's shares in Katanga Mining Limited.[8] The DRC Agent used a portion of the remainder of the loan and a portion of an additional $20 million the Och-Ziff affiliate loaned to Lora in 2011 to pay bribes to DRC Official 1 and DRC Official 2. *See* **Exhibit 7**, Ex. 3 ¶¶ 53-54. These bribes were part of the DRC Agent's "efforts to acquire additional assets and consolidate his DRC holdings in order to sell those holdings to a third-party mining company." *See* **Exhibit 8** ¶ 66.

---

[8] *See* **Exhibit 8** ¶ 65 (portion of the loan used to repay "an outstanding third-party debt for DRC Partner"); *Updated Statement by Glencore and Katanga to the International Consortium of Investigative Journalists*, Int'l Consortium of Investigative Journalists, Oct. 27, 2017, at 2, https://www.icij.org/investigations/paradise-papers/glencore-responds-icijs-questions/ (Glencore entity made a loan to Lora in 2009 secured by Lora's Katanga shares and the loan was fully repaid in 2010), attached hereto as **Exhibit 10**; Ben Doherty, Petra Blum, and Oliver Zihlmann, *The inside story of Glencore's hidden dealings in DRC*, The Guardian (Nov. 5, 2017), at 2 https://www.theguardian.com/business/2017/nov/05/the-inside-story-of-glencore-hidden-dealings-in-drc ("Glencore, the world's biggest mining company, gave a secret $45m loan to [the DRC Agent's] company…."), attached hereto as **Exhibit 11**.

Following the above transactions, DRC Agent bought an interest in the Mutanda and

Kansuki mines, reportedly for below fair market value.[9]  In 2013, Glencore and the DRC Agent

merged Mutanda and Kansuki, resulting in Glencore owning a 54.5% interest in the enlarged

entity (previously Glencore held 60% in Mutanda and 37.5% in Kansuki).[10]  After the merger,

the DRC Agent's company, Rowny Assets Limited, owned a 31% stake.  In addition, as part of

the deal, Glencore had the right to acquire 50% of Rowny Assets Limited in July 2016 and the

remainder in July 2018.  *Id.*  In 2017, Glencore bought the DRC Agent out of their shared assets

in the DRC for hundreds of millions of dollars.[11]  Crusader DRC's lawsuit could have

interrupted the margin loan that set up this plan for Glencore to acquire substantial mining assets.

## VII.    The 2018 Lawsuit and the Restitution Claim

The Hagens first learned that KCC paid a bribe to win Crusader DRC's lawsuit when

Glencore's criminal prosecution became public earlier this year.  Hagen Decl. ¶ 62.  After the

Hagens reconnected with Dr. Kasongo to relay the news about Glencore's prosecution, Dr.

Kasongo told the Hagens that he had filed a new contract action against KCC in 2018.  *Id.* ¶ 64.

On November 28, 2018, Dr. Kasongo sued KCC on behalf of Crusader DRC in the newly

---

[9]  *See* Excerpts from *Final Prospectus*, Glencore (May 4, 2011), https://www.glencore.com/dam/jcr:0a37358d-8528-4389-a12a-90d1feed0688/Final-Prospectus-3-May-201-low-res.pdf at 70, attached hereto as **Exhibit 9** ("20 per cent interest in Mutanda Mining Sprl was recently acquired by Rowny Assets Limited (an entity associated with [the DRC Agent]) from Gecamines" and "25 per cent interest in Kansuki was recently acquired by Biko Invest Corp (an entity associated with Dan Gertler) from Gécamines"); Michael J. Kavanagh and Franz Wild, *IMF Asks Congo for Explanation on State Mining Assets Sale*, Bloomberg (Sept. 28, 2011), https://www.bloomberg.com/news/articles/2011-09-28/imf-asks-congo-for-explanation-on-state-mining-assets-sale#xj4y7vzkg, attached hereto as **Exhibit 12** ("The International Monetary Fund asked two Democratic Republic of Congo state-owned mining companies to explain recent unannounced asset sales at prices below their estimated market value.").

[10]  *See Glencore Half-Yearly Report*, Glencore (2013), https://www.glencore.com/.rest/api/v1/documents/42a2ade47b4db40372123cf3bd0deacd/GLEN-Half-Yearly-Report-2013.pdf at 32, attached hereto as **Exhibit 13**.

[11]  *See* **Exhibit 11**  ("In February [2017], Glencore bought [the DRC Agent] out of their shared assets in DRC for $534m, a move described by analysts as an attempt by the company to dissociate itself from Gertler."); Franz Wild, Jesse Riseborough and Thomas Wilson,  *Glencore Buys Out Billionaire With $1 Billion Congo Mining Deal*, Bloomberg (February 13, 2017), https://www.bloomberg.com/news/articles/2017-02-13/glencore-said-to-agree-on-gertler-buyout-in-960-million-deal#xj4y7vzkg, attached hereto as **Exhibit 14** (same).

established Kolwezi Commercial Court seeking $11,084,556 in principal and $20 million in other damages.  *Id.*

The principal amounts are made up of the same losses Crusader DRC sought in its initial action, including $2.5 million for the cost of construction of the medical facilities and restoration of the Methodist Hospital, $4,364,556 for twelve months of lost profits, $2.5 million for equipment reimbursement and $1,720,000 for six months of operating costs.  *Id.* ¶¶ 49, 64.

Like the 2010 lawsuit, KCC did not challenge the merits of Crusader DRC's claims, and instead presented several procedural defenses to the Court.  Lemaire Decl. ¶ 35.  KCC again raised the defense that the Court lacked jurisdiction because of the arbitration clauses in the contracts.  *Id.*  The Court considered and rejected that defense, finding that KCC acted in bad faith by preventing any chance of an amicable resolution that was nevertheless provided in the contract, and that Crusader DRC's claims were properly before the Court.  *Id.*

On December 31, 2019, the Court found KCC liable to Crusader DRC.  Lemaire Decl. Ex. 5.  Without a discernable explanation or calculation, the Court addressed the categories of damages Crusader DRC sought and then noted the factual record created some "uncertainty" in the calculation and awarded $6,864,556 in principal damages.  *Id.* at 18.  It is unclear from the text of the opinion how the court calculated the total damages award.  Because Crusader DRC ceased active operations in 2013, Crusader DRC no longer employed its financial director who had helped compile the factual record for the original 2010 lawsuit.  Furthermore, given that eight years had passed, Dr. Kasongo's and Crusader DRC's counsel did not have the records of the principal amounts that Crusader DRC had prepared in connection with the 2010 lawsuit. Hagen Decl. ¶ 66.  The Court also awarded Crusader DRC $4 million of the requested $20 million of other damages.  Lemaire Decl. ¶ 36; *id.* Ex. 5 at 19.  The award totaled $10,864,556.

*Id.* Ex. 5 at 20.  To date, the judgment has not been served on either party and the time to appeal

has not yet run for either party.  *Id.* ¶ 36.  Crusader DRC has not received any payment from

KCC under that judgment.  Hagen Decl. ¶ 65.  Moreover, Crusader DRC accrued $3,198,800.00

in legal fees for the 2010 and 2018 litigation against KCC.  *Id.* ¶ 67.

On October 11, 2022, the Hagens filed a letter alerting the Court to their restitution claim

and requesting the opportunity to file a submission outlining the bases for their restitution claim

and the opportunity to be heard at sentencing.  *See* Letter Endorsement, ECF No. 13.  The Court

endorsed the request and set a briefing schedule.  Accordingly, Crusader DRC and the Hagens

submit this victim statement and request for restitution to hold Glencore accountable for the

significant harms it caused with its conspiracy.

## REQUEST FOR RESTITUTION

### I.    Crusader DRC and the Hagens May Seek Restitution From This Court

Ian and Laurethé Hagen bring this restitution claim on behalf of Crusader DRC and on

behalf of themselves as 90% shareholders of Crusader DRC.  Crusader DRC is the "medical

services company" identified in the statement of facts of Glencore's plea agreement, whose

lawsuit against KCC ("Glencore Mining Company 2") was dismissed due to a bribe paid by

Glencore, through the DRC Agent, to the DRC judge overseeing the lawsuit.  *See* **Exhibit 6**, Att.

A ¶ 71.  The Hagens have authorization to pursue Crusader DRC's restitution claim because

Crusader DRC assigned its claim to the Hagens pursuant to a lawfully executed assignment

agreement.

The MVRA expressly provides that a criminal defendant must return the illegally

obtained property "to the owner of the property *or someone designated by the owner*."  18 U.S.C.

§ 3663A(b)(1)(A) (emphasis added).  Courts have interpreted the phrase "someone designated by

the owner" to mean that the MVRA allows assignment of a restitution award to third parties.

19

*See, e.g.*, *United States v. Okun*, No. 3:08-CR-132, 2009 WL 2762620, at *3 (E.D. Va. Aug. 27, 2009) ("[T]he MVRA is best read to permit the sale or assignment of restitution claims to third parties."); *United States v. Stephens*, 374 F.3d 867, 871 (9th Cir. 2004) ("[F]or crimes involving 'damage to or loss or destruction of property,' both the owner of the property and someone designated by that owner can be awarded restitution by the district court.").  Courts in this Circuit and elsewhere routinely recognize the practice of assigning restitution claims to third parties.  *See, e.g.*, *United States v. Bergstein*, No. 16-CR-746, 2018 WL 9539768, at *2 n.3 (S.D.N.Y. Sept. 20, 2018), *aff'd*, 788 F. App'x 742 (2d Cir. 2019) ("WFF, as the assignee of the P2 Fund's claim for restitution, seeks that the Court award in its favor any restitution to the P2 Fund."); *United States v. Hankins*, 858 F.3d 1273, 1275 (9th Cir. 2017) ("In 2002, U.S. Bank assigned its interest in the restitution judgment to [Horton].  In 2011, the district court entered an order substituting Horton as the assigned victim."); *United States v. Swenson*, No. 1:13-CR-00091, 2014 WL 6453984, at *3 (D. Idaho Nov. 17, 2014) ("For victims who assigned their claims to the DBSI PAT, the Court will, as to Doug Swenson, order restitution for a subset of the victims directly to the DBSI PAT.").

As set forth in the Declaration of Herman Lemaire, "DRC law allows an existing or future debt and the right attached thereto to be assigned by contract."  Lemaire Decl. ¶ 8. Accordingly, claims for restitution under U.S. law can be assigned under DRC law.  *Id*. ¶ 9. Further, Mr. Lemaire personally prepared the Agreement for the Assignment of Claims and Rights between Crusader DRC and the Hagens, which assigns Crusader DRC's restitution claim against Glencore to the Hagens.  *Id*. ¶ 11; *id.* Ex. 2.  Mr. Lemaire certifies that the assignment was created "according to the requirements of DRC law" and that it "represents a valid assignment" of Crusader DRC's restitution claim to the Hagens.  *Id*. ¶ 12.  As a result, the

Hagens are "lawfully empowered to pursue the assigned [restitution] claims and recover any amounts that result from the resolution of those claims." *Id.* ¶ 15.  Accordingly, under both DRC law and federal restitution law, the Hagens are authorized to pursue Crusader DRC's restitution claim against Glencore in this Court.

The Hagens may also pursue their own restitution claim against Glencore as 90% shareholders of Crusader DRC.  Shareholders of a victim company, such as the Hagens, can also be considered victims under the MVRA.  *See United States v. OZ Africa Mgmt. GP, LLC*, No. 16-CR-515, 2019 WL 4199904, at *6 (E.D.N.Y. Aug. 29, 2019).  In *OZ Africa*, the former shareholders of Africo Resources Ltd. ("Africo") submitted a restitution claim under the MVRA against the defendant for funding a bribery scheme to steal Africo's rights to develop a mine in the DRC.  The court granted restitution to the Africo shareholders, finding that the "MVRA defines 'victim' broadly; it contains no carve-out for holders of intangible property rights, such as shareholders." *Id.*  Accordingly, the Hagens also qualify as victims of Glencore's conspiracy to violate the FCPA and simultaneously assert their own restitution claim as shareholders of Crusader DRC to recover 90% of the same losses.

## II.     Crusader and the Hagens Are Entitled to Mandatory Restitution Under the MVRA

"The 'primary and overarching' goal of the MVRA is 'to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being.'" *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (citation omitted); *see also United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) ("The primary purpose of the MVRA is to make victims of crime whole by fully compensating them for their losses.").  In keeping with this goal, the MVRA mandates that victims of qualifying criminal offenses must receive restitution from the defendant to make them whole for the losses they suffered as a result of the crime.

> [W]hen sentencing a defendant convicted of a [qualifying] offense … the court shall order, in addition to … any other penalty authorized by law, that the defendant make restitution to the victim of the offense….

18 U.S.C. § 3663A(a)(1).  In this case, as part of its conspiracy to violate the FCPA, Glencore paid a bribe not only to eliminate Crusader DRC's lawsuit against KCC, but also to get rid of Crusader DRC and the Hagens once and for all, and most importantly, to maintain its good standing with the DRC Agent so that it could obtain additional lucrative mining business in the DRC.  Crusader DRC and the Hagens are victims of Glencore's broad conspiracy to violate the FCPA and suffered numerous losses that were directly and proximately caused by Glencore's criminal conduct.  As set forth below, they are entitled to mandatory restitution in an amount between **$48,417,568** to **$50,351,356** broken down as follows:

- **$16,084,556** for the full value of the claims asserted in Crusader DRC's lawsuit against KCC that was dismissed due to Glencore's bribe, as admitted in the statement of facts.

- **$57,294.22** for the retrenchment/severance costs paid to numerous employees whom Crusader DRC was forced to terminate, which could not be recouped after the dismissal of the lawsuit.

- **$15,315,337** to **$17,229,754** in prejudgment interest on the two categories of loss above, based on a simple interest rate of between 8%-9% per annum, to compensate Crusader DRC for not being able to make productive use of those funds for more than eleven years.

- **$3,198,800** in legal fees incurred to pursue the lawsuit against KCC in the DRC.

- **$13,761,581** to **$13,780,952** for the loss of the value of Crusader DRC's remaining business, which ended active operations as a direct result of Glencore's criminal conduct.

### A.     Glencore Pled Guilty to a Qualifying Offense Under the MVRA

The MVRA provides that, when a defendant is convicted of an offense specified in 18 U.S.C. § 3663A(c), the court must order the defendant to "make restitution to the victim of the

offense." 18 U.S.C. § 3663A(a)(1).  One of the offenses specified in Section 3663A(c) that requires an award of restitution under the MVRA is any "offense against property under [Title 18] … including any offense committed by fraud or deceit ... in which an identifiable victim or victims has suffered a ... pecuniary loss."  18 U.S.C. § 3663A(c)(1).  Hence, to qualify for mandatory restitution under the MVRA, the crime of conviction must be an offense (1) under Title 18 of the United States Code, (2) against property, and (3) where the victim suffered a pecuniary loss.  These factors are easily met here.

First, Glencore pled guilty to the crime of conspiracy to violate the FCPA in violation of Title 18, United States Code, Section 371.  *See* Information, ECF No. 2 at 25.  That is an offense under Title 18.  *See United States v. Brennan*, 526 F. Supp. 2d 378, 383 (E.D.N.Y. 2007) ("Conspiracy to commit a crime under Title 18, or conspiracy to commit a crime under Title 18 for a substantive crime under a different title, makes restitution *mandatory* under section 3663A." (emphasis in original)).

Second, Glencore's crime was an offense against property because Glencore committed its offense using fraud and deceit by secretly paying a bribe to have a DRC judge dismiss Crusader DRC's lawsuit, which caused Crusader DRC to lose the roughly $16 million it had claimed, as well as the other amounts listed above.  *See OZ Africa Mgmt.,* 2019 WL 4199904, at *4 n.6 (holding that the defendant's FCPA conspiracy was an "offense against property" because "[t]he conspirators kept stolen assets from [the victim] by bribing judges, did not tell [the victim] about the bribes, and used the stolen assets as leverage to persuade [the victim] to accept a takeover"); *see also United States v. Ng*, 934 F.3d 110, 116 (2d Cir. 2019) (granting restitution in FCPA conspiracy case); *United States v. Green*, 722 F.3d 1146, 1148 (9th Cir. 2013) (same). Property includes the loss of intangible property rights like the loss of the value of Crusader

DRC's remaining business.  *See OZ Africa Mgmt.,* 2019 WL 4199904, at *6 (the MVRA

provides for restitution to victims who lose "intangible property rights" like the opportunity to

develop mining rights); *United States v. Bengis*, 631 F.3d 33, 40 n.3 (2d Cir. 2011) (rejecting

argument that "offenses against property" are limited to offenses against tangible property like

money and noting that "[o]ur precedents dictate that the definition of property is broader than

those cases suggest").

      Finally, Crusader DRC and the Hagens suffered significant pecuniary loss as a result of

Glencore's crime.  Among other losses discussed below, Crusader DRC lost the damages it

sought in its lawsuit against Glencore; namely, twelve months of profits under the contracts

worth approximately $4.3 million, six months of operating expenses totaling approximately $1.7

million, out-of-pocket expenses to construct the Crusader DRC hospital and to purchase medical

equipment totaling approximately $2.5 million each, and $5 million in other damages.

Accordingly, Glencore's crime is an offense for which restitution is mandatory under the

MVRA.

    **B.**    **Crusader DRC and the Hagens Are Victims Under the MVRA**

       1.    <u>Definition of Victim</u>

The MVRA defines a "victim" as:

> [A] person directly and proximately harmed as a result of the
> commission of an offense for which restitution may be ordered
> including, in the case of an offense that involves as an element a
> scheme, conspiracy, or pattern of criminal activity, any person
> directly harmed by the defendant's criminal conduct in the course of
> the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).  This definition requires the court "(1) to identify the 'offense' of

conviction and (2) to ascertain whether the putative 'victim' was 'directly and proximately

harmed' by the defendant's commission of that 'offense.'" *United States v. Hastings*, No. 1:20-CR-534-GHW, 2022 WL 1785579, at *7 (S.D.N.Y. May 31, 2022).

Where a defendant has pled guilty to an offense, courts look to the materials supporting the plea—such as the plea agreement, the indictment, and the allocution statement—to determine the offense of conviction. *See, e.g.*, *OZ Africa Mgmt.*, 2019 WL 4199904, at *1-3 (reviewing materials supporting plea agreement in determining restitution under the MVRA); *see also United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) ("Because Elson was convicted pursuant to a guilty plea rather than by a jury, the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution."), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684 (2018). If the offense of conviction is a conspiracy, the court must look to "the defendant's criminal conduct in the course of" that conspiracy as the basis for restitution. 18 U.S.C. § 3663A(a)(2). The statute does not limit restitution to "losses caused by the actions of that defendant" during the conspiracy but also embraces losses flowing from "the reasonably foreseeable acts of all co-conspirators." *United States v. Boyd*, 222 F.3d 47, 50-51 (2d Cir. 2000).

Victims that are "directly and proximately harmed" by the "offense" of conviction are entitled to restitution. This causation standard is two-pronged. It requires a showing that the defendant's criminal conduct was the direct—or "but for"—cause and the proximate cause of the claimed loss. *See Robers v. United States*, 572 U.S. 639, 645 (2014) (§ 3663A(a)(2) requires that the defendant's conduct be the proximate cause of the loss); *United States v. Marino*, 654 F.3d 310, 322-23 (2d Cir. 2011) (interpreting "directly" in § 3663A(a)(2) as requiring that defendant's conduct be the "but for" cause or "cause in fact" of loss). As to proximate cause, "[t]he basic

question…is whether the harm alleged has a sufficiently close connection to the conduct at issue"—i.e., whether it is "foreseeable." *Robers*, 572 U.S. at 645 (internal quotation marks omitted); *Marino*, 654 F.3d at 324 ("No reasonable person in his position could have failed to foresee that the victims…would ultimately face substantial or even complete loss of their investment."). Stated differently, a defendant is liable when the "risk of loss that [defendant] created…was 'within the zone of risk' concealed by the scheme." *United States v. Schwamborn*, 542 F. App'x 87, 88-89 (2d Cir. 2013).

2. <u>Crusader DRC and the Hagens Were Directly and Proximately Harmed by Glencore's Conspiracy</u>

There can be no genuine dispute that Crusader DRC and the Hagens are victims who were directly and proximately harmed by Glencore's offense. Glencore's offense of conviction includes criminal acts it committed against Crusader DRC and the Hagens that are outlined in paragraphs 71-75 of the statement of facts—i.e., the admission that Glencore paid a bribe to avoid paying more than $16 million to Crusader DRC. But Glencore's criminal conduct goes beyond that. Glencore did not plead guilty solely to bribing a judge in the DRC to dismiss a lawsuit. Rather, Glencore pled guilty to a wide-ranging, multi-year conspiracy to violate the FCPA by providing more than $100 million in bribe payments to foreign officials to secure an improper advantage and to obtain or retain business in several countries in South and Central America and Africa. **Exhibit 6**, Att. A ¶ 30; May 24, 2022 Plea Hr'g Tr. at 25:15-26:2. It is this broader conduct that the Court must also consider in determining whether Glencore's criminal conduct was the direct and proximate cause of the losses to Crusader DRC and the Hagens. *See United States v. Zhou*, 838 F.3d 1007, 1013-14 (9th Cir. 2016) (criminal conduct not mentioned in the guilty plea colloquy still "fit within the scope" of the crime charged in the indictment and was therefore part of the offense of conviction for restitution purposes); *see also United States v.*

*Bailey*, 975 F.2d 1028, 1033-34 (4th Cir. 1992) (the defendant's offense was "defined broadly" and, accordingly, restitution was appropriate for all investors within the indictment, not just those investors named specifically).

Crusader DRC and the Hagens were directly and proximately harmed by Glencore's "criminal conduct in the course of the … conspiracy."  18 U.S.C. § 3663A(a)(2).  Glencore paid a bribe to dismiss Crusader DRC's claims against KCC, knowing full well the devastating economic consequences that would have on Crusader DRC and its business.  This allowed Glencore to avoid jeopardizing the substantial business Glencore stood to gain following the margin loan to the DRC Agent.  As a direct consequence, Crusader DRC and the Hagens were deprived of more than $16 million in damages they had claimed against KCC, they were forced to incur substantial legal fees and other pecuniary losses, and Crusader DRC's business was destroyed.  Crusader DRC and the Hagens must now be made whole for these foreseeable injuries.  *See Schwamborn*, 542 F. App'x at 88-89 (defendant "directly and proximately" caused losses under MVRA where the "risk of loss that [defendant] created…was 'within the zone of risk'" of the scheme).

## III.    Crusader DRC and the Hagens Are Entitled to Restitution for the Full Amount of Their Loss

Under the MVRA, the Hagens are entitled to an amount equal to "the value of the property on the date of the … loss" or "the value of the property on the date of sentencing," whichever is greater.  18 U.S.C. § 3663A(b)(1)(B)(i).  It is well-settled that the MVRA does not require that the calculation of losses be "mathematically precise."  *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).  A "reasonable approximation of losses supported by a sound methodology" is sufficient.  *Id*. at 196.  Any "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making

27

the victim whole." *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008) (citations omitted).

The Hagens are entitled to restitution of at least **$48,417,568** to **$50,351,356**, which consists of the following components of loss that were the direct and proximate result of Glencore's criminal conduct in the course of its illegal scheme.  This is a small fraction of the $1.5 billion Glencore is paying to resolve this matter.  Yet Glencore continues to deprive Crusader DRC and the Hagens (as it has for years) of compensation for the losses it caused.

### A.   Damages Claimed in the 2010 Crusader DRC Lawsuit

Crusader DRC and the Hagens are entitled to restitution for the full value of the damages sought in Crusader DRC's 2010 lawsuit against KCC.  Crusader DRC claimed a total damage amount of **$16,084,556** made up of the following components:

1. $2,500,000 for the cost of construction of the clinic and hospital and the restoration of the Methodist Hospital;

2. $4,364,556 for the lost profit of the contract, representing twelve months of the period remaining therein;

3. $2,500,000 for the reimbursement of all medical equipment, including three ambulances, two pick-up trucks, radiology equipment, and other items;

4. $1,720,000 for the reimbursement of operating costs for six months;

5. $5,000,000 for damages for any and all harm combined.

Hagen Decl. ¶¶ 49, 51.

There can be little doubt that the loss of these claims was a direct result of Glencore's criminal conduct in this case—Glencore has already admitted that as part of its plea agreement.  According to the statement of facts, the DRC Agent and Executive 3 discussed that they would be "screwed big time" if the lawsuit continued.  **Exhibit 6**, Att. A ¶ 72.  Following that conversation, the DRC Agent arranged the bribe to ensure KCC would win the lawsuit:

> GLENCORE employees, overseeing Glencore Mining Company
> 2's [KCC's] operations, approved a $500,000 invoice that was used
> as a bribe payment to have the lawsuit dismissed.…Accordingly,
> GLENCORE avoided paying approximately $16,084,000 to settle
> the claim.

*Id.* ¶¶ 71, 75.  In other words, Glencore has admitted that, but for the bribe, it would have owed

Crusader DRC "approximately $16,084,000" and that the dismissal of the lawsuit was the

proximate cause of Crusader DRC losing that money.  "The goal of restitution, in the criminal

context, is to restore a victim, to the extent money can do so, to the position he occupied before

sustaining injury."  *Marino*, 654 F.3d at 316-17 (internal citations omitted).  Accordingly,

Crusader DRC and the Hagens must be awarded the full amount of Crusader DRC's claims

against KCC; namely $16,084,556.

1. The 2019 DRC Court Judgment Is Not Controlling for Purposes of Calculating Restitution in this Case

The Court should not base its restitution award on the judgment of the Kolwezi

Commercial Court, dated December 31, 2019, finding $10,864,556 in damages for Crusader

DRC.  Lemaire Decl. Ex. 5.  Doing so would not only contradict Glencore's admissions in the

statement of facts, but it would also be inconsistent with the terms of the MVRA.  Under the

MVRA, the victim is entitled to receive the value of the lost property "on the date of the … loss"

or "on the date of sentencing," whichever is greater.  18 U.S.C. § 3663A(b)(1)(B)(i).

Accordingly, the Court must assess the value of Crusader DRC's claims in 2010-2011 when the

bribe was paid and the case was dismissed, or as of today.  The 2019 judgment represents neither

amount.  It is an assessment of the claims made over nine years after the lawsuit was first filed.

For that reason alone, it is not dispositive of the amount of restitution owed to Crusader DRC and

the Hagens.

The 2019 judgment amount would be an improper valuation of Crusader DRC's claims for several additional reasons.  First, imposing a lower restitution amount based on the 2019 judgment would effectively reward Glencore for its criminal conduct.  The apparent reason given by the Kolwezi Commercial Court in the 2019 judgment for denying some of Crusader DRC's primary damages claims was that the factual record created some "uncertainty" in the calculation.  Lemaire Decl. ¶ 36.  At the time of the 2010 lawsuit, Crusader DRC had ample documentation to support its primary damages claims.  Hagen Decl. ¶ 50.  Because of the bribe, the judge presiding over the 2010 lawsuit never considered the underlying documents or reached the merits of the claims.  Crusader DRC had to wait eight years to bring its lawsuit again at a time when the documentary record had deteriorated.  Glencore cannot avail itself of the delay it caused through its own criminal conduct to obtain a lower restitution award.

Second, the 2019 judgment is not dispositive of the harm to Crusader DRC and the Hagens.  The judgment has not been served on the parties and remains subject to appeal.  It could be subject to years of litigation in Glencore's preferred DRC forum, just like Crusader DRC's first lawsuit.  It is also not clear from the 2019 judgment which claims the court granted and which they denied.  In light of this lack of clarity, the Court should not simply accept the amount awarded in the 2019 judgment as the correct value of Crusader DRC's claims.  *See United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005) (district court erred in imposing restitution based on state court civil judgment that did not specify which losses made up the damage award).

     2.     The $5 million in Other Damages Is Part of the Loss Amount for Restitution

The Court also should not discount or subtract the claim for $5 million for "any and all harm combined."  As set forth in Mr. Lemaire's declaration, this claim is for damages under Article 258 of the Congolese Civil Code.  Lemaire Decl. ¶ 26.  Under DRC law, Article 258

damages are amounts that are awarded and paid out to the prevailing party. *Id.* ¶ 29. The dismissal of the lawsuit caused Crusader DRC and the Hagens to lose all of their damages claims, including the claim for Article 258 damages. Had it not been for the bribe, Crusader DRC would have received the $5 million as part of its overall damage award. Accordingly, the $5 million in Article 258 damages are part of the loss suffered by Crusader DRC and the Hagens.

        3.    <u>The Arbitration Clauses in the Contracts Do Not Preclude an Award of Restitution</u>

Finally, the fact that the terminated contracts contained arbitration clauses would not have led the DRC judge to dismiss Crusader DRC's lawsuit, even if she had not been bribed. As set forth in Mr. Lemaire's declaration, under DRC law, arbitration clauses are subject to an obligation of good faith. Lemaire Decl. ¶ 31. If one party to a contract refuses to settle a dispute in bad faith, the other party may set aside the arbitration clause and file a claim in court. *Id.* ¶ 32. The claim will not be dismissed for lack of jurisdiction as long as the party filing the claim can make a showing of the bad faith of the other party. *Id.*

Indeed, KCC raised this same argument in the DRC litigation—not once, but twice—and did not prevail on either occasion. KCC first raised the arbitration clause argument before the High Court of Kolwezi in the 2010 lawsuit. *Id.* ¶ 34. Despite having been bribed by Glencore, the DRC judge did not dismiss on these grounds, and instead dismissed on an entirely separate procedural ground. *Id.* KCC again raised the argument before the Kolwezi Commercial Court in the 2018 lawsuit. *Id.* ¶ 35. That Court specifically rejected KCC's argument and found that Crusader DRC's claim was properly before the court because KCC had acted in bad faith during the pre-suit negotiations. *Id.*

For these reasons, Crusader DRC and the Hagens are entitled to restitution for the full amount of the damages claimed in the 2010 lawsuit: $16,084,556 USD.

### B.      Foreseeable Losses for Retrenchment

In addition to the value of their lawsuit claims, Crusader DRC and the Hagens must also be compensated for retrenchment/severance payments to employees that Crusader DRC was forced to terminate.

Under the MVRA, a victim may recover expenses and other losses that are the "direct and proximate" result of the defendant's wrongdoing including expenses that flow "naturally and directly" from the offense of conviction. *United States v. Boccagna*, 450 F.3d 107, 120-21 (2d Cir. 2006) (victim lender could recover "interest on the loans, maintenance fees, taxes, and selling expenses" that "flowed 'naturally and directly'" from the fraud scheme); *Hastings*, 2022 WL 1785579, at **10-11 (requiring defendant to reimburse company for direct losses from misappropriating funds as well as the reasonably foreseeable expense of restating company earnings); *Schwamborn*, 542 F. App'x at 88-89 (defendant "directly and proximately" caused losses under MVRA where the "risk of loss that [defendant] created…was 'within the zone of risk' concealed by the scheme").

In *Boccagna*, after the defendant's fraudulent scheme to acquire distressed properties and sell them at inflated prices was revealed, HUD, as guarantor on the defendant's defaulted loans, was contractually obligated to pay interest, maintenance fees, taxes, and selling expenses on the foreclosed properties. The Second Circuit affirmed the district court's restitution award relating to these expenses because HUD's $20.6 million of "out-of-pocket loss all flowed 'naturally and directly' from the collapse of [defendant's] fraud scheme." *Boccagna*, 450 F.3d at 120-21.

As in *Boccagna*, Glencore's misconduct naturally and directly caused Crusader DRC to incur substantial out-of-pocket expenses. As a direct and proximate result of KCC's wrongful conduct, Crusader DRC had to fire nearly all of its staff of 92 employees and pay them retrenchment. In 2010, Crusader DRC spent at least **$57,294.22** on retrenchment for

approximately twenty-three employees.  Hagen Decl. ¶ 57.  Additional layoffs followed in 2012 and thereafter, once Crusader DRC's contracts with the Methodist Hospital and other mining companies were satisfied.  Unfortunately, given the passage of time, records of the full retrenchment costs Crusader DRC suffered are not readily available.  Accordingly, Crusader DRC only seeks restitution for its retrenchment costs in 2010 for less than one-third of the staff it was forced to terminate and compensate as a result of Glencore's conspiracy.

These expenses were entirely foreseeable to Glencore.  Crusader DRC warned KCC at least twice before it filed the 2010 lawsuit that it would be forced to retrench staff and requested that KCC hire the 92 employees so that Crusader DRC would not bear the retrenchment cost.  *Id.* ¶¶ 44, 46.  Consequently, Glencore could reasonably foresee that Crusader DRC would suffer the losses when it paid a bribe to have Crusader DRC's lawsuit dismissed.  *See Marino*, 654 F.3d at 324 (awarding restitution where "[n]o reasonable person in [defendant's] position could have failed to foresee that the victims…would ultimately face substantial or even complete loss of their investment").

### C.    Prejudgment Interest

The Court should order simple prejudgment interest at a rate of 8% to 9% on the amount of restitution that Crusader DRC and the Hagens receive for the first two categories of loss.  This interest rate is within the Court's discretion and is necessary to fully compensate Crusader DRC and the Hagens for their losses.

It is well-settled that "the MVRA allows a sentencing court to award prejudgment interest…to ensure compensation 'in the full amount of each victim's losses.'"  *Qurashi*, 634 F.3d at 704 (quoting 18 U.S.C. § 3664(f)(1)(A)); *United States v. Smerling*, No. 21-CR-317 (DLC), 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022) (same).  The purpose of prejudgment interest is to compensate a victim for "the loss of the ability to put their money to productive

use." *Qurashi*, 634 F.3d at 705; *United States v. Jaffe*, 314 F. Supp. 2d 216, 224 (S.D.N.Y. 2004) (explaining that restitution should reflect the loss of a victim's "use and benefit of" funds), *aff'd*, 417 F. 3d 259 (2005).

In the Second Circuit, "'[t]he rate of pre-judgment interest is within the broad discretion of the district court." *United States v. Qurashi*, No. 05-CR-498, 2009 WL 10677000, at *39 (E.D.N.Y. Sept. 1, 2009) (quoting *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 131 (2d Cir. 2001)), *report and recommendation adopted*, No. 05-CR-498 (SJF)(AKT), 2009 WL 10677129 (E.D.N.Y. Sept. 30, 2009); *Smerling*, 2022 WL 1806300, at *2 ("The Second Circuit has not provided guidance regarding the interest rate at which prejudgment interest should be awarded."); *Jaffe*, 314 F. Supp. 2d at 224 (noting that "[f]ederal law does not provide an interest rate for orders of restitution").

Courts within this circuit use a range of methods to calculate prejudgment interest. Under one method, courts calculate prejudgment interest based on the New York statutory interest rate of 9%. Under New York Civil Practice Law and Rules Section 5001(a), "prejudgment interest must be awarded at the rate of 9% per annum on any sum awarded for a contract breach or for the deprivation or interference with property." *Qurashi*, 2009 WL 10677000, at *39 (citing N.Y. C.P.L.R. § 5001(a)); *see also* N.Y. C.P.L.R. § 5004(a). In *Jaffe*, the court applied the New York statutory rate to an MVRA award for victims of bank fraud, explaining that "[a] nine percent interest rate is standard for both pre-and post-judgment payments in the Southern District of New York, for all kinds of commercial cases, including cases requiring restitution, that is, restoring loss to the aggrieved party." 314 F. Supp. 2d at 224.

Another method is to apply the federal rate for post-judgment interest pursuant to 18 U.S.C. § 3612(f)(2), which provides the rate for calculating "[i]nterest on a fine." The federal

rate is tied to the one-year Treasury rate.  In *Smerling*, the Court based its calculation on the average rate from the week before entering the restitution award.  *See* 2022 WL 1806300, at *2; *see also Qurashi*, 2009 WL 10677000, at *40-41 (applying federal rate average from the date of conduct through the date of the restitution hearing, rounded up to 4%, the nearest whole number).

Finally, interest may also be calculated using an adjusted prime rate ("APR") established by the Secretary of the Treasury.  *See Qurashi*, 2009 WL 10677000, at *39 (discussing application of APR).

In this case, an 8% to 9% prejudgment interest rate is necessary to fully compensate Crusader DRC and the Hagens for their losses.  As set forth in the Declaration of Herman Lemaire, Crusader DRC had the right under DRC law to request a standard prejudgment and post-judgment simple interest rate of between 8% and 10% on their claim.  Lemaire Decl. ¶ 17. In Crusader DRC's 2010 and 2019 DRC lawsuits, well before they were aware of Glencore's misconduct, they sought the low end of the standard prejudgment interest rates, or 8%.  *Id*. Exs. 4-5.

New York's 9% prejudgment interest rate is appropriate in the restitution context and is at the midpoint of the DRC's 8% to 10% range.  In choosing to apply the 9% interest rate instead of the federal post-judgment rate, the court in *Jaffe* noted that the federal post-judgement rate applies to criminal fines, which do not have a compensatory function.  314 F. Supp. 2d at 224. As the court explained, the 9% rate made more sense in a restitution case than the federal rate because restitution "is intended to return to the victim that which was wrongfully wrested from him and, since he was deprived of the use and benefit of his funds, restitution should reflect that loss as well."  *Id*.; *see also Alfano v. Cigna Life Ins. Co. of NY*, No. 07 CIV. 9661 (GEL), 2009

WL 890626, at *7 (S.D.N.Y. Apr. 2, 2009) (finding that prejudgment interest should be calculated applying New York's statutory 9% rate, rather than the U.S. Treasury rate, because the 9% rate more accurately captured the "true loss to [the] plaintiff").  The reasoning in *Jaffe* applies with even greater force here.  Not only are the Hagens seeking restitution, but a prejudgment interest of 9% is a very close approximation of the very damages they were deprived of when Glencore improperly caused the dismissal of Crusader DRC's lawsuit.

Moreover, applying New York's 9% interest rate would be in line with how courts within this Circuit, including this court, have determined prejudgment interest when faced with a federal statute that is silent as to the applicable interest rate.  *See SEIU, Loc. 32BJ v. Dayton Beach Park No. 1 Corp.*, No. 18 CIV. 3887 (LGS), 2019 WL 120998, at *4 (S.D.N.Y. Jan. 4, 2019) (Schofield, J.) ("Since the LMRA [Labor Management Relations Act] is silent with respect to interest rate, 'the common practice among courts within the Second Circuit is to grant interest at a rate of nine percent per annum – which is the rate of prejudgment interest under New York State law, N.Y. C.P.L.R. §§ 5001–5004….'"); *Garden City Boxing Club, Inc. v. Morales*, No. 05-CV-0064 (FB)(KAM), 2005 WL 2476264, at *10 (E.D.N.Y. Oct. 7, 2005) ("When a federal statute is silent with respect to a prejudgment interest rate, the '"common practice" among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law.'" (quoting *Serv. Employees Int'l. Union, Loc. 32BJ v. Stone Park Assocs., LLC,* 326 F. Supp. 2d 550 (S.D.N.Y. 2004)).[12]

---

[12] While the Second Circuit expressed skepticism about a 9% prejudgment interest rate in *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), that case is distinguishable.  First, *Vilar* involved a compounding 9% interest rate, while the Hagens are seeking simple non-compounding interest.  *See Vilar*, 729 F.3d at 97, n.38.  Second, the court's concern that such an interest rate would benefit investors in the fraudulent securities over other securities investors does not apply here.  *Id.*  The Hagens were not deprived of an inherently risky investment; they lost their right to obtain an award that is virtually identical to what they are seeking now.  An 8% to 9% prejudgment interest rate, therefore, will not provide a windfall recovery or otherwise give the Hagens more than their due under DRC law.

The Court should apply a simple prejudgment interest rate of 8% to 9% on the damages claimed in the 2010 Crusader DRC lawsuit and the other foreseeable retrenchment costs. These amounts should be calculated as follows:

Crusader DRC Lawsuit Losses:
- Interest rate should be calculated from January 11, 2011, the day after the High Court of Kolwezi issued its ruling dismissing Crusader DRC's lawsuit. Lemaire Decl. Ex. 4.

  *8% Prejudgment Interest*:
  - Loss before interest applied = $16,084,556
  - Prejudgment interest = $15,260,975

  *9% Prejudgment Interest*:
  - Loss before interest applied = $16,084,556
  - Prejudgment interest = $17,168,597

Retrenchment Costs:
- Interest rate should be calculated from January 11, 2011, the day after the High Court of Kolwezi issued its ruling dismissing Crusader DRC's lawsuit. *Id.* at Ex. 4.

  *8% Prejudgment Interest*:
  - Retrenchment before interest applied = $57,294.22
  - Prejudgment interest = $54,362.45

  *9% Prejudgment Interest*:
  - Losses in 2010 before interest applied = $57,294.22
  - Prejudgment interest for 2010 losses = $61,157.76

**Grand Totals:**
**8% Rate:** ($15,260,975 + $54,362.45) = $15,315,337.45
**9% Rate:** ($17,168,597 + $61,157.76) = $17,229,754.76

For these reasons, the Court should award **$15,315,337** to **$17,229,754** in prejudgment interest in order to fully compensate Crusader DRC and the Hagens for the loss of the ability to put their money to productive use due to Glencore's criminal conduct.

### D.    Incurred Legal Fees

Crusader DRC and the Hagens are also entitled to be compensated for the legal fees they have incurred but not yet paid for legal representation in the DRC, including to appeal the improperly dismissed lawsuit and to continue pursuing their claims.  When the defendant's criminal conduct includes illegal acts that impact a legal proceeding and cause the victim to pay attorneys' fees as a result, that loss is directly related to the crime of conviction and is recoverable under the MVRA.  *See, e.g.*, *Qurashi*, 2009 WL 10677000 at *21-22 (allowing recovery of attorneys' fees paid by insurance companies defending themselves against "sham" civil lawsuits); *United States v. Abdelbary*, 746 F.3d 570, 573 (5th Cir. 2014) (granting attorneys' fees to victim that incurred attorneys' fees "defending its rights in the same [bankruptcy] proceeding … in which the fraud occurred"); *United States v. DeGeorge*, 380 F.3d 1203, 1221 (9th Cir. 2004) (holding that "the [victim] insurance company's expenses in the civil trial were *directly*, not tangentially, related to" the defendant's offenses of conspiracy that included perjury and other misconduct during a civil trial as overt acts (emphasis in original)); *United States v. Blackburn*, 9 F.3d 353, 358-59 (5th Cir. 1993) ("The attorney's fees were a direct result of Blackburn's offense, and thus, were properly included.").

Here, after Glencore paid a bribe to dismiss Crusader DRC's lawsuit in 2010 (and corrupted an attorney who represented Crusader DRC in that action), the Hagens spent several years fighting against KCC to have the dismissal reversed.  In 2018, the Hagens' business partner Dr. Kasongo filed an almost identical claim on behalf of Crusader DRC in the Kolwezi Commercial Court that, despite KCC's arguments for dismissal, resulted in a judgment in 2019 awarding Crusader DRC $10,864,556.  Lemaire Decl. ¶ 36.  The lawyers who brought that lawsuit have sent the Hagens an invoice stating they are owed **$3,198,800** in fees for the 2010 and 2018 lawsuits that have not been paid.  Hagen Decl. ¶ 67.  The Hagens are entitled to

restitution for those costs because they are the direct and proximate result of Glencore's criminal conduct. *See United States v. Hatfield*, No. 06-CR-0550, 2015 WL 13385926, at *10 (E.D.N.Y. Mar. 27, 2015) (finding "incurred liabilities" that had not yet been paid are "actual losses" within the meaning of the MVRA).

### E.  Loss of Crusader DRC's Residual Business

Crusader DRC and the Hagens are entitled to restitution for the loss of Crusader DRC's non-Glencore business to compensate it for the loss of value of its remaining business with other mining companies. The loss of this business was the direct and proximate result of Glencore's conspiracy to violate the FCPA, which foreseeably harmed Crusader DRC and led it to end active operations. This loss is separate from the losses described above.

Under the MVRA, a defendant is liable for harms "'within the zone of risk'" of the defendant's scheme. *Schwamborn*, 542 F. App'x at 88-89. Even where a defendant's acts are several steps removed from the ultimate outcome, the defendant must make the victim whole if the defendant is the "but for" cause and the resulting harm "proximately flowed" from the defendant's conduct. *See United States v. Lebedev*, 932 F.3d 40, 57 (2d Cir. 2019).

In *Lebedev*, the Second Circuit affirmed a restitution award to a claimant who was harmed by a chain of events that started with a bribe and led to the ultimate failure of a financial institution. In that case, the defendant, a chairman of a credit union, accepted bribes to allow a cryptocurrency exchange to process transactions through the credit union, which subsequently collapsed. 932 F.3d at 46-47. The district court concluded that, but for the bribery scheme, the credit union would not have begun to rely on fees from automated clearing house transactions and other unsafe practices, most of which were conducted by others after the bribe was paid. *Id*. at 57. The court ordered the defendant to pay restitution to the National Credit Union Administration for the losses it incurred when the credit union began to fail and had to be taken

over and liquidated.  The Second Circuit rejected the defendant's argument on appeal that the restitution award was based on losses that were too remote and that were unrelated to the charged conduct, holding that it was within the district court's discretion to conclude that the credit union's "financial difficulties proximately flowed from" the bribery.  *Id*.

Here too, the loss to Crusader DRC proximately flowed from Glencore's criminal conspiracy, which included corrupting the Congolese courts and driving Crusader DRC out of business.  As set forth more fully in Dr. Hagen's declaration, the DCP and KOL contracts accounted for approximately three-quarters of Crusader DRC's income, which vanished when KCC terminated the contracts.  Hagen Decl. ¶ 56.  At the time, Crusader DRC had expended significant capital contributions to build three medical facilities that would serve KOL and DCP as well as other mining-related companies in the region.  *Id*. ¶¶ 23-24, 29-30.  The non-Glencore contracts accounted for the remaining twenty-five percent of Crusader DRC's business.  *Id*. ¶ 24.  Glencore's actions to ensure that the Congolese court would not fairly rule in its legal case effectively froze Crusader DRC's resources and deprived Crusader DRC of the funds it needed to maintain and develop its remaining business—funds that it would have likely recovered through the lawsuit.[13]

Crusader DRC operated at a loss for as long as it could while it pursued its claims though the DRC courts.  Ultimately, Crusader DRC effectively ended active operations in 2013, having lost its Glencore contracts and later its non-Glencore business.  Hagen Decl. ¶ 60.  Because Crusader DRC's collapse is directly traceable to Glencore's scheme, Glencore should compensate Crusader DRC for the loss of its non-Glencore business.  *See Lebedev*, 932 F.3d at

---

[13]  Glencore knew that KCC was unlikely to win the case.  In Glencore's plea agreement, the DRC Agent and Executive 3 discussed that they would be "screwed big time" after a meeting with the DRC judge.  **Exhibit 6**, Att. A ¶ 72.  Following that conversation, the DRC Agent arranged the bribe to ensure KCC would win the lawsuit.  *Id.* ¶¶ 73-74.

57 (affirming restitution order requiring the defendant to pay for the losses incurred as a result of the failure and liquidation of a federal credit union flowing from the defendant's misconduct).

Furthermore, it was foreseeable to Glencore that depriving Crusader DRC of the $16 million it was owed would cause Crusader DRC "as a whole [to] suffer from future loss of profits and income." Hagen Decl. ¶ 44. During negotiations to resolve the dispute, Crusader DRC warned KCC that it would fail if it was not compensated for its "significant capital investment" in reliance on the contracts with DCP and KOL. *Id.* Nevertheless, Glencore negotiated in bad faith and then bribed a judge to ensure that Crusader DRC had no avenue for relief. Glencore cannot now credibly argue that it did not foresee that as a result of its actions the Hagens "would ultimately face substantial or even complete loss of their investment." *Marino*, 654 F.3d at 324.

The actual value of the property Glencore harmed includes the likely growth of Crusader DRC's business that was lost as a result of Glencore's criminal conduct. *See, e.g.*, *Scott*, 321 F. App'x at 72 (affirming district court's award of "stolen funds plus the subsequent investment gains lost as a result of the theft" (internal citations omitted)). The loss of Crusader DRC's business has been reasonably approximated by expert Gene B. Phillips in his report attached as **Exhibit 15**.

In his report, Mr. Phillips isolates Crusader DRC's non-Glencore business to value it as of the present, assuming that Crusader DRC received compensation for its lawsuit in 2011. To do so, he first determined the portion of Crusader DRC's first quarter 2010 earnings attributable to the non-Glencore contracts. *Id.* He then applied a conservative growth estimate and inflation adjustment to those first quarter 2010 earnings from the date Crusader DRC's lawsuit was dismissed until the end of the third quarter of 2022. *Id.* Mr. Phillips used the growth rate of

mining personnel over the same period, as Crusader DRC's revenue model was based on headcounts.  *Id.*  The analyses provide the present-day earnings of the Crusader DRC's non-Glencore business.  *Id.*  In the final step of his analyses, Mr. Phillips applies a conservative multiplier to the projected earnings to derive a present-day value for the residual company and calculates 8% and 9% interest on that value from the end of the third quarter of 2022 until the date of sentencing.  *Id.*  In total, according to this conservative methodology, Mr. Phillips estimates Crusader DRC's non-Glencore business would be worth **$13,761,581** to **$13,780,952** as of the date of sentencing.  *Id.*  The Court should include this amount in its restitution award.

**CONCLUSION**

For the reasons set forth above, Crusader DRC and the Hagens are victims of the FCPA conspiracy to which Glencore pled guilty and are entitled to mandatory restitution under the MVRA.  We respectfully request that the Court award Crusader DRC an amount between **$48,417,568** to **$50,351,356**, or, in the alternative, award 90% of that same amount (**$43,575,811 to $45,316,221)** to Ian and Laurethé Hagen.[14]

Dated:  October 25, 2022
         New York, New York

Respectfully submitted,

*/s/ Mark S. Cohen*

Mark S. Cohen
Christian R. Everdell
Shannon A. Daugherty
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Phone: 212-957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sdaugherty@cohengresser.com

*Attorneys for Ian and Laurethé Hagen*

---

[14] The Hagens also respectfully request that, in issuing any orders or judgments in connection with Glencore's sentencing, this Court prioritize the payment of restitution to victims, such as the Hagens, over the payment of forfeiture to the Government, as other courts in this Circuit have done.  *See United States v. Cohan*, 988 F. Supp. 2d 323, 329 (E.D.N.Y. 2013) (ordering that forfeiture order would not be executed until defendant's restitution obligation was satisfied in full); *United States v. Steel*, No. 11-CR-244 (NGG), 2012 WL 5879143, at *2–3 (E.D.N.Y. Nov. 21, 2012) (requiring defendant to satisfy restitution obligations before forfeiture obligations because "the court is properly more concerned with the prompt and likely compensation of victims than the Government's receipt of forfeiture funds.").

**CERTIFICATION OF SERVICE**

I hereby certify that on October 25, 2022, I caused the foregoing victim impact statement and request for restitution and accompanying documents to be filed with the Clerk of the Court using CM/ECF system, which will effect service on all parties.

Dated:  October 25, 2022
        New York, New York


                                                            */s/    Christian R. Everdell*