Exhibit 6



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Criminal Division*
*Fraud Section*
*Money Laundering and Asset*
*Recovery Section*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza 950*
*New York, New York 10007*

*Bond Building*
*1400 New York Ave, NW*
*11th Floor*
*Washington, D.C. 20005*

ORIGINAL

May 24, 2022

Howard Shapiro, Esq.
Kimberly Parker, Esq.
Erin Sloane, Esq.
Christopher Davies, Esq.
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Re:     *United States v. Glencore International A.G.*

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery Section ("MLARS"), and the Office of the United States Attorney for the Southern District of New York ("the USAO-SDNY") (collectively the "Offices"), and the Defendant, GLENCORE INTERNATIONAL A.G. (the "Defendant" or the "Company"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors,

1

hereby submit and enter into this plea agreement (the "Agreement").  The terms and conditions of this Agreement are as follows:

## Term of the Defendant's Obligations Under the Agreement

1.      Except as otherwise provided in Paragraph 12 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained, as described in Paragraphs 25-29 below (the "Term").  The Defendant agrees, however, that in the event the Offices determine, in their sole discretion, that the Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 31-34 below.  Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship and any enhanced self-reporting described in Attachments D, E, and F for an equivalent period.  In the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship described in Attachments D and E, the monitorship may be terminated early.

## The Defendant's Agreement

2.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the District Court for the Southern District of New York, and to plead guilty to a one count criminal Information charging the Defendant with Conspiracy to Violate the Foreign Corrupt Practices Act of 1977 (the "FCPA"), as amended, in

2

violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Section 78dd-3. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A ("Statement of Facts").

3.       The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

a.       An unlawful agreement between two or more individuals to violate the FCPA existed; specifically, as a person or entity, while in the territory of the United States, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the Defendant and its co-conspirators in obtaining and retaining business for and with, and directing business to, any person;

b.       The Defendant knowingly and willfully joined that conspiracy;

3

c.      One of the members of the conspiracy knowingly committed or caused to be committed, in the Southern District of New York or elsewhere in the United States, at least one of the overt acts charged in the Information; and

d.      The overt acts were committed to further some objective of the conspiracy.

4.      The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local, or foreign prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other law enforcement, regulatory, and debarment authorities, as well as Multilateral Development Banks ("MDBs"), if requested by the Defendant.

5.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

6.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, including:

4

      a.     The nature, seriousness, and pervasiveness of the offense conduct, as described in the Statement of Facts attached hereto as Attachment A, including a scheme to pay over one hundred million dollars to intermediaries with the intent that a significant portion of the payments be used for bribes to government officials in numerous countries for over a ten-year period carried out by high-level employees and agents of the Company;

      b.     The Defendant did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") § 9.47.120, or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because it did not voluntarily and timely disclose to the Offices the conduct described in the Statement of Facts;

      c.     The Defendant received credit for cooperation under U.S.S.G. § 8C2.5(g)(2), because it cooperated with the Offices' investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Defendant also received partial credit for its cooperation pursuant to the FCPA Corporate Enforcement Policy, JM § 9-47.120 by, among other things, providing information obtained through its internal investigation, which allowed the government to preserve and obtain evidence as part of its own independent investigation, making regular and detailed factual presentations to the Offices, producing a significant amount of documents located outside the United States to the Offices in ways that did not implicate foreign data privacy laws, collecting and producing voluminous evidence and information to the Offices, accompanied by translations of documents, and producing an analysis of complex trading activity conducted by the company's outside forensic accounting firm; in addition, the Defendant also provided to the Offices all relevant facts known to it, including

information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Offices prior to the Agreement;

      d.      The Defendant did not receive full credit pursuant to the Corporate Enforcement Policy, JM § 9-47.120, for its cooperation, because the Defendant did not at all times demonstrate a commitment to full cooperation and was delayed in producing some relevant evidence, or for its remediation, because it did not timely and appropriately remediate with respect to disciplining certain employees involved in the misconduct;

      e.      The Defendant engaged in remedial measures, including: (i) terminating and separating certain employees who were involved in the conduct; (ii) establishing a centralized compliance function, hiring a Head of Compliance, and significantly increasing the number of employees in compliance functions; (iii) enhancing its business partner management, including reducing the number of third-party business partners engaged and implementing due diligence procedures, payment controls, and post-engagement monitoring measures (iv) investing in increased head count and data analytics to support real time compliance monitoring and risk assessment and continuous improvement, and (v) requiring global anti-corruption compliance and business ethics training as well as additional risk-based training for high-risk and control employees, directors, and business partners;

      f.      Although the Defendant had inadequate anti-corruption controls and an inadequate compliance program and policies during the period of the conduct described in the Statement of Facts, the Defendant has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program");

6

g.      Because certain of the Defendant's compliance enhancements are new and have not been fully implemented or tested to demonstrate that they would prevent and detect similar misconduct in the future, the imposition of a Monitor is necessary to reduce the risk of recurrence of misconduct, as described more fully below in Paragraphs 25-29 and Attachments D and E to this Agreement;

h.      The Defendant has no prior criminal history, although some of the Defendant's subsidiaries have been the subject of prior enforcement actions, including the convictions of its Rotterdam subsidiary in 2012 related to bribes paid to a European Union official to obtain non-public information, and a regulatory enforcement action involving a civil settlement by Katanga Mining Ltd. with the Ontario Securities Commission in 2018;

i.      The Defendant is entering into a resolution with the U.S. Commodity Futures Trading Commission ("CFTC") through a cease-and-desist proceeding relating to the conduct described in the Statement of Facts and other conduct;

j.      The Defendant is entering into a resolution with authorities in the United Kingdom and Brazil relating to certain conduct described in the Statement of Facts; and

k.      The Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraph 12 below.

l.      Accordingly, after considering (a) through (k) above, the Offices believe that the appropriate resolution in this case is for the Defendant to plead guilty to one count of conspiracy to violate the anti-bribery provisions of the FCPA pursuant to this Agreement; a discount of 15 percent off the bottom of the applicable U.S. Sentencing Guidelines fine range pursuant to the FCPA Corporate Enforcement Policy, JM § 9-47.120; and the imposition of a Monitor, as set forth in Attachments D and E to this Agreement.

7

8.      The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

a.      to plead guilty as set forth in this Agreement;

b.      to abide by all sentencing stipulations contained in this Agreement;

c.      to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.      to commit no further crimes;

e.      to be truthful at all times with the Court;

f.      to pay the applicable fine and special assessment;

g.      to consent to and to pay the applicable forfeiture amount;

h.      to cooperate fully with the Offices as described in Paragraph 12;

i.      to continue to implement a compliance and ethics program as described in Paragraphs 9-10 and Attachment C; and

j.      to use its best efforts to retain an independent compliance monitor for Glencore International A.G. consistent with applicable law (see Attachment D) by the sentencing date (subject to any reasonable adjournments sought by the Offices).  If, despite best efforts, an independent compliance monitor for Glencore International A.G. cannot be retained consistent with applicable law by the sentencing date (subject to any reasonable adjournments sought by the Offices), the Company agrees to retain an independent compliance monitor for Glencore UK Ltd (see Attachment E) and agrees to enhanced self-reporting by Glencore International A.G. (see Attachment F).  The term of the monitorship and any enhanced self-reporting shall be three years from the date on which the Monitor is retained, subject to extension or early termination as

8

described in Paragraph 1. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachments D and E, and the terms of any enhanced self-reporting are set forth in Attachment F to this Agreement.

9.      The Defendant represents that it has implemented and will continue to implement a compliance and ethics program that meets, at a minimum, the elements set forth in Attachment C. Such program shall be designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption. Thirty days prior to the expiration of the Term, the Defendant, by the Chief Executive Officer and Head of Compliance of the Glencore Group, will certify to the Fraud Section, in the form of executing the document attached as Attachment H to this Agreement, that the Defendant has met its compliance obligations pursuant to this Agreement.

10.      In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Defendant will adopt new or modify existing internal controls, compliance policies, and procedures in order to ensure that the Defendant maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting

9

controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C. The Offices, in their sole discretion, may consider the Monitor's certification decision in assessing the Defendant's compliance program and the state of its internal accounting controls.

11.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Attachment A of the Agreement attached hereto, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Defendant prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Offices; the Defendant agrees that such transaction(s) will

10

not be consummated. In addition, if at any time during the Term of the Agreement, the Offices determine in their sole discretion that the Defendant has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraphs 31-34. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12.     The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Attachment A and any individual or entity referred to therein, as well as any other conduct under investigation by the Offices at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs, in any investigation of the Defendant, its subsidiaries or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment A and other conduct under investigation by the Offices at any time during the Term. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such

11

assertion. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

        a.     The Defendant shall timely and truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

        b.     Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 12(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

        c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

        d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to

any and all disclosures, subject to applicable law and regulations, to other governmental authorities including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

13.    In addition to the obligations provided for in Paragraph 12 of the Agreement, during the Term, should the Defendant learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the term of the cooperation obligations provided for in Paragraph 1 of the Agreement, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Offices, in the form of executing the document attached as Attachment G to this Agreement, that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14.    The Defendant agrees that any fine or restitution imposed by the Court will be due and payable as specified in Paragraph 22 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of New York the mandatory special assessment of $400 within ten business days from the date of sentencing.

### The United States' Agreement

15.    In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree they will not file additional criminal

13

charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures relating to the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or any of its direct or indirect affiliates, subsidiaries, officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

**Factual Basis**

16.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Attachment A, and that the Information and Attachment A accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the

14

Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### The Defendant's Waiver of Rights, Including the Right to Appeal

17.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving the Fraud Section, MLARS, and/or the USAO-SDNY and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including USSG § 1B1.1(a)) that the Statement of Facts set forth in Attachment A to this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form). Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their

15

obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

18.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of criminal defendants include the following:

(a)     the right to plead not guilty and to persist in that plea;

(b)     the right to a jury trial;

(c)     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

(d)     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

(e)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Offices in this plea agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant also knowingly waives the right to bring any collateral challenge challenging either the conviction, or the sentence imposed in this case.  The Defendant hereby

16

waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment A or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Penalty

19.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 is:  a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Section 371 and Title 18, United States Code, Sections 3571(c) and (d)); five years' probation (Title 18, United States Code, Section 3561(c)(1)); and a mandatory special assessment of $400

17

(Title 18, United States Code, Section 3013(a)(2)(B)); and restitution in the amount ordered by the Court. In this case, the parties agree that the gross pecuniary gain resulting from the offense is $315,089,098. Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is twice the gross gain, or approximately $630,178,196.

### Sentencing Recommendation

20.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 19.

21.     The Offices and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

a.     The November 1, 2018 U.S.S.G. are applicable to this matter.

b.     Offense Level. Based upon U.S.S.G. § 2C1.1, the total offense level is 46, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | More than One Bribe | +2 |
| (b)(2) | Benefit (more than $250 million) | +28 |
| (b)(3) | Involvement of High-Level Public Official | +4 |

18

| | |
|---|---|
| **TOTAL** | 46 |

c.   Base Fine. Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $315,089,098 (the pecuniary gain to the Defendant from the offense)

d.   Culpability Score. Based upon U.S.S.G. § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | Individual within the high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | + 5 |
| (g)(2) | Cooperation, Acceptance | - 2 |
| | **TOTAL** | 8 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $315,089,098 |
| Multipliers | 1.6 (min)/3.2 (max) |
| Fine Range | $504,142,557 (min)/ $1,008,285,114 (max) |

22.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate disposition of the case:

a.    Disposition. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed upon time, impose a sentence requiring the Defendant to pay a criminal fine, as set forth below. Specifically, the parties agree, based on the application of the United States Sentencing Guidelines, that the appropriate

19

total criminal fine is $428,521,173 ("Total Criminal Fine"). This reflects a 15 percent discount off of the bottom of the applicable Sentencing Guidelines fine range for the Defendant's partial cooperation and remediation.

   b. The Offices and the Defendant further agree that the Defendant will pay the United States $262,590,214, equal to approximately 60 percent of the Total Criminal Fine. The Defendant agrees to pay $262,590,214 to the United States Treasury no later than ten business days after entry of the judgment by the Court. The Offices agree to credit the remaining amount of the Total Criminal Fine as follows:

    (1) Up to $136,236,140 of the Total Criminal Fine will be credited against the amount the Defendant pays to authorities in the United Kingdom—so long as the Defendant pays such amount to the United Kingdom pursuant to the Defendant's separate resolution with United Kingdom authorities related to bribery conduct in Nigeria, Cameroon, Equatorial Guinea, and Ivory Coast occurring in or around and between March 2012 and 2018; provided that, in the event the Defendant does not pay the United Kingdom any part of the $136,236,140 within six months after this Agreement is fully executed, the Defendant will be required to pay the full remaining amount to the United States Treasury within ten business days of the expiration of such six-month period, on or before December 8, 2022; and

    (2) Up to $29,694,819 of the Total Criminal Fine will be credited against the amount the Defendant pays to authorities in Switzerland—so long as the Defendant pays such amount to Switzerland pursuant to the Defendant's separate resolution with Swiss authorities relating to conduct specified in

Attachment A concerning the Democratic Republic of the Congo; provided that, in the event the Defendant does not pay the Swiss authorities any part of the $29,694,819 within twelve months after this Agreement is fully executed, the Defendant will be required to pay the full remaining amount to the United States Treasury within ten business days of the expiration of such twelve-month period, on or before June 8, 2023.

The Defendant and the Offices agree that the Total Criminal Fine is appropriate given the facts and circumstances of this case, including the factors described in Paragraph 7(a) through 7(l). The Total Criminal Fine is final and shall not be refunded. The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to any fine, penalty, forfeiture, or disgorgement amounts that Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in Attachment A. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Fine. The Offices believe that a disposition that includes a fine of $428,521,173 is appropriate based on the factors outlined in Paragraph 7 of the Agreement and those in 18 U.S.C. § 3553(a).

      c.    Forfeiture. The Defendant hereby admits that the facts set forth in Attachment A establish that the sum of $272,185,792 (the "Total Forfeiture Amount") is forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The Offices agree that payments made by the Defendant in connection with its concurrent settlement of a related regulatory action brought by the CFTC shall be credited against the Total Forfeiture Amount in the amount of $90,728,597 (the "Civil Credit"). The Defendant therefore admits the forfeiture allegation with respect to Count

21

One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), a sum of money equal to $181,457,195 in United States currency, representing proceeds traceable to the commission of said offense (the "Money Judgment"), and which reflects the Total Forfeiture Amount less the anticipated payment of the Civil Credit to the CFTC. The Defendant agrees that it shall make a payment ("the Criminal Forfeiture Payment") in the full amount of the Money Judgment by wire transfer pursuant to instructions provided by the Offices no later than ten business days after entry of the judgment by the Court. It is further understood that any forfeiture of the Defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the Defendant in addition to forfeiture. The Defendant consents to the entry of the Consent Preliminary Order of Forfeiture/Money Judgment annexed hereto as Attachment I and agrees that the Consent Preliminary Order of Forfeiture/Money Judgment shall be final as to the Defendant at the time it is ordered by the Court.

        d.    <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of New York within ten days of the date of sentencing the mandatory special assessment of $400.

     23.    This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant

22

further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

24.     The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek a sentencing by the Court immediately following the Rule 11 hearing in the absence of a PSR. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

### Independent Compliance Monitor

25.     Promptly after the Offices' selection pursuant to Paragraph 27 below, the Defendant agrees to retain a Monitor for the term specified in Paragraph 1. The Monitor's duties and authority, and the obligations of the Defendant, or alternatively Glencore UK Ltd, with respect to the Monitor and the Offices, are set forth in Attachments D and E, which are incorporated by reference into this Agreement. No later than 30 business days after the date of execution of this Agreement, the Defendant shall submit a written proposal identifying the monitor candidates, and, at a minimum, providing the following:

      a.     a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

      b.     a written certification by the Defendant that the Defendant and its subsidiaries will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

      c.     a written certification by each of the candidates that he/she is not a current or recent (i.e., within the prior two years) employee, agent, or representative of the

23

Defendant and holds no interest in, and has no relationship with, the Defendant, its

subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

        d.     a written certification by each of the candidates that he/she has notified any

clients that the candidate represents in a matter involving the Offices (or any other

Department component) handling the monitor selection process, and that the candidate has

either obtained a waiver from those clients or has withdrawn as counsel in the other

matter(s); and

        e.     a statement identifying the monitor candidate that is the Defendant's first,

second, and third choice to serve as the Monitor.

26.     The Monitor candidates or their team members shall have, at a minimum, the

following qualifications:

        a.     demonstrated expertise with respect to the FCPA and other applicable anti-

corruption laws, including experience counseling on FCPA issues;

        b.     experience designing and/or reviewing corporate compliance policies,

procedures and internal controls, including FCPA and anti-corruption policies, procedures

and internal controls;

        c.     the ability to access and deploy resources as necessary to discharge the

Monitor's duties as described in the Agreement; and

        d.     sufficient independence from the Defendant and its subsidiaries to ensure

effective and impartial performance of the Monitor's duties as described in the Agreement.

27.     The Offices retain the right, in their sole discretion, to choose the Monitor from

among the proposed candidates, though the Defendant may express its preference(s) among the

candidates. Monitor selections shall be made in keeping with the Department's commitment to

24

diversity and inclusion. If the Offices determine, in their sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Offices, in their sole discretion, are not satisfied with the candidates proposed, the Offices reserve the right to request that the Defendant nominate additional candidates. In the event the Offices reject any proposed Monitors, the Defendant shall propose additional candidates within twenty (20) business days after receiving notice of the rejection so that three qualified candidates are proposed. This process shall continue until a Monitor acceptable to both parties is chosen. The Offices and the Defendant will use their best efforts to complete the selection process within sixty (60) business days of the execution of this Agreement. The Offices retain the right to determine that the Monitor should be removed if, in the Offices' sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 26 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachments D or E, the Defendant shall within twenty (20) business days recommend a pool of three qualified Monitor candidates from which the Offices will choose a replacement, following the process outlined above.

28.    The Monitor's term shall be three years from the date on which the Monitor is retained , subject to extension or early termination as described in Paragraph 1.

29.    The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachments D and E. The Defendant agrees that the Defendant and its subsidiaries will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant and its subsidiaries discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during

25

the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities.

### Corporate Compliance Reporting

30.     As described in paragraph 8(j), if applicable, the Defendant agrees that it will report to the Offices annually during the Term regarding remediation and maintenance of the compliance measures described in Attachment C.  This reporting will be conducted in accordance with Attachment F.

### Breach of Agreement

31.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 12 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 9-10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charge in the Information described in Paragraph 3, which may be pursued by the Offices in the U.S. District Court for the Southern District of New York or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Defendant or its personnel.  Any such prosecution

relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

32.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

33.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the Information and the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

34.     The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.   The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Public Statements by the Defendant

35.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Defendant set forth above or the facts described in the Information and Attachment A. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 31-34 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment A, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

      34.      The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

29

## **Complete Agreement**

35.     This document, including its attachments, states the full extent of the Agreement between the parties.   There are no other promises or agreements, express or implied.   Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR GLENCORE INTERNATIONAL A.G.:**

Date: 5/24/22                    By: _____

General Counsel of Glencore International A.G.

Date: 5/24/22                    By: _____

Howard M. Shapiro, Esq.
Kimberly A. Parker, Esq.
Christopher Davies, Esq.
Erin Sloane, Esq.

WilmerHale
Outside counsel for Glencore International A.G.

**FOR THE DEPARTMENT OF JUSTICE:**

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Leila Babaeva
James Mandolfo
Trial Attorneys

30

DEBORAH CONNOR
Chief, MLARS
Criminal Division
U.S. Department of Justice

Michael Khoo
Trial Attorney


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
U.S. Department of Justice

Michael McGinnis
Juliana Murray
Assistant United States Attorneys

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery Section ("MLARS"), and the Office of the United States Attorney for the Southern District of New York ("the USAO-SDNY") (collectively the "Offices"), and the Defendant, GLENCORE INTERNATIONAL A.G. (the "Defendant" or the "GLENCORE"). The Defendant admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, the Defendant acknowledges that the United States would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the Criminal Information.

**Glencore and Other Relevant Entities and Individuals**

1.      GLENCORE, the defendant, was a multinational commodity trading and mining company headquartered in Baar, Switzerland. GLENCORE had operations and subsidiaries in various locations around the world, including the United States, the United Kingdom, Africa, and South America.

2.      Glencore UK Ltd. was a direct subsidiary of GLENCORE and the direct owner of Glencore Energy UK Ltd. Glencore UK Ltd. and Glencore Energy UK Ltd. (collectively, the "Glencore UK Subsidiaries") were located in London, United Kingdom, and served as GLENCORE's head offices for oil and gas trading. The Glencore UK Subsidiaries and their employees were agents of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—in buying and selling oil worldwide.

A-1

3.      Glencore Ltd. was a subsidiary of GLENCORE that was located in Stamford, Connecticut and later relocated to New York, New York.

4.      Glencore do Brasil Comércio e Exportação Ltda. ("Glencore Brazil") was a subsidiary of GLENCORE, located in Rio de Janeiro, Brazil.

5.      Glencore de Mexico S.A. de C.V. ("Glencore Mexico") was a subsidiary of GLENCORE, located in Cancun, Mexico.

6.      "Glencore Mining Company 1" and its subsidiary "Glencore Mining Company 2" held interests in copper and cobalt mining operations located in the Democratic Republic of the Congo ("DRC"). From in or about 2010 to in or about 2013, Glencore Mining Company 1 and Glencore Mining Company 2 were direct or indirect subsidiaries of GLENCORE.

7.      "Executive 1" was a United Kingdom citizen and resident who held several senior roles at Glencore entities from at least in or about 1995 to in or about 2019. From at least in or about 2007 to in or about 2019, Executive 1 was a high-ranking executive at the Glencore UK Subsidiaries who acted on behalf of GLENCORE and had responsibility over GLENCORE's sale and purchase of oil worldwide. Executive 1 reported directly to a high-ranking GLENCORE executive. Executive 1 was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

8.      "Executive 2" was a United Kingdom citizen and resident who held multiple executive roles at GLENCORE entities and GLENCORE's predecessor, Marc Rich & Co., from in or about 1987 to in or about 2018, including as a senior executive in GLENCORE's oil and gas business from at least in or about 2007 to in or about 2018. Executive 2 was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

A-2

9.    "Executive 3" was a Greek and United Kingdom citizen and a resident of Switzerland, and a senior executive who was employed by GLENCORE's copper and zinc department from in or about 1993 to in or about 2018.  From at least in or about 2007 to in or about 2018, Executive 3 was based in Switzerland.  Executive 3 was an employee and agent of GLENCORE as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3.

10.    Anthony Stimler was a United Kingdom citizen and resident who held several roles at Glencore Energy UK Ltd. from in or about 2002 to in or about 2009 and from in or about June 2011 to in or about August 2019.  During the later time period, Stimler was a senior trader in charge, along with Trader Z below, of GLENCORE's West Africa desk for the crude oil business. Stimler had responsibility for crude oil purchases from, among other places, Nigeria.  Stimler was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

11.    "Trader Y" was a United Kingdom citizen and resident who was a trader at Glencore Energy UK Ltd. from in or about 1993 to 2009, and a consultant for Glencore Energy UK Ltd. from in or about 2010 to in or about 2012, and from in or about 2015 to in or about 2017. Trader Y was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

12.    "Trader Z" was a United Kingdom citizen and resident who was a trader at Glencore Energy UK Ltd. from in or about 2011 to in or about 2019.  Trader Z was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

13.    "Employee X" was a Brazilian citizen and resident who, from at least in or about 2004 to at least in or about 2018, was a business development employee at Glencore Brazil.

Employee X was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

14.    "Employee Y" was a Mexican citizen and resident who held a role as a senior employee at Glencore Mexico from in or about 2006 to in or about 2016. Employee Y was an agent of GLENCORE as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3.

15.    "Employee Z" was a senior executive at Glencore Mining Company 1. Employee Z was an agent of GLENCORE as that term is used in the FCPA, Title15, United States Code, Section 78dd-3.

### Foreign Government Entities and Officials

16.    The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian state-owned and state-controlled oil company headquartered in Abuja, Nigeria, and performed a function that Nigeria treated as its own. NNPC was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A), and employees of NNPC were "foreign official[s]," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

17.    "Nigeria Official X" was a high-ranking official in the Nigerian Ministry of Petroleum Resources from at least in or about 2010 up to and including in or about 2015. Nigeria Official X was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

18.    "Nigeria Official Y" was a high-ranking Nigerian government official. From at least in or about 2011 up to and including in or about 2015, Nigeria Official Y was a close associate of Nigeria Official X and a senior official in the Pipelines and Product Marketing Company

A-4

("PPMC"), a wholly-owned subsidiary of NNPC and an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A). Nigeria Official Y was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

19.     Petróleo Brasileiro S.A. ("Petrobras") was a Brazilian state-owned and state-controlled oil company headquartered in Rio de Janeiro, Brazil, that refined, produced, and distributed oil, oil products, gas, biofuels, and energy.  Through voting rights, the Brazilian government directly owned more than 50 percent of Petrobras's common shares, while an additional 10 percent of Petrobras's shares were controlled by the Brazilian Development Bank and Brazil's Sovereign Wealth Fund.  Petrobras was controlled by the Brazilian government and performed government functions.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

20.     "Brazil Official 1" was a Brazilian citizen and an oil trader for Petrobras.  From at least in or about 2010 up to and including in or about 2014, Brazil Official 1 was based in Houston, Texas. Brazil Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

21.     "Brazil Official 2" was a Brazilian citizen and a trading manager for Petrobras. Brazil Official 2 was based in Rio de Janeiro, Brazil, from at least in or about 2010 up to and including in or about 2014.  Brazil Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

22.     "Brazil Official 3" was a Brazilian citizen and a fuel oil trader for Petrobras.  Brazil Official 3 was based in Rio de Janeiro, Brazil, from at least in or about 2010 up to and including

in or about 2014.  Brazil Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

23.    Institut National de Préparation Professionnelle ("INPP") was a government entity in the Democratic Republic of the Congo that provided vocational and professional training to DRC residents.  INPP was supervised by the Ministry of Employment, Labor and Social Welfare. INPP was an "instrumentality" of a foreign government, and its officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

24.    Petróleos de Venezuela S.A. ("PDVSA") was Venezuela's state-owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates were responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government. PDVSA and its wholly-owned subsidiaries, were owned and controlled by, and performed functions of, the Venezuelan government.  PDVSA and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and their officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

<u>**Third Party Agents and Consultants**</u>

25.    "West Africa Intermediary Company" was a Nigerian company used by GLENCORE and its subsidiaries to pay bribes to government officials in Nigeria and other countries in West Africa, in order to obtain oil cargoes and other business advantages for GLENCORE.  West Africa Intermediary Company contracted with GLENCORE from at least in or about 2007 up to and including in or about 2011, and with Glencore Energy UK Ltd. from at

least in or about 2011 up to and including in or about 2014. West Africa Intermediary Company was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria and other countries in West Africa.

26.    "West Africa Agent," a citizen and resident of Nigeria and the United Kingdom, was the owner, operator, and principal employee of West Africa Intermediary Company from at least in or about 2006 up to and including in or about 2014. West Africa Agent was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria and other countries in West Africa.

27.    "Nigeria Intermediary Company" was a Cyprus-incorporated intermediary used by GLENCORE and its subsidiaries to pay bribes to Nigerian government officials in order to obtain oil cargoes from NNPC for GLENCORE. Nigeria Intermediary Company was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—and acted on behalf of GLENCORE and the Glencore UK Subsidiaries in Nigeria.

28.    "Brazil Consultant" was a Brazilian citizen and an intermediary who facilitated bribe payments to Brazilian government officials, including Brazil Official 1, Brazil Official 2, and Brazil Official 3, on behalf of GLENCORE and others. Brazil Consultant was an agent of GLENCORE—as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3—and acted on behalf of GLENCORE and Glencore Brazil in Brazil.

29.    "Venezuela Intermediary Company" was an entity that assisted GLENCORE in obtaining payment priority on payments due from PDVSA, among other business advantages, by making bribe payments to a PDVSA official. From at least in or about 2009 up to at least in or

about 2016, Venezuela Intermediary Company and other related companies had business operations in the United States that assisted Glencore.

## The Bribery Scheme

30.     From at least in or about 2007 up to and including in or about 2018, GLENCORE, through certain of its employees and agents, while acting on behalf of GLENCORE, together with its co-conspirators, knowingly and willfully conspired and agreed with others to corruptly provide more than $100 million in payments and other things of value to various intermediaries with the intent that a significant portion of these payments would be used to pay bribes to and for the benefit of foreign officials to secure an improper advantage and to influence those foreign officials in order to obtain and retain business in Nigeria, Cameroon, Ivory Coast, Equatorial Guinea, Brazil, Venezuela, and the Democratic Republic of the Congo.

## A.  Bribes Paid to Officials in West Africa

### Overview

31.     Beginning at least as early as in or about 2007 and continuing through in or about 2018, GLENCORE, through certain of its employees and agents, including the Glencore UK Subsidiaries, Stimler, Executive 1, Executive 2, Trader Y, Trader Z, and others, caused approximately $79.6 million in payments to be made to West Africa Intermediary Company and Nigeria Intermediary Company with the intent that a significant portion of the payments would be used to pay bribes to and for the benefit of foreign officials in order to secure improper advantages to obtain and retain business with state-owned and state-controlled entities in Nigeria, Cameroon, Ivory Coast, and Equatorial Guinea.

32.     To conceal the bribe payments, GLENCORE and the Glencore UK Subsidiaries, together with their co-conspirators, entered into sham consulting agreements, paid inflated

A-8

invoices, and used West Africa Intermediary Company and Nigeria Intermediary Company to make corrupt payments to numerous foreign officials. GLENCORE, the Glencore UK Subsidiaries, and others agreed to use, and did use, purported "commissions" for oil cargoes, at least in part, to conceal bribe payments to government officials in exchange for obtaining and retaining business on behalf of GLENCORE and its affiliates.

33.     GLENCORE and the Glencore UK Subsidiaries' employees and agents, including Stimler and Executive 2, facilitated and approved bribe payments, and engaged in other acts in furtherance of the bribery scheme, while in the United States.

34.     In addition, GLENCORE made and caused to be made at least approximately $39,900,000 of the payments using correspondent bank accounts held at financial institutions in the Southern District of New York, to West Africa Intermediary Company and Nigeria Intermediary Company with the intent that a significant portion of the payments would be used to pay bribes to and for the benefit of foreign officials.

*Bribe Payments to Nigerian Officials*

35.     From at least in or about 2007 up to and including in or about 2018, GLENCORE and the Glencore UK Subsidiaries entered into multiple agreements to purchase crude oil and refined petroleum products from the NNPC and its subsidiaries. During that period, both GLENCORE and the Glencore UK Subsidiaries engaged West Africa Intermediary Company and Nigeria Intermediary Company to pursue business opportunities and other improper business advantages, while knowing that the intermediaries would make bribe payments to Nigerian government officials to obtain those business opportunities and advantages. In total, GLENCORE and the Glencore UK Subsidiaries—acting on GLENCORE's behalf—paid more than $52 million through intermediaries, intending that those funds be used, at least in part, to pay bribes. Senior

A-9

executives of the Glencore UK Subsidiaries, including Executive 1 and Executive 2, approved most of the illicit bribe payments. As a result of these payments, GLENCORE earned profits of approximately $124 million.

### *West Africa Intermediary Company*

36.     From at least in or about 2007 up to and including in or about 2014, GLENCORE engaged West Africa Intermediary Company as an agent to help identify business opportunities and to act as a conduit for bribe payments to Nigerian government officials in order to obtain and retain business for GLENCORE and the Glencore UK Subsidiaries, and to secure other improper business advantages.

37.     When communicating with West Africa Intermediary Company, employees at the Glencore UK Subsidiaries used coded language to conceal their discussion of bribe payments, referring to bribe payments as "newspapers" or "journals" or "pages." In one instance, on or about November 17, 2008, Trader Y exchanged emails with the West Africa Agent, noting that the Glencore UK Subsidiaries needed to make a $90,000 payment to be used, at least in part, to pay bribes to officials of PPMC, an NNPC subsidiary, in order to falsely undervalue a cargo of fuel oil for the benefit of GLENCORE. Later in the same email thread, on or about November 17, 2008, Trader Y told West Africa Agent that this payment was the "amount they needed to cover ppmc in newspapers reading material." In response, West Africa Agent wrote that "the newspapers will be delivered" by himself personally.

38.     GLENCORE agents, including Stimler and Executive 2, while in the territory of the United States, approved bribe payments to be made through West Africa Intermediary Company. For example, on or about January 18, 2011, while in the territory of the United States, Executive 2 approved a payment of $325,000 to West Africa Intermediary Company, intending

that all or part of those funds would be used to bribe Nigerian officials in connection with the purchase of fuel oil from an NNPC subsidiary.

*Crude Oil Term Contracts*

39.     From at least in or about 2007 up to and including in or about 2014, GLENCORE entered into multiple contracts to purchase crude oil from the NNPC.  GLENCORE designated Glencore UK Ltd., via a services agreement, to administer the contracts.  Employees of both Glencore UK Subsidiaries administered and performed work under the NNPC contracts on behalf of GLENCORE.

40.     In order to obtain these crude oil contracts, the Glencore UK Subsidiaries—acting on GLENCORE's behalf—arranged to pay bribes through West Africa Intermediary Company to NNPC officials.  For example, on or about February 9, 2012, in an email to Stimler, Trader Z, and another Glencore Energy UK Ltd. employee, West Africa Agent used the code word "filings" to refer to bribe payments that were needed to secure a new crude oil contract, writing that it was "very VERY urgent re our filings have to have meeting monday." In response to this email, Trader Z obtained approval from Executive 2 to pay West Africa Agent $1,050,981, knowing that at least part of the payment would be used to bribe Nigerian officials to award a crude oil contract to GLENCORE.  Glencore Energy UK Ltd. made the payment to West Africa Intermediary Company (*i.e.*, West Africa Agent's company) on or about February 13, 2012.

41.     Similarly, on or about March 27, 2014, Executive 1 and Executive 2 approved Trader Y's request for Glencore Energy UK Ltd. to make a $500,000 payment from Glencore Energy UK Ltd. to West Africa Intermediary Company, upon receipt of which West Africa Agent withdrew a portion of the payment and passed it to Nigeria Official Y as a bribe to assist

A-11

GLENCORE and its subsidiaries in winning an annual contract for the purchase of crude oil cargoes.

### *Swap Agreement*

42.     In or about March 2011, employees of the Glencore UK Subsidiaries agreed to pay West Africa Intermediary Company $14 million that was intended, at least in part, to be passed on to NNPC officials to secure an agreement with NNPC subsidiary PPMC for refined crude oil petroleum products (the "Swap Agreement").

43.     Prior to the bribe payment, in or about 2011, Executive 1 met with West Africa Agent and Nigeria Official Y in London to discuss the Swap Agreement, and Executive 1 agreed to make the $14 million payment through West Africa Intermediary Company, knowing that the money would be used, at least in part, to pay bribes to Nigerian officials.

44.     On or about March 1, 2011, the Glencore UK Subsidiaries wired $14 million to West Africa Intermediary Company from Switzerland to Nigeria, through a correspondent bank account held at a financial institution in the Southern District of New York.

45.     On or about March 2, 2011, West Africa Agent withdrew $1,020,000 in cash from a West Africa Intermediary Company bank account and gave the cash in Nigeria to Nigeria Official Y as a bribe payment in connection with the Swap Agreement.  Subsequently, after the Glencore UK Subsidiaries opted not to pursue the Swap Agreement, West Africa Agent returned approximately $8 million of the $14 million to the Glencore UK Subsidiaries.

### *Nigeria Intermediary Company*

46.     From at least in or about 2007 up to and including in or about 2018, the Glencore UK Subsidiaries entered into multiple agreements with Nigeria Intermediary Company.  Under the terms of the agreements, Nigeria Intermediary Company received a fee for: (a) acting as an

intermediary for the Glencore UK Subsidiaries in obtaining refined petroleum products from NNPC; and (b) acting as a front for the Glencore UK Subsidiaries by purchasing crude oil cargoes from NNPC and immediately re-selling them to the Glencore UK Subsidiaries. The Glencore UK Subsidiaries employees knew that Nigeria Intermediary Company would use the fees it obtained through these agreements, at least in part, to pay bribes to, or for the benefit of, Nigerian government officials in exchange for the improper business advantages GLENCORE and the Glencore UK Subsidiaries obtained.

47.    For example, on or about September 25, 2014, an employee of Nigeria Intermediary Company ("NIC Employee 1") sent an email to Stimler stating that Nigeria Official X had asked that all companies or "customers" of NNPC give an "advance" of $300,000 to the re-election campaign of a senior Nigerian official in exchange for receiving crude oil cargoes.

48.    On or about October 3, 2014, in response to information communicated by another employee of Nigeria Intermediary Company ("NIC Employee 2," together with NIC Employee 1, the "NIC Employees"), Stimler caused Glencore Energy UK Ltd. to send a wire transfer of approximately $300,000 from Glencore Energy UK Ltd.'s bank account in Switzerland, through a correspondent bank account held at a financial institution in the Southern District of New York, to a Nigeria Intermediary Company bank account in Cyprus.

49.    On or about October 5, 2014, Stimler emailed the NIC Employees that Glencore Energy UK Ltd.'s management had approved the $300,000 payment and that Nigeria Intermediary Company should make sure that "NNPC perform[s]," *i.e.*, provides the expected crude oil cargoes to the Glencore UK Subsidiaries in exchange for the bribe payment.

50.    On or about April 20, 2015, while in the United States, Stimler received an email from NIC Employee 1 in which Nigeria Intermediary Company offered to make a payment for the

A-13

benefit of a Nigerian official of approximately $50,000 per oil cargo for four cargoes of NNPC oil

to be delivered to Glencore Energy UK Ltd. in May and June 2015.  On or about April 20, 2015,

while in the United States, Stimler replied to Nigeria Intermediary Company's email, expressing

interest on behalf of GLENCORE in receiving one of the June 2015 NNPC oil cargoes. On or

about May 5, 2015, Stimler received an invoice from Nigeria Intermediary Company for $50,000

as an "Advance Payment" against the June 2015 cargo.

        51.    Subsequently, on or about May 5, 2015, Glencore Energy UK Ltd. sent a wire

transfer of $50,000 to Nigeria Intermediary Company from a bank account in Switzerland, through

a correspondent bank account held at a financial institution in the Southern District of New York,

to Nigeria Intermediary Company's bank account in Cyprus.  As per the April email exchange

between Stimler and NIC Employee 1, the funds were intended to be paid, at least in part, to

Nigerian government officials in exchange for the June 2015 oil cargo from NNPC.

        52.    As a result of GLENCORE and the Glencore UK Subsidiaries' dozens of

agreements to make corrupt payments to Nigerian officials through West Africa Intermediary

Company and Nigeria Intermediary Company, on behalf of and for the benefit of GLENCORE,

GLENCORE earned profits of approximately $124 million.

                          *Cameroon, Ivory Coast, and Equatorial Guinea*

        53.    From at least in or about 2006 up to and including in or about 2014, GLENCORE

and its subsidiaries and affiliates made, and caused to be made, approximately $27 million in

payments to West Africa Intermediary Company knowing that the funds would be used, at least in

part, to make corrupt payments to foreign officials in Cameroon, Ivory Coast, and Equatorial

Guinea.  GLENCORE used West Africa Intermediary Company to make corrupt payments to

government officials of those countries in order to secure an improper advantage for GLENCORE

A-14

in obtaining and retaining business, including, for example, to receive crude oil cargoes from state-owned and state-controlled oil companies. As a result of these payments, GLENCORE obtained more than $92 million in profits.

54. From at least in or about 2006 up to and including in or about 2014, GLENCORE made more than $21 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Cameroon in connection with transactions associated with state-owned and state-controlled entities. As a result of these payments, GLENCORE made a profit of more than $67 million.

55. From at least in or about 2007 up to and including in or about 2010, GLENCORE made over $4 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Ivory Coast in connection with transactions associated with state-owned and state-controlled entities. As a result of these payments, GLENCORE made a profit of more than $30 million.

56. From at least in or about 2007 up to and including in or about 2010, GLENCORE made over $1.5 million in payments to West Africa Intermediary Company which were intended, at least in part, to be paid as bribes to government officials in Equatorial Guinea in connection with transactions associated with state-owned and state-controlled entities. As a result of these payments, GLENCORE made a profit of more than $3 million.

57. Some of these corrupt payments were paid in cash that was dispensed from GLENCORE's offices in Baar, Switzerland, or from the Glencore UK Subsidiaries' offices in London, United Kingdom. GLENCORE maintained a "cash desk" in London until in or about 2011, and maintained a "cash desk" in Baar until in or about 2016.

**B. Bribes Paid to Officials in Brazil**

58.    In or about July 2011, GLENCORE, through certain of its employees and agents, including Employee X, Employee Y, Brazil Consultant, and others, caused approximately $147,202 to be used, at least in part, as corrupt payments to be made to, and for the benefit of, Brazilian officials, in order to secure improper business advantages.  Specifically, Employee X negotiated with Brazil Consultant to pay approximately $147,202 to Brazil Consultant, knowing that a portion of the funds would be paid in bribes to Petrobras officials in exchange for Glencore Ltd. having the opportunity to buy an oil cargo from Petrobras.  Specifically, on or about April 30, 2011, Employee X emailed Brazil Consultant in connection with purchasing the oil cargo at a price that included a built-in "delta," which represented the bribe amount.

59.    To conceal discussions of the bribery scheme, Employee X used a personal email address to communicate with Brazil Consultant and arranged with Brazil Consultant to disguise the "delta" or bribe payment as an inflated service fee of $0.50 per barrel of the purchased cargo. On or about July 13, 2011, Employee Y executed a sham services agreement between Glencore Mexico and Brazil Consultant to disguise the "delta" as a $0.50 per barrel commission payment to Brazil Consultant.

60.    Subsequently, on or about July 20, 2011, Glencore Energy UK Ltd.—one of the Glencore UK Subsidiaries—wired approximately $147,202 from an account in Switzerland to an account held by Brazil Consultant at a bank in Houston, Texas, which represented Brazil Consultant's previously agreed upon "delta" of $0.50 per barrel.  From this payment, Brazil Consultant subsequently paid bribes in the following approximate amounts: (a) $40,000 to Brazil Official 1; (b) $31,000 to Brazil Official 2; and (c) $40,000 to Brazil Official 3.

A-16

## C. Bribes Paid to an Official in Venezuela

61.     Beginning in or around 2011 and continuing through approximately 2014, GLENCORE, through certain of its employees and agents, including Venezuela Intermediary Company and others, caused corrupt payments to be made to, and for the benefit of, a Venezuelan official, in order to secure improper business advantages.

62.     As part of its business dealings in Venezuela, GLENCORE and its subsidiaries sold oil product to, and purchased them from, PDVSA. If PDVSA did not pay GLENCORE's invoices on time, PDVSA incurred interest that was owed to GLENCORE because of late payments. Additionally, if PDVSA did not load or discharge a GLENCORE vessel within an agreed upon time frame, PDVSA incurred demurrage (*i.e.*, a charge payable to GLENCORE for the delay).

63.     By in or about 2011, PDVSA owed millions of dollars to GLENCORE and its subsidiaries related to late payments for accrued interest and demurrage. Due to difficulties in obtaining payment from PDVSA, GLENCORE used intermediaries, including Venezuela Intermediary Company, to assist in obtaining payment priority from PDVSA over other similarly situated companies. GLENCORE paid the intermediaries a percentage fee based on the total amount of money obtained from PDVSA.

64.     For example, on or about December 11, 2012, Glencore Energy UK Ltd. paid Venezuela Intermediary Company's invoice in the amount of $18,605.19 as a fee for recovering a late interest payment from PDVSA.

65.     In total, from at least in or about 2012 up to and including in or about 2014, GLENCORE paid at least approximately $1,286,057 to Venezuela Intermediary Company, with the intent that a portion of the payments be used as bribes to, and for the benefit of, a PDVSA official, in order to obtain payment priority from PDVSA. GLENCORE and its subsidiaries

obtained a total of approximately $11,981,164 in payments from PDVSA through Venezuela Intermediary Company.

**D. Bribes Paid to Officials in the Democratic Republic of the Congo**

*Overview*

66.     From at least in or about 2010 up to and including in or about 2013, GLENCORE, through certain of its employees and agents, including Executive 3, Employee Z, Glencore Mining Company 1, Glencore Mining Company 2, and others, knowingly and willfully conspired and agreed to corruptly offer and pay more than approximately $27,500,000 to third parties with the intent that a portion of the payments be used as bribes to, and for the benefit of, DRC officials, in order to secure improper business advantages by reducing liabilities related to government audits and litigation costs. GLENCORE and its affiliated companies obtained at least $43 million in benefits related to their mining operations from the corrupt resolutions with the DRC government and its agencies.

*DRC Bribe Payments Related to Government Audits*

67.     As part of their official duties, DRC government officials and agencies conducted audits of mining operations within the country. These audits included, for example, investigations related to taxes and mandatory employer contributions for companies located in the DRC. These audits frequently resulted in significant fines and costs to GLENCORE and its subsidiaries.

68.     From at least in or about 2010 up to and including in or about 2013, Glencore Mining Company 1 and Glencore Mining Company 2, through Employee Z and others, used an agent in the DRC ("DRC Agent") to pay a tax consultant ("DRC Agent's Tax Consultant"), knowing that the payments would be used, at least in part, to bribe DRC officials. In furtherance of the scheme, DRC Agent's Tax Consultant created fraudulent invoices that billed Glencore

A-18

Mining Company 2 for purported professional services, disguising that such payments were in fact intended to be bribes to benefit DRC officials. In total, Glencore Mining Company 2 and affiliated companies paid DRC Agent's Tax Consultant and his company approximately $27,084,851 with the intent that a portion of the payments be used to bribe DRC officials for advantages related to various government audits.

69. For example, on or about May 16, 2012, Glencore Mining Company 2 received notice that the INPP, a DRC government agency, would be auditing Glencore Mining Company 2's mandatory employer financial contributions with projected fines to cost Glencore Mining Company 2 approximately $700,000. To reduce Glencore Mining Company 2's potential fine, Employee Z and DRC Agent engaged in a chat message exchange about bribing local officials by creating an invoice that would cover "250 official" for the INPP and "450 grat" for the "gratuity" or bribe for the DRC official.

70. DRC Agent's Tax Consultant subsequently emailed Employee Z and others an invoice for the INPP matter, billing Glencore Mining Company 2 in the amount of $454,000. This amount reflected the "grat," or gratuity, referenced in the chat messages between Employee Z and DRC Agent. After paying the $454,000 invoice, Glencore Mining Company 2's remaining official liability for the audit was reduced from the projected amount of $700,000 to approximately $180,000.

### *DRC Bribe Payments Relating to a Litigation Dispute*

71. In or about January 2010, a medical services company sued Glencore Mining Company 2 for breach of contract in the amount of more than $16 million. GLENCORE employees, overseeing Glencore Mining Company 2's operations, approved a $500,000 invoice that was used as a bribe payment to have the lawsuit dismissed.

72.     Specifically, on or about November 3, 2010, emails between DRC Agent and Executive 3 stated, in substance and in part, that DRC Agent talked with a DRC official who was meeting with DRC Agent and a judge presiding over the contract dispute and that, "[w]ithout [the DRC official's] help we will be screwed big time, I believe.  We need political pressure."  DRC Agent suggested that GLENCORE could ensure that Glencore Mining Company 2 would prevail in the contract dispute if DRC Agent had a "reasonable amount of ammunition to make it happen," and further indicated that the attorney for the third-party plaintiff "is ready to play along for the good cause."

73.     On or about November 4, 2010, DRC Agent emailed an employee for GLENCORE and copied Employee Z, asking whether to prepare an invoice for $500,000 in the name of an accountant or lawyer.  The next day, DRC Agent forwarded Employee Z and others a fake invoice in the amount of $500,000, purportedly from DRC Agent's attorney for work relating to the contract dispute.  On or about November 9, 2010, Glencore Mining Company 2 paid a $500,000 invoice via wire transfer through a correspondent bank account held at a financial institution located in the Southern District of New York.

74.     On or about November 17, 2010, DRC Agent emailed Employee Z and Executive 3, explaining that DRC Agent had attended a "personal meeting" with the judge for the contract dispute, stating the meeting was "in front of [a public official]" and that "[e]verything is under control . . . [I]ts [sic] thanks to [the public official] that [Glencore Mining Company 2] will win that case . . . ."

75.     In or about January 2011, the contract dispute was decided in Glencore Mining Company 2's favor.  Accordingly, GLENCORE avoided paying approximately $16,084,000 to settle the claim.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, GLENCORE INTERNATIONAL A.G. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery Section ("MLARS") and the United States Attorney's Office for the Southern District of New York (the "USAO-SDNY") (collectively, the "Offices") regarding issues arising in relation to the Offices' investigation of violations of Title 18, United States Code, Section 371, Conspiracy, and Title 15, United States Code, Section 78dd-3, the Foreign Corrupt Practices Act by certain of the Company's employees and agents;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into the Plea Agreement with the Offices (the "Agreement");

WHEREAS, the Company's Group General Counsel Shaun Teichner together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.    The Company (a) acknowledges the filing of the one-count Information charging the Company with a felony violation of Conspiracy to Violate the Foreign Corrupt Practices Act in violation of Title 18, United States Code, Section 371, and Title 15, United States Code, Section 78dd-3; (b) waives indictment on such charge and enters into the Agreement with the Offices; (c) agrees to pay a Total Criminal Monetary Amount of $700,706,965 under the Agreement with respect to the conduct described in the Information;

B-1

;and (d) admits the Court's jurisdiction over the Company and the subject matter of such action and consents to the judgment therein;

2.    The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement and Information or relating to conduct known to the Offices prior to the date on which the Agreement is signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.    The Group General Counsel of the Company, Shaun Teichner is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors with such changes as the Group General Counsel of the Company, Shaun Teichner, may approve;

4.    The Group General Counsel of the Company, Shaun Teichner, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Group General Counsel of the Company, Shaun Teichner, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.


Date:   May 24, 2022            By:   _____

                                      John Burton
                                      Corporate Secretary
                                      GLENCORE INTERNATIONAL A.G.

B-3

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, GLENCORE INTERNATIONAL A.G. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.     The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws. its compliance policies, and its Code of Conduct.

C-1

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which shall be memorialized in a written compliance policy or policies.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company. These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company. Such policies and procedures shall address:

a.      gifts;

b.      hospitality, entertainment, and expenses;

c.      customer travel;

d.      political contributions;

e.      charitable donations and sponsorships;

C-2

      f.       facilitation payments; and

      g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

      a.      transactions are executed in accordance with management's general or specific authorization;

      b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

      c.      access to assets is permitted only in accordance with management's general or specific authorization; and

      d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses

C-3

and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.    The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance policies and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of Glencore Plc's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.    The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-corruption compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

C-4

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

       9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

      10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's Code of Conduct or anti-corruption compliance policies and procedures.

      11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance policies and procedures.

*Enforcement and Discipline*

      12.     The Company will implement mechanisms designed to effectively enforce its Code of Conduct and anti-corruption compliance policies and procedures, including appropriately incentivizing compliance and disciplining violations.

13.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.    The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.    informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's Code of Conduct and anti-corruption compliance policies and procedures; and

c.    seeking a reciprocal commitment from agents and business partners.

15.    Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance policies and procedures regarding anti-corruption laws; and

b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

C-7

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its Code of Conduct and anti-corruption compliance policies and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of GLENCORE INTERNATIONAL A.G. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") (Collectively "the Offices") are as described below:

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the provision for extension or early termination described in Paragraph 1 of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

D-1

*Company's Obligations*

3.     The Company shall cooperate fully with the Monitor, and the Monitor shall have

the authority to take such reasonable steps as, in his or her view, may be necessary to be fully

informed about the Company's compliance program in accordance with the principles set forth

herein and subject to applicable law, including applicable data protection and labor laws and

regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's

documents and resources; not limit such access, except as provided in Paragraphs 5-6; and

provide guidance on applicable local law (such as relevant data protection and labor laws).  The

Company shall provide the Monitor with access to all information, documents, records, facilities,

and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate

of the Monitor under the Agreement.  The Company shall use its best efforts to provide the

Monitor with access to the Company's former employees and its third-party vendors, agents, and

consultants.

4.     Any disclosure by the Company to the Monitor concerning corrupt payments,

false books and records, and internal accounting control failures shall not relieve the Company of

any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to

the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the

Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor

access to information, documents, records, facilities, or current or former employees of the

Company that may be subject to a claim of attorney-client privilege or to the attorney work-

product doctrine, or where the Company reasonably believes production would otherwise be

D-2

inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices. Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d)

the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the first report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar

days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe

comprehensively the Company's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to:

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

After consultation with the Company, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Offices.

13.     Within one hundred fifty (150) calendar days after receiving the Monitor's first report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Company need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.     A follow-up ("second") review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Company, the Monitor and the Offices). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review. After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Offices concerning any recommendations that the Company

considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.     The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18. Following the third review, the Monitor shall certify whether the Company's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented

to prevent and detect violations of the anti-corruption laws. The final review and report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.    (a)    Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- the Company may have maintained false books, records or accounts; or

the Company may have failed to implement a system of internal accounting controls that is sufficient to accurately record the Company's transactions (collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Glencore Group General Counsel, the Glencore Group Head of Compliance, and/or the Ethics, Compliance and Culture Committee of Glencore Plc for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when it requests the information.

(b)    In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or

D-9

the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the Glencore Group General Counsel, the Glencore Group Head of Compliance, and/or the Ethics, Compliance and Culture Committee of Glencore Plc should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting among the Offices, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determines in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and

the obligations of GLENCORE UK Ltd (the "Company"), on behalf of itself and its subsidiaries

and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal

Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery

Section ("MLARS"), and the United States Attorney's Office for the Southern District of New

York ("USAO-SDNY") (Collectively "the Offices") are as described below:

1.      The Company will retain the Monitor for a period of three years (the "Term of the

Monitorship"), unless the provision for extension or early termination described in Paragraph 1

of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's

compliance with the terms of the Agreement, including the Corporate Compliance Program in

Attachment C, to specifically address and reduce the risk of any recurrence of the Company's

misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set

forth below, the effectiveness of the internal accounting controls, record-keeping, and financial

reporting policies and procedures of the Company as they relate to the Company's current and

ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the

"anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to

fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the

Board of Directors' and senior management's commitment to, and effective implementation of,

the corporate compliance program described in Attachment C of the Agreement.

E-1

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be

inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.    If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices.  Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.    In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.    The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d)

the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below. With respect to the first report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar

days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe

E-5

comprehensively the Company's history or compliance policies, procedures and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005

After consultation with the Company, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Offices.

13.    Within one hundred fifty (150) calendar days after receiving the Monitor's first report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Company need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.     A follow-up ("second") review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Company, the Monitor and the Offices). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the first review. After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Offices concerning any recommendations that the Company

considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices.  The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.    The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18. Following the third review, the Monitor shall certify whether the Company's compliance program, including its policies, procedures, and internal controls, is reasonably designed and implemented

to prevent and detect violations of the anti-corruption laws.  The final review and report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.    (a)    Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- the Company may have maintained false books, records or accounts; or the Company may have failed to implement a system of internal accounting controls that is sufficient to accurately record the Company's transactions (collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Glencore Group General Counsel, the Glencore Group Head of Compliance, and/or the Ethics, Compliance and Culture Committee of Glencore Plc for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when it requests the information.

(b)    In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or

E-9

the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the Glencore Group General Counsel, the Glencore Group Head of Compliance, and/or the Ethics, Compliance and Culture Committee of Glencore Plc should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting among the Offices, the Monitor, and the Company.

E-10

22.    At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determines in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT F**

**COMPLIANCE REPORTING REQUIREMENTS**

GLENCORE INTERNATIONAL A.G. (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money Laundering and Asset Recovery Section ("MLARS"), and the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") (collectively, "the Offices") periodically.

During the Term, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures described in Attachment C. The Company shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare at least two follow-up reviews and reports, as described below. Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review. The Company shall also, at no less than three-month intervals during the Term, meet with the Offices regarding remediation, implementation and testing of its compliance program and internal controls, policies, and procedures described in Attachment C.

In conducting the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with the FCPA and other applicable anti-corruption laws; (b) inspection and testing of the Company's systems procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and, comprehensive testing of the Company's compliance program.

*Written Work Plans, Reviews and Reports*

1.      The Company shall conduct a first review and prepare a first report, followed by at least two follow-up reviews and reports.

2.      Within sixty (60) calendar days of the date this Agreement is executed, the Company shall, after consultation with the Offices, prepare and submit a written work plan to address the Company's first review.  The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

3.      With respect to each follow-up review and report, after consultation with the Offices, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.   The work plans shall also take into account the work of the Monitor with respect to Glencore UK Ltd, described in Attachment E of this Agreement.

5.      Any disputes between the Company and the Offices with respect to any written work plan shall be decided by the Offices in their sole discretion.

7.      No later than one year from the date this Agreement is executed, the Company shall submit to the Offices a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is

effective in deterring and detecting violations of the FCPA and other applicable anti-corruption laws. The report shall be transmitted to:

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> United States Department of Justice
> 1400 New York Avenue N.W.
> Washington, D.C. 20005

The Company may extend the time period for issuance of the first report with prior written approval of the Offices.

### *Follow-up Reviews and Reports*

8.      The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Offices on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the FCPA and other applicable anti-corruption laws.

9.      The first follow-up ("second") review and report shall be completed by no later than one year after the first report is submitted to the Offices.

10.     The second follow-up ("third") report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term.

11.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Offices.

### *Meetings During the Term*

12.     The Company shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report.

F-3

13.     At least quarterly, and more frequently if the Offices deem it appropriate in their sole discretion, representatives from the Company and the Offices will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices.

### *Confidentiality of Submissions*

14.     Submissions by the Company, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT G**

**CERTIFICATION**

To:     United States Department of Justice
Criminal Division, Fraud Section
Attention: Chief of the Fraud Section

United States Department of Justice
Criminal Division, Money Laundering and Asset
Recovery Section ("MLARS")
Attention: Chief of the MLARS Section

United States Department of Justice
United States Attorney's Office
Southern District of New York ("SDNY")
Attention: United States Attorney for SDNY

Re:     Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 13 of the Plea Agreement ("the

Agreement") filed on May 24, 2022 in the United States District Court for the Southern District of

New York, by and between the United States of America and GLENCORE INTERNATIONAL

A.G. (the "Company"), that undersigned are aware of the Company's disclosure obligations under

Paragraph 13 of the Agreement, and that the Company has disclosed to the United States

Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the Money

Laundering and Asset Recovery Section ("MLARS") and the United States Attorney's Office for

the Southern District of New York (the "USAO-SDNY") (collectively, the "Offices") any and all

evidence or allegations of conduct required pursuant to Paragraph 13 of the Agreement, which

includes evidence or allegations of any violation of the anti-bribery provisions of the Foreign

Corrupt Practices Act committed by the Company's employees and agents ("Disclosable

Information"). This obligation to disclose information extends to any and all Disclosable

Information that has been identified through the Company's compliance and controls program,

whistleblower channel, internal audit reports, due diligence procedures, investigation process, or

G-1

other processes.  The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 13 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Offices' determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Glencore Group, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of New York. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of New York.

Date:_____     Name (Printed): _____

                                   Name (Signed): _____
                                   Chief Executive Officer
                                   GLENCORE GROUP


Date:_____     Name (Printed): _____

                                   Name (Signed): _____
                                   Chief Financial Officer
                                   GLENCORE GROUP

**ATTACHMENT H**

**CERTIFICATION**

To:    United States Department of Justice
Criminal Division, Fraud Section
Attention: Chief of the Fraud Section

United States Department of Justice
Criminal Division, Money Laundering and Asset
Recovery Section ("MLARS")
Attention: Chief of the MLARS Section

United States Department of Justice
United States Attorney's Office
Southern District of New York ("SDNY")
Attention: United States Attorney for SDNY

Re:    Plea Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 9 of the Plea Agreement (the

"Agreement") filed on May 24, 2022, in the United States District Court for the Southern

District of New York, by and between the United States of America and GLENCORE

INTERNATIONAL A.G. (the "Company"), that the undersigned are aware of the Company's

compliance obligations under Paragraphs 9 and 10 and attachment C of the Agreement, and

that, based on the undersigned's review and understanding of the Company's anti-corruption

compliance program, the Company has implemented an anti-corruption compliance program

that meets the requirements set forth in Attachment C to the Agreement. The undersigned

certifies that such compliance program is reasonably designed to detect and prevent violations

of the Foreign Corrupt Practices Act and other applicable anti-corruption laws throughout the

Company's operations. [*If applicable:* The undersigned further certifies that based on a review

of the Company's reports submitted to the Department of Justice, Criminal Division, Fraud

Section and Money Laundering and Asset Recovery Section and the U.S. Attorney's Office for

the Southern District of New York pursuant to Paragraph 30 of the Agreement, the reports were true, accurate, and complete as of the date they were submitted.]

The undersigned hereby certify that they are respectively the Chief Executive Officer ("CEO") and the Head of Compliance of the Glencore Group and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of New York. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of New York.

Date:_____     Name (Printed): _____

                                 Name (Signed): _____
                                 Chief Executive Officer
                                 GLENCORE GROUP

Date:_____     Name (Printed): _____

                                 Name (Signed): _____
                                 Chief Compliance Officer
                                 GLENCORE GROUP

**ATTACHMENT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :

UNITED STATES OF AMERICA              :     CONSENT PRELIMINARY ORDER

                                    OF FORFEITURE/
          - v. -                :     MONEY JUDGMENT

GLENCORE INTERNATIONAL A.G.,     :

                                 :     22 Cr. ___ ( )
           Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WHEREAS, on or about May 24, 2022, GLENCORE INTERNATIONAL A.G. (the "Defendant"), was charged in a one-count information, 22 Cr. ___ ( ) (the "Information"), with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), in violation of Title 18, United States Code, Section 371 (Count One);

WHEREAS, the Information included a forfeiture allegation as to Count One of the Information, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense charged in Count One of the Information, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of the offense charged in Count One of the Information;

WHEREAS, on or about May 24, 2022, the Defendant pled guilty to Count One of the Information, pursuant to a plea agreement with the Government, wherein the Defendant admitted the forfeiture allegation with respect to Count One of the Information and agreed to forfeit to the United States a sum of money equal to $181,457,195 in United States currency, representing proceeds traceable to the commission of the offense charged in Count One of the Information;

WHEREAS, the Defendant consents to the entry of a money judgment in the amount of $181,457,195 in United States currency, representing the proceeds traceable to the commission of the offense charged in Count One of the Information that the Defendant personally obtained; and

WHEREAS, the Defendant admits that, as a result of acts and/or omissions of the Defendant, the proceeds traceable to the offense charged in Count One of the Information that the Defendant personally obtained cannot be located upon the exercise of due diligence.

IT IS HEREBY STIPULATED AND AGREED, by and between the United States Department of Justice, Criminal Division, Fraud Section and Money Laundering and Asset Recovery Section and the United States Attorney's Office for the Southern District of New York (collectively, the "Government") and the Defendant GLENCORE INTERNATIONAL A.G. and its counsel, Howard M. Shapiro, Esq., that:

1.      As a result of the offense charged in Count One of the Information, to which the Defendant pled guilty, a money judgment in the amount of $181,457,195 in United States currency (the "Money Judgment"), representing the amount of proceeds traceable to the offense charged in Count One of the Information that the Defendant personally obtained, shall be entered against the Defendant.

2.      The Defendant shall make a payment in the amount of $181,457,195 in United States currency (the "Payment") by wire transfer pursuant to instructions provided by the United States no later than ten business days after entry of this Consent Preliminary Order of Forfeiture/Money Judgment. Upon receipt of the Payment by the Government, the Money Judgment shall be fully satisfied.

3.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Consent Preliminary Order of Forfeiture/Money Judgment is final as to the Defendant, GLENCORE INTERNATIONAL A.G., and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

4.      The United States Marshals Service is authorized to deposit the payments on the Money Judgment in the Assets Forfeiture Fund, and the United States shall have clear title to such forfeited property.

5.      Pursuant to Title 21, United States Code, Section 853(p), the United States is authorized to seek forfeiture of substitute assets of the Defendant up to the uncollected amount of the Money Judgment.

6.      Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the Government is authorized to conduct any discovery needed to identify, locate or dispose of forfeitable property, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas.

7.      The Court shall retain jurisdiction to enforce this Consent Preliminary Order of Forfeiture/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

8.      The signature page of this Consent Preliminary Order of Forfeiture/Money

Judgment may be executed in one or more counterparts, each of which will be deemed an original

but all of which together will constitute one and the same instrument.

AGREED AND CONSENTED TO:

**FOR THE GOVERNMENT:**

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

Date:   5/24/22          By:   _____
                                Leila Babaeva, Trial Attorney
                                James Mandolfo, Trial Attorney


DEBORAH CONNOR
Chief, Money Laundering and Asset
   Recovery Section
Criminal Division
United States Department of Justice

Date:  5/24/22          By:   _____
                                Michael Khoo, Trial Attorney


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

Date:  5/24/22          By:   _____
                                Michael C. McGinnis
                                Juliana N. Murray
                                Assistant United States Attorneys

GLENCORE INTERNATIONAL A.G.

By: _____          5/24/22
     Shaun Teichner, General Counsel,          DATE
     on behalf of GLENCORE INTERNATIONAL A.G.

By: _____          5/24/22
     Howard M. Shapiro, Esq.                   DATE
     Attorney for Defendant


SO ORDERED:


_____          _____
HONORABLE LORNA G. SCHOFIELD               DATE
UNITED STATES DISTRICT JUDGE