UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                                      :
UNITED STATES OF AMERICA                              :
                                                      :   22 Cr. 297 (LGS)
        v.                                            :
                                                      :
GLENCORE INTERNATIONAL A.G.,                          :
                                                      :
                        Defendant.                    :
                                                      :
------------------------------------------------------x

## DECLARATION OF DR. IAN HAGEN

Pursuant to 28 U.S.C. § 1746, I declare, to the best of my knowledge and following due inquiry, as follows:

1. My wife, Laurethé Hagen, and I together are the 90% owners of Crusader Health RDC SARL ("Crusader DRC"). I submit this Declaration in support of the victim impact statement and request for restitution on behalf of Crusader DRC, which has assigned its restitution claim to us, and on behalf of my wife and myself as 90% shareholders of Crusader DRC, in connection with Glencore International A.G.'s ("Glencore") criminal sentencing.

2. Crusader DRC suffered significant losses because of Glencore's criminal conduct in the Democratic Republic of Congo (the "DRC"). Glencore conspired to violate the FCPA by paying bribes to obtain business in multiple countries over several years. As part of that conspiracy, Glencore paid a bribe to have Crusader DRC's $16 million lawsuit against a Glencore subsidiary dismissed in 2011, while at the same time high level employees of the subsidiary threatened to permanently destroy Crusader's DRC business. Because Glencore paid the bribe, Crusader DRC was unable to recover any of the money the Glencore subsidiary owed Crusader DRC, which destroyed our otherwise successful business.

3.      We have patiently waited for over a decade for justice to be served and to be made whole.  I welcome this opportunity to tell the Court our story.  My wife and I currently reside abroad, but we are willing and able to testify in person as part of Glencore's sentencing, if the Court requires it.

**I.   Background**

4.      Laurethé and I founded Crusader DRC in 2007 when we expanded our business to the DRC.  Prior to expanding to the DRC, we had been providing medical services to underserved mining communities in Africa for a decade through our company Medical Services International ("MSI") and local medical services companies in various African countries all bearing the name Crusader Health.

5.      I am a trained medical doctor with a Bachelor of Medicine and Bachelor of Surgery from the University of Pretoria in South Africa.  I have experience in emergency medicine, including underground rescues, general medicine, surgery of all natures (including orthopedic surgery, microsurgery and hand surgery), infectious diseases and tropical medicine.  I also have postgraduate qualifications in Health Services Management, Tropical Medicine and Hygiene, and Community Health.  I also have six business-related qualifications (diplomas, graduate diplomas and advanced diplomas) in Business, Business Administration, Strategic Leadership, Programme Management, Project Management and Portfolio Management.

6.      Laurethé earned her undergraduate degree from the University of Pretoria.  She studied physical education and pursued an honors degree in biokinetics with a focus on cardiac rehabilitation, orthopedic rehabilitation, sport medicine and wellness.  She completed her master's thesis on the effect of HIV/AIDS on the physical work capability of underground mine workers. She also has the same business qualifications mentioned above.

7. I was introduced to the mining industry in my first medical position at Gold Fields West Hospital in 1988. In 1993, I became the Chief Medical Officer of Gold Fields Ghana. After completing her master's degree, Laurethé joined me in Ghana and worked as a teacher for Gold Fields. We have been working in the mining industry ever since.

8. My wife and I established MSI in 1997. MSI partnered with local medical services companies that my wife and I created under the name Crusader Health.

9. We operated the Crusader Health companies under the motto "*Deo Gloria*: To God be the Glory" and included this in our logo as a reminder of our mission.



10. As steadfast Christians, we felt called to use our businesses to serve others. At the time, healthcare options in mining communities throughout Africa were subpar. This resulted in high death rates and significant disease outbreaks in mining communities where mine workers and their families lived.

11. Our goal was to provide quality health care to these communities. MSI and Crusader Health companies provided full scope health care services, including feasibility studies; medical systems planning; hospital or clinic design and construction; ownership and/or management of hospitals, larger mining clinics, or smaller container-based clinics; health insurance; medical consultancy; travel insurance; expatriate medical services; pharmaceutical manufacturing; sanitation and pathogen-transmitting insect control; medical evacuations and occupational health services.

12. Our business was very successful. We were able to grow quickly because of our business model. In each new country, MSI and its local Crusader Health partner would contract

3

with a large international mining company to comprehensively manage the medical services for the mining company's employees and their dependents in exchange for the mining company paying Crusader Health's overhead expenses.  As part of its contractual obligations, MSI and Crusader Health would often agree to build new medical facilities to service patients, which Crusader Health would then own.  MSI provided the capital for the building projects through loans to the local companies that would be paid back over time.  The mining companies provided some infrastructure and equipment and paid a per-capita rate for the care of the mine's workers and their dependents.  After MSI and Crusader Health established one successful contract, we quickly acquired others based on word of mouth about our services.  For example, in Ghana, MSI and Crusader Health began with one contract at a major mine and over the course of several years expanded to service virtually all the mines in Ghana.

13.  This model also allowed the Crusader Health entities to charge very affordable prices to walk-in patients who lived in the mining communities but who were not associated with the mining companies.  This was an important part of our mission.

14.  Crusader Health companies paid employees above-standard wages, partnered with public health providers to elevate the level of training and care, and took great pride in the quality of medical care we provided to traditionally underserved communities.

15.  Throughout its history, MSI and Crusader Health companies operated in approximately eleven countries across Africa, including South Africa, Mali, Zambia, Sierra Leone, Ghana, Burkina Faso, Guinea, Tanzania, Kenya, Ivory Coast and the DRC.

## II.  Crusader Health in the DRC

16.  In 2006, MSI explored expanding to the DRC.

17. My wife and I established Crusader DRC in March 2007 to provide the local medical services in the DRC while MSI remained responsible for international services like insurance, medivacs, management of expatriate staff, equipment expenses and capital contributions.

18. Laurethé and I each own 45% of Crusader DRC, for a total of 90%, and Dr. Peniel Kasongo, a doctor residing in the DRC and our local medical partner, owns the remaining 10% of Crusader DRC. Attached as **Exhibit 1** is Crusader DRC's original registration certificate.

19. In August 2007, MSI and Crusader DRC executed a contract with DRC Copper and Cobalt Project SARL ("DCP"). Attached as **Exhibit 2** is a copy of the 2007 contract with DCP.

20. As described in the contract, MSI and Crusader DRC agreed to provide medical care to the DCP mining communities and Crusader DRC agreed to build three medical facilities in the villages of Luilu, Musonoi and Kapata near the city of Kolwezi in the Katanga Province. Crusader DRC also agreed to provide medical services at the hospital owned by the United Methodist Church in Kolwezi (the "Methodist Hospital") and certain clinics the mines had already built.

21. In connection with the contract with DCP, Crusader DRC signed a five-year contract to use the nearby Methodist Hospital while Crusader DRC constructed the new medical facilities pursuant to the contract with DCP. Attached as **Exhibit 3** is the agreement between Crusader DRC and the Methodist Hospital.

22. In 2008, MSI and Crusader DRC renewed their contract with DCP and executed new contracts with a second mining company that also operated in the Katanga Province, Kamoto Operating Limited ("KOL"). Like the original contract with DCP, MSI and Crusader DRC agreed to provide medical care to the KOL mining communities and to build the three medical facilities.

Attached as **Exhibits 4** and **5** are Crusader DRC's 2008 contracts with KOL and DCP, respectively.

23.     Due to the success of our relationship with KOL and DCP, MSI and Crusader DRC expanded to provide medical services to several other mining operations in the region. In 2008, Crusader DRC was providing medical services for more than 40,000 people in the DRC, excluding its community medical services and some private commercial medical services.

24.     By 2009, Crusader DRC had contracts with approximately eight other companies in the mining industry in and around the Katanga Province, which made up approximately one quarter of Crusader DRC's income. Like the contracts with KOL and DCP, contracts with other mining companies were also invoiced based on capitation fees. Capitation refers to a pricing structure that is determined by headcount, or per-capita.

25.     Around this time, Crusader DRC learned that Katanga Copper Company SARL ("KCC"), the Glencore subsidiary, would be taking over KOL and DCP's contracts with Crusader DRC, which made up approximately three quarters of Crusader DRC's income. Crusader DRC's contracts with DCP and KOL enabled it to provide high quality patient care to many miners and their families and were also profitable.

26.     MSI and Crusader DRC negotiated new three-year contracts with KCC. Attached as **Exhibit 6** is a draft of Crusader DRC's contract with KCC dated August 31, 2009.

27.     The negotiated contract reflected an update to the agreement in paragraph 7 of Annexure A regarding the three medical facilities Crusader DRC agreed to build. According to the amended agreement, Crusader DRC would complete the Luilu clinic and, instead of two separate clinics at Musonoi and Kapata, Crusader DRC would build one hospital in the city of Kolwezi.

28. The new contracts were nearly ready to be signed at the end of 2009.

29. Crusader DRC completed the Luilu clinic in 2009 and it was operational by the end of that year.

30. By the end of 2009, the construction of the hospital at Kolwezi was on schedule and nearly complete. Attached as **Exhibit 7** is a picture of the structure of the Crusader DRC hospital on September 3, 2009. At that time, the core and internal structure was complete, and we were preparing to install the equipment and do the internal fit-out.

31. In 2009, Laurethé and I had to travel to Australia as part of the process to obtain Australian citizenship. We had to manage MSI and our Crusader Health companies from abroad with our capable and experienced teams in-country.

### III. Dispute Regarding KCC's New Medical Manager

32. In September 2009, I was told by my Crusader DRC staff that KCC appointed a new doctor as the medical/health manager (the "Medical Manager") to oversee Crusader DRC's contracts. I was told that the Medical Manager had been treating patients at Mutanda, another Glencore mine approximately 40km from Kolwezi.

33. I did not know this at the time, but I later learned that the Medical Manager was closely connected to and sponsored by Glencore and a foundation run by the DRC Agent mentioned in the statement of facts of Glencore's plea agreement.

34. Questions soon arose about the Medical Manager. Crusader DRC medical staff, who were working with the Medical Manager, reported to me that his medical knowledge and competence were suspect and "at best on the level of a paramedic." I and my staff began conducting diligence to verify the Medical Manager's medical credentials.

35.     I understand that the local medical council, the Council of the Order of Physicians of Kolwezi, opened an investigation into the Medical Manager due to another referral questioning his credentials.  At the time, Dr. Kasongo was president of that council.  According to my review of the attached document and my understanding at the time, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, as reflected in the document attached as **Exhibit 8**.

36.     From October to December 2009, I corresponded with my Crusader DRC colleagues in the DRC about the ongoing investigation into the Medical Manager by the medical council and our own efforts to verify his medical credentials.  Attached as **Exhibits 9-13** are copies of this correspondence.  As reflected in the emails, we were not able to verify the Medical Manager's medical credentials.  We were informed in an affidavit from the Health Professionals Council of South Africa that he did not appear in their records.  The affidavit is attached as **Exhibit 14**.  We also received correspondence from the same organization that said he was a "bogus doctor," and we were unable to confirm other information about his work and education history.  Attached as **Exhibit 15** is an email dated November 24, 2009, in which I summarized the status of our investigation.  This information was concerning because it impacted the health and safety of Crusader DRC's patients.  It was important to confirm that the Medical Manager had the medical credentials he claimed because, in his role, he made medical decisions.  Plus, he was continuing to treat patients at the Mutanda mine.

37. In certain of those emails from November 2009, Dr. Kasongo our local partner, reported that he was facing threats and bribes because of the investigation into the Medical Manager. These emails included reports that:

   a. DRC prosecutors and the DRC's national intelligence agency, Agence Nationale de Renseignements (the "Agence Nationale"), were told that Dr. Kasango set fire to the Medical Manager's house. **Exhibit 10**. Of course, Dr. Kasongo did not do so. In fact, Dr. Kasongo was in Kinshasha—far from Kolwezi—at the time of the fire. **Exhibits 10-11**. Dr. Kasongo was interrogated for three hours about the purported arson by the Agence Nationale. **Exhibit 12**.

   b. Dr. Kasongo was threatened by the head of Group Bazano, an entity that held an ownership interest in the Mutanda mine where the Medical Manager had been practicing as a doctor. The head of Group Bazano threatened Dr. Kasongo to stop investigating the Medical Manager or else he would "have [his] head" and "use[] his power to creat[e] [] problems." **Exhibit 10**.

   c. The head of Group Bazano also tried the incentive approach with Dr. Kasongo. He told Dr. Kasongo that the Group had an interest in Katanga and there was a potential job for Dr. Kasongo if he stopped his investigation. **Exhibit 10**.

38. I also spoke to Dr. Kasongo on the phone in late 2009. He reported that during a conversation, the head of Group Bazano threatened his and his family's safety because of the investigation.

39. I believe Dr. Kasongo provided accurate accounts of his experiences because during this same period I too received a threatening phone call from KCC's CEO. He told me that the issue with the Medical Manager must be "swept under the carpet" or he will make sure that

9

Crusader "will never operate in the DRC again." During the same phone call, he also threatened my physical safety and that of my family.

40. I took these threats very seriously because I knew that KCC through Glencore had power and influence in the DRC and around the world. However, Crusader DRC could not stop the investigation and risk compromising the quality of patient care and its ethics. I refused to look the other way and instructed my staff at Crusader DRC to continue the investigation.

41. In 2009, Crusader DRC's offices in the DRC served as Crusader Health's Central African Hub. As a result of KCC's threats towards Crusader DRC, we made the decision at the end of 2009 to move the Central African Hub to neighboring Zambia along with Crusader DRC's back-office staff. We felt this change was necessary to ensure the safety and well-being of Crusader DRC and its staff.

42. Crusader DRC moved its office to Zambia at the beginning of 2010. Several years later, the Zambia office was burglarized. Computers, hard drives and backups were destroyed or stolen, and some hard-copy records disappeared in the process. We appeared to be the target of the break-in. As a result, Crusader DRC lost some of its financial records.

**IV.   Termination of Crusader DRC's Contract and Crusader DRC's Lawsuit**

43. Just as KCC's CEO threatened, on January 11, 2010, he sent Crusader DRC and MSI letters on behalf of KCC terminating the contracts, effective April 10, 2010. Attached as **Exhibits 16-19** are copies of the termination letters dated January 11, 2010. The letters did not provide a reason for termination, but it was clear to Laurethé and myself that the termination was in retaliation for the investigation of the Medical Manager.

44. Crusader DRC tried in good faith to resolve the dispute with KCC for months. In a letter dated January 28, 2010, attached as **Exhibit 20**, Crusader DRC informed KCC that because

of the "significant capital investment" Crusader DRC had made in reliance on entering into new three-year contracts with KCC, Crusader DRC "as a whole will suffer from future loss of profits and income." Crusader DRC also informed KCC that the termination of the contract would "inevitably lead to retrenchment of staff," among other losses to Crusader DRC. Retrenchment refers to severance payments due to terminated employees under DRC law.

45.     There were several meetings with KCC. During one such meeting on March 1, 2010, a KCC employee warned Crusader DRC that the legal costs of proceeding with our dispute would be exorbitant. This is reflected in the letter dated March 31, 2010, attached as **Exhibit 21**.

46.     In another letter dated March 15, 2010, attached as **Exhibit 22**, Crusader DRC explained each component of Crusader DRC's loss and the $16,084,556 recovery it would seek from KCC because of the termination of the contracts. Crusader DRC also notified KCC of its request that KCC take over the clinic and hospital and the responsibility for the retrenchment/severance costs associated with transferring Crusader DRC's staff of 92 employees to KCC.

47.     As reflected in the March 31, 2010 letter, KCC refused to explain why it terminated the contracts and rebuffed Crusader DRC's request that KCC compensate it for its losses. After several months of Crusader DRC seeking compensation through correspondence with KCC, it became clear that Crusader DRC would not be able to resolve the dispute with KCC, which was acting in bad faith.

48.     In July 2010, Crusader DRC issued KCC a formal notice claiming damages of $16,084,556. Attached as **Exhibit 23** is a copy of the formal notice.

49.     As the notice reflects, Crusader DRC sought recovery of $11,084,556 in principal and $5,000,000 in damages under DRC law. The $11,084,556 principal included the following:

11

a. $2,500,000 for the construction costs of one clinic and the hospital and the restoration of the Methodist Hospital;

b. $4,364,556 for the lost profit of the contract, covering a period of 12 months;

c. $2,500,000 for the reimbursement of all medical equipment, including 3 ambulances, 2 pick-up trucks, radiology equipment and staff; and

d. $1,720,000 for the reimbursement of operating costs for 6 months.

50. Crusader DRC's financial director at the time was charged with preparing all the documentation for the amounts Crusader DRC sought in the lawsuit. Crusader DRC had documentary support for each amount we requested.

51. Following the formal notice, Crusader DRC sued KCC in a DRC court in October 2010 seeking the damages specified in the formal notice.

52. On February 1, 2011, I received an email from Dr. Kasongo explaining that the Court had decided against Crusader DRC. As it was explained to me, the Court decided Crusader DRC could not pursue the lawsuit because it did not receive an ordinance from the DRC President to create Crusader DRC in 2007.

53. At the time, we did not know that Glencore had bribed the judge in our case.

54. In response to Dr. Kasongo's email, I explained that things were "desperate with Crusader [DRC] due to the current situation." At the time, I had been "keeping things afloat from my own pockets" and I explained to Dr. Kasongo that I had "extended myself beyond any reason to be able to stay alive in DRC." Crusader DRC needed to resolve the matter quickly because we needed "cashflow to survive in DRC." Attached as **Exhibit 24** is a copy of my email correspondence with Dr. Kasongo in February 2011.

55. Crusader DRC had been operating at a loss while waiting for the judgment. Crusader DRC anticipated that it would receive a recovery in the contract action that would cover its losses. In the meantime, Crusader DRC was obligated to honor its other contracts. For example, Crusader DRC's contract with the Methodist Hospital was binding for another two years, until 2012. Laurethé and I felt that it was only fair that Crusader DRC honor these obligations, even though Crusader DRC would operate at a loss until it received recovery in the contract action.

56. Before the DCP and KOL contracts were terminated, they accounted for approximately three-quarters of Crusader DRC's income. MSI, Laurethé and I personally loaned money to Crusader DRC to keep it afloat while we waited for the judgment.

57. In 2010, Crusader DRC had to retrench at least 23 staff that had worked at the DCP and KOL locations at a loss of $57,294.22. Attached as **Exhibit 25** is Crusader DRC's audited income statement from January to September 2010 that reflects the retrenchment in row 30.

58. With the dismissal of the lawsuit, it became more certain that we would not recover any amount from KCC. After consulting with Crusader DRC's lawyers, we decided to appeal the decision in the hopes that we could recover something for Crusader DRC's losses. KCC challenged our appeal.

59. As the appeal dragged on for years, Crusader DRC continued to lose money. On April 2011 and April 2012, Laurethé and I participated in Crusader DRC board meetings with Dr. Kasongo. Crusader DRC's books reflected significant losses during these years.

60. By the end of 2012, Crusader DRC had honored all of its contracts in the DRC and retrenched a significant number of its remaining professional staff and effectively ended active operations. All but a few of the 92 employees from 2010 have been let go. Unfortunately, given

the time that has passed, Crusader DRC does not have records of its retrenchment costs after 2010 readily available.

61. The only reason Crusader DRC was not liquidated in 2012 was because of its pending appeal of the January 2011 judgment.

**V.  Glencore's Criminal Case**

62. In 2022, Laurethé and I learned of Glencore's criminal prosecution in the United States. Prior to learning of the case, we did not know that KCC paid a bribe to win the DRC lawsuit. In reviewing Glencore's plea agreement, we also learned for the first time that the DRC lawyers that represented Crusader DRC were "playing along" with Glencore.

63. In response to this news, I contacted Dr. Kasongo who told me that in or around 2010, the Medical Manager helped Glencore plan the construction of a new hospital north of Kolwezi in Kisangani. Once the hospital was operational, the Medical Manager served as the medical director and chief surgeon. Dr. Kasongo explained that the DRC Agent mentioned in Glencore's plea agreement had been asked by the then-President of the DRC, Joseph Kabila, to have the hospital at Kisangani built.

64. Dr. Kasongo also told me that on November 28, 2018, he filed a new action on behalf of Crusader DRC in the newly established Kolwezi Commercial Court seeking the same $11,084,556 of principal amounts Crusader DRC sought in its initial action and $20 million in damages.

65. On December 31, 2019, the Kolwezi Commercial Court found KCC liable to Crusader DRC. Crusader DRC has not received any payment from KCC under the judgment.

66. Dr. Kasongo told me that because we had to end Crusader DRC's operations following the bribe and our former financial director was no longer working for Crusader DRC in

2018, Dr. Kasongo did not have the records of the principal amounts that Crusader DRC had prepared in connection with the 2010 lawsuit.  He also told me that the lawyers did not appear to have the financial records from the original court case.  Hence, due to the passage of time, we have been unable to locate records from the original case.

67. In total, Crusader DRC accrued $3,198,800.00 in legal fees for the 2010 and 2018 litigation against KCC.  Attached as **Exhibit 26** is a copy of an invoice from Crusader DRC's counsel dated September 2, 2022.  As of the date of this letter, this invoice has not been paid.

68. I also provide Crusader DRC's statutory financial statements from 2010 in connection with this application, which are attached as **Exhibit 27**.

69. My wife and I and Crusader DRC have filed for restitution before this Court to be made whole for the injuries we suffered as a result of Glencore's criminal conduct.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and following due inquiry, the foregoing is true and correct.

Dated: October 25, 2022
       Brisbane, Australia

Dr. Ian Hagen