# Exhibit 2

# MEDICAL SERVICES AGREEMENT

between

### DRC COPPER AND COBALT PROJECT SARL
("DCP")

and

### MEDICAL SERVICES INTERNATIONAL
("MSI")

and

### CRUSADER HEALTH RDC SPRL
("CRUSADER")



## CONTENTS

**CLAUSE NO**      **CLAUSE HEADING**

| | |
|---|---|
| 1. | Definitions and Terminology |
| 2. | Interpretation |
| 3. | Basis of the Agreement |
| 4. | Scope and Duration of the Agreement |
| 5. | Obligations of CRUSADER and MSI |
| 6. | Obligations of DCP |
| 7. | People covered by the Agreement |
| 8. | Payment for Medical Services |
| 9. | Adjustment of Consideration |
| 10. | Use of Clinic, Mine accommodation and other items |
| 11. | Indemnities and Insurance |
| 12. | Confidentiality and Public Statements |
| 13. | Independent Contractor |
| 14. | Force Majeure |
| 15. | Warranty |
| 16. | Assignment |
| 17. | Waiver |
| 18. | Breach and Cancellation |
| 19. | Suspension or Cessation of Mining Operations |
| 20. | Return of clinic, mine accommodation and other items upon termination |
| 21. | Applicable Law and Arbitration |
| 22. | Entire Agreement and Variation |
| 23. | Notices |

| | |
|---|---|
| Annexure "A" | Definition of Clinic / PMT |
| Annexure "B" | Definition of Medical Services |
| Annexure "C" | Definition of DCP Mine Employees and Eligible Dependants |
| Annexure "D" | Payment for Medical Management Services to MSI |
| Annexure "E" | Payment for Medical Services to CRUSADER |
| Annexure "F" | Items belonging to DCP and Mine accommodation to be used by CRUSADER and MSI |



## 1. DEFINITIONS AND TERMINOLOGY

In this Agreement, unless the content indicates otherwise:

| | | |
|---|---|---|
| 1.1 | Agreement | means this document, including all annexure and addenda hereto; |
| 1.2 | Clinic | means the clinics referred to in Annexure "A", being initially the KZC PMT and SKM PMT and later the Luilu Clinic; |
| 1.3 | CRUSADER | means CRUSADER Health RDC SPRL, a company incorporated in the Democratic Republic of Congo, which is a subsidiary company of MSI, and includes its authorised representatives and agents, successors and assigns; |
| 1.4 | DCP | means DRC Copper & Cobalt Project SARL, a company incorporated in the Democratic Republic of Congo, which is a subsidiary company of Nikanor PLC, and includes its authorised representatives and agents, successors and assigns; |
| 1.5 | DCP Projects and Operations | Means the two divisions within DCP. |
| 1.5 | DCP Contractor Employees | means employees of contracting companies that is contracted to DCP Projects and is working on site at the DCP operations as defined in 3 and inter alia exclude employees of contractor companies working on other non-DCP operations or working for DCP Operations; |
| 1.6 | DRC | means the Democratic Republic of Congo; |
| 1.7 | DCP Operations Dependants | means a spouse and those authorised dependants of the DCP Operations Employee residing in the DRC as contemplated in Annexure "C"; which list may be amended in writing from time to time in accordance with this Agreement; authorised dependants being limited to bona fide children 18 years of age and below. |
| 1.8 | DCP Operations Employees | means any person who is directly employed by DCP Operations and inter alia excludes contractors, expatriates, consultants or visitors, as contemplated in Annexure "C"; |
| 1.9 | Government | means the Government of the Democratic Republic of Congo; |
| 1.10 | Items | means the Items belonging to DCP specified in Annexure "F", Paragraph 1 |
| 1.11 | Medical Services | means the Medical Services specified in Annexure "B"; |
| 1.12 | MSI | means Medical Services International, a company incorporated in the Turks and Caicos Islands, and includes its authorised representatives and agents, successors and assigns; |
| 1.13 | Parties | means the parties to this Agreement being DCP, MSI, and CRUSADER and their respective successors-in-the-title; |
| 1.14 | PMT | means the primary health care centres on the mine site, currently being KZC and SKM. |



## 2. INTERPRETATION

2.1   In this Agreement:

    2.1.1   the index and the headings to clauses shall be deemed to have been included for purposes of convenience only and shall not govern the interpretation hereof;

    2.1.2   unless the context indicates otherwise, a reference to:

        2.1.2.1 the singular shall be deemed to include a reference to the plural and visa versa;

        2.1.2.2 any one gender shall be deemed to include a reference to the other gender;

        2.1.2.3 a natural person shall be deemed to include a reference to a body corporate.

2.2   The terms defined in 1 shall be construed as binding provisions of this Agreement, and any rights conferred and obligations imposed upon the parties by such definitions shall be binding upon them.

## 3. BASIS OF THE AGREEMENT

3.1   WHEREAS DCP carries out mining and related activities at its KOV, Tilwizembe and Kananga pits situated near the town of Kolwezi in the Katanga Province of the Democratic Republic of Congo;

3.2   AND WHEREAS DCP is operating a concentrator plant at KZC;

3.3   AND WHEREAS DCP needs on-site medical care for its DCP Operations personnel and approved contractors in relation to occupational health, injuries and disease;

3.4   AND WHEREAS DCP needs off-site medical care for the dependants of its projects employees.

3.5   AND WHERAS DCP has an existing agreement specifically for the mine rehabilitation project which already covers the expatriate medical care, DCP projects employees and dependants and DCP Project Contractors and which agreement will run concurrent with this Agreement,

3.6   AND WHEREAS DCP's core business is mining and requires a reliable party to provide a solution through one supplier to provide, or cause to be provided, the comprehensive health care needs as stipulated in this Agreement to DCP Operations, DCP Operations Employees and their Eligible Dependants (as defined in this Agreement) and approved DCP Operations contractors;

3.7   AND WHEREAS CRUSADER and MSI are respectively experienced providers of the required Medical Services and Medical Management Services and warrant that they are suitably organised, qualified, financed, equipped, staffed, licensed and able to provide the required Medical Services in terms of this Agreement to DCP Projects, and to fulfil all the other obligations in terms of this Agreement;

3.8   NOW THEREFORE the parties record the following:

## 4. SCOPE AND DURATION OF THE AGREEMENT

4.1    This Agreement shall provide for and comprise of:

    4.1.1    the provision of Medical Services by CRUSADER and MSI to DCP, DCP Operations employees and their Eligible Dependants (as defined in this Agreement) and to approved DCP Operations Contractors;

    4.1.2    ancillary matters, including:

        4.1.2.1    the use of the Clinic by CRUSADER and MSI;
        4.1.2.2    the use of certain of DCP's accommodation by CRUSADER and MSI to house some of their staff employed at the Clinic;
        4.1.2.3    The provision of transport to CRUSADER employees;
        4.1.2.4    The supply of equipment to the clinic.

4.2    Not withstanding the dates of signature hereof, this Agreement shall be deemed to have commenced on and take effect from 1 September 2007.

4.3    This Agreement shall remain in force for thirty six (36) months from the date of commencement, provided that:

    4.3.1    the Agreement may be terminated at any time in accordance with 18 and 19;

    4.3.2    the parties may renew the Agreement for a further period if they can agree on the terms and conditions of renewal, provided that any such renewal shall be set out in an addendum to this Agreement signed by the parties.

    4.3.3    the Agreement may be terminated at any time after the twelve (12) months of the term of the Agreement by any party giving six (6) months prior written notice of termination which notice period shall not commence before the end of the initial twelve (12) months period and shall be calculated from the date the notice is received by the other parties;

4.4    The parties hereby cancel all previous agreements and arrangements which may exists between the parties regarding the subject matter of this Agreement with effect from the date of commencement of this Agreement, which shall from such date in all respect supersede such previous agreements. The parties however acknowledge the presence of a separate parallel contract with DCP projects as referenced in 3.5 and footnoted as: "DCPProj/MSI/CH Contract January 2007", that is not being cancelled by this Agreement.

4.5    Cancellation of said previous agreements and arrangements shall be effective notwithstanding any cancellation of this Agreement.

4.6    All reporting and correspondence in terms of this Agreement shall be dealt with directly between the Chief Operating Officer of DCP and the Chief Executive Officer of Crusader, or their duly authorised representative, whom the parties shall appoint in writing.

## 5. OBLIGATIONS OF CRUSADER AND MSI

CRUSADER shall, with necessary assistance from MSI:

5.1    Provide the Medical Services specified in Annexure "B" to DCP, DCP Operations Employees and their Eligible Dependants and approved DCP Contractors in accordance with the provisions of this Agreement;

5.2    Operate a twenty-four (24) hour adequately staffed clinic on site at DCP's KZC PMT and a day clinic at the SKM PMT, by using the existing DCP Operations staff on a seconded basis and augment the staff by their own.

5.3    Provide the equipment list for the non-medical items for Luilu Clinics in consultation with the Health Safety and Environmental Manager of DCP, to be purchased by DCP.

5.4    Provide the medical equipment list for the clinics to DCP operations for approval. Equipment will be purchased by MSI/Crusader on a cost plus principle.

5.5    Provide recommended changed to the Clinics to DCP Operation for their approval and upgrade.

5.6    Appoint appropriate extra staff to operate the KZC PMT on a 24/7 basis, with the intent to have a PMT facility for sick reporting in the mornings and have an after hours emergency standby as per 5.2.

5.7    Appoint appropriate extra staff to operate the SKM PMT on a day clinic basis, with the intent to have a PMT facility for sick reporting in the mornings and have afternoon standby for emergencies.

5.8    At all times provide and maintain in good and safe operating condition all buildings, accommodation, equipment, vehicles and whatever else may be necessary for the satisfactory provision of the Medical Services and the fulfilment of their obligations under this Agreement, other than those buildings, accommodation and other items to be provided by DCP in accordance with 10;

5.9    At all times provide and retain sufficient adequately licensed, trained, experienced and capable personnel as may be necessary for the satisfactory provision of the Medical Services and the fulfilment of their obligations under this Agreement, including:

   5.9.1    one (1) expatriate paramedic, suitably qualified for service in Democratic Republic of Congo, who shall be available to provide the Medical Services for forty two (42) weeks during each twelve (12) month period during the term of this Agreement and who shall be available when the doctor referred to in 5.9.2 is absent;

   5.9.2    one (1) expatriate doctor suitably qualified for service in Democratic Republic of Congo or Democratic Republic of Congolese doctor who shall be available to provide the Medical Services for fifty two (52) weeks during each twelve (12) month period during the term of this Agreement and who shall be available when the expatriate paramedic referred to in 5.9.1 is absent;

   5.9.3    the other personnel specified in Annexure "B";

5.10    ensure that the Clinic and the Items listed in Annexure "F" are at all times kept clean, tidy and in a safe and sanitary condition suitable for the provision of the Medical Services;

5.11    ensure that the mine accommodation listed in Annexure "F" is at all times kept clean, tidy and in a safe and sanitary condition;

5.12    obtain, renew and, at all times, maintain in force the necessary agreements, permits, licences, certificates, consents and other authorities necessary to enable them to perform their obligations in terms of this Agreement;

5.13    at all times comply with all applicable legislation, laws, by-laws, regulations and standards relating to the provision of the Medical Services and their related activities;

5.14    Provide DCP with the equipment and facility requirements;

5.15    Procure the MSI recommended and DCP approved equipment to the site with the clearing assistance of DCP;

5.16    at all times ensure that their activities do not:

    5.16.1  create a nuisance to DCP or people in the neighbourhood of the Clinic;

    5.16.2  in any way impede the operations of DCP.

5.17    the mine accommodation is only used to accommodate CRUSADER and MSI staff (as envisage in Annexure "F") employed at the clinic;

5.18    CRUSADER and MSI shall not make any alterations, extensions or renovations to the clinic, the items or the mine accommodation without obtaining prior written approval from DCP;

5.19    CRUSADER and MSI shall not alienate, let or in any way encumber the Clinic, the mine accommodation or the Items.

5.20    Crusader shall comply with all of DCP's health, safety and environmental standards and rules that are conveyed in writing to the Crusader.    Where DCP has no such standard or rule, DRC legislation remains the minimum standard of work until such time as DCP issues a standard or rule.  DCP reserve the right to change or introduce new standards at any time that are considered International Best Practice

5.21    Without limiting the generality of Crusader's obligations contained in this clause, the Crusader shall supply personnel appropriate clothing and personal protective equipment stipulated for the area in which their personnel are working as required by DCP and regulatory requirements. All equipment used must be of an acceptable standard and rating for the task being performed and be approved of by DCP.  Any clothing or personal protective equipment supplied by DCP to Crusader shall be back-charged to Crusader.

5.22    Crusader shall regularly remove rubbish and surplus material.   Waste materials shall be segregated, collected and transported in accordance with statutory and DCP requirements.  Under

no circumstances will the Contractor allow waste materials of any type or empty product containers to accumulate on the Site or to be disposed of in an inappropriate manner.

5.23 Any pollution, contamination or other damage caused by Crusader and not addressed by the Contractor in a timely and appropriate manner will be attended to by DCP and all costs will be back-charged to the Contractor.

5.24 Crusader shall at all reasonable times give DCP access to any place where the Works are being carried out for the purpose of conducting an audit to determine Crusader's level of compliance with the environmental and safety requirements. In the event that DCP's audit identify non-compliances, they shall be rectified by Crusader as directed and in no case later than 60 (sixty) days after receipt of written notification.

5.25 Crusader shall investigate and report all incidents including, but not limited to, any reportable release of a hazardous substance (including, without limitation, use by any person of drugs or alcohol while working on the Site) and any injuries, promptly DCP and to government authorities as required by law. Crusader shall consult with DCP during the course of investigating and reporting incidents in order to protect all privileges available to DCP.

5.26 Crusader shall fully cooperate with any investigation undertaken by DCP or its appointed representatives following any incident or accident. Crusader shall fully implement any measures as required by DCP following an incident investigation.

5.27 Crusader shall submit by the third day of the following month the total manhours worked within a month by the contractor and its sub-contractors to the DCP Safety department.

5.28 Crusader shall provide all personnel, including sub-contractors, with health cover. For all non-Congolese personnel, this shall also include medical evacuation cover. Proof of such cover shall be provided to DCP prior to mobilisation to site of personnel. If in the event that DCP provides health services for any reason to the contractor's personnel, including sub-contractors, DCP shall do so and back charge the contractor all incurred costs.

## 6. OBLIGATIONS OF DCP

DCP shall, subject to the other provisions of this Agreement, with the necessary assistance from DCP Contractors or subsidiaries:

6.1 provide and maintain the Clinic / PMT and the other items listed in Annexure "F" to CRUSADER and MSI free of charge and in a condition suitable for the purposes intended in terms of this Agreement, in order to enable CRUSADER and MSI to provide the Medical Services in terms of this Agreement (e.g. buildings, clinic equipment, equipped ambulance, doctors official vehicle, etc.);

6.2 maintain the services to the Facilities on the DCP Mine Site in Kolwezi;

6.3 Provide and maintain appropriate accommodation for the Expatriate paramedic and doctor, for the national staff (if required). Provide and maintain appropriate accommodation for visiting technical experts / executive visits on prior approval by DCP. The accommodation will be suitable for the level of staff member as per DCP standards, i.e. senior management of

CRUSADER / MSI will be expected to be housed in appropriate senior management accommodation as DCP would house their senior management and likewise for junior staff members.

6.4     provide free of charge all electricity and water necessary in order to enable CRUSADER and MSI to operate the Facilities, which will include standby generator power as needed;

6.5     provide to Crusader the best available communication means;

6.6     allow CRUSADER and MSI use of DCP's electronic mail facilities, subject to the rules set out by DCP;

6.7     provide CRUSADER / MSI with a server facility and appropriate bandwidth (128 kbps) to run their medical software and tele-medical service, failing which; CRUSADER shall provide a direct V-SAT facility of 128 kbps at DCP cost.

6.8     allow access to the Facilities of suppliers, clients or contractors authorised by CRUSADER or MSI;

6.9     allow CRUSADER and MSI to erect appropriate directional signs to the Clinics on DCP's mining concessions, as well as stickers or notices as appropriate for successfully fulfilling their obligations under this Agreement;

6.10    when necessary make every reasonably effort to maintain and repair the Facilities and the services referred to in 6.3, 6.4, 6.5, 6.6 and 6.7. as a priority task;

6.11    provide CRUSADER with updated employee lists monthly by the last day of the month or the next working day to allow CRUSADER & MSI to provide the Medical Services and invoices timeously for DCP to comply to 6.14;

6.12    allow MSI or CRUSADER employees working at DCP's DRC operations to join the daily bus transport to site;

6.13    DCP shall render assistance with obtaining visas and work permits in order for Crusader & MSI to fulfil their obligations of expatriate presence under this Agreement, if required by Crusader or MSI.

6.14    Pay CRUSADER and MSI monthly in arrears, not later than the second working day of the following month as per annexure D and E.

6.15    DCP Operations shall use their offices to assist Crusader to obtain permissions to procure vacant stands on the DCP concessions at Luilu, Kapata and Musunoi to establish a three community based Crusader clinics.

6.16    Crusader and MSI shall report directly to the Chief Operating Officer or his representative, as notified in writing to Crusader.

## 7. PEOPLE COVERED BY THE AGREEMENT

CRUSADER and MSI shall provide Medical Services in terms of this Agreement to DCP, DCP Operations Employees, their Eligible Expatriate Dependants and authorised DCP Operations Contractors. Unless specifically stated, this Agreement only covers on-site first response care for Contractors with work related injuries. National (DRC) DCP Projects Employees and Dependants, as well as Expatriate staff and visitors are outside the scope of this agreement. Services at any off-site private or CRUSADER Health off-site facility will be levied on a fee for service basis.

## 8. PAYMENT FOR MEDICAL SERVICES

8.1    As consideration for Medical Services provided by CRUSADER and MSI in compliance with the provisions of this Agreement, DCP shall pay CRUSADER and MSI monthly in arrears within 30 days of issue of invoices as stipulated in Annexures "D" and "E", provided that:

    8.1.1    CRUSADER and MSI:

        8.1.1.1 submit correct invoices to DCP;

        8.1.1.2 ensure that each invoice is accompanied by all necessary supporting documentation as may be reasonably required by DCP;

        8.1.1.3 ensure that each invoice and all supporting documentation complies with all applicable legislation;

    8.1.2    DCP shall be entitled to:

        8.1.2.1 deduct any monies due by CRUSADER to DCP after supplying supporting documentation as may be reasonably required and authorisation by CRUSADER;

        8.1.2.2 reject any invoice or supporting documentation that does not comply with 8.1.1.2 or 8.1.1.3.; with the provision that it is done within 7 days of the issuing of the invoice.

8.2    CRUSADER and MSI shall receive no other payments whatsoever from DCP other than those stipulated in Annexure "D" and "E" respectively for providing the Medical Services and complying with their other obligations in terms of this Agreement. Notwithstanding this clause, CRUSADER and MSI shall have the right to seek the recovery of medical expenses from the insurers and medical aid schemes of inter alia DCP contractors, visitors and consultants, if any.

## 9. ADJUSTMENT OF CONSIDERATION

Subject to 4.3.2, the rates of consideration stipulated in Annexure "D" and "E" shall be subject to renegotiation during the term of this agreement and shall take effect as agreed to by both parties in writing.

## 10.  USE OF CLINIC, DCP MINE ACCOMMODATION AND OTHER ITEMS

Subject to the provisions of this Agreement, CRUSADER and MSI shall be entitled to use the Clinics specified in Annexure "A", those Items (as listed in annexure "F") belonging to DCP in the Clinics, and the mine accommodation listed in Annexure "F" to house some of their staff employed at the Clinics provided that:

10.1    the Clinics are only used to provide Medical Services to DCP, DCP Operations Employees and their Eligible Dependants, approved DCP Operations Contractors, and medical services independently to members of the public and other third parties;

10.2    the Items belonging to and purchased by DCP are only used in the Clinic in accordance with the provisions of this Agreement;

10.3    the mine accommodation is only used to accommodate CRUSADER and MSI staff (as envisage in Annexure "F") or their consultants;

10.4    CRUSADER and MSI shall not make any alterations, extensions or renovations to the Clinic, the items or the mine accommodation without obtaining prior written approval from DCP Projects;

10.5    CRUSADER and MSI shall not alienate, let or in any way encumber the Clinics, the mine accommodation or the Items.

## 11.  INDEMNITIES AND INSURANCE

11.1    CRUSADER and MSI hereby jointly and severally indemnify DCP against all losses, damages, costs, claims and demands made upon or suffered by DCP or its employees, agents and representatives as a result of, or arising from any risk that CRUSADER and/or MSI are liable for or any negligent act or omission on the part of CRUSADER and/or MSI, provided that neither CRUSADER nor MSI shall be liable to DCP for consequential damages suffered by DCP as a result of a breach of this Agreement.  For the purposes of this clause, consequential damages shall mean loss of profits.

11.2    DCP hereby indemnifies CRUSADER and MSI against all losses, damages, costs, claims and demands made upon or suffered by CRUSADER and MSI or their employees, agents and representatives as a result of, or arising from, any risk that DCP is liable for or any negligent act or omission on the part of DCP, provided that DCP shall not be liable to CRUSADER and MSI for consequential damages suffered by CRUSADER and MSI as a result of a breach of the Agreement. For the purposes of this clause, consequential damages shall mean loss of profits.

11.3    Each, of the parties shall, at its own expense, take out and maintain in force during the currency of this Agreement insurance policies indemnifying the other party against the losses, damages, costs, claims and demands made upon or suffered by the other party as referred to in 11.1 and 11.2. CRUSADER and MSI shall in addition, at their own expense, take out and maintain in force during the currency of the Agreement, comprehensive insurance to cover:

11.3.1  medical malpractice liability;

11.3.2 those risks CRUSADER and MSI are required to insure against as the operators of a private or mine clinic in Democratic Republic of Congo as required by the Ministry of Health and any other applicable Government authorities.

11.4 Each party shall furnish the other parties with copies of all insurance policies they have taken out in terms of 11 as well as copies of documents evidencing payment of insurance premiums.

## 12. CONFIDENTIALITY AND PUBLIC STATEMENTS

The parties acknowledge that the details of this Agreement, and any communication between the parties arising out of or in connection with this Agreement, are strictly confidential and undertake that the same shall not be disclosed to any third party without the prior written consent of the other parties. Likewise this agreement shall only be released to signatories of this contract and employees of the parties on a need to know basis as per prior approval by the parties. The parties shall not be entitled to make any public announcement or public disclosure without the prior written consent of the other parties, which shall not be unreasonably withheld.

## 13. INDEPENDENT CONTRACTOR

13.1 The relationship of CRUSADER and MSI to DCP shall be that of independent contractors and employees and representatives of CRUSADER and MSI shall in no way be construed as being employees of DCP. Upon termination of this agreement for whatsoever reason neither CRUSADER's or MSI's employees and representatives shall be entitled to any redundancy/ retrenchment/ severance payments or benefits whatsoever from DCP.

13.2 Those employees seconded from DCP to Crusader shall be comprehensively under the management control of Crusader, but all employment issues such as salaries, leave allowances, formalised disciplinary action, retrenchments, etc. shall be dealt with directly by DCP and be for their cost. Operational issues such as duty rosters, deployment, etc will be Crusader's responsibility. Crusader shall have the right to reject seconded DCP employees for any reason whatsoever.

13.3 Provision of any Medical Services by CRUSADER and/or MSI to DCP Employees or their Eligible Dependants, DCP contractors or any medical services whatsoever to any members of the public or any other third parties shall be done on an independent basis by CRUSADER and MSI acting as principals and shall not be provided or in any way be construed as being provided, by them as agents acting in any way on behalf of DCP.

## 14. FORCE MAJEURE

14.1 Notwithstanding any other provision of this Agreement, no party to this Agreement shall be liable for a failure to perform any obligation in terms of this Agreement in the event and to the extent that such failure is caused by force majeure, provided that prompt (and no later than seven (7) days) written notice of the force majeure is given to the effected parties, which written notice shall adequately described the nature of the force majeure and the extent of the interruption. Upon cessation of the force majeure the parties shall resume the performance of the respective

obligations and insofar as may be reasonably practicable, shall perform all obligations that were suspended during the continuance of the force majeure.

14.2 For the purpose of this Agreement "force majeure" shall mean supervening impossibility of performance attributable to a cause beyond the control of the party responsible for such performance.

## 15. WARRANTY

CRUSADER, MSI and DCP warrant to the extent relevant to them:

15.1 that they are qualified and licensed to conduct business in Democratic Republic of Congo;

15.2 that they are not trading or carrying on business in insolvent circumstances;

15.3 that they are empowered, authorised and entitled to enter into this Agreement and that no transaction contemplated hereby is in breach of the articles of association, certificate of incorporation or any other agreement or arrangement to which they are a party;

15.4 that all corporate and other proceedings required to authorise them to enter into and carry out this Agreement have been duly and properly taken;

15.5 that they will procure that any subsidiary or contractor which becomes a party to this Agreement or assumes any obligation in terms hereof will perform its respective obligations timeously so as to ensure that the objectives of this Agreement are achieved.

## 16. ASSIGNMENT

No Party to this Agreement shall subcontract, cede, assign, transfer, make over, encumber, delegate or share any of their rights or obligations under this Agreement without the prior written consent of the other parties.

## 17. WAIVER

The failure of a party to insist upon the strict performance of any provision of this Agreement or to exercise any right, power or remedy consequent upon a breach hereof shall not constitute a waiver by such party to require strict and punctual compliance with each and every provision of this Agreement.

## 18. BREACH AND CANCELLATION

Notwithstanding any other provision of this Agreement and without prejudice to any other rights which the parties may have:

18.1 DCP shall have the right to cancel this Agreement forthwith should either of CRUSADER or MSI be in breach of any of the provisions of the Agreement and fail within ninety (90) days of receipt of a notice calling upon it to remedy such breach, to comply therewith;

18.2 CRUSADER and MSI shall have the right to cancel this Agreement forthwith should DCP be in breach of any of the provisions of this Agreement and fail within ninety (90) days of receipt of a notice calling upon it to remedy such breach to comply therewith.

## 19. SUSPENSION OR CESSATION OF MINING OPERATIONS

In the event of DCP suspending or ceasing mining operations completely it shall, notwithstanding any other provisions of this Agreement, be entitled to terminate this Agreement by giving CRUSADER and MSI ninety (90) days notice in writing of the suspension or cessation of mining operations. This clause refers to the suspension of operations and does not apply to any take-overs, mergers, or other vehicles being used to change the structure or ownership of DCP.

## 20. RETURN OF CLINIC, ACCOMMODATION, EQUIPMENT AND OTHER ITEMS UPON TERMINATION

20.1 Within thirty (30) days of the termination of this Agreement for whatsoever reason CRUSADER shall at their expense:

20.1.1 vacate and return the Clinic and the mine accommodation, and

20.1.2 return all Items belonging to DCP including those listed in Annexure "F",

to DCP in the same order and repair as they were at the commencement of the Agreement, maintenance by DCP, approved alterations, extensions and renovations and fair wear and tear excepted.

20.2 CRUSADER shall be responsible for and bear all costs relating to the eviction of any of their employees and their dependants from DCP accommodation, including all court proceedings (regardless of whether or not these are instituted by CRUSADER, MSI or DCP).

20.3 CRUSADER shall be responsible for and bear all costs and claims relating to the removal of any unauthorised structures or extensions made by their employees and their dependants at the DCP accommodation and shall ensure the removal of any such structures and extensions within thirty (30) days of the termination of this Agreement for whatsoever reason.

## 21. APPLICABLE LAW AND ARBITRATION

21.1 The validity, interpretation and performance of this Agreement shall be governed by the laws of the Republic of South Africa.

21.2 Should any dispute arise between the parties in connection with:

21.2.1 the formation or existence of;

21.2.2 the implementation of;

21.2.3  the interpretation or application of the provisions of;

21.2.4  the parties respective rights and obligations in terms of;

21.2.5  the validity, enforceability, rectification, termination or cancellation, whether in whole or in part of;

21.2.6  any document furnished by the parties pursuant to the provisions of, this Agreement or which relates in any way to any matter effecting the interests of the parties in terms of this Agreement, that dispute shall, unless resolved amongst the parties of the dispute, be referred to and be determined by arbitration in terms of this clause.

21.3  Any party to this Agreement may demand that a dispute be determined in terms of this clause by written notice given to the other parties.

21.4  This clause shall not preclude any party from obtaining interim relief on an urgent basis from a court of competent jurisdiction pending the decision of the arbitrator.

21.5  The arbitrator shall be a legal practitioner of not less than ten (10) years standing who shall be agreed upon by the parties, or failing agreement within thirty (30) days of receipt of written notice by the other parties, be appointed by the then President of the Republic of South African Bar Association.

21.6  The arbitration shall be held:

21.6.1  in Johannesburg or any alternative venue agreed to by all parties;

21.6.2  with only the legal and other representatives of the parties of the dispute present;

21.6.3  subject to the other provisions to this clause in accordance with the provisions of the Arbitration Act of the Republic of South Africa as amended or substituted,

it being the intention that the arbitration shall be held and completed as soon as possible.

21.7  The decision of the arbitrator shall be final and binding on the parties to the dispute and may be made an order of any competent court at the instance of any of the parties to the dispute.

21.8  The parties hereby consent to the jurisdiction of any court of competent jurisdiction for the enforcement of any arbitration award.

21.9  The provisions of this clause:

21.9.1  constitute an irrevocable consent by the parties to any proceedings in terms hereof and no party shall be entitled to withdraw there from or claim at any such proceedings that it is not bound by such provisions;

21.9.2  are severable from the rest of this Agreement and shall remain in effect despite the termination of or invalidity for any reason of this Agreement.

21.10  Each party shall bear its own costs during the conduct of the arbitration and on conclusion of the arbitration, the arbitrator shall be instructed to make an award as to costs.

## 22. ENTIRE AGREEMENT AND VARIATION

22.1  This Agreement embodies the entire agreement between the parties as to the subject matter hereof. It is however understood that a separate agreement between the Parties also exist referred to as the DCP Projects agreement.

22.2  No alteration or variation of any of the provisions of this Agreement shall be of any force or effect unless it is recorded in writing and signed by the parties hereto.

## 23. NOTICES

23.1 All notices, consents, demands or communications intended for any party pursuant to this Agreement shall be made in writing and shall:

23.1.1  if delivered by hand during the normal business hours of the addressee at the addressee's business address stipulated in 23.2, be rebuttably presumed to have been received by the addressee within one (1) working day of delivery;

23.1.2  if posted by couriers mail such as DHL form an address outside the Democratic Republic of Congo to the addressee's postal address stipulated in 23.2, be rebuttably presumed to have been received by the addressee on the ten (10) day after the date of posting;

Notwithstanding anything to the contrary contained in this Agreement, a written notice or communication actually received by one of the parties from another shall be adequate written notice or communication to such party.  Notice served on CRUSADER shall be deemed to be served on both CRUSADER and MSI.

23.2  The parties choose the following as their respective addresses and contact numbers for all purposes flowing from this Agreement.

23.2.1  In the case of DCP:

a)  Business Address and Postal address
57 Ave. Lusanga
Dilala
Kolwezi, Katanga Province
Democratic Republic of Congo

23.2.2  In the case of MSI

a)  Business Address and Postal Address
40 Craven Street
Charing Cross
London.  WC2N 5NG
United Kingdom

23.2.3  In the case of CRUSADER

    a)    <u>Business Address and Postal Address</u>
           1580 Ave. 30 Juin
           Quarters Mutoshi, Comune Manika
           Kolwezi, Katanga Province
           Democratic Republic of Congo

23.3    Any party may by written notice to the other parties, alter its addresses.

Thus done and signed on behalf of DCP Projects at _____Kolwezi_____ on this day the 3/ day of _____August_____ 2007.

_____
AUTHORISED REPRESENTATIVE

_____
WITNESS   Brands Branda

Thus done and signed on behalf of MSI at _____Kolwezi_____ on this day the 29th day of _____August_____ 2007.

_____
AUTHORISED REPRESENTATIVE
Dr. I. J. HAGEN

_____
WITNESS
MIREILLE ILUNGA

Thus done and signed on behalf of CRUSADER at _____Kolwezi_____ on this day the 29th day of _____August_____ 2007.

_____
AUTHORISED REPRESENTATIVE
Dr. I. J. HAGEN.

_____
WITNESS
MIREILLE ILUNGA

## ANNEXURE "A"

### DEFINITION OF CLINICS / PMTs

1. Subject to the provisions of this Agreement, the Clinics referred to will be the existing SKM PMT and KZC clinic. Both these clinics are the property of DCP Operations. The clinics will be upgraded as per the information provided by MSI to DCP and equipped to an acceptable level as per the same proposals. This capital expenditure will also belong to DCP. Which party orders what equipment will be agreed to on site prior to the placement of any order. Such orders by Crusader or MSI shall attract the fees as stipulated in Annexure D and E.

2. Upon completion of the Luilu clinic it clinic will also be available to DCP Operations, DCP operations employees and approved DCP contractors. The management of the Luilu clinic fall outside the scope of this agreement and is extensively covered under the Agreement between Crusader/MSI and DCP Projects. It is understood that, should this Projects agreement terminate for whatever reason, then the Luilu clinic will remain outside the scope of the agreement unless brought under the scope of this agreement by an amendment of this agreement.

3. Crusader will manage the facilities by utilizing existing seconded DCP staff and augment it with their own as per operational requirements and subject to other requirements within the agreement.

4. Overhead equipment, such as vehicles, needed to fulfil the requirements of this agreement, other than those specified to under this Agreement or agreed to, shall be purchased by and belongs to Crusader or MSI.

5. The Crusader Methodist Clinic in Kolwezi will be available for direct use by dependants. It is recorded here that the owner of this hospital is the United Methodist Church (UMC) under management control of Crusader. All equipment in the facility will either belong to the UMC, Crusader or MSI, whichever is applicable, but not to DCP. Management of this facility is at the sole discretion of Crusader/MSI.

6. Crusader and MSI can add more or remove preferred health service providers to/from this list at any time, but will do so in consultation with DCP Operations and confirm in writing. It is anticipated that Crusader will expand their health services provider network in the DRC.

7. Furthermore Crusader shall, with the capital investment of MSI, establish three community based day clinics in the Kapata, Musunoi and Luilu villages to provide services to the Eligible Dependants. Crusader shall fully plan, construct, own and manage these clinics as part of the Crusader health provider network. Crusader will charge DCP $1 per DCP Operations member, as per Annexure D, towards this capital expenditure to provide this service which is expected to cost MSI in between one million and two million US Dollars. Should the exact number of members not be available, then Crusader shall assume the ratio of members to employees to be one to eight, in which case $8 per employee will be charged.

## ANNEXURE "B"

## DEFINITION OF MEDICAL SERVICES

The Medical Services shall consist of, inter alia, the following:

### 1. OCCUPATIONAL HEALTH CARE SERVICES

An occupational health care expert shall be retained by CRUSADER and MSI to provide advice on occupational health care services. Occupational health care services shall include all those services generally understood in the medical profession as constituting occupational health care services. Without derogating from the generality of the aforesaid, occupational health care services shall, inter alia, include:

1.1 Provision of pre-employment, periodical and exit medical examinations and related reports in respect of DCP Operations employees and prospective DCP Operations employees at the request of DCP.

1.2 Ongoing advice to DCP on changes in legislation, laws, by-laws, regulations and standards relating to occupational health matters.

1.3 Overseeing first aid training provided by DCP Operations training staff to DCP Operations Employees in order to ensure that this is up to date and adequate. During the first six months of the Agreement Crusader shall train one hundred employees to St John basic first aid level. Crusader shall also arrange for the training of trainers, at DCP cost, to take over this training function thereafter.

1.4 On-site curative and remedial services for medical problems and injuries incurred by DCP Operations Employees whilst on duty.

1.5 Approved DCP Operations Contractors shall only be covered for on-site first response care of mine-site accidents. All other medical services provided to Contractors will be a direct arrangement between the contractor and Crusader at the cost of the Contractor, exonerating DCP of any responsibility.

1.6 Occupational Health audits as necessary.

1.7 Assessment of DCP Operations Employees, approved DCP Operations Contractor employees and ex-DCP Project Employees / Contractors for compensation for injuries sustained whilst on duty, including the arranging of Regional Medical Boards, and provision of related reports.

1.8 Occupational Hygiene falls outside the scope of this agreement.

1.9 Crusader will provide technical and day supervision and management of the DCP clinics, including advice for upgrading the buildings and equipment, overseeing/upgrading of the existing staff and identifying gaps in DCP in-house resources (equipment/drugs/capacity). Ensure staff capacity is improved to address site risks of a typical mine site. The existing DCP staff will be seconded to Crusader to provide full management control, but will be for the cost of DCP. Their deployment will be at the discretion of Crusader, but in consultation with DCP. Crusader may reject any seconded member as per 13.2 of this Agreement.

## 2. PRIMARY & SECONDARY HEALTH CARE SERVICES

Primary health care services shall include all those services generally understood in the medical profession as constituting primary health care services. Without derogating from the generality of the aforesaid primary health care services shall, inter alia, include:

2.1     Conducting of medical consultations and provision of necessary treatment to DCP Operations employees, including where necessary admittance to the Medical Facilities on an in-patient basis.

2.2     Referrals and oversight to recommended outside doctors, specialist or medical facilities for DCP Operations employees and Eligible Dependants whose condition cannot be treated or dealt with in the Clinic due to the condition's medical nature such as, inter-alia, gynaecological operations, ophthalmologist referrals, optometrist referrals, etc. Only specialist appointed by Crusader may be used.

2.3     It is expressly understood that HIV and Tuberculoses treatment is excluded under this agreement as it is comprehensively covered by a National programme (Refer paragraph 8). Plastic surgery, dental work, traditional medical practitioners, herbal remedies tertiary care and research medicine and the provision of glasses for deteriorating eyesight are also excluded. All self-inflicted injuries, conditions or disease are excluded. All diseases or conditions as a direct result of social behaviour, inter alia, sexually transmitted diseases or alcoholism are excluded. If these services (e.g. dental) are required by DCP operations, then it will be arranged by Crusader at no extra charge, but the service shall attract a commercial fee for service. Services shall only be in-country. If international medical services may be required, then it will be in consultation with DCP and for the cost of DCP.

2.4     No referrals shall take place in respect of any treatment that must be provided at the Clinic in terms of this Agreement. Crusader shall endeavour to reduce referrals to Lubumbashi as much as possible, but not to the detriment of any patient. This will be done by upgrading the facilities, equipment and staff knowledge and skills over time.

2.5     Conducting of medical consultations and provision of necessary medical treatment to DCP contractors, consultants or visitors working at DCP on-site, which shall attract a fee for service to either DCP Operations or the Contractor, whichever apply. All off-site services may be arranged by Crusader but will be for the cost of the DCP Contractor. CRUSADER maintains the right to not allow individual contracting companies access to medical services where there are reasonable grounds for doing so, except in cases of emergencies, and after prior consultation with DCP. CRUSADER may however provide a comprehensive off-site service to the Contractor employees and/or dependants as well, but this will be for negotiation direct between CRUSADER and the Contractor.

## 3. TRAUMA STABILISATION AND EVACUATIONS

A trauma stabilisation and evacuation service that shall, inter alia, include:

3.1     Twenty-four (24) hour primary stabilisation of injured DCP Operations Employees and their Eligible Dependants and approved DCP Contractors at the scene of accident on the DCP Mine Site or at the Clinic / PMT, whichever is as appropriate.

3.2     For this purpose Crusader will establish a centralised response centre, 24/7 staffed by trained dispatchers, ambulance drivers and first responders. For this purpose DCP will provide an equipped ambulance and two response vehicles. Care of these vehicles will be for the cost of DCP, but oversight of Crusader. Crusader will augment this with their own vehicles as per operational requirements.

3.3     Stabilisation and monitoring of patients in the Clinic in anticipation of evacuation to the nearest appropriate medical facility if evacuation is deemed necessary by CRUSADER or MSI.

3.4     Arranging evacuation in conjunction with the DCP Operations Employees, their Eligible Dependant or DCP Contractor's designated medical insurance/evacuation company, if any, and DCP or DCP Contractor.

3.5     Physical evacuation of an injured or sick DCP Operations Employee or Eligible Dependant by air or road in conjunction with the relevant DCP medical evacuation insurance company, if any, and DCP, and accompaniment of the injured person by suitable CRUSADER or MSI personnel should this be deemed necessary by CRUSADER or MSI.

3.6     Where a DCP Contractor, DCP Expatriate Employee or Eligible Dependant or DCP Operations Employee is not covered for evacuation by a medical insurance company, DCP or DCP contractor shall, if it agrees to evacuation, pay for all costs relating to evacuation and consequent hospitalisation, provided that Medical Services provided prior to evacuation are covered as set out in Annexure "D".

## 4. PUBLIC/COMMUNITY HEALTH SERVICES

A public/community health specialist shall be retained by CRUSADER and MSI to provide public/community health advice, which shall, inter alia, include:

4.1     Monitoring of and reporting on water and sanitation conditions at DCP's Minesite, upon request, provided that laboratory tests shall only be conducted or arranged at the request of DCP and at DCP's expense.

4.2     Promotive and preventative services, including health education and appropriate screening and immunisation for common diseases, and HIV/AIDS education and counselling to DCP operations Employees and Eligible Dependants.

4.3     Provision of advice to DCP on public/community health issues and applicable legislation, laws, by-laws, regulations and standards.

4.4     Oversight of Vector control conducted by DCP Projects. Vector control is outside the scope of this agreement.

4.5     Crusader shall, with the capital investment from MSI, and some assistance from DCP Operations, provide community based day clinics in the communities of DCP dependants.

## 5. TEST SERVICES

The following tests services shall, inter alia, be provided:

5.1    A Clinic laboratory test service providing e.g. malaria tests, microscopy, blood and urine biochemistry, serological tests and haematology upon completion of the Luilu clinic

5.2    Referrals to recommended outside test laboratories for DCP Operations Employees, DCP Eligible Dependants and DCP Contractors who need to undergo tests where these tests cannot be provided at the Clinic, provided that the costs of such tests on DCP employees and Contractors shall be borne by the DCP or DCP Contractors.

## 6. MEDICAL OPERATIONS SERVICES

6.1    In-Clinic medical operation facilities shall be provided by CRUSADER that enable them to perform such procedures that can reasonable be expected to be performed by General Practitioners in primary health care (Clinic) settings.

6.2    All operations required outside the Clinic will be performed or procured nationally by CRUSADER for National DCP Operations Employees.

## 7. PHARMACEUTICAL SERVICES

7.1    Provision of a Clinic pharmacy adequately stocked at all times with the medicines, drugs, bandages, syringes and other treatments and items necessary to:

7.1.1    provide the Medical Services;

7.1.2    treat those diseases and illnesses that can be contracted or can develop in the region where DCP's Kolwezi operations are situated;

7.1.3    treat accidents that may occur to DCP Operations Employees and Eligible Dependants and DCP Operations Contractors.

7.2    Should the pharmacy be out of stock of any item required to provide the Medical Services then CRUSADER shall ensure that it procures the item as soon as practically possible. If it is not reasonably possible for CRUSADER to procure the item in question timeously, then CRUSADER shall issue a prescription.

7.3    Procurement of medicines, drugs, and other items needed to stock DCP's mine safety post/s, as and when requested by DCP, provided that the costs of such items shall be borne by DCP.

## 8. TUBERCULOSIS AND HIV TREATMENTS

Tuberculoses and HIV treatments are excluded in this Agreement as a comprehensive Government initiative exists in Kolwezi at no cost. CRUSADER however maintains responsibility in oversight of these patients to ensure quality care.

## 9. ADMINISTRATIVE AND INFORMATION SERVICES

Administrative and information services shall, inter alia, include:

9.1　All administration and record keeping necessary in order to enable the Medical Services to be timeously and smoothly provided and recorded for future reference.

9.2　Keeping easily accessible confidential individual medical records of all DCP Employees and Eligible Dependants. These records will not be assessable by DCP during the term of this agreement, but will revert to the DCP's new medical service upon non-continuance of this agreement.

9.3　Scrutinising, checking or commenting on all medical expense claims made against DCP by outside doctors, specialists and medical facilities.

9.4　Scrutinising, checking and commenting on all medical insurance and medical evacuation policies and contracts that DCP wishes to or has entered into with companies to provide cover for DCP Employees and Eligible Dependants, in order to advise DCP on what cover is and is not provided.

9.5　Scrutinising, checking and processing all medical expense claims made by DCP to its medical insurers and evacuation companies.

9.6　Provision of medical and health & safety statistics and graphs relating to, inter alia, attendance at the Clinic by DCP Operations Contractors, DCP Employees and Eligible Dependants as required by DCP for insertion in its weekly, monthly, quarterly and/or annual reports.

## 10. MEDICAL SERVICES PROVIDED OUTSIDE THE CLINIC

In addition to medical services specified above CRUSADER and MSI shall provide the following Medical Services outside the Clinic / PMT:

10.1　Medical stabilisation and accompaniment as noted in Annexure "B" paragraph 3.

## 11. HOURS OF OPERATION OF CLINIC

11.1　The Luilu PMT, KZC PMT and Methodist Hospital shall be open twenty-four (24) hours a day and on every day of the year during the term of this Agreement in order to handle medical emergencies for DCP Contractors, DCP Employees and Eligible Dependants.

11.2　The SKM Clinic shall be operational for 8 hours a day as per operational requirements.

11.3　A doctor shall be on call for medical emergencies and shall be accessible by telephone and (or) mobile radio at all times during the term of this Agreement.

11.4　Apart from medical emergencies, the Clinics/PMT shall be open for normal medical consultations and disbursement of pharmaceutical items prescribed during these consultations for DCP Operations Employees and Eligible Dependants in accordance with the following schedule. This schedule may be modified by CRUSADER and MSI, as per operational requirements in

consultation with DCP, with the prior written consent of DCP. Such consent shall not be unreasonably withheld.

## Hours of Operation

| Unit | Mon-Friday | Saturdays | Sundays & Public holidays |
|------|-----------|-----------|---------------------------|
| Dispensary | 08h00 – 14h00 | 08h00 – 12h00 | Emergencies Only |
| X-Ray | 08h00 – 14h00 | 08h00 – 12h00 | Emergencies Only |
| Laboratory | 08h00 – 14h00 | 08h00 – 12h00 | Emergencies Only |
| Doctor Consultations | 08h00 – 12h00 | 08h00 – 10h00 | Emergencies Only |
| Expatriate clinic | 08h00 – 12h00 By appointment | Emergencies Only | Emergencies Only |

- Before and after these hours are for the cleaning and maintenance of the equipment, facilities, inspections, training and various other medical functions.

## ANNEXURE C

### DEFINITION OF DCP EMPLOYEES AND ELIGIBLE DEPENDANTS

For the purposes of this Agreement DCP Operations Employees and Eligible Dependants shall be those persons set out in the most recent written list provided to CRUSADER from time to time by an authorised representative of DCP. Likewise DCP Operations should supply CRUSADER monthly with updated lists of their eligible contractors.

It is expressly understood by the parties that:

- DCP may, on its own, amend these lists from time to time;

- The most recent list provided to CRUSADER by an authorised representative of DCP shall supersede all previous lists.

- DCP shall provide an update list of DCP Operations Contractors and DCP Expatriate Employees and their Eligible dependants at least monthly.

- DCP shall provide a headcount of employees and eligible dependants (members) at least monthly by the last day of the month or the first working day thereafter if the last day is a non-working day to allow Crusader and MSI to process invoices.

| EMPLOYEE NUMBER | NAME OF EMPLOYEE | NAME OF ELIGIBLE EXPATRIATE DEPENDANT (s) | RELATIONSHIP OF ELIGIBLE DEPENDANT TO EMPLOYEE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## ANNEXURE "D"

### PAYMENT FOR MEDICAL MANAGEMENT SERVICES TO MSI

As consideration for technology transfer services and management oversight provided by MSI in compliance with the provisions of this Agreement, to DCP, DCP Operations employees and Eligible Dependants, approved Contractors and Crusader, DCP shall pay MSI monthly in advance as follows:

1. Payment shall consist of a management fee of $30,000.00 (thirty thousand United States dollars) per month net of any withholding or sales taxes that may be levied, payable into a non-DRC account nominated by MSI.

2. A further monthly capitation fee of one USD per member (or eight USD per registered employee if the number of members is unavailable) will be levied as a capital allowance towards the planning, construction and operation of three turnkey community clinics within the three most populous communities of DCP Operations dependants, i.e. Luilu, Musunoi and Kapata.

3. Equipment shall be supplied at the procured cost plus 10%. All equipment purchases shall be pre authorised by DCP Operations. A forecast list shall be provided to DCP for approval of the capital expenditure.

4. Reasonable travel and accommodation expense shall be reimbursed for the executive and technical expertise visits (based on return business class from point of origin). These visits shall not be less than quarterly, but also not exceed a monthly frequency. Additional visits shall be for the cost of MSI.

5. A demobilisation fee will be levied at actual expenditure only if there is non-continuance of the agreement. The demobilisation cost will be for repatriation of the expatriate(s) and retrenchment / pension of employees (if applicable).

6. Should DCP Operations or DCP Contractors requests MSI to arrange, oversee and pay the medical evacuation insurance of expatriates, then the cost thereof shall be reimbursed by DCP. The management cost thereof shall attract no additional charge.

7. Payments due to MSI shall be deemed to be exclusive of all local taxes that may be charged by the Democratic Republic of Congolese tax authorities. DCP shall be responsible for payment of any withholding taxes that may be charged by the Democratic Republic of Congolese tax authorities. Evidence of payment of withholding tax by DCP (if applicable) in the form of tax credit certificates will be sent to MSI upon payment of such taxes.

8. The monthly fee referenced in 1.1. is annually renegotiable if needed and failing to reach an agreement will escalate by 4% p.a.

## ANNEXURE "E"

## PAYMENT FOR MEDICAL SERVICES TO CRUSADER

As consideration for Medical Services provided by CRUSADER, in compliance with the provisions of this Agreement, to DCP Operations Employees and Eligible Dependants, approved DCP Contractor and Employees, DCP Operations shall pay CRUSADER monthly in arrears as follows:

1. An overhead flat fee of USD 25000 (twenty five thousand US Dollar) will be charged to cover overhead expenses such as medical personnel, insurances, administration, etc. This fee shall increase from January 2008 to USD 30,000 (thirty thousand United States Dollar).

2. A further payment will be levied to DCP Operations on a fee per service basis. This fee will be communicated to DCP in writing from time to time.

3. All off-DCP-site services shall be for normal commercial cost to DCP.

4. Consumable materials such as pharmaceuticals will be charged at a procured cost plus 15 percent, or where a cost cannot be established, on a competitive pricing basis.

5. All costs relating to the provision of Medical Services in terms of advice to DCP Operations will attract no additional fee.

6. Subject to compliance with the provisions of clause 8 of this Agreement, payments shall be made no later than 30 days after provision of invoices.

## ANNEXURE "F"

## ITEMS BELONGING TO DCP AND MINE ACCOMMODATION TO BE USED BY CRUSADER AND MSI

### 1.    ITEMS

1.1  MSI shall supply the following equipment for the KZC and SKM Clinics. MSI shall indicate and price any additional items that are required to ensure the safe, efficient operation of the medical facility as and when required.

These items shall be purchased on a procured cost reimbursable basis, with a percentage added as markup as per Appendix D or E. Procured cost is the cost of the item, shipping, handling and insurance delivered to site. To ensure maximum tax benefits the consignee of the order will be DCP and where possible it will be shipped with existing DCP orders from SA. The equipment list has been provided to DCP and it will be finalised after execution of this agreement and added to this Annexure as an amendment.

**KZC Clinic Equipment, furniture and appliances**
**SKM Clinic Equipment, furniture and appliances**

1.2  DCP Operations shall supply the following equipment to ensure the efficient operation of the Operations Clinic/PMTs.

- ICT: A dedicated 128 kbps bandwidth internet connection connected to a dedicated fire-walled server (on Projects Contract); 6 workstations (1 at SKM, 5 at KZC), 2 Black and white laser network printer, 2 Black and white laser printers and one colour inkjet printer with appropriate UPS supply and networking. Failing the installation of this within a reasonable time, then Crusader shall proceed to install it on a reimbursable cost bases. A repeater and a specific frequency will be provided to Crusader for radio communications.
- Furniture, shelving and benches as per specifications given to DCP Operations.
- Vehicles. DCP Operations shall supply and maintain one ambulance and two response vehicles in a reliable and safe condition for the use of Crusader at their discretion for the fulfillment of this Agreement.

### 2.    MINE ACCOMMODATION

Mine accommodation shall consist of the following:

- Units for Expatriate paramedics / doctor shall consist of at least two double bedroom units in the senior staff camp or in town;
- Appropriate accommodation for an expatriate accountant / operations manager;
- Appropriate accommodation for visiting consultants and management as and when applicable.
- Maintenance and use of electricity and water in the aforementioned mine accommodation by authorised occupants of said accommodation will be for the account of DCP.