# Exhibit 5

# MEDICAL SERVICES AGREEMENT

between

## DRC COPPER AND COBALT PROJECT SARL
### ("DCP")

and

## CRUSADER HEALTH RDC SPRL
### ("CRUSADER")

## CONTENTS

| CLAUSE NO | CLAUSE HEADING |
|---|---|
| 1. | Definitions and Terminology |
| 2. | Interpretation |
| 3. | Scope and Duration of the Agreement |
| 4. | Obligations of CRUSADER |
| 5. | Obligations of DCP |
| 6. | People covered by the Agreement |
| 7. | Payment for Medical Services |
| 8. | Use of Mine Medical Facilities |
| 9. | Indemnities and Insurance |
| 10. | Confidentiality and Public Statements |
| 11. | Independent Contractor |
| 12. | Force Majeure |
| 13. | Warranty |
| 14. | Assignment |
| 15. | Sub-contractors |
| 16. | Waiver |
| 17. | Breach and Cancellation |
| 18. | Suspension or Cessation of Mining Operations |
| 19. | Return of Mine Medical Facilities, accommodation, equipment and other items upon termination |
| 20. | Applicable Law and Arbitration |
| 21. | Entire Agreement and Variation |
| 22. | Notices |
| Annexure "A" | Definition of Medical Facilities |
| Annexure "B" | Definition of Medical Services |
| Annexure "C" | Definition of DCP Mine Employees and DCP Eligible Dependants |
| Annexure "D" | Payment for Medical Services to CRUSADER |
| Annexure "E" | Items belonging to DCP and Mine accommodation to be used by CRUSADER |

# MEMORANDUM OF AGREEMENT

entered into between:

## DRC COPPER AND COBALT PROJECT SARL

a company duly incorporated under the laws of the Democratic Republic of Congo, having its main place of business at 57, Avenue Lusanga, Commune de Dilala, Kolwezi, Republique Democratique du Congo. (hereinafter referred to as "DCP")

and

## CRUSADER HEALTH RDC SPRL

a company incorporated in the Democratic Republic of Congo, having its main place of business at 1580 Ave. 30 Juin Quarters Mutoshi, Comune Manika, Kolwezi, Katanga Province. (hereinafter referred to as "CRUSADER")

WHEREAS:

a) DCP carries out mining and related activities in the Kolwezi area of the Katanga Province of the Democratic Republic of Congo;

b) KOL manages the operations in the DRC. DCP is also in the process of a merger between Katanga Mining Limited and Nikanor PLC, which has not yet been finalised;

c) DCP needs on-site medical care for its DCP Employees, national and expatriates, and approved contractors in relation to primary health, occupational health, injuries and disease;

d) DCP needs off-site medical care for DCP Employees and their DCP Eligible Dependants of its employees.

e) DCP's core business is mining and requires a reliable party to provide a solution through one supplier to provide, or cause to be provided, the comprehensive health care needs as stipulated in this Agreement to DCP, DCP Employees and their DCP Eligible Dependants (as defined in this Agreement) and Authorised Contractors;

f) CRUSADER to perform all DRC in-country Medical Services, whilst MSI shall conduct the out-of-country Medical Services and overall contractual responsibility of this Agreement;

g) CRUSADER are respectively experienced providers of the required Medical Services and warrant that they are suitably organised, qualified, financed, equipped, staffed, licensed and able to provide the required Medical Services in terms of this Agreement to DCP, and to fulfil all the other obligations in terms of this Agreement;

h) AGREEMENT with numbers: KOL/CH Contract 10 September 2008 exist between KOL and CRUSADER for the provision of comprehensive medical services;

NOW THEREFORE the parties record the following:

## 1. DEFINITIONS AND TERMINOLOGY

In this Agreement, unless the content indicates otherwise:

1.1 Agreement means this document, including all annexure and addenda hereto;

1.2 Authorised Contractors means DCP Contractors authorised by DCP to receive the Medical Service

1.3 Claim means any claim against the other party including (without limitation) any allegation, debt, cause of action, claim, notice, demand, action, proceeding, litigation, investigation, judgment, loss, cost, expense or liability of whatever nature however arising and whether present or future, fixed or unascertained, actual or contingent, and whether arising at law, in equity, under statute or otherwise;

1.4 Community Clinics Means the three community based day clinics that CRUSADER will establish in the communities of Luilu, Kapata and Musunoi;

1.5 Commencement Date means the 1ˢᵗ day of November 2008 notwithstanding the dates of signature hereof.

1.6 Confidential Information means all information and materials disclosed, provided or otherwise made accessible to the either of the parties in the course of performing the Medical Services, whether before or after execution of this agreement including, but not limited to, the policies, services, processes, procedures, methods, formulations, facilities, products, plans, affairs, transactions, organisations, business connections and clients of either of the parties and its related bodies corporate but excludes information that the parties can prove:
(a) was in the public domain at the date of this agreement;
(b) subsequent to the date of this agreement, became part of the public domain otherwise than as a result of disclosure by the Consultant or Personnel directly or indirectly in breach of this agreement; or
(c) was known to either of the parties prior to the date it was received from the other party.

1.7 Consequential Loss means in the case of Liability resulting from a breach of contract – indirect, remote, consequential or unforeseeable loss including loss of profits, loss of revenue, loss of production, loss of contracts, loss of markets or access to markets, loss or denial of opportunity, loss of goodwill, loss of business reputation or future reputation, publicity, damage to credit rating, loss of use or any similar loss occasioned by that breach, whether or not in the reasonable contemplation of the parties at the time of execution of this Agreement as being a probable result of the relevant breach; and in the case of Liability arising from any negligence – indirect, remote or unforeseeable loss and, in the case of pure economic loss, loss not flowing directly from the commission of the negligent act or omission.

1.8 CRUSADER means Crusader Health RDC SPRL, a company incorporated in the Democratic Republic of Congo, and includes its authorised representatives, agents and successors.

| 1.9 | DRC | means the Democratic Republic of Congo; |
|---|---|---|
| 1.10 | Expatriate Employees | means any non-DRC national person who is directly employed by DCP and inter alia excludes contractors, consultants or visitors, as contemplated in Annexure "C"; |
| 1.11 | FAS | means a First Aid station providing emergency care or treatment before regular medical care can be obtained. |
| 1.12 | Government | means the Government of the Democratic Republic of Congo; |
| 1.13 | Items | means the Items belonging to DCP specified in Annexure "E"; |
| 1.14 | DCP | means DRC Copper & Cobalt Project SARL, a company incorporated in the Democratic Republic of Congo, which is a subsidiary company of Katanga Mining Limited, and includes its authorised representatives and agents, successors and assigns; |
| 1.15 | DCP Contractor | means employees of contracting companies that are contracted to DCP and is working on site at the DCP operations and inter alia exclude employees of contractor companies working on other non-DCP operations; |
| 1.16 | DCP Eligible Dependants | means one legal spouse and those authorised dependants of the DCP Employee residing in the DRC as contemplated in Annexure "C"; which list may be amended in writing from time to time in accordance with this Agreement; authorised dependants being limited to bona fide children below 19 years of age, with the exception of those in full-time education of below 25 years of age (not including apprenticeships). No siblings, siblings of children or same-generation relatives, no-one of parents' generation, no previous partners. The number of dependants will not exceed six in number. |
| 1.17 | DCP Employees | means any person who is directly employed by DCP and inter alia excludes contractors, expatriates, consultants or visitors, as contemplated in Annexure "C"; |
| 1.18 | Medical Facilities | means the collection of all the contractually agreed clinics, owned by DCP, MSI, CRUSADER or approved third parties, that can be used by DCP Employees, DCP Eligible Dependants and Authorised Contractors as defined in Annexure "A" |
| 1.19 | Medical Services | means the Medical Services specified in Annexure "B"; |
| 1.20 | Mine | means the DCP mine site and include KZC, SKM, Luilu PMT's and the container clinic at Tilwezembe |
| 1.21 | MSI | means Medical Services International, a company incorporated in the Turks and Caicos Islands, and includes its authorised representatives and agents, successors and assigns. |

| 1.22 | Mine Medical Facilities | means the collection of mine owned premises referred to in clause 4.2, 4.3, 4.4, and 4.5 in which the Medical Service are provided; |
|---|---|---|
| 1.23 | Parties | means the parties to this Agreement being DCP, CRUSADER, and their respective successors-in-the-title; |
| 1.24 | PHCC | means the primary health care centres on the Mine. |

## 2. INTERPRETATION

2.1    In this Agreement:

    2.1.1    the index and the headings to clauses shall be deemed to have been included for purposes of convenience only and shall not govern the interpretation hereof;

    2.1.2    unless the context indicates otherwise, a reference to:

        2.1.2.1 the singular shall be deemed to include a reference to the plural and visa versa;

        2.1.2.2 any one gender shall be deemed to include a reference to the other gender;

        2.1.2.3 a natural person shall be deemed to include a reference to a body corporate.

2.2    The terms defined in 1 shall be construed as binding provisions of this Agreement, and any rights conferred and obligations imposed upon the parties by such definitions shall be binding upon them.

## 3. SCOPE AND DURATION OF THE AGREEMENT

3.1    This Agreement shall commence on the Commencement Date.

3.2    This Agreement shall remain in force for thirty six (36) months, provided that:

    3.2.1    the Agreement may be terminated at any time in accordance with 18 and 19;

    3.2.2    the parties may renew the Agreement for a further period if they can agree on the terms and conditions of renewal, provided that any such renewal shall be set out in an addendum to this Agreement signed by the parties.

    3.2.3    Should a renewal as envisaged in 3.2.2 take effect, then the Agreement may be terminated at any time after the twelve (12) months of the new term of the Agreement by any party giving three (3) months prior written notice of termination which notice period shall not commence before the end of the initial twelve (12) months period and shall be calculated from the date the notice is received by the other parties;

3.3    CRUSADER and the director medical services of DCP shall agree key result areas and indicators against which the Medical Services performance will be measured. These will include, but not be limited to areas such as emergency response, medical resource presence and competence, buildings, equipment, diagnostic capability and accuracy, treatment outcome and reporting.

3.4     The parties hereby cancel all previous agreements and arrangements which may exist between the parties regarding the subject matter of this Agreement, including but not limited to the agreements with numbers DCPProj/MSI/CH - January 2007 and DCPOPS/MSI/CH - September 2007, but excluding the agreements numbered KOL/CH Contract 10 September 2008 and KOL/MSI/CH Contract 10 September 2008, with effect from the Commencement Date, which shall from such date, in all respect, supersede such previous agreements.

3.5     All reporting and correspondence in terms of this Agreement shall be dealt with directly between the duly authorised representatives of the respective Parties to the Agreement, whom the Parties shall appoint in writing.

## 4. OBLIGATIONS OF CRUSADER

CRUSADER shall, with the assistance of MSI and other DRC subcontractors:

4.1     provide the Medical Services specified in Annexure "B" to DCP, DCP Employees and their DCP Eligible Dependants and approved DCP Contractors;

    4.1.1   in a commercial, prudent and reasonable manner;

    4.1.2   in accordance with suitable and appropriate methods and practices;

    4.1.3   with a high degree of professional skill, care and diligence that may reasonably be expected of a skilled, professional person, suitably qualified and experienced, in the performance of services similar to the Medical Services;

    4.1.4   in accordance with the terms of this Agreement;

4.2     operate one (1) twenty-four (24) hour adequately staffed Primary Health and Emergency Care Centre (PHCC) on DCP site;

4.3     operate a twenty-four (24) hour adequately staffed ambulance dispatch from where and to where emergency response will take place on DCP site;

4.4     operate one (1) twenty four (24) hour adequately staffed First Aid Station (FAS) on DCP site;

4.5     operate a single (1) 8 hours per day adequately staffed First Aid Station (FAS) on DCP site.

4.6     utilise existing medical staff of DCP on a seconded basis until such time that a reasonable formal offer of employment has been provided by CRUSADER and negotiated with the appropriate DCP medical staff, provided that CRUSADER shall not be obliged to offer employment to any medical staff member where CRUSADER considers, acting reasonably, that such staff member is not suitably qualified for the position or has otherwise displayed inappropriate conduct for the position. Such a formal offer of employment will be provided within three (3) months following signature to this agreement and will be deemed to be an act in good faith by CRUSADER in employing such staff, failing which DCP may deduct the salaries of such medical staff from the CRUSADER invoice. The amounts to be deducted will be mutually agreed before deduction and will be based on the higher of the reasonable cost of employing the said individual in the open labour market or the CRUSADER job offer.    No historical cost, inter alia, pensions, retrenchments, severance cost of Gecamines, will be for the account of CRUSADER. Failing to

reach an agreement within a reasonable period of time as to acceptance of the CRUSADER job offer or secondment, then the DCP employee will be removed from the medical services under CRUSADER supervision. In the interim CRUSADER may augment the medical staff with their own. Notwithstanding the above, paragraph 11.2 and Annexure "B" paragraph 1.10 also apply.

4.7 provide recommended changes to the physical structure of Mine Medical Facilities to DCP for consideration by DCP.

4.8 provide an equipment list for the non-medical equipment and sundries for Mine Medical Facilities in consultation with the director medical services of DCP, to be purchased by DCP directly upon approval by DCP.

4.9 procure a medical equipment list for the Mine Medical Facilities to DCP, in consultation with the director medical services of DCP. Quotations will be pre-approved by DCP in writing before the procurement of the equipment will take place.

4.10 appoint appropriate staff to operate the Mine Medical Facilities on a 24/7 basis, with the intent to have a PHCC facility for sick reporting in the mornings (as per 4.2) and have an afterhours emergency standby as per 4.3, 4.4, 4.5 and Annexure "B" Paragraph 5.

4.11 at all times provide and maintain in clean and safe operating condition all buildings, accommodation, equipment, vehicles and whatever else may be necessary for the satisfactory provision of the Medical Services and the fulfilment of their obligations under this Agreement, other than those buildings, accommodation, vehicles and other items to be provided by DCP in accordance with 10;

4.12 at all times provide and retain sufficient adequately licensed, trained, experienced and capable personnel as may be necessary for the satisfactory provision of the Medical Services and the fulfilment of their obligations under this Agreement, including:

4.12.1 A minimum of one expatriate paramedic, suitably qualified for service in Democratic Republic of Congo, who shall be available to provide the Medical Services for fifty two (52) weeks during each twelve (12) month period during the term of this Agreement;

4.12.2 A minimum of one expatriate doctor suitably qualified for service in Democratic Republic of Congo and a Democratic Republic of Congo (local) doctor, both who shall be available to provide the Medical Services for fifty two (52) weeks during each twelve (12) month period during the term of this Agreement;

4.12.3 the other personnel specified in Annexure "B";

4.13 ensure that the Mine Medical Facilities and the Items listed in Annexure "E" are at all times kept clean, tidy and in a safe and sanitary condition suitable for the provision of the Medical Services, in conjunction with cleaners provided by DCP;

4.14 ensure that the Mine accommodation listed in Annexure "E" is at all times kept clean, tidy and in a safe and sanitary condition, in conjunction with cleaners provided by DCP;

4.15 obtain, renew and, at all times, maintain in force the necessary agreements, permits, licences, certificates, consents and other authorities necessary to enable them to perform their obligations in terms of this Agreement and indemnify and hold DCP harmless against and from the

consequences of any failure to obtain, renew and maintain any necessary agreements, permits, licences, certificates, consents and other authorities necessary to enable them to perform their obligations;

4.16 at all times comply with all applicable legislation, laws, by-laws, regulations and standards relating to the provision of the Medical Services and their related activities;

4.17 at all times ensure that their activities do not:

4.17.1 create a nuisance to DCP or people in the neighbourhood of the Mine and / or CRUSADER Medical Facilities;

4.17.2 in any way impede the operations of DCP.

4.18 at all times ensure that the Mine accommodation is only used to accommodate CRUSADER staff (as envisage in Annexure "E");

4.19 not make any alterations, extensions or renovations to the Mine Medical Facilities, the items or the Mine accommodation without obtaining prior written approval from DCP;

4.20 not alienate, let or in any way encumber the Mine Medical Facilities, the Mine accommodation or the Items;

4.21 shall comply with all of DCP's health, safety and environmental standards and rules that are conveyed in writing to CRUSADER. Where DCP has no such standard or rule, DRC legislation remains the minimum standard of work until such time as DCP issues a standard or rule. DCP reserve the right to change or introduce new standards at any time that are considered international best practice.

4.22 Without limiting the generality of CRUSADER obligations contained in this clause, CRUSADER shall supply personnel appropriate clothing and personal protective equipment stipulated for the area in which their personnel are working, as required by DCP and regulatory requirements. All equipment used must be of an acceptable standard and rating for the task being performed and be approved of by DCP. Any clothing or personal protective equipment supplied by DCP to CRUSADER shall be back-charged to CRUSADER at pre-approved rates.

4.23 shall regularly remove rubbish, surplus material and medical waste. Waste materials shall be segregated, collected and transported in accordance with statutory and DCP requirements. Under no circumstances will CRUSADER allow waste materials of any type to accumulate on the Mine or to be disposed of in an inappropriate manner.

4.24 any pollution, contamination or other damage caused by CRUSADER and not addressed by CRUSADER in a timely and appropriate manner will be attended to by DCP and all costs will be back-charged to CRUSADER.

4.25 shall at all reasonable times give DCP access to any place where the Medical Services are being carried out for the purpose of conducting an audit to determine CRUSADER level of compliance with the environmental and safety requirements, but all visits of this nature will be accompanied by either a manager of CRUSADER or a resident expatriate doctor and no competitors of CRUSADER/MSI shall conduct such audits due to conflict of interest. In the event that DCP's

audit identify non-compliances, they shall be rectified by CRUSADER as directed and in no case later than 30 (thirty) days after receipt of written notification.

4.26   shall promptly report and investigate all incidents including, but not limited to, any reportable release of a hazardous substance and any injuries, to DCP and government authorities as required by law. CRUSADER shall consult with DCP during the course of investigating and reporting incidents in order to protect all privileges available to DCP.

4.27   shall fully cooperate with any investigation undertaken by DCP or its appointed representatives following any incident or accident. CRUSADER shall fully implement any measures as required by DCP following an incident investigation.

4.28   shall provide all of its personnel with health cover. For all non-Congolese personnel, this shall also include medical evacuation cover. Proof of such cover shall be provided to DCP prior to mobilisation to site of personnel.

4.29   shall submit by the third day of the following month the total man hours worked within a month by CRUSADER and its sub-contractors to the DCP director medical services.

## 5.   OBLIGATIONS OF DCP

DCP shall, subject to the other provisions of this Agreement, with the necessary assistance from DCP Contractors or subsidiaries:

5.1   provide and maintain the Mine Medical Facilities and the other items listed in Annexure "E" to CRUSADER free of charge and in a condition suitable for the purposes intended in terms of this Agreement, in order to enable CRUSADER to provide the Medical Services in terms of this Agreement (e.g. buildings, clinic equipment, equipped ambulance, doctors official vehicle, etc.);

5.2   maintain the services to the Facilities on the Mine in Kolwezi and Tilwezembe;

5.3   provide and maintain for the duration of the Agreement appropriate accommodation for the expatriate staff of CRUSADER, as well as for the national staff if required. Provide and maintain appropriate accommodation for visiting technical experts / executive visits to DCP. The accommodation will be suitable for the level of staff member as per DCP standards, i.e. senior management of CRUSADER will be expected to be housed in appropriate senior management accommodation as DCP would house their senior management and likewise for junior staff members.

5.4   provide free of charge all electricity and water necessary in order to enable CRUSADER to operate the Mine Medical Facilities and CRUSADER facilities providing health service to the community , which will include standby generator power as needed;

5.5   provide CRUSADER with an incinerator on site, for the disposal of medical waste generated in Mine Medical Facilities;

5.6   provide CRUSADER with the best available communication means in the DRC, including but not limited to, radio access, but excluding cell phones;

5.7    allow CRUSADER use of DCP's electronic mail and internet facilities, subject to the rules set out by DCP;

5.8    provide CRUSADER with server/s facility and appropriate bandwidth (128 kbps) to run their medical software, digital equipment and tele-medical service, failing which; CRUSADER shall provide a direct V-SAT facility of 128 kbps at DCP cost.

5.9    provide Information Technology hardware to the Medical Facilities (4.2, 4.3, 4.4, and 4.5), to provide the Medical Services as per Annexure "B", with the minimum of two (2) computers / terminals workstations and one (1) desk top printer / scanner per facility and at least two (2) multifunction devices (network based printer/scanner/copier).

5.10   allow access to suppliers, clients or contractors authorised by CRUSADER to the Mine Medical Facilities of DCP;

5.11   allow CRUSADER to erect appropriate directional signs to the Medical Facilities on DCP's mining concessions, as well as stickers or notices as appropriate, for successfully fulfilling their obligations under this Agreement, including but not limited to the markings on DCP emergency vehicles;

5.12   when necessary make every reasonable effort to maintain and repair the Facilities and the services referred to in 5.1, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8 and 5.9 as a priority task;

5.13   provide CRUSADER with updated employee lists monthly by the last day of the month or the next working day to allow CRUSADER to provide the Medical Services and invoices timeously for DCP to comply to 5.16; failing which, the last available list will be used by CRUSADER and reconciled with the next available list;

5.14   allow CRUSADER employees working at DCP's Kolwezi operations to join the daily bus transport to site;

5.15   DCP shall render assistance with obtaining visas and work permits in order for CRUSADER to fulfil their obligations of expatriate presence under this Agreement, if required by CRUSADER.

5.16   In consideration for CRUSADER providing the Medical Services, pay CRUSADER the fees in the amounts calculated in accordance with annexure "D".

5.17   CRUSADER shall report directly to the authorised DCP Representative (contract administrator), as notified in writing to CRUSADER by DCP Managing Director.

## 6.  PEOPLE COVERED BY THE AGREEMENT

6.1    CRUSADER shall provide Medical Services in terms of this Agreement to DCP, DCP Employees, DCP Expatriate Employees, their DCP Eligible Dependants and authorised DCP Contractors.

6.2    DCP may inform CRUSADER in writing of other approved dependants of DCP Employees not conforming to the definition of DCP Eligible Dependants, including but not limited to parents of DCP Employees, with the provision that in case the number of dependants exceed six (6), then an additional capitation fee of 10 USD per month per excess depended will be charged.

6.3     Unless specifically stated, this Agreement only covers on-site first response care for DCP Contractors with work related injuries.

6.4     Upon receipt in writing from DCP of notification of an Authorised Contractor, then the full scope of on DCP site services will be rendered to the Authorised Contractor, excluding their dependants, for a fee as per Annexure "D", paragraph 6. Services at any off DCP site facility to Authorised Contractors will be levied on a fee for service basis.

6.6     DCP may give written approval that certain DCP Contractors may be covered comprehensively on the same basis as DCP Employees and DCP Eligible Dependants. In this event an agreed capitation fee will apply as per Annexure "D" Paragraph 1.

## 7. PAYMENT FOR MEDICAL SERVICES

7.1     As consideration for Medical Services provided by CRUSADER in compliance with the provisions of this Agreement, DCP shall pay CRUSADER monthly in arrears within 15 working days following approval of the CRUSADER invoice by the authorised DCP Representative, as stipulated in Annexure "D", provided that:

   7.1.1   CRUSADER:

         7.1.1.1 submit correct invoices to DCP

         7.1.1.2 ensure that each invoice is accompanied by all necessary supporting documentation as may be reasonably required by DCP;

         7.1.1.3 ensure that each invoice and all supporting documentation complies with all applicable legislation;

   7.1.2   DCP shall be entitled to:

         7.1.2.1 deduct any monies due by CRUSADER to DCP after supplying supporting documentation as may be reasonably required by CRUSADER;

         7.1.2.2 reject in writing any invoice or supporting documentation that does not comply with 7.1.1.2 or 7.1.1.3; with the provision that it is done within 15 days of the issuing of the invoice. If the invoice has not been rejected within 15 days of the issuing thereof, the invoice shall be deemed to have been approved by DCP and the invoice shall become payable within 15 days of such tacit approval.

7.2     CRUSADER shall have the right to seek the recovery of medical expenses not payable under this Agreement by DCP from the insurers and medical aid schemes of inter alia DCP Contractors, visitors and consultants, if any.

7.3     Failure by DCP to pay within 30 working days of approval of the undisputed invoice shall result in interest at a rate of 1% above the LIBOR rate from time to time, levied on the arrear invoice, reckoned from the due date of such amounts until they are respectively paid.

# 8. USE OF MINE MEDICAL FACILITIES, DCP MINE ACCOMMODATION AND OTHER ITEMS

Subject to the provisions of this Agreement, CRUSADER shall be entitled to use the Mine Medical Facilities specified in Annexure "A", those Items belonging to DCP in the Mine Medical Facilities, and the Mine accommodation listed in Annexure "E" (to house some of their staff employed at the Mine Medical Facilities) provided that:

8.1 the Mine Medical Facilities are only used to provide Medical Services to DCP, DCP Employees and their DCP Eligible Dependants, approved DCP Contractors, and any emergency case, except with prior written permission from DCP;

8.2 the Items belonging to and purchased by DCP are only used in the Mine Medical Facilities in accordance with the provisions of this Agreement and Annexure "E";

8.3 the Mine accommodation is only used to accommodate CRUSADER staff (as envisage in Annexure "E") or their consultants;

8.4 CRUSADER shall not make any alterations, extensions or renovations to the Mine Medical Facilities, the items or the Mine accommodation without obtaining prior written approval from DCP;

8.5 CRUSADER shall not alienate, let or in any way encumber the Mine Medical Facilities, the Mine accommodation, vehicles or the related items.

# 9. INDEMNITIES AND INSURANCE

9.1 CRUSADER hereby indemnify DCP against all Claims made upon or suffered by DCP or its employees, agents and representatives as a result of, or arising from any risk that CRUSADER are liable for or any negligent act or omission on the part of CRUSADER or its employees, agents, sub-contractors and representatives, provided that CRUSADER shall not be liable to DCP for Consequential damages suffered by DCP as a result of a breach of this Agreement.

9.2 DCP hereby indemnifies CRUSADER against all Claims made upon or suffered by CRUSADER or their employees, agents and representatives as a result of, or arising from, any risk that DCP is liable for or any negligent act or omission on the part of DCP or its employees, agents, sub-contractors and representatives, provided that DCP shall not be liable to CRUSADER for Consequential damages suffered by CRUSADER as a result of a breach of the Agreement.

9.3 Each, of the Parties shall, at its own expense, take out and maintain in force during the currency of this Agreement third party liability insurance policies with a minimum claim limit of USD 5,000,000 (five million United State Dollars) per claim, indemnifying the other Party against all Claims and demands made upon or suffered by the other Party, as referred to in 9.1 and 9.2, with the exception of medical malpractice

9.3 CRUSADER shall in addition, at their own expense, take out and maintain in force during the currency of the Agreement, comprehensive insurance to cover:

9.3.1 medical malpractice liability with a minimum claim limit of USD 5,000,000 (five million United State Dollars) per claim and a maximum deductible of USD 100,000 (one hundred thousand United State Dollars) ;

9.3.2 those risks CRUSADER are required to insure against as the operators of a private or Mine Medical Facility in  Democratic Republic of Congo as required by the Ministry of Health and any other applicable Government authorities.

9.4 Each party shall furnish the other parties with copies of all insurance policies they have taken out in terms of 9 as well as copies of documents evidencing payment of insurance premiums annually, for the duration of the agreement.

## 10. CONFIDENTIALITY AND PUBLIC STATEMENTS

10.1 The recipient Party of Confidential Information must not, and must ensure that its personnel do not, unless first agreed to in writing by the original owner party, publish, transmit, disclose to anyone else, or use for a purpose other than the execution of this Agreement, any of the Confidential Information.

10.2 The recipient Party may make copies of written or computer stored materials incorporating Confidential Information only if those copies are necessary for the purpose of providing the Medical Services and must:

(a) return to the original owner party all Confidential Information (including any copies made by it); and

(b) permanently delete any Confidential Information stored by it in a computer or electronic retrieval system so that it is incapable of retrieval,

within 7 days of the first to occur of the following:

(a) a receipt of a request from the requesting party to do so; or

(b) the termination of the Agreement in accordance with Clause 17

and provide a certificate to the original owner party that these obligations have been complied with.

10.3 The recipient Party must notify the owner Party immediately if it becomes aware of, or suspects, any disclosure, use or copying of Confidential Information that is not authorised by this agreement and must take all steps reasonably required by the original owner party to stop that unauthorised disclosure, use or copying.

10.4 The recipient Party must restrict disclosure of the Confidential Information to its personnel who need to know it in order to provide the Medical Services and will, on reasonable request by the original owner party, ensure those personnel execute confidentiality agreements similar in effect to this clause.

10.5  Clause 10.1 does not affect:

   (a)  disclosure of information, documents and material available publicly otherwise than because the persons disclosing them contravened this clause 10;

   (b)  disclosures required by law; or

   (c)  disclosures to either of the parties legal, accounting and financial advisers, provided that those advisers are bound by equivalent obligations of confidentiality to those in this clause.

10.6  The Parties shall not be entitled to make any public announcement or public disclosure without the prior written consent of the other Party, which shall not be unreasonably withheld.

## 11. INDEPENDENT CONTRACTOR

11.1  The relationship of CRUSADER to DCP shall be that of independent contractors and employees and representatives of CRUSADER shall in no way be construed as being employees of DCP. Upon termination of this agreement for whatsoever reason neither CRUSADER's employees and representatives shall be entitled to any redundancy/ retrenchment/ severance payments or benefits whatsoever from DCP other than that stipulated in the Agreement.

11.2  Those employees seconded from DCP to CRUSADER shall be comprehensively under the management control of CRUSADER, but all employment issues such as salaries, leave allowances, formalised disciplinary action, retrenchments, etc. shall be dealt with directly by DCP and be for their cost.  Operational issues such as duty rosters, deployment, etc will be the responsibility of CRUSADER and they can be deployed at any site as per the discretion of CRUSADER, within their normal scope of work.  CRUSADER shall be responsible for any actions of employees seconded to CRUSADER as if they were the actions of CRUSADER. CRUSADER shall have the right to reject, seconded DCP Employees, subject to clause 4.6, in which case they will revert back to DCP for redeployment. Should the DCP seconded employee be replaced by CRUSADER, then the new engagement will be for CRUSADER cost. DCP will endeavour to encourage the DCP medical employees to take up direct employment with CRUSADER in order to allow CRUSADER to comply with paragraph 4.6 and have a uniform workforce.

11.3  Provision of any Medical Services by CRUSADER to DCP Employees or their DCP Eligible Dependants, DCP Contractors or any medical services whatsoever to any member of the public or any other third party shall be done on an independent basis by CRUSADER acting as principals and shall not be provided or in any way be construed as being provided, by them as agents acting in any way on behalf of DCP.

## 12. FORCE MAJEURE

12.1  Neither of the Parties shall be liable for a failure to perform any of its obligations insofar as it proves:

   12.1.1  that the failure was due to an impediment beyond its control;

12.1.2 that it could not reasonably be expected to have taken the impediment and its effects upon the Party's ability to perform into account at the time of the conclusion of this Agreement; and

12.1.3 that it could not reasonably have avoided or overcome the impediment or at least its effects.

12.2 An impediment, as aforesaid, may result from events such as the following, this enumeration not being exhaustive:

12.2.1 war, whether declared or not, civil war, civil violence, riots and revolutions, acts of sabotage;

12.2.2 natural disasters such as violent storms, cyclones, earthquakes, tidal waves, floods, destruction by lightning;

12.2.3 explosions, fires, destruction of machines, of factories and of any kind of installations;

12.2.4 boycotts, strikes and lock-outs of all kinds, go-slows, occupation of factories and premises, and work stoppages;

12.2.5 acts of authority, whether lawful or unlawful, apart from acts from which the party seeking relief has assumed the risk by virtue of any other provisions of this Agreement.

12.3 For the purposes of this clause "impediment" does not include lack of authorisations, of licences, of permits or of approvals necessary for the performance of this Agreement and to be issued by the appropriate public authority.

12.4 Relief from liability for non-performance by reason of the provisions of this clause shall commence on the date upon which the party seeking relief gives Notice of the impediment relied upon and shall terminate upon the date upon which such impediment ceases to exist; provided that if such impediment continues for a period of more than sixty (60) days either of the Parties shall be entitled to terminate or suspend this Agreement.

## 13. WARRANTY

13.1 CRUSADER and DCP warrant to the extent relevant to them:

13.1.1 that they are qualified and licensed to conduct business in Democratic Republic of Congo;

13.1.2 that they are not trading or carrying on business in insolvent circumstances;

13.1.3 that they are empowered, authorised and entitled to enter into this Agreement and that no transaction contemplated hereby is in breach of the articles of association, certificate of incorporation or any other agreement or arrangement to which they are a party;

13.1.4 that all corporate and other proceedings required to authorise them to enter into and carry out this Agreement have been duly and properly taken;

13.1.5 that they will procure that any subsidiary or contractor which becomes a party to this Agreement or assumes any obligation in terms hereof will perform its respective obligations timeously so as to ensure that the objectives of this Agreement are achieved.

## 14. ASSIGNMENT

14.1    CRUSADER may not cede, assign, transfer, make over, encumber, delegate or share any of their rights or obligations under this Agreement without the prior written consent of DCP.

14.2    DCP may assign any rights under this agreement to any legal entity that assumes all of DCP's obligations and accepts all of the DCP's rights under this agreement by giving 14 days notice to CRUSADER.

## 15. SUB-CONTRACTORS

15.1    CRUSADER may engage sub-contractors to assist in the provision of the Medical Services.

15.2    If CRUSADER engages a sub-contractor, CRUSADER:

15.2.1 must ensure the work performed by the sub-contractor or any representative of the sub-contractor meets the requirements of this agreement, including without limitation, clause 4.1;

15.2.2 is liable to DCP for the acts, omissions and defaults of that sub-contractor or any representative of the sub-contractor as if they were the acts, omissions and defaults of CRUSADER;

15.2.3 must ensure that the sub-contractor is immediately terminable, and that sub-contractor vacates DCP's property immediately, if this agreement is terminated;

15.2.4 will indemnify DCP against all Claims relating to the sub-contractor, a sub-contract or the provision of the Medical Services pursuant to a sub-contract; and

15.2.5 must ensure that it enters into a written agreement with the sub-contractor that is wholly consistent with CRUSADER's obligations under this agreement.

## 16. WAIVER

The failure of a party to insist upon the strict performance of any provision of this Agreement or to exercise any right, power or remedy consequent upon a breach hereof shall not constitute a waiver by such party to require strict and punctual compliance with each and every provision of this Agreement.

## 17. BREACH AND CANCELLATION

Notwithstanding any other provision of this Agreement and without prejudice to any other rights which the parties may have:

17.1   DCP shall have the right to terminate this agreement at any time by not less than (90) days' written notice to CRUSADER.

17.2   DCP shall have the right to terminate the engagement of CRUSADER by notice to CRUSADER if:

    17.2.1   CRUSADER does not provide the Medical Services at the standard required or otherwise breaches a provision of this agreement and that failure or breach:

        (i)     is incapable of remedy; or

        (ii)    if capable of remedy, continues for (30) days after DCP gives CRUSADER a notice requiring the breach to be remedied; or

    17.2.2   an insolvency Event occurs in relation to CRUSADER.

17.3   CRUSADER shall have the right to cancel this Agreement forthwith should DCP be in breach of any of the provisions of this Agreement and fail within (30) days of receipt of a notice calling upon it to remedy such breach to comply therewith.

## 18. SUSPENSION OR CESSATION OF MINING OPERATIONS

In the event of DCP suspending or ceasing mining related operations completely it shall, notwithstanding any other provisions of this Agreement, be entitled to terminate this Agreement by giving CRUSADER ninety (90) days notice in writing of the suspension or cessation of mining operations. This clause refers to the suspension of operations and does not apply to any take-overs, mergers, or other vehicles being used to change the structure or ownership of DCP.

## 19. RETURN OF MINE MEDICAL FACILITIES, ACCOMMODATION, EQUIPMENT AND OTHER ITEMS UPON TERMINATION

19.1   Within thirty (30) days of the termination of this Agreement for whatsoever reason CRUSADER shall at their expense:

    19.1.1   vacate and return the Mine Medical Facilities and the Mine accommodation; and

    19.1.2   return all items belonging to DCP including those listed in the asset register as per Annexure "F", 1.2,

to DCP in the same order and repair as they were at the commencement of the Agreement, maintenance by DCP, approved alterations, extensions and renovations and fair wear and tear excepted.

19.2 CRUSADER shall be responsible for and bear all costs relating to the eviction of any of their employees and their dependants from DCP accommodation, including all court proceedings (regardless of whether or not these are instituted by CRUSADER, MSI or DCP).

19.3 CRUSADER shall be responsible for and bear all costs and claims relating to the removal of any unauthorised structures or extensions made by their employees and their dependants at the DCP accommodation and shall ensure the removal of any such structures and extensions within thirty (30) days of the termination of this Agreement for whatsoever reason.

19.4 Until the requirements of clause 19.1, 19.2 and 19.3 are complied with, DCP can withhold payment of any fees or other money it may owe CRUSADER under this agreement.

## 20. APPLICABLE LAW AND ARBITRATION

20.1 The language of the contract is English; this Agreement is governed by the laws of the Republic of South Africa

20.2 In the event of a dispute between the Parties, either party will deliver a written notice to the other Party which identifies the dispute (a "Notice of Dispute").

20.3 If a Notice of Dispute is delivered, representatives of the parties with authority to resolve the dispute will meet within 15 business days of the issue of the Notice of Dispute and attempt to resolve the dispute.

20.4 If the dispute is not resolved within 30 business days after the issue of the relevant Notice of Dispute, either party may refer the dispute to arbitration.

20.5 This clause shall not preclude any Party from obtaining interim relief on an urgent basis from a court of competent jurisdiction pending the decision of the arbitrator.

20.6 The arbitrator shall be a legal practitioner of not less than ten (10) years standing who shall be agreed upon by the Parties, or failing agreement within thirty (30) days of receipt of written notice by the other Parties, be appointed by the then President of the Republic of South African Bar Association.

20.7 The arbitration shall be held:

20.7.1 in Johannesburg or any alternative venue agreed to by all Parties;

20.7.2 with only the legal and other representatives of the Parties of the dispute present;

20.7.3 subject to the other provisions to this clause in accordance with the provisions of the Arbitration Act of the Republic of South Africa as amended or substituted,

it being the intention that the arbitration shall be held and completed as soon as possible.

20.8 The decision of the arbitrator shall be final and binding on the Parties to the dispute and may be made an order of any competent court at the instance of any of the parties to the dispute.

20.9    The Parties hereby consent to the jurisdiction of any court of competent jurisdiction for the enforcement of any arbitration award.

20.10   The provisions of this clause:

    20.10.1 constitute an irrevocable consent by the Parties to any proceedings in terms hereof and no Party shall be entitled to withdraw there from or claim at any such proceedings that it is not bound by such provisions;

    20.10.2 are severable from the rest of this Agreement and shall remain in effect despite the termination of or invalidity for any reason of this Agreement.

20.11   Each party shall bear its own costs during the conduct of the arbitration and on conclusion of the arbitration, the arbitrator shall be instructed to make an award as to costs.

## 21. ENTIRE AGREEMENT AND VARIATION

21.1    This Agreement embodies the entire agreement between the Parties as to the subject matter hereof.

21.2    No alteration or variation of any of the provisions of this Agreement shall be of any force or effect unless it is recorded in writing and signed by the Parties hereto.

## 22. NOTICES

22.1    All notices, consents, demands or communications intended for any Party pursuant to this Agreement shall be made in writing and shall:

    22.1.1 if delivered by hand during the normal business hours of the addressee at the addressee's business address stipulated in 22.2, be rebuttably presumed to have been received by the addressee within one (1) working day of delivery;

    22.1.2 if posted by couriers mail such as DHL form an address outside the Democratic Republic of Congo to the addressee's postal address stipulated in 22.2, be rebuttably presumed to have been received by the addressee on the twenty first (21) day after the date of posting;

Notwithstanding anything to the contrary contained in this Agreement, a written notice or communication actually received by one of the parties from another shall be adequate written notice or communication to such party. Notice served on CRUSADER shall be deemed to be served on any and all of CRUSADER's sub-contractors and subsidiaries operating pursuant to this Agreement.

22.2    The parties choose the following as their respective addresses and contact numbers for all purposes flowing from this Agreement.

22.2.1 In the case of DCP:

a)   Business Address and Postal address
     The Place
     1 Sandton Drive
     Sandton, Johannesburg
     South Africa
     2139

22.2.2 In the case of CRUSADER

a)   Business Address and Postal Address
     1580 Ave, 30 Juin
     Quarters Mutoshi, Comune Manika
     Kolwezi, Katanga Province
     Democratic Republic of Congo

22.3   Any party may by written notice to the other parties, alter its addresses.

Thus done and signed on behalf of DCP at _____ on this the ___ day of _____ 2008.

SIGNED by **Tim Henderson** for and on behalf of     )
**DCP** in the presence of:                          )
                                                     )
                                                     _____
                                                     Signature of duly appointed representative

                                                     _____
                                                     Position

................................................
Witness
Name (printed): _____

Thus done and signed on behalf of CRUSADER at _____ on this the ___ day of _____ 2008.

SIGNED by **Ian Hagen** for and on behalf of         )
**CRUSADER** in the presence of:                     )
                                                     )
                                                     _____
                                                     Signature of duly appointed representative

                                                     _____
                                                     Position

................................................
Witness
Name (printed): _____

## ANNEXURE "A"

### DEFINITION OF MEDICAL FACILITIES

1. Subject to the provisions of this Agreement, the Mine Medical Facilities referred to in 4.2, 4.3, 4.4, and 4.5 will be provided by and will remain the property of DCP.

2. DCP will provide an on site fully equipped Occupational Health Facility to provide the services as per Annexure "B", paragraph 1.

3. The Mine Medical Facilities will be upgraded as per the information provided by CRUSADER to DCP, in consultation with the DCP director medical services and equipped to an acceptable level, as per the same proposals. This capital expenditure will also belong to DCP. Which party orders what equipment will be agreed to on site prior to the placement of any order. Such orders by CRUSADER shall attract the fees as stipulated in Annexure "D".

4. CRUSADER shall manage the Mine Medical Facilities referred to 4.2, 4.3, 4.4, and 4.5 in accordance with that required to provide the Medical Services stipulated in Annexure "B" on an international best practice principle, subject to the number of Mine Medical Facilities and/or the hours of operation may not increase without prior negotiation and adjustment of payment for medical services to compensate for these services. The deployment of these clinics will be at the sole discretion of the Chief Executive Officer of DCP or his Authorised Representative.

5. CRUSADER shall manage an ambulance dispatch referred to in 4.3 utilising adequately first aid trained CRUSADER staff (nurses) in conjunction with adequately trained DCP drivers. Adequate training for ambulance drivers will at a minimum include successful completion of a Level 1 first aid course (CRUSADER), advance driving course and familiarity with underground driving and operations.

6. CRUSADER will manage the facilities by utilizing existing seconded DCP staff and augment it with their own as per operational requirements and subject to other requirements within the agreement. It is advisable that DCP retrench the existing staff and they get employed by CRUSADER in order to prevent conflict of interest, employees playing up one party against the other and assist CRUSADER to comply with paragraph 4.6. CRUSADER maintains the right subject to clause 4.6 not to accept any DCP Employees either by secondment or via a job offer. Re-deployment or retrenchment of these rejected employees will be at the discretion and for cost of DCP.

7. Overhead equipment, such as vehicles, needed to fulfil the requirements of this agreement, other than those specified to under this Agreement or agreed to, shall be purchased by and belongs to CRUSADER.

8. The Methodist Clinic in Kolwezi will be available for direct use by dependants. It is recorded here that the owner of this hospital is the United Methodist Church (UMC) under management control of CRUSADER. All equipment in the facility will either belong to the UMC, CRUSADER or MSI, whichever is applicable, but not to DCP. Management of this facility is at the sole discretion of CRUSADER/MSI. However, CRUSADER/MSI shall at all reasonable times give DCP access to the CRUSADER Methodist Clinic for the purpose of conducting an inspection and provide comments, but all visits of this nature will be accompanied by either the company manager or a resident expatriate doctor and no competitors of CRUSADER/MSI shall conduct such audits due to conflict of interest.

9.  CRUSADER can add more or remove preferred health service providers to/from this list at any time, but will do so in consultation with DCP health manager and confirm in writing. It is anticipated that CRUSADER will expand their health services provider network in the DRC

10. Furthermore CRUSADER shall, with the capital investment of MSI, establish three Community Clinics for implementation by 31 December 2008 in the Kapata, Musunoi and Luilu villages to provide medical services to the community, including DCP Employees and the DCP Eligible Dependants. CRUSADER shall fully plan, construct, own and manage these clinics as part of the CRUSADER health provider network in the DRC.

## ANNEXURE "B"

### DEFINITION OF MEDICAL SERVICES

The Medical Services shall consist of, inter alia, the following:

## 1. OCCUPATIONAL HEALTH CARE SERVICES

An occupational health care expert shall be retained by CRUSADER to provide advice on occupational health care services. Occupational health care services shall include all those services generally understood in the medical profession as constituting occupational health care services. Without derogating from the generality of the aforesaid, occupational health care services shall, inter alia, include:

1.1 Provision of pre-employment, periodical and exit medical examinations and related reports in respect of DCP Employees and prospective DCP Employees at the request of DCP, excluding DCP Expatriate pre-employment medical examinations. CRUSADER will perform the Fitness Certification of DCP Expatriates if the relevant pre-employment medical examination results are received by CRUSADER. CRUSADER can arrange the pre-employment and pre-travel medicals upon the request of and at the cost of DCP.

1.2 Ongoing advice to DCP on changes in legislation, laws, by-laws, regulations and standards relating to occupational health matters.

1.3 CRUSADER will not be involved with first aid training provided by DCP training staff to DCP Employees. However, CRUSADER shall provide first aid training to ambulance drivers (Level 1; CRUSADER) and nursing staff likely to be involved with emergencies to Level 3 (CRUSADER).

1.4 On-site curative and remedial services for medical problems and injuries incurred by DCP Employees whilst on duty.

1.5 DCP Contractors shall only be covered for on-site first response care of Mine accidents. All other medical services provided to DCP Contractors will be a direct arrangement between the DCP Contractor and CRUSADER at the cost of the DCP Contractor, exonerating DCP of any responsibility. If DCP gives formal notification for CRUSADER to cover DCP Contractors for other than that mentioned above, then the full scope of services shall be rendered on site only to the approved DCP Contractor employee only at a fee as in annexure "E"

1.6 Baseline Occupational Health Risk Assessments will be performed in conjunction with DCP health, safety, HR and area representatives, at the request of DCP. The scope of such risk assessments can be focussed on positions/jobs and, or work areas.

1.7 Assessment of DCP Employees, Authorised Contractor employees and ex-DCP Employees / Contractors for compensation for injuries sustained whilst on duty, including the arranging of Regional Medical Boards, and provision of related reports.

1.8 Occupational Hygiene, being baseline and ongoing exposure measurements as well as exposure control, falls outside the scope of this agreement. However advice can be provided if requested by DCP health manager.

1.9 Food Service Provider audits shall be performed, upon request by DCP, provided that laboratory tests shall only be conducted or arranged at the request of DCP and at DCP's expense

1.10 CRUSADER will provide technical and day supervision and management of the DCP Medical Facilities, including advice for upgrading the buildings and equipment, overseeing/upgrading of the existing staff and identifying gaps in DCP in-house resources (equipment/drugs/capacity). Ensure staff capacity is improved to address site risks of a typical mine site.

## 2. PRIMARY & SECONDARY HEALTH CARE SERVICES

Primary health care services shall include all those services generally understood in the medical profession as constituting primary health care services. Without derogating from the generality of the aforesaid primary health care services shall, inter alia, include:

2.1 Conducting of medical consultations and provision of necessary treatment to DCP Employees, including where necessary admittance to a Medical Facility on an in-patient basis.

2.2 Referrals and oversight to recommended outside doctors, specialist or medical facilities for DCP Employees and DCP Eligible Dependants whose condition cannot be treated or dealt with in the Clinic due to the condition's medical nature such as, inter alia, gynaecological operations, ophthalmologist referrals, optometrist referrals, etc. Only specialist appointed by CRUSADER may be used.

2.3 It is expressly understood that HIV and Tuberculoses treatment is excluded under this agreement as it is comprehensively covered by a National programme (Refer paragraph 9). Plastic surgery, traditional medical practitioners, herbal remedies, tertiary care (i.e. research and academic medicine) and oncology (cancer) medicine are also excluded. If these services are required by DCP operations, then it will be arranged by CRUSADER at no extra charge, but the service shall attract a commercial fee for service. Services shall only be in-country. If international medical services may be required, then it will be in consultation with DCP and for the cost of DCP. A subsidiary of MSI, Crusader Health, is fully licensed, equipped and organised to provide these services at the highest international level.

2.4 Medical exclusions:

The following conditions are excluded from the definition of Medical Services. These services may be rendered to the DCP Employees and DCP Eligible Dependants on a charge per service basis in consultation with the DCP health manager

2.4.1 All dental work not covered in paragraph 3.

2.4.2 Cancer investigation (beyond primary diagnosis) and treatment (oncology)

2.4.3 Glasses and frames for other than eye disease and injuries and not covered in Annexure "B", Paragraph 4. However the eye testing will be included.

2.4.4 Traditional healers or herbal treatments

2.4.5 Plastic surgery other than post traumatic reconstruction of mine injuries

2.4.6 Tertiary and research medicine.

2.4.7 Anti-retroviral therapy, tuberculosis treatment and vaccinations

2.4.8 All specialist referrals that has not gone through our primary health care system and preferred service provider networks. DCP undertakes to inform their DCP Employees and DCP Eligible Dependants accordingly.

2.4.9 Direct visits to health care providers not on CRUSADER preferred service provider network list. DCP undertakes to inform their DCP Employees and DCP Eligible Dependants accordingly.

2.4.10 Pregnancy related conditions of children.

2.4.11 Self inflicted injuries.

2.4.12 Out of country medical services. DCP undertakes to inform their DCP Employees and DCP Eligible Dependants accordingly.

2.5 No referrals shall take place in respect of any treatment that must be provided at the Clinic in terms of this Agreement. CRUSADER shall endeavour to reduce referrals to Lubumbashi as much as possible, but not to the detriment of any patient. This will be done by upgrading the facilities, equipment and staff knowledge and skills over time.

2.6 Conducting of medical consultations and provision of necessary medical treatment to DCP Contractors, consultants or visitors, excluding Authorised Contractors, working at DCP on-site, which shall attract a fee for service to either DCP or the Contractor, whichever apply. All off-site services may be arranged by CRUSADER but will be for the cost of the DCP Contractor. CRUSADER maintains the right to not allow individual contracting companies access to medical services where there are reasonable grounds for doing so, except in cases of emergencies, and after prior consultation with DCP. CRUSADER may however provide a comprehensive off-site service to the DCP Contractors' employees and/or dependants as well, but this will be for negotiation direct between CRUSADER and the DCP Contractor.

## 3  DENTAL CARE SERVICES

Dental care services shall include all those services generally understood in the medical profession as constituting basic dental care. Without derogating from the generality of the aforesaid dental care services shall, inter alia, include filling of dental caries and tooth extraction.

The following conditions are excluded from the definition of Dental Services. These services may be rendered to the DCP Employees and DCP Eligible Dependants on a charge per service basis in consultation with the DCP health manager

3.1  Periodontal services

3.2  Orthodontal services

3.3  Facial-maxillo surgery

3.4  Dentures and other tooth replacement devices such as caps and bridges

3.5  Implants

## 4  SPECTACLES

Visual acuity (eye) testing, standard glasses and frames shall be included with the provision that:

4.1  The total cost shall not exceed one hundred and sixty USD. DCP undertakes to inform their DCP Employees and DCP Eligible Dependants accordingly. DCP shall reimburse CRUSADER the amount in excess of one hundred and sixty USD and retain the right to recoup such cost from DCP Employee and DCP Eligible Employees in any why they deem appropriate.

4.2  Only one pair of spectacles shall be provided over a period of two years. Unless near and far vision spectacles are require at the same time and the total for both pairs do not exceed 160 USD.

4.3  The following are excluded but may be provided on a fee per service:

4.3.1  Sunglasses and tinting of lenses

4.3.2   Multifocal and varifocal lenses

4.3.3   Special frames

4.3.4   Multiple pairs of spectacles for whatever reason other than in 4.2

4.3.5   Contact lenses and corneal corrective lenses

4.3.6   Replacement of broken, scratched or lost glasses and frames within the stated two year period

4.3.7   Safety spectacles

However DCP is advised to consider replacing standard spectacles with visual adapted safety glasses for those DCP Employees that require wearing safety glasses in the course of their duties.

## 5   TRAUMA STABILISATION AND EVACUATIONS

A trauma stabilisation and evacuation service that shall, inter alia, include:

5.1.   Twenty-four (24) hour primary stabilisation of injured DCP Employees and their DCP Eligible Dependants and approved DCP Contractors at the scene of accident or at the appropriate Medical Facility.

5.2.   For this purpose CRUSADER will establish a centralised response centre, 24/7 staffed by trained dispatchers, ambulance drivers and first responders.  For this purpose DCP will provide the fully equipped facility, three equipped ambulances and one response vehicle.  Care of these vehicles will be for the cost of DCP, but oversight of CRUSADER.  CRUSADER will augment this with its own vehicles as per operational requirements.

5.3.   Stabilisation and monitoring of patients in the Mine Medical Facility in anticipation of evacuation to the nearest appropriate medical facility if evacuation is deemed necessary by CRUSADER.

5.4.   Arranging evacuation in conjunction with the DCP Employees, their DCP Eligible Dependant or DCP Contractor's designated medical insurance/evacuation company, if any, and DCP or DCP Contractor.

5.5.   Physical evacuation of an injured or sick DCP Employee or DCP Eligible Dependant by air or road in conjunction with the relevant DCP medical evacuation insurance company, if any, and DCP, and accompaniment of the injured person by suitable CRUSADER personnel should this be deemed necessary by CRUSADER.

5.6.   Where a DCP Contractor, DCP Expatriate Employee or DCP Eligible Dependant or DCP Employee is not covered for evacuation by a medical insurance company, DCP or DCP Contractor shall, if it agrees to evacuation, pay for all costs relating to evacuation and consequent hospitalisation, provided that Medical Services provided prior to evacuation are covered as set out in Annexure "D".

## 6.  PUBLIC/COMMUNITY HEALTH SERVICES

A public/community health specialist shall be retained by CRUSADER to provide public/community health advice, which shall, inter alia, include:

6.1   Monitoring of and reporting on water and sanitation conditions at the Mine, upon request, provided that laboratory tests shall only be conducted or arranged at the request of DCP and at DCP's expense.

6.2     Promotive and preventative services, including health education and appropriate screening for common diseases, and HIV/AIDS education and counselling to DCP Employees and DCP Eligible Dependants.

6.3     Provision of advice to DCP on public/community health issues and applicable legislation, laws, by-laws, regulations and standards.

6.4     CRUSADER shall, with the capital investment from MSI, and some assistance from DCP in the form of water, electricity and fuel, provide community based day clinics in the communities of DCP dependants.

## 7.  TEST SERVICES

The following tests services shall, inter alia, be provided:

7.1.    A laboratory test service within the Mine Occupational Health Centre providing e.g. malaria tests, blood and urine biochemistry, if and when a Mine Occupational Health Centre is established by DCP.

7.2.    Referrals to recommended outside test laboratories for DCP Employees, DCP Eligible Dependants and DCP Contractors who need to undergo tests where these tests cannot be provided at the CRUSADER Medical Facilities, provided that the costs of such tests on DCP Contractors shall be borne by the DCP Contractors.

## 8.  MEDICAL OPERATIONS SERVICES

8.1.    In-Clinic medical operation facilities shall be provided by CRUSADER to enable them to perform such procedures that can reasonable be expected to be performed by General Practitioners in primary health care (Clinic) settings.

8.2.    All operations required outside the Clinic will be performed or procured nationally by CRUSADER for National DCP Employees.

## 9.  PHARMACEUTICAL SERVICES

9.1     Provision of adequate stock at all times, within the Mine Medical Facilities and appropriate to the function of that facility, with the medicines, drugs, bandages, syringes and other treatments and items necessary to:

     9.1.1    provide the Medical Services;
     9.1.2    treat those diseases and illnesses that can be contracted or can develop in the region where DCP's Kolwezi operations are situated;
     9.1.3    treat accidents that may occur to DCP Employees and DCP Eligible Dependants and DCP Contractors.

9.2     Should the pharmacy be out of stock of any item required to provide the Medical Services then CRUSADER shall ensure that it procures the item as soon as practically possible. If it is not reasonably possible for CRUSADER to procure the item in question timeously, then CRUSADER shall issue a prescription for the individual to collect the medicine.

9.3     Procurement of medicines, drugs, and other items needed to stock DCP's mine safety post/s (Rescue bay/s) as and when requested by DCP, provided that the costs of such items shall be borne by DCP.

## 10. TUBERCULOSIS AND HIV TREATMENTS

Tuberculoses and HIV treatments are excluded in this Agreement as a comprehensive Government initiative exists in Kolwezi at no cost. CRUSADER however maintains responsibility in oversight of these patients to ensure quality care.

## 11. ADMINISTRATIVE AND INFORMATION SERVICES

Administrative and information services shall, inter alia, include:

11.1.   All administration and record keeping necessary in order to enable the Medical Services to be timeously and smoothly provided and recorded for future reference.

11.2.   Keeping easily accessible confidential individual medical records of all DCP Employees and DCP Eligible Dependants. These records will not be assessable by DCP during the term of this agreement, unless such information is deemed by a CRUSADER medical practitioner appropriate and within the International Standard of Medical Ethics, preferably with the consent of the patient.

11.3.   However all occupational health medical records and data will revert to the DCP's new appointed medical service provider upon non-continuance of this agreement.

11.4.   Scrutinising, checking or commenting on all medical expense claims made against DCP by outside doctors, specialists and medical facilities.

11.5.   Scrutinising, checking and commenting on all medical insurance and medical evacuation policies and contracts that DCP wishes to or has entered into with companies to provide cover for DCP Employees and DCP Eligible Dependants, in order to advise DCP on what cover is and is not provided.

11.6.   Scrutinising, checking and processing all medical expense claims made by DCP to its medical insurers and evacuation companies.

11.7.   Provision of medical and health & safety statistics and graphs relating to, inter alia, attendance at the Mine and CRUSADER Medical Facilities by DCP Contractors, DCP Employees and DCP Eligible Dependants as required by DCP for insertion in its weekly, monthly, quarterly and/or annual reports.

## 12. MEDICAL SERVICES PROVIDED OUTSIDE THE CLINIC

In addition to Medical Services specified above CRUSADER shall provide the following Medical Services outside the Mine Clinic:

12.1.   Medical stabilisation and accompaniment as noted in Annexure "B" paragraph 5.

## 13. HOURS OF OPERATION OF CLINIC

13.1.   The Mine Medical Facilities and Methodist Hospital shall be open as stipulated in paragraph 4.2, 4.3, 4.4 and 4.5 on every day of the year during the term of this Agreement in order to handle medical emergencies for DCP Contractors, DCP Employees and DCP Eligible Dependants.

13.2.   Provide service as per operational requirement suitable to the particular Medical Facility.

13.3.   A doctor shall be on call for medical emergencies and shall be accessible by cell phone and (or) mobile radio at all times during the term of this Agreement.

13.4.   Apart from medical emergencies, the Mine Medical Facilities shall be open for normal medical consultations and disbursement of pharmaceutical items prescribed during these consultations for DCP Employees and DCP Eligible Dependants in accordance with the following schedule. This schedule may be modified by CRUSADER, as per operational requirements in consultation with DCP, with the prior written consent of DCP. Such consent shall not be unreasonably withheld.

13.5.   This Schedule shall not be modified, at the insistence of DCP, as to the number of Mine Medical Facilities and/or the hours of operation without prior negotiation with CRUSADER and adjustment of payment for medical services, as per Annexure "A" paragraph 4

### Hours of Operation

| Unit | Mon-Friday | Saturdays | Sundays & Public holidays |
|------|-----------|-----------|---------------------------|
| Dispensary | 08h00 – 20h00 | 08h00 – 18h00 | 09h00 – 14h00 |
| X-Ray | 08h00 – 14h00 | 08h00 – 12h00 | Emergencies Only |
| Laboratory | 08h00 – 14h00 | 08h00 – 12h00 | Emergencies Only |
| Doctor Consultations | 08h00 – 16h00 | 08h00 – 12h00 | Emergencies Only |
| Expatriate clinic | 08h00 – 12h00 By appointment | By appointment | Emergencies Only |

- Before and after these hours are for the cleaning and maintenance of the equipment, facilities, inspections, training and various other medical functions.

## 14. EXPATRIATE MEDICAL EVACUATION INSURANCE SCHEME

14.1   All DCP Expatriate Employees and DCP Dependants who are not on pre-existing evacuation or travel medicine insurance may be enrolled on one of the Crusader Expatriate Medical Evacuation Insurance Schemes as currently underwritten by Santam Insurance, administered by TIC and assistance supported by Europassistance.

14.2   Individuals will be enrolled on a case per case basis as per cost to be determined by CRUSADER and approved by DCP by written notice.

14.2   Cases not insured will be evacuated by CRUSADER with the Crusader Health Group of Companies or Europassistance support on receiving written acceptance of the responsibility of the cost by DCP.

14.3   Pre-insured cases will be evacuated with the assistance of the relevant evacuation company, subject to the rules of the insurance scheme and their availability of inter alia transport. CRUSADER will not be held responsible in the event on non-performance of this DCP elected evacuation company.

## ANNEXURE C

### DEFINITION OF DCP EMPLOYEES AND DCP ELIGIBLE DEPENDANTS

For the purposes of this Agreement DCP Employees and DCP Eligible Dependants shall be those persons set out in the most recent written list provided to CRUSADER from time to time by an authorised representative of DCP. Likewise DCP should supply CRUSADER monthly with updated lists of their Authorised Contractors.

It is expressly understood by the parties that:

- DCP may, on its own, amend these lists from time to time;

- The most recent list provided to CRUSADER by an authorised representative of DCP shall supersede all previous lists.

- DCP shall provide an update list of DCP Contractors and **DCP Expatriate Employees and their DCP Eligible dependants at least monthly.**

- **DCP shall provide a headcount of DCP Employees and DCP Eligible dependants (members) at least monthly by the last day of the month or the first working day thereafter if the last day is a non-working day to allow CRUSADER to process invoices.**

A separate list will be supplied by DCP for dependants that they would like to provide with cover that does not conform to the definition of DCP Eligible Dependants as set out in the Agreement paragraph 1.

| EMPLOYEE NUMBER | NAME OF EMPLOYEE | NAME OF ELIGIBLE EXPATRIATE DEPENDANT (s) | RELATIONSHIP OF ELIGIBLE DEPENDANT TO EMPLOYEE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | · |
| | | | |

## ANNEXURE "D"

### PAYMENT FOR MEDICAL SERVICES TO CRUSADER

As consideration for Medical Services provided by CRUSADER in compliance with the provisions of this Agreement, to DCP, DCP Employees and DCP Eligible Dependants and Authorised Contractors, DCP shall pay CRUSADER monthly in arrears as follows:

1.  A monthly capitation fee of USD 41.00 (FORTY ONE UNITED STATES DOLLARS) per employee (DCP Employee plus DCP Expatriate Employees), net of any withholding or sales taxes that may be levied, payable into a DRC account nominated by CRUSADER.

2.  The capitation fee in 1 above will include the DCP Eligible Dependants. Those not complying with the definition will be dealt with as per paragraph 6.2 of the Agreement.

3.  A monthly fee of USD 12.00 (TWELVE UNITED STATES DOLLARS) per registered Authorised Contractor will be levied for on-DCP-site medical services rendered to Authorised Contractors. If DCP opts not to register their contractors, then CRUSADER shall enter into a direct agreement with the contractor.

4.  Consumable materials such as pharmaceuticals, first aid kits or training material ordered at the request of DCP, which is outside the scope of the Agreement will be charged at a procured cost plus 10 (TEN) percent, or where a cost cannot be established, on a competitive pricing basis.

5.  CRUSADER shall be responsible for payment of ICA tax (whether for mining services or otherwise at any applicable rate) or any other taxes that may be charged by the Democratic Republic of Congolese tax authorities. Evidence of payment of withholding tax by CRUSADER (if applicable) in the form of tax credit certificates will be sent to DCP upon payment of such taxes (if applicable)

6.  The monthly fee referenced in 1 and 3 is annually renegotiable and effected on the 1st day of November for the duration of this Agreement and failing to reach an agreement will escalate by 4% p.a. The negotiations shall be in good faith and based upon an open book arrangement with regards to the costs to deliver the Medical Service to DCP. No electronic or hardcopies of records will be made available in order to ensure confidentiality of information. It is also recorded that confidentiality clauses in agreements of other Crusader clients restricts the provision of information relating to other clients.

7.  It is recorded that if the Katanga/Nikanor merger is finalised and they are joined on this agreement, then the existing KOL agreements' management fees will be added to this fee.

8.  All costs relating to the provision of Medical Services in terms of advice to DCP will attract no additional fee.

## ANNEXURE "E"

## ITEMS BELONGING TO DCP AND MINE ACCOMMODATION TO BE USED BY CRUSADER

### 1.   ITEMS

1.1   Crusader shall supply the following Clinic Equipment, furniture and appliances for the Luilu Clinic. Crusader shall indicate and price any additional items that are required to ensure the safe, efficient operation of the medical facility as and when required.

- Ambu emergency pack complete
- Ambulance Toyota Landcruizer PC type – pre converted
- Assorted instruments (as per Dr. Hagen's specs)
- Audiometer complete with sound proof booth
- Autoclave
- Bed side table X 4
- Cardiac table X 4
- Cervical Collars S, M, L (Or 1 universal size)
- Centrifuge
- Collapsible stretcher
- Consultation Beds X 4
- Coulter Counter
- Diagnosa (ECG, NIBP, BP and Lung functions)
- Diagnostic set X 2
- Drawer trolley X 3
- Dressing trays, Kidney dishes and Gally pots assorted (as per Dr. Hagen specs)
- Drip stand X 3
- Digital scale & Height meter combo
- Filing Cabinettes (Tidy Files system)
- First Aid bag complete (as per Dr. Hagen's specs)
- First Aid training equipment (as per tender document)
- Guedal airways complete set
- ICT: Clinic Office Client Server Database; Stock control system; Laptop computer
- Ishiara Chart
- Laryngoscope set
- Lead PPE for radiography
- Life pack defibrillator or alternative AED
- Medical bed X 4
- Microscope
- Mobile light
- Motorola Radio base station plus antennae, 2 portables (with charges), Mobile for

ambulance and mobile for Doctor's vehicle
- Motorola Repeater
- Nebuliser
- Patella hammer X 2
- Pedal operation waste bin (S/s) X 6
- Pneumo pac ventilator
- Portable Oxygen cylinders with regulator and fittings
- Powerful rechargeable torch.
- Privacy Screen x 3
- Pulse Oximeter
- QBC attachment and centrifuge
- Quick release tourniquet
- Reflotron
- Scoop stretcher
- Snellen chart X 2
- Sound proof booth
- Sphygmomanometer X 3
- Splint set complete
- Steps X 2
- Stethoscope Littman Classic 2 X3
- Suction apparatus
- Thomas Transport Pack Complete
- Thermometer (Braun infrared) X 3
- Treatment bed (Examination couch type)
- Trolley 3 tier X 3
- W/A Examination Light X 2
- X-ray viewing box X 3
- X-ray facility equipment

These items listed in 1.1 shall be purchased on a procured cost reimbursable basis, with a 10 (TEN) percent added as mark-up. Procured cost is the cost of the item, shipping, handling and insurance delivered to site. To ensure maximum tax benefits the consignee of the order will be DCP and where possible it will be shipped with existing DCP orders from SA. The forecasted cost price of this list is USD 400,000 based on USD rates as at December 2006 as per details in tender document. The purchase of these items is to proceed once written authorisation from DCP Projects has been received.

1.2   CRUSADER shall indicate and price any additional items that are required to ensure the safe and efficient operation of the medical facility as and when required. Any Mine Medical Facility equipment, supplied by CRUSADER, shall be subject to pre-consultation and authorisation by the authorised DCP Representative (director medical services)

These items under this clause 1.2 shall be purchased on a procured cost reimbursable basis, with a percentage added as mark-up as per Appendix D. Procured cost is the cost of the item, shipping,

handling and insurance delivered to site. To ensure maximum tax benefits the consignee of the order will be DCP and where possible it will be shipped with existing DCP orders.

1.3     CRUSADER may move any item or equipment for the sole purpose of optimising service delivery, subject to reaching an agreement with the authorised DCP representative (director medical services) and updating an asset register, prior to such move. CRUSADER undertakes not to alienate such DCP items or equipment as per paragraph 10.5 and replace such items if lost while under CRUSADER care.

1.4     DCP shall supply the following equipment to ensure the efficient operation of the Mine Medical Facilities.

- **ICT:**

  **Overhead:** A dedicated 128 kbps bandwidth internet connection connected to a dedicated fire-walled server/s as per paragraph 6.8

  **DCP Mine Clinics**: IT facility, workstations and networking, also considering paragraph 6.9. Failing the installation of this within a reasonable time, then CRUSADER shall proceed to install it on a reimbursable cost bases.

- A repeater and a specific frequency will be provided to CRUSADER for radio communications.

- Furniture, shelving and benches etc. as per specifications given to DCP.

- Vehicles. DCP shall supply and maintain the ambulance and response vehicles in a reliable and safe condition for the use of CRUSADER at their discretion, within reason, for the fulfilment of this Agreement.

## 2.    MINE ACCOMMODATION

Mine accommodation and boarding, with a maximum of ten (10) individuals, which shall inter alia consist of the following:

- Units for the expatriate paramedics and doctors shall consist of at least two double bedroom units in the senior staff camp or in town;

- Appropriate accommodation for other expatriate personnel and/or operations manager (if required);

- Appropriate accommodation for visiting consultants and management as and when applicable.

- Maintenance and use of electricity and water in the aforementioned Mine accommodation by authorised occupants of said accommodation will be for the account of DCP.

22.2.1 In the case of DCP:

    a)    <u>Business Address and Postal address</u>
            The Place
            1 Sandton Drive
            Sandton, Johannesburg
            South Africa
            2139

22.2.2 In the case of CRUSADER

    a)    <u>Business Address and Postal Address</u>
            1580 Ave. 30 Juin
            Quarters Mutoshi, Comune Manika
            Kolwezi, Katanga Province
            Democratic Republic of Congo

22.3    Any party may by written notice to the other parties, alter its addresses.

Thus done and signed on behalf of DCP at _Sandton_ on this the 26th day of _November_ 2008.

SIGNED by **Tim Henderson** for and on behalf of   )
**DCP** in the presence of:   )
   )

                      Signature of duly appointed representative

                      _Interim Coo_
                      Position
                          MW

Witness
Name (printed): _Frederik J Hendriksz_.

Thus done and signed on behalf of CRUSADER at _Pretoria_ on this the 26 day of _November_ 2008.

SIGNED by **Ian Hagen** for and on behalf of   )
**CRUSADER** in the presence of:   )
   )

                      Signature of duly appointed representative

                      Managing Director
                      Position

Witness
Name (printed): _W. G. Smit_

22.2.1 In the case of DCP:

a)    Business Address and Postal address
The Place
1 Sandton Drive
Sandton, Johannesburg
South Africa
2139

22.2.2 In the case of CRUSADER

a)    Business Address and Postal Address
1580 Ave. 30 Juin
Quarters Mutoshi, Comune Manika
Kolwezi, Katanga Province
Democratic Republic of Congo

22.3    Any party may by written notice to the other parties, alter its addresses.

Thus done and signed on behalf of DCP at ___Sandton___ on this the 25ᵗʰ day of _November_ 2008.

SIGNED by **Tim Henderson** for and on behalf of   )
**DCP** in the presence of:   )
   )

_____
Signature of duly appointed representative

    Interim  Coo
Position   MW

_____
Witness
Name (printed): _Frederik J Hendriksz_ .

Thus done and signed on behalf of CRUSADER at _Pretoria_ on this the 26 day of _November_ 2008.

SIGNED by **Ian Hagen** for and on behalf of   )
**CRUSADER** in the presence of:   )
   )

_____
Signature of duly appointed representative

    Managing Director
Position

_____
Witness
Name (printed): _W. G. Smit_