# Exhibit 6

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

# MEDICAL SERVICES AGREEMENT

**between**

**KAMOTO COPPER COMPANY SARL**
**("KCC")**

**and**

**CRUSADER HEALTH RDC SPRL**
**("CRUSADER")**

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## CONTENTS

**CLAUSE NO**          **CLAUSE HEADING**

1.          Definitions and Terminology
2.          Interpretation
3.          Scope and Duration of the Agreement
4.          Obligations of CRUSADER
5.          Obligations of KCC
6.          People covered by the Agreement
7.          Payment for Medical Services
8.          Use of Mine Medical Facilities
9.          Indemnities and Insurance
10.         Confidentiality and Public Statements
11.         Independent Contractor
12.         Force Majeure
13.         Warranty
14.         Assignment
15.         Sub-contractors
16.         Waiver
17.         Breach and Cancellation
18.         Suspension or Cessation of Mining Operations
19.         Return of Mine Medical Facilities, accommodation, equipment and other items upon termination
20.         Applicable Law and Arbitration
21.         Entire Agreement and Variation
22.         Notices

Annexure "A"    Definition of Medical Facilities

Annexure "B"    Definition of Medical Services

Annexure "C"    Definition of KCC Mine Employees and KCC Eligible Dependants

Annexure "D"    Payment for Medical Services to CRUSADER

Annexure "E"    Items belonging to KCC and Mine accommodation to be used by CRUSADER

Annexure "F"    Key result areas and indicators

# MEMORANDUM OF AGREEMENT

entered into between:

## KAMOTO COPPER COMPANY SARL

a company duly incorporated under the laws of the Democratic Republic of Congo, having its main place of business at 57, Avenue Lusanga, Commune de Dilala, Kolwezi, Republique Democratique du Congo. (hereinafter referred to as "KCC")

and

## CRUSADER HEALTH RDC SPRL

a company incorporated in the Democratic Republic of Congo, having its main place of business at 1580 Ave. 30 Juin Quarters Mutoshi, Comune Manika, Kolwezi, Katanga Province. (hereinafter referred to as "CRUSADER")

WHEREAS:

a)     AGREEMENTS with numbers "KOL/CH Contract 10 September 2008" and "DCP/CH Contract 21 November 2008" exist respectively between KOL and DCP with CRUSADER for the provision of comprehensive medical services;

b)     The two subsidiary companies of Katanga Mining Limited in the DRC, being KCC and DCP, are due to be merged into a New Joint Venture Company; this new entity will be referred to as KCC in this Agreement, and such reference shall, where appropriate constitute a reference to KOL and DCP;

c)     KCC carries out mining and related activities in the Kolwezi area of the Katanga Province of the Democratic Republic of Congo;

d)     KCC needs on-site medical care for its KCC Employees and KCC Expatriates in relation to primary health, occupational health, injuries and disease;

e)     KCC needs off-site medical care for KCC Employees, Eligible Dependants of KCC employees and KCC expatriates and their dependents in Kolwezi;

f)     KCC's core business is mining and KCC requires a reliable and competent party to provide a solution through one supplier to provide, or cause to be provided, the comprehensive health care needs, as stipulated in this Agreement, to KCC, KCC Employees and their KCC Eligible Dependants and KCC Expatriates and their dependents in Kolwezi;

g)     CRUSADER is to perform all DRC in-country Medical Services, whilst MSI shall conduct, in terms of a separate agreement, the out-of-country Medical Services;

h)     CRUSADER warrants that it is an experienced and competent provider of the required Medical Services and further warrants that they are suitably organised, qualified with the necessary skills

and know-how, financed, equipped, staffed, licensed and able to provide the required Medical Services in terms of this Agreement to KCC, and to fulfil all the other obligations in terms of this Agreement;

NOW THEREFORE the parties record the following:

## 1. DEFINITIONS AND TERMINOLOGY

In this Agreement, unless the content indicates otherwise:

| | | |
|---|---|---|
| 1.1 | Agreement | means this document, including all annexures and addenda hereto; |
| 1.2 | Claim | means any claim against any one or more of the Parties to this Agreement including (without limitation) any allegation, debt, cause of action, claim, notice, demand, action, proceeding, litigation, investigation, judgment, loss, cost, expense or liability of whatever nature however arising and whether present or future, fixed or unascertained, actual or contingent, and whether arising at law, in equity, under statute or otherwise; |
| 1.3 | Community Clinic | means the community-based day clinic that CRUSADER will establish in the area of Luilu; |
| 1.4 | Commencement Date | means the 1st day of September 2009 notwithstanding the dates of signature hereof; |
| 1.5 | Confidential Information | means all information and materials disclosed, provided or otherwise made accessible to the either of the Parties in the course of performing the Medical Services, whether before or after execution of this Agreement including, but not limited to, the policies, services, processes, procedures, methods, formulations, facilities, products, plans, affairs, transactions, organisations, business connections and clients of either of the Parties and its related bodies corporate but excludes information that the Parties can prove: <br>(a) was in the public domain at the date of this Agreement; <br>(b) subsequent to the date of this Agreement, became part of the public domain otherwise than as a result of disclosure by either Party directly or indirectly in breach of this Agreement; or <br>(c) was known to either of the Parties prior to the date it was received from the other party. |
| 1.6 | Consequential Loss | means in the case of Liability resulting from a breach of contract – indirect, remote, consequential or unforeseeable loss including loss of profits, loss of revenue, loss of production, loss of contracts, loss of markets or access to markets, loss or denial of opportunity, loss of goodwill, loss of business reputation or future reputation, publicity, damage to credit rating, loss of use or any similar loss occasioned by that breach, whether or not in the reasonable contemplation of the parties at the time of execution of this Agreement as being a probable result of the relevant breach; and in the case of Liability arising from any negligence – indirect, remote or unforeseeable loss and, in the case of pure economic loss, loss not flowing directly from the commission of the negligent |

act or omission.

| | | |
|---|---|---|
| 1.7 | CRUSADER | means Crusader Health RDC SPRL, a company incorporated in the Democratic Republic of Congo, and includes its authorised representatives, agents and successors. |
| 1.8 | DRC | means the Democratic Republic of Congo; |
| 1.9 | DCP | means DRC Copper & Cobalt Project SARL, a company incorporated in the Democratic Republic of Congo, which is a subsidiary company of Katanga Mining Limited, and includes its authorised representatives and agents, successors and assigns; |
| 1.10 | Expatriate Employees | means any non-DRC national person who is directly employed by KCC on site and includes Katanga Mining Limited employees on site at KCC but excludes inter alia contractors, consultants or visitors; |
| 1.11 | FAS | means a First Aid station providing emergency care or treatment before regular medical care can be obtained. |
| 1.12 | Government | means the Government of the DRC; |
| 1.13 | Items | means the Items belonging to KCC specified in Annexure "E"; |
| 1.14 | KCC | means Kamoto Copper Company SARL, a company incorporated in the DRC, which is a subsidiary company of Katanga Mining Limited, and includes its authorised representatives and agents, successors and assigns; and it refers collectively to KOL and DCP as well as the new Merged JV Company that will exist after completion of the merger of DCP and KOL; |
| 1.15 | KOL | means Kamoto Operating Limited, a company incorporated in the DRC, which is a subsidiary company of Katanga Mining Limited, and includes its authorised representatives and agents, successors and assigns; |
| 1.16 | KCC Contractors | means employees of contracting companies that are contracted to KCC and are working on site at the KCC operations from time to time and exclude, inter alia, employees of contractor companies working on other non-KCC operations; |
| 1.17 | KCC Eligible Dependants | means one spouse and  6 dependants of the KCC Employee residing in the DRC; dependants being limited to dependent children below 19 years of age, with the exception of those in full-time education of below 25 years of age (not including apprenticeships). The definition of Eligible dependents also includes parents of the Employee or spouse, who are proven to be financially dependent on the Employee. No siblings, siblings of children, same-generation relatives or previous partners will constitute Eligible Dependants in terms of this Agreement.  The number of dependants shall not exceed six in number; |
| 1.18 | KCC Employee | means any person who is directly employed by KCC from time to time and excludes, inter alia, contractors, expatriates, consultants or visitors of KCC, as contemplated in Annexure "C"; |

| 1.19 | Medical Facilities | means the collection of all the contractually agreed upon clinics, owned by KCC,  MSI, CRUSADER or approved third parties, that can be used by KCC Employees and  KCC Eligible Dependants as defined in Annexure "A"; |
|---|---|---|
| 1.20 | Medical Services | means the Medical Services specified in Annexure "B"; |
| 1.21 | Mine | means the KCC mine site and includes KTO, KTC and Luilu PMT's and the container clinics at the open pit and  Luilu; |
| 1.22 | MSI | means Medical Services International, a company incorporated in the Turks and Caicos Islands, and includes its authorised representatives and agents, successors and assigns. |
| 1.23 | Mine Medical Facilities | means the collection of mine-owned premises referred to in clause 4.2, 4.3, 4.4, and 4.5; |
| 1.24 | Parties | means the parties to this Agreement being KCC, CRUSADER, and their respective successors-in-the-title; |
| 1.25 | Signature Date | means the date of signature of this Agreement by the last of its signatories. |

## 2.  INTERPRETATION

2.1     In this Agreement:

2.1.1    the index and the headings to clauses shall be deemed to have been included for purposes of convenience only and shall not govern the interpretation hereof;

2.1.2    unless the context indicates otherwise, a reference to:

2.1.2.1 the singular shall be deemed to include a reference to the plural and visa versa;

2.1.2.2 any one gender shall be deemed to include a reference to the other gender;

2.1.2.3 a natural person shall be deemed to include a reference to a body corporate.

2.2     The terms defined in 1 shall be construed as binding provisions of this Agreement, and any rights conferred and obligations imposed upon the parties by such definitions shall be binding upon them.

## 3.  SCOPE AND DURATION OF THE AGREEMENT

3.1     This Agreement shall commence on the Commencement Date.

3.2     This Agreement shall remain in force for thirty six (36) months, provided that:

3.2.1    the Agreement may be terminated at any time in accordance with the provisions of clauses 17 and 18 of the Agreement;

3.2.2   the Parties may renew the Agreement for a further period if they can agree on the terms and conditions of renewal, provided that any such renewal shall be set out in an addendum to this Agreement and signed by the Parties.

3.3   MSI performance will be measured by key result areas and indicators as referred to in Annexure F.

3.4   The Parties hereby cancel all previous agreements and arrangements which may exist between the Parties regarding the subject matter of this Agreement, including but not limited to the agreements with numbers "KOL/CH Contract 10 September 2008" and "KOL/MSI/CH Contract 10 September 2008", "DCP/CH Contact 21 November 2008" and "DCP/MSI/CH Contract 21 November 2008" with effect from the Commencement Date, which shall from such date, in all respect, supersede such previous agreements, provided that all fees due up to the Commencement Date have been fully paid; failing which, the abovementioned existing agreements shall remain in full force and effect until such fee commitments have been finalised.

3.5   Any Medical Services performed prior to the Commencement Date shall be deemed to have been performed pursuant to this Agreement and any payments made in respect of those Medical Services shall be deemed to have been paid pursuant to this Agreement once the provisions of clause 3.4 have been fulfilled.

3.6   All reporting and correspondence in terms of this Agreement shall be dealt with directly between the duly authorised representatives of the respective Parties to the Agreement, whom the Parties shall appoint in writing on the Signature Date.

## 4. OBLIGATIONS OF CRUSADER

CRUSADER shall, with the assistance of MSI and other DRC subcontractors:

4.1   provide the Medical Services specified in Annexure "B" to KCC Employees, KCC Eligible Dependants and KCC Expatriates and their dependents;

4.1.1   in a commercial, prudent and reasonable manner;

4.1.2   in accordance with suitable and appropriate industry acceptable methods and practices;

4.1.3   with a high degree of professional skill, care and diligence that may reasonably be expected of a skilled, professional person, suitably qualified and experienced, in the performance of services similar to the Medical Services;

4.1.4   in accordance with the terms of this Agreement;

4.2   operate three (3) twenty-four hour adequately-staffed Mine Medical Facilities on the Mine;

4.3   operate a twenty-four (24) hour adequately-staffed ambulance dispatch service from where emergency response will take place on the Mine;

4.4   operate a single (1) 8 hours per day adequately-staffed Mine Medical Facility at Luilu;

4.5   document within 30 days of the Signature Date, recommended changes (if any) with respect to the physical structure of Mine Medical Facilities for consideration by KCC;

4.6    provide to KCC, in consultation with the Manager Health, Safety and Medical services of KCC and within 30 days of the Signature Date, a list of non-medical equipment and sundries that may be required for the Mine Medical Facilities. Articles listed will be for the consideration of KCC and if agreed to, purchased by KCC;

4.7    provide to KCC, in consultation with the Manager Health, Safety and Medical Services of KCC and within 30days of the Signature Date, a medical equipment list for the Mine Medical Facilities;

4.8    appoint appropriate staff to operate the Mine Medical Facilities;

4.9    at all times provide and maintain in a clean, safe and proper operating condition, all buildings, accommodation, equipment, vehicles and whatever else may be necessary for the satisfactory provision of the Medical Services and the fulfilment of its obligations under this Agreement;

4.10   at all  times provide and retain sufficient adequately-licensed, trained, experienced and capable personnel as may be necessary for the satisfactory provision of the Medical Services and the fulfilment of its obligations  under this Agreement, including:

4.10.1 a minimum of one expatriate paramedic, suitably qualified for service in the DRC, who shall be available to provide the Medical Services for fifty two (52) weeks during each twelve (12) month period during the term of this Agreement. This expatriate paramedic must be registered as such with the South African Health Professions Council and also with the equivalent body in the DRC;

4.10.2 a minimum of two expatriate doctors suitably qualified for service in the DRC both of whom shall be available to provide the Medical Services for fifty two (52) weeks during each twelve (12) month period during the term of this Agreement.  These two expatriate doctors must be registered as such with the South African Health Professions Council and also with the DRC Couseil National de L'ordre des Medicins.

4.10.3 other personnel necessary to fulfil the obligations contained  in Annexure "B";

4.11   ensure that the Mine Medical Facilities and the Items listed in Annexure "E" are at all times kept clean, tidy and maintained in a safe, proper and sanitary condition suitable for the provision of the Medical Services;

4.12   obtain, renew and, at all times, maintain in force the necessary agreements, permits, licences, certificates, consents and other authorities necessary to enable it to perform its obligations in terms of this Agreement.  CRUSADER hereby indemnifies and holds KCC harmless against and from the consequences of any failure to obtain, renew and maintain any necessary agreements, permits, licences, certificates, consents and other authorities necessary to enable it to perform its obligations in terms of this Agreement;

4.13   at all times comply with all applicable legislation, laws, by-laws, regulations and standards relating to the provision of the Medical Services and the conduct of related activities;

4.14   at all times ensure that their activities do not:

4.14.1 create a nuisance to KCC or people in the neighbourhood of the Mine

4.14.2 in any way impede the operations of KCC;

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

4.15   at all times ensure that the Mine accommodation provided by KCC to CRUSADER is only used to accommodate CRUSADER staff;

4.16   not make any alterations, extensions or renovations to the Mine Medical Facilities, the Items or the Mine accommodation without obtaining prior written approval from KCC;

4.17   not alienate, let or in any way encumber the Mine Medical Facilities, the Mine accommodation or the Items owned by KCC;

4.18   shall comply with all of KCC's health, safety and environmental standards and rules that are conveyed in writing to CRUSADER. Where KCC has no such standards or rules, DRC legislation remains the minimum standard of work until such time as KCC issues such standards or rules. KCC reserves the right to change or introduce new standards at any time in line with International best practice;

4.19   without limiting the generality of CRUSADER obligations contained in this clause, CRUSADER shall supply its personnel with appropriate clothing and personal protective equipment stipulated for the area in which its personnel are working, as required by KCC and/or DRC regulatory requirements. All equipment used must be of an acceptable standard and rating for the task being performed and must be approved by KCC. Any clothing or personal protective equipment supplied by KCC to CRUSADER shall be back-charged to CRUSADER at pre-approved rates;

4.20   shall regularly remove rubbish, surplus material and medical waste. Waste materials shall be segregated, collected and transported in accordance with KCC requirements and DRC regulatory requirements. Under no circumstances may CRUSADER allow waste materials of any type to accumulate on the Mine or not to be disposed of in an appropriate manner;

4.21   any pollution, contamination or other damage caused by CRUSADER and not addressed by CRUSADER in such a timely and appropriate manner as may be requested by KCC may be attended to by KCC and all costs will be back-charged to CRUSADER;

4.22   shall at all reasonable times give KCC access to any place where the Medical Services are being carried out for the purpose of conducting an audit to determine CRUSADER level of compliance with the environmental and health and safety requirements as required by KCC and DRC legislation. All visits of this nature will be accompanied by either a manager of CRUSADER or a resident expatriate doctor and no competitors of CRUSADER/MSI shall conduct such audits, due to conflict of interest.   In the event that KCC's audit identifies non-compliances, they shall be rectified by CRUSADER as directed and in no case later than 30 (thirty) days after receipt of written notification from KCC;

4.23   shall promptly report and investigate all incidents including, but not limited to, any reportable release of a hazardous substance and any injuries. CRUSADER shall consult with KCC during the course of investigating and reporting incidents in order to protect all privileges available to KCC;

4.24   shall fully cooperate with any investigation undertaken by KCC or its appointed representatives following any incident or accident.   CRUSADER shall fully implement any measures as required by KCC following an incident investigation;

4.25   shall provide all of its personnel with health insurance cover.   For all non-DRC personnel, this shall also include medical evacuation insurance cover.   Proof of such insurance cover shall be provided to KCC prior to the mobilisation to site of CRUSADER personnel.

## 5.   OBLIGATIONS OF KCC

KCC shall, subject to the other provisions of this Agreement:

5.1     provide and maintain the Mine Medical Facilities, furnishings and medical equipment to CRUSADER free of charge and in a condition suitable for the purposes intended in terms of this Agreement, in order to enable CRUSADER to provide the Medical Services in terms of this Agreement;

5.2     maintain and provide free of charge the water and electrical services to the Mine Medical Facilities;

5.3     brief KCC Employees on the scope and ambit of medical services that KCC shall provide and inform KCC Employees that CRUSADER has been contracted by KCC to provide such medical services to KCC Employees and KCC Eligible Dependants on behalf of KCC;

5.4     provide and maintain for the duration of the Agreement appropriate accommodation for the expatriate staff of CRUSADER.  Provide and maintain appropriate accommodation for visiting Crusader technical experts / executive visits to KCC.  The accommodation must be appropriate to the level of staff member, as per KCC standards, i.e. senior management of CRUSADER will be expected to be housed in appropriate senior management accommodation as KCC would house their senior management and likewise for junior staff members;

5.5     provide CRUSADER with the best available communication means in the DRC, including but not limited to, radio access, but excluding cell phones;

5.6     allow CRUSADER use of KCC's electronic mail and internet capabilities in the Mine Medical Facilities subject to the rules set out by KCC from time to time;

5.7     provide Information Technology hardware and software to the Mine Medical Facilities to enable CRUSADER to provide the Medical Services as per Annexure "B", with the minimum of one (1) computer / terminal workstation and one  (1) desk top printer / scanner per facility;

5.8     allow reasonable access to suppliers, clients or contractors authorised by CRUSADER to the Mine Medical Facilities of KCC, subject to KCC's access rules and regulations from time to time;

5.9     allow CRUSADER to, at the cost of CRUSADER erect appropriate directional signs to the Mine Medical Facilities on KCC's mining concessions, as well as stickers or notices as appropriate, for successfully fulfilling its obligations under this Agreement, including but not limited to the markings on KCC emergency vehicles;

5.10    when necessary make every reasonable effort to maintain and repair the Mine Medical Facilities as a priority task;

5.11    provide CRUSADER with updated employee lists monthly by the last day of the month, or the next working day, to enable CRUSADER to provide the Medical Services and invoices timeously, failing which, the last available list will be used by CRUSADER and reconciled with the next

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

available list;

5.12    allow CRUSADER employees working at KCC's Kolwezi operations to use the daily bus transport to site;

5.13    render reasonable non-financial assistance if required by CRUSADER, in respect of obtaining visas and work permits for CRUSADER personnel in order to enable CRUSADER to fulfil its obligations of expatriate presence under this Agreement;

5.14    in consideration for CRUSADER providing the Medical Services, pay CRUSADER the fees in the amounts calculated in accordance with annexure "D";

5.15    CRUSADER shall report directly to the authorised KCC Representative (contract administrator), as notified in writing to CRUSADER by the KCC COO.

## 6. PEOPLE COVERED BY THE AGREEMENT

6.1    CRUSADER shall provide Medical Services in terms of this Agreement to KCC Employees, KCC Eligible Dependants and KCC Expatriate Employees and their dependents in Kolwezi or Lubumbashi;

6.2     in respect of KCC Expatriate Employees and their dependents in Kolwezi or Lubumbashi, the cost of any medical service delivery by Crusader shall be limited to $ 50 per event. It is noted that KCC Expatriate Employees and their dependents in Kolwezi or Lubumbashi are all on a Medical Plan, paid for by KCC as part of a condition of service;

6.3    in the case of KCC Contractors with work-related injuries or a medical emergency whilst on the mine site, this Agreement only covers the on-site emergency medical response care to such KCC Contractors.

## 7. PAYMENT FOR MEDICAL SERVICES

7.1    As consideration for Medical Services provided by CRUSADER in compliance with the provisions of this Agreement, KCC shall pay CRUSADER monthly in arrears within 30 working days following approval of the CRUSADER invoice by the authorised KCC Representative, as stipulated in Annexure "D"; Provided that:

   7.1.1    CRUSADER shall:

      7.1.1.1 submit correct invoices to KCC;

      7.1.1.2 ensure that each invoice is accompanied by any and all supporting documentation as may be reasonably required by KCC;

      7.1.1.3 ensure that each invoice and any supporting documentation complies with all applicable DRC legislation;

   7.1.2    KCC shall be entitled to:

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

7.1.2.1 deduct any monies that are due by CRUSADER to KCC from payment of the invoices to CRUSADER after supplying supporting documentation to CRUSADER as may be reasonably required by CRUSADER;

7.1.2.2 reject in writing any invoice or supporting documentation that does not comply with the provisions of 7.1.1.1, 7.1.1.2 or 7.1.1.3; on condition that the invoice is rejected within 15 days of the receipt of the invoice. If the invoice has not been rejected within 15 days of receipt, the invoice shall be deemed to have been approved by KCC and the invoice shall become payable within 15 days of such approval.

7.2 Failure by KCC to make payment to CRUSADER within 30 working days of approval of the undisputed invoice by KCC shall result in interest at a rate of 1% above the LIBOR rate from time to time, being levied on the arrear invoice, reckoned from the due date of such amounts until they are respectively paid.

## 8. USE OF MINE MEDICAL FACILITIES, KCC MINE ACCOMMODATION AND OTHER ITEMS

Subject to the provisions of this Agreement, CRUSADER shall be entitled to use the Mine Medical Facilities specified in Annexure "A", those Items belonging to KCC in the Mine Medical Facilities, and the Mine accommodation listed in Annexure "E" provided that:

8.1 the Mine Medical Facilities are only used to provide Medical Services to KCC Employees, KCC Eligible Dependants, KCC Contractors, and any emergency case. In so far as CRUSADER wishes to utilise the Mine Medical Facilities for any other purpose, it shall be required to obtain prior written permission from KCC;

8.2 the Items belonging to and purchased by KCC are only used in the Mine Medical Facilities in accordance with the provisions of this Agreement and Annexure "E";

8.3 the Mine accommodation is only used to accommodate CRUSADER staff (as envisaged in Annexure "E");

8.4 CRUSADER shall not make any alterations, extensions or renovations to the Mine Medical Facilities, the Items or the Mine accommodation without obtaining prior written approval from KCC;

8.5 CRUSADER shall not alienate, let or in any way encumber the Mine Medical Facilities, the Items, the Mine accommodation, vehicles or related items owned by KCC, and shall utilise same solely for purposes of rendering services to KCC in terms of this Agreement.

## 9. INDEMNITIES AND INSURANCE

9.1 CRUSADER hereby indemnifies KCC against all Claims made upon or suffered by KCC or its employees, agents and/or representatives as a result of, or arising from any risk that CRUSADER is liable for in terms of this Agreement or any negligent act or omission on the part of CRUSADER or its employees, agents, sub-contractors and/or representatives, provided that

CRUSADER shall not be liable to KCC for any Consequential Loss suffered by KCC as a result of a breach of this Agreement.

9.2     KCC hereby indemnifies CRUSADER against all Claims made upon or suffered by CRUSADER or its employees, agents and representatives as a result of, or arising from, any risk that KCC is liable for in terms of this Agreement or any negligent act or omission on the part of KCC or its employees, agents, sub-contractors and representatives, provided that KCC shall not be liable to CRUSADER for any Consequential Loss suffered by CRUSADER as a result of a breach of this Agreement.

9.3     Each of the Parties shall, at its own expense, take out and maintain in force during the currency of this Agreement third party liability insurance policies with a reputable Insurer with a minimum claim limit of USD 5,000,000 (five million United States Dollars) per claim, indemnifying the other Party against all Claims and demands made upon or suffered by the other Party, as referred to above in 9.1 and 9.2, with the exception of medical malpractice liability.

9.4     CRUSADER shall in addition, at its own expense, take out and maintain in force during the currency of the Agreement, comprehensive insurance to cover:

9.4.1   medical malpractice liability with a minimum claim limit of USD 5,000,000 (five million United States Dollars) per claim and a maximum deductible of USD 100,000 (one hundred thousand United States Dollars) ;

9.4.2   those risks CRUSADER are required to insure against as the operators of a private or Mine Medical Facility in the DRC as required by the Ministry of Health and any other applicable Government authorities.

9.5     Each Party shall furnish the other Party, within 30 days after the Signature Date, with copies of all insurance policies it has taken out in terms of this clause 9 as well as copies of documents evidencing payment of insurance premiums annually within 30 days after making such payment, for the duration of the Agreement.


## 10.  CONFIDENTIALITY AND PUBLIC STATEMENTS

10.1    The recipient Party of Confidential Information shall not, and shall ensure that its personnel do not, publish, transmit, disclose to anyone else, or use for any purpose other than the execution of this Agreement, any of the owner Party's Confidential Information, unless such publication, transmission or disclosure has been authorised in writing by the owner Party.

10.2    The recipient Party may make copies of written or computer stored materials incorporating Confidential Information only if those copies are necessary for the purposes of providing the Medical Services in terms of this Agreement and must:

(a)     return to the owner Party all Confidential Information (including any copies made by it); and

(b)     permanently delete any Confidential Information stored by it in a computer or electronic retrieval system so that it is incapable of retrieval within 7 days of the first to occur of the following:

      i.    a receipt of a written request from the requesting party to do so;

     ii.    the termination of the Agreement in accordance with clause 17 of the Agreement

and provide written notification to the owner Party that these obligations have been complied with.

10.3  The recipient Party must notify the owner Party immediately if it becomes aware of, or suspects, any disclosure, use or copying of Confidential Information that is not authorised by this Agreement and must take all steps as are reasonably required by the owner Party to stop the unauthorised disclosure, use or copying of the Confidential Information.

10.4  The recipient Party must restrict disclosure of the Confidential Information to relevant personnel who require knowledge of this information in order to provide the Medical Services in terms of this Agreement and must, on reasonable request by the owner Party, ensure those relevant personnel execute confidentiality agreements that are similar in effect to the provisions of this clause.

10.5  Clause 10.1 does not affect:

(a)  the disclosure of information, documents and material that are publicly available otherwise than because the persons disclosing such information contravened this clause 10;

(b)  disclosures required by law; or

(c)  disclosures to either of the Party's legal, accounting and financial advisers, provided that such advisers are bound by equivalent confidentiality obligations to those contained in this clause.

10.6  The Parties shall not be entitled to make any public announcement or public disclosure without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

## 11. INDEPENDENT CONTRACTOR

11.1  The relationship of CRUSADER to KCC shall be that of independent contractor and employees and representatives of CRUSADER shall in no way be construed as being employees of KCC. Upon termination of this Agreement for whatsoever reason, neither CRUSADER's employees nor representatives shall be entitled to any redundancy, retrenchment, severance payments or benefits whatsoever from KCC other than what has been stipulated in this Agreement.

11.2  Provision of any Medical Services by CRUSADER to KCC Employees, KCC Eligible Dependants, KCC Expatriates, contractors or any member of the public or any other third party shall be done on an independent basis by CRUSADER acting as principal and shall not be provided or in any way be construed as being provided by CRUSADER as agents acting for or on behalf of KCC.

## 12. FORCE MAJEURE

12.1   Neither of the Parties shall be liable for a failure to perform any of its obligations in terms of this Agreement insofar as it proves:

12.1.1  that the failure was due to an impediment beyond its control;

12.1.2  that such impediment was not reasonably foreseeable at the time of the conclusion of this Agreement; and

12.1.3  that it could not reasonably have avoided or overcome the impediment or the effects of such impediment,

in which event the obligations of the Parties in terms of this Agreement shall be suspended.

12.2   An impediment, as aforesaid, may result from events such as the following, this enumeration not being exhaustive:

12.2.1  war, whether declared or not, civil war, civil violence, riots and revolutions, acts of sabotage;

12.2.2  natural disasters such as violent storms, cyclones, earthquakes, tidal waves, floods, destruction by lightning;

12.2.3  explosions and fires which result in the destruction of machines, factories and any kind of installations;

12.2.4  boycotts, strikes and lock-outs of all kinds, go-slows, occupation of factories and premises, and work stoppages;

12.2.5  acts of authority, whether lawful or unlawful, apart from acts from which the party seeking relief has assumed the risk by virtue of any other provisions of this Agreement.

12.3   For the purposes of this clause "impediment" does not include lack of authorisations, licences, permits or approvals that are required to be issued by the appropriate public authority and are necessary for the performance of this Agreement.

12.4   Relief from liability for non-performance by reason of the provisions of this clause shall commence on the date upon which the Party seeking relief gives notice to the other Party of the impediment relied upon and shall terminate upon the date upon which such impediment ceases to exist; Provided that if such impediment continues for a period of more than sixty (60) days either of the Parties shall be entitled to terminate or suspend this Agreement.

## 13. WARRANTY

13.1   CRUSADER and KCC warrant to the extent relevant to them:

13.1.1  that they are qualified and licensed to conduct business in the DRC;

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

13.1.2  that they are not trading or carrying on business in insolvent circumstances;

13.1.3  that they are empowered, authorised and entitled to enter into this Agreement and that no transaction contemplated hereby is in breach of the articles of association, certificate of incorporation or any other agreement or arrangement to which they are a party;

13.1.4  that all corporate and other proceedings required to authorise them to enter into and carry out this Agreement have been duly and properly executed;

13.1.5  that they will procure that any subsidiary or contractor that becomes a party to this Agreement or assumes any obligation in terms hereof, will perform its respective obligations timeously so as to ensure that the objectives of this Agreement are achieved.

## 14.  ASSIGNMENT

14.1  CRUSADER may not cede, assign, transfer, make over, encumber, delegate or share any of its rights or obligations under this Agreement without the prior written consent of KCC.

14.2  KCC may assign any rights under this Agreement to any legal entity that assumes all of KCC's obligations and accepts all of KCC's rights under this Agreement by giving 14 days notice to CRUSADER.

## 15.  SUB-CONTRACTORS

15.1  Subject to clause 14, CRUSADER may engage sub-contractors to assist in the provision of the Medical Services in terms of this Agreement.

15.2  If CRUSADER engages a sub-contractor, CRUSADER:

15.2.1  must ensure the work performed by the sub-contractor or any representative of the sub-contractor meets the requirements of this Agreement, including without limitation, clause 4.1;

15.2.2  is liable to KCC for the acts, omissions and defaults of that sub-contractor or any representative of the sub-contractor as if they were the acts, omissions and defaults of CRUSADER;

15.2.3  must ensure that the agreement with the sub-contractor is terminable on one month's notice, and that the sub-contractor vacates KCC's property immediately, if this Agreement is terminated;

15.2.4  shall indemnify KCC against all Claims relating to the sub-contractor, a sub-contract or the provision of the Medical Services pursuant to a sub-contract; and

15.2.5  shall ensure that it enters into a written agreement with the sub-contractor that is wholly consistent with CRUSADER's obligations under this Agreement and meets with KCC's prior approval.

## 16.  WAIVER

The failure of a Party to insist upon the strict performance of any provision of this Agreement or to exercise any right, power or remedy consequent upon a breach hereof by the other Party shall not constitute a waiver by such Party or whether by estoppel or otherwise, limit any of the existing or future rights of such Party, save in the event and to the extent that such Party has signed a written document expressly waiving or limiting such rights..

## 17.  BREACH AND CANCELLATION

Notwithstanding any other provision of this Agreement and without prejudice to any other rights which the Parties may have:

17.1    The Parties shall have the right to terminate this Agreement at any time by not less than (90) days' written notice.

17.2    KCC shall have the right to terminate the engagement of CRUSADER by 30 days written notice to CRUSADER if

    17.2.1 CRUSADER does not provide the Medical Services at the standard required or otherwise breaches a provision of this Agreement and that failure or breach:

        (i)      is incapable of remedy; or

        (ii)     if capable of remedy, continues for (30) days after KCC provides CRUSADER with written notification requiring the breach to be remedied; or

    17.2.2 CRUSADER becomes insolvent or commits an act of insolvency..

17.3    CRUSADER shall have the right to cancel this Agreement forthwith should KCC be in breach of any of the provisions of this Agreement and fail within (30) days of receipt of a notice calling upon it to remedy such breach to comply therewith.

## 18.  SUSPENSION OR CESSATION OF MINING OPERATIONS

In the event of KCC suspending or ceasing mining-related operations completely it shall, notwithstanding any other provisions of this Agreement, be entitled to terminate this Agreement by giving CRUSADER ninety (90) days notice in writing of the suspension or cessation of mining operations.  This clause refers exclusively to the suspension of mining operations and does not apply to any take-overs, mergers, or other commercial vehicles that may be used to change the structure or ownership of KCC.

## 19.  RETURN OF MINE MEDICAL FACILITIES, ACCOMMODATION, EQUIPMENT AND OTHER ITEMS UPON TERMINATION

19.1 Within thirty (30) days of the termination of this Agreement for whatsoever reason, CRUSADER shall, at its expense:

19.1.1 vacate and return to KCC the Mine Medical Facilities and the Mine accommodation; and

19.1.2 return all Items belonging to KCC including those listed in the asset register as per Annexure "E",

to KCC in the same order and repair as they were at the commencement of the Agreement, maintenance by KCC, approved alterations, extensions, renovations and fair wear and tear excepted.

19.2 CRUSADER shall be responsible for and shall bear all costs relating to the eviction of any of its employees and/or their dependants from KCC accommodation, including the costs of all court proceedings (regardless of whether or not these are instituted by CRUSADER, MSI or KCC).

19.3 CRUSADER shall be responsible for and shall bear all costs and claims relating to the removal of any unauthorised structures or extensions made by its employees and/or their dependants at the KCC accommodation and shall ensure the removal of any such structures and extensions within thirty (30) days of the termination of this Agreement for whatsoever reason.

19.4 Until the requirements of clause 19.1, 19.2 and 19.3 are complied with, KCC shall, without prejudice to any of its other rights be entitled to withhold payment of any fees or other money as may be owing to CRUSADER under this Agreement.


## 20.  APPLICABLE LAW AND ARBITRATION

20.1 The language of the contract is English; this Agreement is governed by the laws of the DRC

20.2 In the event of a dispute arising between the Parties in respect of this Agreement, either Party must deliver a written notice to the other Party which notice must detail the nature of the dispute (a "Notice of Dispute").

20.3 Upon receipt of a Notice of Dispute, each Party's duly authorised representative/s shall arrange to meet within 15 business days of the issue of the Notice of Dispute and attempt to resolve the dispute.

20.4 If the dispute remains unresolved for 30 business days after the issue of the relevant Notice of Dispute, the dispute shall be referred to arbitration.

20.5 This clause shall not preclude any Party from obtaining interim relief on an urgent basis from a court of competent jurisdiction pending the decision of the arbitrator.

20.6 Any dispute, controversy or claim arising out of or relating to this contract, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the UNCITRAL Arbitration Rules as at present in force.

20.6.1 The arbitrator shall, if the dispute is agreed in writing by the Parties to be -

15.6.1  primarily an accounting matter, be an independent practising accountant of not less than ten years' standing as such;

15.6.2  primarily a legal matter, be an attorney of not less than ten years' standing as such or a practising senior counsel at the Johannesburg Bar;

15.6.3  any other matter, be a suitably qualified independent person,

agreed upon in writing by the Parties;  provided that if the Parties do not, within three days after the date on which the arbitration is demanded, agree in writing as to the nature of the dispute and the identity of the arbitrator, the arbitrator shall, irrespective of the nature of the dispute, be appointed by  the Chairman of the Johannesburg Bar Council or its successor-in-title as the case may be, upon request by either party to make such appointment after the expiry of such three day period.

20.6.2  The arbitration shall be held:

15.7.1  in Johannesburg or any alternative venue agreed to by all Parties;

15.7.2  with only the legal and other representatives of the Parties of the dispute present;

15.7.3  subject to the other provisions to this clause in accordance with the rules of the Arbitration Foundation of Southern Africa ("AFSA"),

it being the intention that the arbitration shall be held and completed as soon as possible.

20.6.3  The Parties hereby consent to the jurisdiction of any court of competent jurisdiction for the enforcement of any arbitration award.

20.6.4  The provisions of this clause:

15.9.1  constitute an irrevocable consent by the Parties to any proceedings in terms hereof and no Party shall be entitled to withdraw therefrom or claim at any such proceedings that it is not bound by such provisions;

15.9.2  are severable from the rest of this Agreement and shall remain in effect despite the termination or invalidity for any reason of this Agreement.

20.7  The decision of the arbitrator shall be final and binding on the Parties and may be made an order of any competent court at the instance of any of the Parties.

.

20.8  Each party shall bear its own costs during the conduct of the arbitration and on conclusion of the arbitration, the arbitrator shall be instructed to make an award as to costs.

## 21.   ENTIRE AGREEMENT AND VARIATION

21.1    This Agreement embodies the entire agreement between the Parties as to the subject matter hereof.

21.2    No alteration or variation of any of the provisions of this Agreement shall be of any force or effect unless recorded in writing and signed by the Parties hereto.

## 22.   NOTICES

22.1    All notices, consents, demands or communications intended for any Party pursuant to this Agreement shall be made in writing and shall:

22.1.1  if delivered by hand during the normal business  hours of the addressee at the addressee's business address stipulated in 22.2, be rebuttably presumed to have been received by the addressee within one (1) working day of delivery;

22.1.2  if posted by courier or mailed from an address outside the DRC to the addressee's postal address stipulated in 22.2, be rebuttably presumed to have been received by the addressee on the twenty first (21) day after the date of posting.

Notwithstanding anything to the contrary contained in this Agreement, a written notice or communication actually received by one of the Parties from another shall be adequate written notice or communication to such Party.   Notice served on CRUSADER shall be deemed to be served on any and all of CRUSADER's sub-contractors and subsidiaries operating pursuant to this Agreement.

22.2    The parties choose the following as their respective addresses and contact numbers for all purposes flowing from this Agreement.

22.2.1 In the case of KCC:

a)      <u>Business Address and Postal address</u>
        The Place
        1 Sandton Drive
        Sandton, Johannesburg
        South Africa
        2139

22.2.2  In the case of CRUSADER

a)      <u>Business Address and Postal Address</u>
        1580 Ave. 30 Juin
        Quarters Mutoshi, Comune Manika
        Kolwezi, Katanga Province
        Democratic Republic of Congo

22.3    Any Party may by written notice to the other Party, alter its addresses.

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

Thus done and signed on behalf of KCC at _____ on this the ____ day of _____ 2009.

SIGNED by _____ for and on behalf       )
of **KCC** in the presence of:                                        )
                                                                                   )  _____
                                                                                        Signature of duly appointed representative

                                                                                        _____
                                                                                        Position

.................................................................
Witness
Name (printed):_____

Thus done and signed on behalf of CRUSADER at _____ on this the ____ day of _____ 2009.

SIGNED by **Ian Hagen** for and on behalf of        )
**CRUSADER** in the presence of:                          )
                                                                                   )  _____
                                                                                        Signature of duly appointed representative

                                                                                        _____
                                                                                        Position

.................................................................
Witness
Name (printed):  _____

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## ANNEXURE "A"

## DEFINITION OF MINE MEDICAL FACILITIES

1.  Subject to the provisions of this Agreement, the Mine Medical Facilities referred to in 4.2, 4.3, and 4.4, will be provided by and will remain the property of KCC.

2.  The Mine Medical Facilities and equipment will be upgraded as necessary based on reports provided by CRUSADER to KCC, in consultation with the KCC Manager Health, Safety and Medical Services. Any such capital expenditure will be for the account of KCC.

3.  CRUSADER shall manage the Mine Medical Facilities referred to in paragraphs 4.2, 4.3, and 4.4 of this Agreement, in accordance with its obligations to provide the Medical Services stipulated in Annexure "B" on an international best practice standards principle The number of Mine Medical Facilities and/or the hours of operation of these Mine Medical Facilities may not increase or decrease without prior negotiation between the Parties and adjustment of payment.

4.  CRUSADER shall manage an ambulance dispatch service referred to in paragraph 4.3 of this Agreement utilising adequately trained CRUSADER staff (nurses) in conjunction with adequately trained KCC drivers.  Adequate training for ambulance drivers will, at a minimum, include successful completion of a Level 1 first aid course, advance driving course and familiarity with underground driving and operations.

5.  Overhead equipment, such as vehicles, needed to fulfil the requirements of this Agreement, other than those specified in terms of this Agreement, shall be purchased by and belong to CRUSADER.

6.  CRUSADER shall procure that the Methodist Clinic in Kolwezi will be available for direct use by KCC employees and their KCC Eligible Dependants.  It is recorded here that the owner of this hospital is the United Methodist Church (UMC) under the management and control of CRUSADER.  All equipment in the facility will either belong to the UMC, CRUSADER or MSI, whichever is applicable, but not to KCC.  Management of this facility is at the sole discretion of CRUSADER.  However, CRUSADER shall at all reasonable times give KCC access to the CRUSADER Methodist Clinic for the purpose of conducting an inspection and providing comments, but all visits of this nature will be accompanied by either the company manager or a resident expatriate doctor and no competitors of CRUSADER shall conduct such audits, due to conflict of interest.

7.  CRUSADER shall, with the capital investment of MSI, establish by no later than September 30th 2009 one Community Clinic in the Luilu village to provide Medical Services to the community, including KCC Employees and the KCC Eligible Dependants. Crusader shall also establish by October 31st 2009, with the capital investment of MSI, a new permanent hospital in Kolwezi. CRUSADER shall fully plan, construct, equip, own and manage these facilities as part of the CRUSADER health provider network in the DRC and such facilities shall be made available to KCC Employees and KCC Eligible Dependants.

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## ANNEXURE "B"

### DEFINITION OF MEDICAL SERVICES

**Introduction**

**The DRC Mining and Labour codes and the "Labour Convention" that KCC has entered into with the Union require that medical services to employees and dependents be provided by a mining company. The scope of such medical services is not defined. KCC has therefore considered the following in determining the scope of medical services that the company will provide to employees and dependents:**
1. **The medical services normally available to employees and their dependents of private mining companies in the DRC.**
2. **The medical services that are provided to employees and dependents of the State mining company (Gecamines) in the DRC.**
3. **That KCC has made a decision that it will not pay for medical services that require referral outside of the DRC.**

**In the light of the above, this Annexure is intended to define the scope of medical services which KCC believes it should be providing to employees and dependents and which KCC has contracted to Crusader for delivery.**


## 1. OCCUPATIONAL MEDICAL SERVICES

An occupational medical expert shall be retained by CRUSADER to provide advice on occupational medicine. Occupational medicine shall include all those services generally understood in the medical profession as constituting occupational medicine. Specifically, this service will take cognisance of DRC legislation in this regard. Without derogating from the generality of the aforesaid, occupational medical services shall include:

1.1 Provision of pre-employment, periodical and exit medical examinations and related certificates and reports in respect of KCC Employees and prospective KCC Employees at the request of KCC, excluding KCC Expatriate pre-employment medical examinations. CRUSADER shall perform the Fitness Certification of KCC Expatriates if the relevant pre-employment medical examination results are received by CRUSADER. CRUSADER shall arrange the pre-employment and pre-travel medicals of KCC expatriate employees if requested by and at the cost of KCC;

1.2 ongoing advice to KCC on changes in DRC legislation, laws, by-laws, regulations and standards relating to occupational medical matters;

1.3 provision of first aid training to ambulance drivers and medical emergency training to nursing staff likely to be involved with emergencies;

1.4 on-site curative and remedial services for medical problems and injuries incurred by KCC Employees whilst on duty;

1.5 KCC Contractors shall only be covered for on-site <u>emergency medical or trauma response;</u>

1.6     Baseline Occupational Health Risk Assessments will be performed in conjunction with KCC occupational hygiene and  safety representatives, at the request of KCC;

1.7     assessment of KCC Employees and ex- KCC employees who sustained injuries whilst on duty. This will include provision of reports to KCC and reports necessary in terms of DRC legislation;

1.8     occupational Hygiene falls outside the scope of this Agreement;

1.9     Food Service Provider audits shall be performed, upon request by KCC, provided that laboratory tests shall only be conducted or arranged at the request of KCC and at KCC's expense;

1.10    CRUSADER shall staff and manage the KCC Medical Facilities;

## 2. HEALTH CARE SERVICES

Health care services shall include:

2.1     conducting medical consultations and provision of necessary treatment, including where necessary admission to a Medical Facility ;

2.2     referrals and oversight to outside doctors, specialist or medical facilities for KCC Employees and KCC Eligible Dependants whose conditions cannot be treated or dealt with in Crusader Medical Facilities;

2.3     Services shall only be in-country DRC and if International medical services are required, then this will be in consultation with KCC and not for the cost of Crusader;

2.4     Medical exclusions:
        The following are excluded from the definition of Medical Services;
        2.4.1   cancer investigation and treatment, beyond what is necessary for primary diagnosis
        2.4.2   traditional healers or herbal treatments
        2.4.3   tonics other than vitamins
        2.4.4   chronic medication for KCC expatriates and their dependents
        2.4.5   skin lotions and cosmetics other than those normally prescribed for skin diseases
        2.4.6   plastic surgery, other than post traumatic reconstruction in respect of mine injuries
        2.4.7   prostheses and surgical appliances
        2.4.8   tertiary and research medicine
        2.4.9   anti-retroviral therapy, tuberculosis treatment and vaccinations
        2.4.10  hospice or hospitalisation beyond 3 months
        2.4.11  all specialist referrals that have not gone through the Crusader primary health care system
        2.4.12  attendance and treatment by health care providers not authorised by Crusader
        2.4.13  self-inflicted injuries
        2.4.14   medical services outside of the DRC.

2.5     No medical referrals shall be made for diagnosis and treatment that could normally be provided at the Methodist Clinic or Crusader Kolwezi Hospital.  CRUSADER shall endeavour to reduce referrals as much as possible, but not to the detriment of any patient.  This will be done by upgrading the facilities, equipment, staff knowledge and skills over time. Crusader shall be responsible for all medical costs related to referrals but not for transport and non hospital accommodation costs of such referrals.

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## 3   DENTAL SERVICES

Dental services shall include all those services generally understood in the medical profession as constituting basic dental care. Without derogating from the generality of the aforesaid, dental care shall include consultations, filling and tooth extraction.

The following conditions are excluded from the definition of Dental Services;
3.1   periodontal services
3.2   orthodontic services
3.3   maxillo-facial surgery
3.4   dentures and other tooth replacement devices such as caps and bridges
3.5   implants.

## 4   SPECTACLES

Visual acuity (eye) testing, standard glasses and frames shall be included under Medical Services with the provision that:

4.1   the total cost of these services shall not exceed one hundred and sixty (160) USD;

4.2   only one pair of spectacles per person shall be provided over a period of two years, unless near and far vision spectacles are required at the same time, in which case the total cost for both pairs of spectacles will not exceed 160 USD;

4.3   the following are excluded:

   4.3.1   sunglasses and tinting of lenses
   4.3.2   multifocal and varifocal lenses
   4.3.3   special frames
   4.3.4   multiple pairs of spectacles for whatever reason other than those stipulated above in 4.2
   4.3.5   contact lenses and corneal corrective lenses
   4.3.6   replacement of broken, scratched or lost glasses and frames within the  two year period
   4.3.7   safety spectacles.

## 5   TRAUMA AND MEDICAL EMERGENCY STABILISATION AND EVACUATION

KCC will provide a 24/7 emergency response centre, three equipped and driven ambulances and one response vehicle for the Crusader doctor on call.
CRUSADER will provide professional nurse staffing for the KCC 24/7 emergency response centre.
Crusader will manage the KCC 24/7 emergency response centre through provision of a qualified paramedic or doctor.

The 24/7 trauma and medical emergency stabilisation and evacuation service will include;

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

5.1.    primary stabilisation of KCC Employees and KCC Contractors on site;

5.2.    primary stabilisation of KCC Employees and KCC Eligible dependants off site;

5.3.    stabilisation and monitoring of KCC Employees, KCC Eligible Dependants and KCC Expatriate Employees and dependents, in anticipation of evacuation to the nearest appropriate medical facility, if evacuation is deemed necessary by CRUSADER.

5.4.    beyond primary on site stabilisation and transport to a Kolwezi medical facility, Crusader shall not be required to provide stabilisation and monitoring of contractors while awaiting evacuation - irrespective of whether the contractor is an expatriate or DRC National and whether due to an injury while on duty or a medical condition, unless Crusader has been contracted by the Contractor Company for such, or unless KCC Manager Health, Safety and Medical Services agrees that KCC will pay Crusader for such services;

5.5.    in the case of KCC Expatriate Employees and their dependents, arranging evacuation in conjunction with the designated medical insurance or evacuation company;

5.6.    arranging evacuation of a KCC Employee or KCC Eligible Dependant, in which case transport costs are for KCC

5.7.    accompaniment of the patient by suitable CRUSADER medical personnel should this be necessary;

## 6.  PUBLIC/COMMUNITY HEALTH SERVICES

A public/community health specialist shall be retained by CRUSADER to provide public/community health advice, which shall include:

6.1    monitoring of and reporting on water and sanitation conditions at the Mine, upon request, provided that laboratory tests shall only be conducted or arranged at the request of KCC and at KCC's expense;

6.2    promotive and preventative services, including appropriate screening for common diseases, for the cost of KCC, health education and HIV/AIDS education and counselling to KCC Employees and KCC Eligible Dependants;

6.3    provision of advice to KCC on public/community health issues and applicable DRC legislation, laws, by-laws, regulations and standards.

6.4    CRUSADER shall, with capital investment support from MSI, provide a community-based day clinic in the community of Luilu;

6.5    Crusader shall, with the capital investment support of MSI, provide a new hospital in Kolwezi.

## 7.  LABORATORY TEST SERVICE

The following laboratory tests services shall be provided:

7.1.    Laboratory tests shall be performed at Crusader Health facilities as far as possible utilising microscopy and  a "dipstick" system

7.2.    When laboratory tests are not available at Crusader facilities then referrals to outside test laboratories for KCC Employees and KCC Eligible Dependants shall be made.

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## 8.  SURGICAL SERVICES

8.1.   Surgical facilities shall be provided by CRUSADER in order for them to perform such procedures that can reasonably be expected to be undertaken by general medical practitioners.

8.2.   Where the surgical procedure falls outside the scope provided for in 8.1 such patients will be referred to an appropriate medical facility in the DRC.

## 9.  PHARMACEUTICAL SERVICES

9.1    Provision of adequate stock at all times, within the Mine Medical Facilities and appropriate to the function of that facility, including the medicines, bandages, other treatments and items that are necessary to treat disease and injury that may be reasonably expected.

9.2    Should the pharmacy be out of stock of any item required to provide the Medical Services, then CRUSADER shall ensure that it procures the item as soon as possible.  If it is not possible for CRUSADER to procure such item within reasonable time then CRUSADER shall issue a prescription for the individual to collect the medicine and CRUSADER shall meet the cost of such prescription.

## 10. TUBERCULOSIS AND HIV TREATMENTS

Treatment for Tuberculosis and HIV is excluded from this Agreement in so far as a free comprehensive government initiative exists in Kolwezi.

## 11. ADMINISTRATIVE AND INFORMATION SERVICES

Administrative and information services shall include:

11.1.   All administration and record keeping that is necessary for the Medical Services to be appropriately managed;

11.2.   keeping easily accessible confidential individual medical records of all KCC Employees, KCC Eligible Dependants and KCC Expatriate Employees.  These records will not be accessible by KCC during the term of this Agreement, unless a CRUSADER medical practitioner deems it appropriate to disclose this information to KCC, provided that this is done within the International norms of medical ethics and confidentiality and that, specifically, the written consent of the patient is obtained prior to the disclosure of any information;

11.3.   however, all occupational medical records and data will revert to KCC's newly appointed medical service provider, upon termination of this Agreement;

11.4.   providing advice to KCC, if requested, on any medical expense claims that may be made against KCC by outside medical providers;

11.5.   providing advice to KCC, if requested, on any medical insurance, medical evacuation policies and contracts that KCC wishes to, or has entered into, with respect to cover for KCC Expatriates, KCC Employees and KCC Eligible Dependants.

11.6.    provision of medical and health and safety statistics and graphs relating to attendance at the Mine and CRUSADER Medical Facilities by KCC Employees, KCC Eligible Dependants and KCC Expatriate Employees, as required by KCC for insertion in its weekly, monthly, quarterly and/or annual reports and in order to comply with the requirements of Annexure "F".

## 13. HOURS OF OPERATION

13.1.    The Mine Medical Facilities will be open as stipulated in paragraph 4.2, 4.3 and 4.4 on every day of the year during the term of this Agreement.

13.2.    Crusader will provide medical services as per operational requirements suitable to the particular Medical Facility.

13.3.    An expatriate doctor shall be on call for medical emergencies and shall be accessible by cell phone and (or) mobile radio at all times during the term of this Agreement.

13.4.    Apart from being open for medical emergencies 24/7, the Crusader Kolwezi Hospital shall be open for normal medical consultations and treatment of KCC Employees, KCC Eligible Dependants, KCC Expatriate Employees and their dependents, in accordance with the following schedule.  This schedule may be modified by CRUSADER after consultation with and consent from KCC. Such consent shall not be unreasonably withheld.

**Hours of Operation**

| Unit | Mon-Friday | Saturdays | Sundays & Public holidays |
|---|---|---|---|
| Dispensary | 08h00 – 20h00 | 08h00 – 18h00 | 09h00 – 14h00 |
| X-Ray | 08h00 – 16h00 | 08h00 – 12h00 | Emergencies Only |
| Laboratory | 08h00 – 16h00 | 08h00 – 12h00 | Emergencies Only |
| Doctor Consultations | 08h00 – 16h00 | 08h00 – 12h00 | Emergencies Only |

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## ANNEXURE C

## DEFINITION OF KCC EMPLOYEES AND KCC ELIGIBLE DEPENDANTS

For the purposes of this Agreement, KCC Employees and KCC Eligible Dependants shall be those persons set out in the most recent written list provided to CRUSADER, each month, by an authorised representative of KCC. KCC will also provide a monthly list to CRUSADER of KCC Expatriate employees.

It is expressly understood by the parties that:

- KCC shall provide CRUSADER with a monthly list of KCC Employees and KCC Eligible dependants by the last day of the month, or the first working day thereafter if the last day is a non-working day, in order for CRUSADER to process invoices;
- KCC shall also provide CRUSADER with a monthly list of KCC Expatriate Employees;
- the most recent lists provided to CRUSADER by an authorised representative of KCC shall supersede all previous lists;

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## ANNEXURE "D"

## PAYMENT FOR MEDICAL SERVICES TO CRUSADER

As consideration for Medical Services provided by CRUSADER in compliance with the provisions of this Agreement, KCC shall pay CRUSADER monthly in arrears as follows:

1.      A monthly capitation fee of USD 41.00 (FORTY ONE UNITED STATES DOLLARS) per each KCC Employee, net of any withholding or sales taxes that may be levied, payable into a DRC account nominated by CRUSADER.

2.      An additional monthly capitation fee of $10 for each dependent of an Employee where the number of Eligible dependents exceeds the agreed maximum number for dependents (6), as per 1.17 of the agreement.

3.      KCC will pay a monthly capitation fee of $15 per KCC expatriate employee.

4.      CRUSADER shall be responsible for payment of ICA tax (whether for mining services or otherwise at any applicable rate) or any other taxes that may be charged by the DRC tax authorities.   Evidence of payment of withholding tax paid on behalf of CRUSADER (if applicable) in the form of tax credit certificates shall be sent to CRUSADER upon payment of such taxes (if applicable).

5.      The monthly fee referenced in paragraphs 1, 2 and 3 of this Annexure "D" is renegotiable on an annual basis and such negotiations shall commence on the Commencement Date for the duration of this Agreement. Any negotiations shall be conducted in good faith and the Parties acting reasonably, and shall be based upon transparency with regards to the costs of delivering the Medical Service to KCC.  No electronic or hardcopies of records will be made available in order to ensure confidentiality of information.

6.      Medical Services provided by Crusader to KCC shall attract no additional fee other than fees provided for in this Agreement.

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

## ANNEXURE "E"

## ITEMS BELONGING TO KCC AND MINE ACCOMMODATION TO BE USED BY CRUSADER

**1.      ITEMS**

1.1      CRUSADER shall on or before 30 days for the Date of Signature provide written notification to KCC in respect of the furniture and medical equipment items that are required by CRUSADER in order to ensure the safe and efficient operation of the Mine Medical Facilities.

1.3      CRUSADER may move any item or equipment for the sole purpose of optimising service delivery, subject to reaching an agreement with the authorised KCC representative and updating an asset register, prior to such move.  CRUSADER undertakes -

1.3.1    not to alienate such KCC items or equipment as per paragraph 8.5 of this Agreement; and

1.3.2    replace such items if lost while under CRUSADER care.

1.4      KCC shall supply the following equipment to ensure the efficient operation of the Mine Medical Facilities -.

- Information Technology hardware and software to the Mine Medical Facilities -  being one desk top computer and one desk top printer/scanner per facility;
- furniture, shelving and benches as per specifications given to KCC;
- vehicles;  KCC shall supply and maintain the ambulances and a doctor/paramedic response vehicle in a reliable and safe condition for the use by CRUSADER for the fulfilment of this Agreement.

**2.      MINE ACCOMMODATION**

Mine accommodation and boarding, for a maximum of eight (8) individuals, which shall consist of the following:

- units for the expatriate paramedic and doctors, which shall consist of at least one double bedroom unit in the senior staff camp or in town;
- appropriate accommodation for other expatriate personnel and/or operations managers (if required);
- appropriate accommodation for visiting consultants and management, as and when applicable;

## ANNEXURE "F"

## KEY RESULT AREAS AND INDICATORS

| Key Result Areas | Indicator |
|---|---|
| 1. Occupational Medicine (OM) limited to a maximum of 30 employees per day booked according to the relevant KCC SOP/s. | |
| 1.1 Examination booking | 1.1 A booking delay of no more than 5 working days |
| 1.2 Pre employment medical exam | 1.2 Completed in less than 1 day, results by next day |
| 1.3 Periodical medical exam | 1.3 Completed in less than 1 day, results by next day |
| 1.4 Transfer medical exam | 1.4 Completed in less than 1 day, results by next day |
| 1.5 Exit medical exam | 1.5 Completed in less than 1 day, results by next day |
| 1.6 Quality of OM examinations | 1.6 Random selection of at least 5 examination forms, X- Rays and audiograms, selected by the doctor responsible for OM, to be shown to and discussed with Manager Health, Safety and Medical Services (MHSMS) each month in the OM facility. |
| 1.7 Statistics | 1.7 Monthly report including analysis and commentary on OM to MHSMS |
| 2. Health advice | 1. Report to the MHSMS on any changes in DRC legislation that may impact the delivery of the agreed health service provision by Crusader or may be of importance to KCC<br>2. Advice, when requested, by the MHSMS on DRC legislation and on any other matter that may concern health issues covered in terms of this agreement |
| 3. Emergency response | 1. Monthly report with analysis.<br>2. Specifically, medical and geographic details and time taken to respond to mine accident cases<br>3. 24/7 professional nurse presence at the ambulance dispatch and underground emergency room |
| 4. Mine accidents | 100% adherence to the KCC Standard Operating Practice (SOP) on Mine Accidents, Response and Reporting. |

C:\NrPortbl\Litigation\SJANSSEN\314703_1.DOC 31st August 2009

| | |
|---|---|
| 5.  Standard Operating Practices (SOP) | Adherence to all KCC SOPs that are applicable to the delivery of the health service and which have been discussed with and agreed to by Crusader |
| 6.  General medical service satisfaction | 1.  Anonymous questionnaires drawn up by Crusader and made available at all times in each medical facility.<br>2.  Crusader staff shall encourage patients covered by this agreement  to complete these questionnaires<br>3.  Monthly report  and comment to the MHSM on answers obtained |
| 7.  Surgical outcomes | 1.  Number of surgical procedures performed on patients covered by this agreement<br>2.  Sepsis  rate of theatre |
| 8.  Treatment availability | % of scripts that had to be filled outside of Crusader pharmacy for people covered by this agreement. |
| 9.  Time waiting in mine medical facilities and in hospital outpatients | % patients waiting more than 1 hour before being seen. Crusader will determine how this is measured. Results will be reported each month. |
| 10. Hospital mortality rate | Number of deaths/admissions of KCC employees and dependents , reported each month. |
| 11. Statistics and other reports | A medical report will be compiled by the 28th of each month, containing, in addition to the information required in 1 to 10 (above),   statistics and commentary on at least:<br>1.  Attendance and disease profiles of employees attending  mine medical facilities<br>2.  Attendance and disease profiles of dependents attending medical facilities<br>3.  Referrals outside of Kolwezi for medical treatment<br>4.  Any infectious diseases that may have the potential to impact mining operations, such as cholera, malaria, viral haemorrhagic fevers etc. |
| 12. Monthly and weekly review meetings | 1.  Hold a monthly meeting with the MHSMS where these key result areas and indicators are tabled and discussed.<br>2.  Hold weekly operational review meetings with the MHSMS where operational issues are tabled, discussed and resolved.  Records will be kept by Crusader of these meetings |
| 13. Other key result areas and indicators | Work to and reporting against other key result areas and indicators as may be reasonably agreed to, from time to time, by the Crusader Country Manager and the KCC MHSMS |