UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
  UNITED STATES OF AMERICA                                  :
                                                            :
              -against-                                     :        22 Cr. 297 (LGS)
                                                            :
  GLENCORE INTERNATIONAL A.G.,                              :        **OPINION AND ORDER**
                                                            :
                             Defendant.                     :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Defendant Glencore International A.G. ("Glencore" or "Defendant") pleaded guilty to

conspiring to violate the anti-bribery provision of the Foreign Corrupt Practices Act of 1977, as

amended, in violation of 18 U.S.C. § 371.  In connection with Glencore's upcoming sentencing, Dr.

Ian and Laurethé Hagen ("Claimants"), on behalf of Crusader Health DRC SARL ("Crusader"),

have filed a request for restitution in an amount between $48,417,568 to $50,351,356.  Claimants'

request arises from Glencore's admitted scheme to bribe a public official in the Democratic

Republic of the Congo (the "DRC") in exchange for dismissing a lawsuit (the "2010 Lawsuit")

brought by Crusader against an indirect subsidiary of Glencore.  Claimants make their request under

the Crime Victims' Rights Act (the "CVRA") and the Mandatory Victim Restitution Act (the

"MVRA").  For the reasons below, the request is granted in part.

I.      **BACKGROUND**

      **A.  The Parties and Claimants' Business**

      Dr. Ian Hagen is a South African doctor with multiple professional degrees and

qualifications.  His wife, Laurethé Hagen, is also South African and has an honors degree in

biokinetics.  Glencore is a multinational commodity trading and mining company headquartered in

Baar, Switzerland.

In 1997, Claimants founded Medical Services International ("MSI").  MSI partnered with local medical services companies that Claimants created and ran under the name Crusader Health. MSI and Crusader Health operated in eleven African countries.  Claimants' businesses provided health care-related services, including designing, building and operating hospitals, health and travel insurance, pharmaceutical manufacturing, sanitation and medical evacuations.

Claimants expanded their MSI and Crusader Health business to the DRC in 2006.  In March 2007, they founded Crusader to provide local medical services in the DRC.  Claimants are 90% shareholders of Crusader.  Dr. Peniel Kasongo, a doctor residing in the DRC, is the Claimants' local medical partner and the remaining 10% shareholder of Crusader.

### B.  Crusader's Contracts with Two Defendant-Affiliated Mining Companies

In 2007 and 2008, MSI and Crusader executed contracts with two different DRC mining companies -- Kamoto Operating Limited ("KOL") and DRC Copper and Cobalt Project SARL ("DCP") -- to provide medical care to their respective mining communities and to build three medical facilities.  KOL and DCP were subsidiaries of Kamoto Copper Company ("KCC") and, by extension, Katanga Mining Limited, in which Defendant had a minority stake at the time. Defendant became the majority shareholder of Katanga Mining Limited in mid-2009.  While the medical facilities were under construction, Crusader signed a five-year contract to use the nearby Methodist Hospital to provide services to both KOL and DCP.

In 2008, Crusader was providing medical services for more than 40,000 people in the DRC. In addition to the contracts with KOL and DCP, MSI and Crusader had contracts with approximately eight other mining-related companies in and around the Katanga Province.  The KOL and DCP contracts accounted for approximately three-quarters of Crusader's income, with the other contracts providing the other quarter.

In 2009, Crusader learned that KCC, an indirect subsidiary of Defendant, would be taking over KOL's and DCP's contracts with Crusader.  MSI and Crusader negotiated new three-year contracts with KCC.  By that time, Crusader had completed one of the three medical facilities and the construction of the others was on schedule.

In September 2009, KCC appointed a new medical manager (the "Medical Manager") to oversee Crusader's contracts with KOL and DCP.  Crusader was unable to verify the Medical Manger's medical credentials, and the local medical council opened an investigation into the Medical Manager.  Claimants did not realize at the time that the Medical Manager had a close relationship with Defendant, which held an interest in KCC.  Around late 2009, a KCC executive called Dr. Hagen and told him that the issue with the Medical Manager must be "swept under the carpet" or he would make sure that Crusader "will never operate in the DRC again."  On the same phone call, the KCC executive threatened the physical safety of Dr. Hagen and his family.  Dr. Kasongo reported that he faced threats and was offered bribes because of the investigation.

On January 11, 2010, the same KCC executive sent Crusader and MSI letters terminating their contracts with KOL and DCP, effective April 10, 2010.  The letters did not provide a reason for the termination.  Claimants believe the termination was in retaliation for Crusader's investigation of the Medical Manager.

After receiving the termination letters, Crusader tried to resolve the dispute with KCC.  In a letter dated January 28, 2010, Crusader informed KCC that because of the "significant capital investment" Crusader had made in reliance on its new three-year contracts with KCC, Crusader "as a whole will suffer from future loss of profits and income" from the termination of the contracts.  Crusader also informed KCC that the termination of the contracts would "inevitably lead to retrenchment of staff," among other losses to Crusader.  "Retrenchment" refers to severance payments due to terminated employees under DRC law.

In a meeting on March 1, 2010, a KCC employee warned Crusader that the legal costs of proceeding with the dispute would be exorbitant.  In a letter dated March 15, 2010, Crusader explained each component of loss it would seek from KCC because of the termination of the contracts.  Crusader requested that KCC take over the clinic and hospital and assume responsibility for the severance costs associated with transferring Crusader's staff of 92 employees to KCC.  KCC refused to reimburse Crusader for any amounts due under the contract.

### C.  The 2010 Lawsuit and Crusader's Demise

In October 2010, Crusader sued KCC in the DRC for $16,084,556 (the "2010 Lawsuit").  In January 2011, the court dismissed the action on a procedural ground that had not been raised by KCC.  According to the court, Crusader did not have the appropriate corporate formation documents on file and therefore could not proceed with the lawsuit.  It later came to light that Defendant had approved an invoice for $500,000 that was paid as a bribe to have the 2010 Lawsuit dismissed.

While the lawsuit was pending, Claimants and MSI loaned money to Crusader to keep it afloat, Crusader having lost three-quarters of its income due to KCC's termination of the DCP and KOL contracts.  Crusader anticipated that it would receive a recovery in the 2010 Lawsuit that would cover its losses.  By 2011, Crusader was in desperate need of cash and was operating at a significant loss.  In 2011 and 2012, Crusader's books reflected significant losses.  By the end of 2012, Crusader had honored all of its contracts in the DRC and retrenched a significant number of its remaining professional staff.  Crusader effectively ended active operations in late 2012.

### D.  The 2018 Lawsuit

On November 28, 2018, Dr. Kasongo sued KCC on behalf of Crusader in the newly established Kolwezi Commercial Court seeking $11,084,556 in reimbursement of contractual amounts (e.g. hospital, ambulances, operating expenses) and $20 million in other damages (the

"2018 Lawsuit").  Like the 2010 Lawsuit, KCC did not challenge the merits of Crusader's claims, and instead presented several procedural defenses.  KCC again raised the defense that the court lacked jurisdiction because of the arbitration clauses in the contracts.

On December 31, 2019, the Kolwezi Commercial Court found KCC liable to Crusader, concluding that the contracts' arbitration clause was unenforceable under Congolese law and that KCC had wrongfully terminated the contracts.  The court addressed the categories of damages Crusader sought, noted that the factual record created some uncertainty in the calculation and awarded $6,864,556 in contractual damages and $4 million in other damages.  To date, Crusader has not received any payment from KCC under the judgment.  Crusader accrued $3,198,800 in legal fees from the 2010 and 2018 litigation against KCC.

### E.  This Criminal Action

On May 24, 2022, the Government filed a one-count Information charging Defendant with conspiring to violate the anti-bribery provision of the Foreign Corrupt Practices Act ("FCPA").  The next day, pursuant to a plea agreement (the "Plea Agreement"), Defendant pleaded guilty to conspiring to violate the FCPA from approximately 2007 until 2018 by paying more than $100 million in bribes to foreign officials to secure an improper advantage and to obtain or retain business in several countries, including the DRC.  The Plea Agreement provided, among other things, "that any restitution imposed by the Court will be due and payable in accordance with the Court's order."  The Plea Agreement incorporated by reference a Statement of Facts, which Defendant expressly admitted.  Defendant also agreed to the admissibility of the Statement of Facts in any sentencing proceeding and agreed "not [to] contradict anything in the attached Statement of Facts at any such proceeding."

The Statement of Facts describes, among other conduct, Glencore's scheme to bribe a public official in the DRC with a payment of $500,000 in exchange for dismissing the 2010 Lawsuit.  The

Plea Agreement states that, as a result, Glencore "avoided paying approximately $16,084,000 to settle the claim" asserted in the 2010 Lawsuit.  For ease of reference, this amount is sometimes referred to below as the "$16 Million."

## II.     Applicable Law Regarding Restitution

The MVRA provides that a sentencing court "shall order" defendants convicted of specified crimes, including "an offense against property under this title . . ., including any offense committed by fraud or deceit," to "make restitution to the victim of the offense" in addition to "any other penalty authorized by law."  18 U.S.C. §§ 3663A(a)(1); (c)(1)(A)(ii).  Under the statute, a "'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2).  "Thus, in determining to whom a defendant owes restitution, the statute requires the court (1) to identify the 'offense' of conviction and (2) to ascertain whether the putative 'victim' was 'directly and proximately harmed' by the defendant's commission of that 'offense.'"  *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021).

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" is on the Government.  18 U.S.C. § 3664(e).  Where the Government takes no position on the amount of loss and the victim and Defendant are in possession of the relevant proof, the Court may consider that proof to determine the amount of loss, assigning the burden of proof to the victim claimant.  *See, e.g.*, *United States v. Doherty*, No. 5 Cr. 494, 2009 WL 1310877, at *8 (E.D.N.Y. May 7, 2009) ("Here, the government has taken no position on the restitution and provided no proof of loss whatsoever.  I note this anomaly for the record, but note further that the government has not argued that the [claimants] are entitled to no restitution, and I will consider the [claimants'] proof of loss.").

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).  The "MVRA requires only a reasonable approximation of losses supported by a sound methodology."  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013).  "[T]he preponderance standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."  *Id.* (internal quotation marks omitted).

Both direct and proximate cause must be established.  Under the MVRA, "restitution may be imposed only for losses arising from the specific conduct that is the basis of the offense of conviction."  *Goodrich*, 12 F.4th at 228 (internal quotation marks omitted).  In the context of a criminal conspiracy, restitution is not limited only to "losses caused by the actions of that defendant during the conspiracy, but also embraces losses flowing from the reasonably foreseeable actions of that defendant's co-conspirators."  *Id.* (internal quotation marks and citations omitted).  The "MVRA requires that the 'offense' of conviction 'directly and proximately harmed' the victim entitled to restitution.  Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively."  *Id.* at 229.  "Regarding cause in fact, the defendant's conduct must have been a necessary factor in bringing about the victim's harm."  *Id.*  Regarding proximate cause, the "basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct, which we evaluate based on whether that harm was 'foreseeable' to a defendant."  *Id.* (internal quotation marks omitted).  "[R]estitution is designed to make the victim whole . . . and must therefore be based only on the actual loss caused by the scheme."  *United States v. Calderon*, 944 F.3d 72, 94 (2d Cir. 2019) (internal quotation marks omitted).

In a case involving loss or destruction of property, the MVRA provides that an order of restitution "shall require" the defendant to return the lost property or "if return of the property . . . is

impossible, impracticable, or inadequate, pay an amount equal to (i) the greater of (I) the value of the property on the date of the damage, loss, or destruction; or (II) the value of the property on the date of sentencing, less (ii) the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). "Thus, the MVRA unambiguously tells a court *what* to value (the property lost; the property returned) and even *when* to value it (in the case of the loss value, property is evaluated on the date of the damage, loss, or destruction, or on the date of sentencing, whichever is greater)." *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006) (cleaned up).

Because the statute is silent regarding how the referenced property is to be valued, "the law appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case." *Id.* Thus, the Second Circuit construes "'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose." *Id.* at 115. "In determining the appropriate measure of value for property relevant to restitution, a district court must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." *Id.* "However, not all harms caused by a defendant's offense are compensable under the MVRA -- only those articulated in the statute." *United States v. Calonge*, No. 20 Cr. 523, 2022 WL 1805852, at *4 (S.D.N.Y. June 1, 2022); *see United States v. Maynard*, 743 F.3d 374, 379 (2d Cir. 2014) ("If Congress intended to include all harms directly and proximately caused by a defendant's offense, it could have done so with wording more simple and categorical.").

## III.    DISCUSSION

Claimants seek restitution from Defendant in an amount between $48,417,568 and $50,351,356, comprising (1) $16,084,556 as the amount Crusader sought in the 2010 Lawsuit that

was dismissed; (2) $57,294 for severance costs for Crusader's former employees; (3) $15,315,337 to $17,229,754 in prejudgment interest for the two items above at a simple interest rate of 8% to 9% per annum; (4) $3,198,800 in civil legal fees related to the 2010 and 2018 Lawsuits and (5) between $13,761,581 and $13,780,952 for the loss of the value of Crusader's remaining business in the DRC.

Defendant opposes Claimants' application in part and argues that the losses alleged by Claimants overvalue the 2010 Lawsuit and include speculative harms that extend beyond the offense of conviction, an excessive prejudgment interest rate and expenses that are not compensable under the MVRA.

The Government does not oppose an award of restitution to Claimants for losses directly and proximately caused by Glencore's offense of conviction, notes that Claimants and Defendant are in possession of the relevant facts and evidence, and takes no position on the disputed amount of direct and proximate loss suffered by Claimants resulting from Defendant's bribe.

For the reasons below, Crusader is awarded restitution in the amount of $29,691,165, comprised of (1) $16,084,556 for the value of the 2010 Lawsuit as of the date the action was dismissed and (2) $13,606,609 for the value of Crusader's residual business as of September 30, 2022.  Crusader is also awarded prejudgment interest at a rate of 5.0425%.

**A. Claimants as Assignees Are Entitled to Restitution under the MVRA**

Defendant pleaded guilty to conspiring to violate the FCPA in violation of 18 U.S.C. § 371, which is a qualifying offense under the MVRA.  *See United States v. Brennan*, 526 F. Supp. 2d 378, 383 (E.D.N.Y. 2007) ("Conspiracy to commit a crime under Title 18 . . . or conspiracy to commit a crime under Title 18 for a substantive crime under a different title, makes restitution *mandatory* under section 3663A.").  Defendant acknowledges that Crusader and, by extension, Claimants were

harmed by the offense to which Defendant pleaded guilty.  Defendant is "prepared to pay restitution in the amount of any loss directly and proximately caused by that offense."

Claimants bring this restitution claim on behalf of Crusader or, in the alternative, on behalf of themselves as 90% shareholders of Crusader.  Claimants are authorized to pursue Crusader's restitution claims because Crusader assigned its claim to Claimants pursuant to a lawfully executed assignment agreement.  *See* 18 U.S.C. § 3663A(b)(1)(A) ("The order of restitution shall require that such defendant . . . return the property to the owner of the property *or someone designated by the owner*. . ." (emphasis added)); *see also United States v. Keough*, No. 4 Cr. 98, 2019 WL 1594360, at *5 (D. Vt. Apr. 15, 2019) ("[T]he MVRA is best read to permit the sale or assignment of restitution claims to third parties." (internal quotation marks omitted)).  Claimants have requested that the Court award Crusader the restitution amount or award.  Accordingly, restitution as described below is awarded to Crusader and shall be paid to Claimants as assignees of Crusader's restitution claim.

**B.  Value of the 2010 Lawsuit**

Crusader is entitled to $16,084,000 for the value of Crusader's 2010 Lawsuit.  The Statement of Facts provides that the damages claimed in the lawsuit was "more than $16 million." Defendant's employees directly and proximately caused that loss by "approv[ing] a $500,000 invoice that was used as a bribe payment to have the lawsuit dismissed."  As a result of the bribe, the contract dispute was resolved in Defendant's favor, and Defendant "avoided paying approximately $16,084,000 [to Crusader] to settle the claim."  Defendant admitted these facts in the Plea Agreement, which incorporates the Statement of Facts by reference, and Defendant stipulated to the admissibility of the Statement of Facts in any sentencing proceeding and agreed to not contradict anything in the Statement of Facts at any such proceeding.  As $16,084,000 is the amount Crusader would have received from Defendant, but for the bribe, it is the best measure of the "value

of the [lawsuit] on the date of damage, loss, or destruction" due to Crusader under the MVRA.  18 U.S.C. § 3663A(b)(1)(B).

Defendant does not dispute that Crusader is entitled to the value of the claim asserted in the 2010 Lawsuit.  But Defendant argues that the appropriate value of that claim is $10,860,000 -- a "straightforward measure" of the loss readily available in the form of the DRC court's judgment in the 2018 Lawsuit, which adjudicated the same claims as in the 2010 Lawsuit.  This argument might have merit, but it does not because Defendant stipulated to $16,084,000 in the Plea Agreement.

Defendant further argues that the $16,084,000 represents its own ill-gotten gain from the bribe payment, but not the amount of Crusader's actual provable loss, and that only the latter is recoverable as restitution.  *See United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012).  This argument is rejected because, here, "every dollar gained by the defendant was necessarily lost by [the] victim[]."  *United States v. Finazzo*, 850 F.3d 94, 118 (2d Cir. 2017).  Defendant's admission in the Statement of Facts says as much -- that Defendant "avoided paying approximately $16,084,000 [to Crusader] to settle the claim."  The avoided payment is Defendant's gain and Crusader's loss.

### C.  Loss of Crusader's Residual Business

#### a.  Direct and proximate causation

Crusader is entitled to $13,606,609 as of September 30, 2022, for the lost value of Crusader's business that remained after the DCP and KOL contracts were terminated.  Claimants have sustained their burden of showing that Defendant's unlawful conduct was both the cause-in-fact and proximate cause of this loss.  *See Goodrich*, 12 F.4th at 229.

The record evidence shows that, even without the DCP and KOL contracts, had Crusader received the $16 Million in damages from the 2010 DRC Lawsuit, it would not have been forced out of business for lack of funds.  The DCP and KOP contracts accounted for approximately three-

11

quarters of Crusader's income.  After KCC terminated the two contracts, Crusader had to rely on loans from Claimants and MSI to fulfill its other contractual obligations.  Crusader operated at a loss for as long as it could while it pursued its claims through the DRC courts.  By the time Defendant procured the fraudulent judgment in 2011, Crusader was in desperate need of cash and was operating at a significant loss.  Without the $16 Million from the 2010 Lawsuit to mitigate the loss of the terminated contracts, Crusader did not have the funds necessary to sustain and grow its remaining business and ended operations in late 2012.  Consistent with these facts, Claimants' valuation expert Gene B. Phillips stated that "the losses suffered because the failure to receive the [$16 Million] left the company in a crippled state, thereby hampering its return to profitability and growth."  He opined that, had Crusader obtained those funds,  "it . . . likely . . .  would have been restored to a position it would have been in but for the alleged misconduct: that is, as the growing, profitable company it was in Q1 2010, albeit without the Glencore Contracts."  This evidence is sufficient to establish that the loss of the $16 Million damages award was a cause-in-fact of the demise of Crusader's residual business.  *See id.* (Cause-in-fact is established when a defendant's conduct a "necessary factor in bringing about the victim's harm.").

Claimants also have established proximate cause by a preponderance of the evidence.  For proximate cause, the "basic question . . . is whether the harm alleged has a sufficiently close connection to the conduct, which we evaluate based on whether that harm was 'foreseeable' to the defendant."  *Id.* (internal quotation marks omitted).  It was foreseeable to Defendant that depriving Crusader of the $16 Million would undermine Crusader's ability to conduct its remaining business, because Defendant, through its own subsidiary KKC, had just eliminated Crusader's main source of revenue by terminating the DCP and KOL contracts.  Defendant delivered the proverbial one-two punch to make good on its threat that Crusader "will never operate in the DRC again."  First, Defendant terminated the two contracts, placing Crusader in a dramatically weakened financial

position.  Then, Defendant paid an illegal bribe to ensure that Crusader would not collect funds that would enable it to survive without the lost contract revenue.  Defendant's knowledge of the magnitude and termination of the two contracts is sufficient without more to establish foreseeability.  In addition, Crusader explicitly informed KKC, and by extension Defendant, of the financial hardships that Crusader faced because of the termination, hardships that obviously would have been relieved with an influx of the $16 Million.  Defendant was therefore on notice that the failure of the company was well "within the zone of risk" and foreseeable to Defendant.  *Calderon*, 944 F.3d at 95.

Defendant's response is that the loss of Crusader's residual business is too speculative and remote from Defendant's bribery offense to satisfy the proximate cause requirement.  First, Defendant suggests that any causal link between the bribery payment and the loss of Crusader's business was broken by Crusader's own independent business judgment:  Crusader entered into the DCP and KOL contracts as a sophisticated party, aware that the contracts had a limited term and could be terminated on 90 days' notice.  This argument fails because it does not address whether Defendant's bribe caused Crusader's residual business to fail.  Although the contract terminations placed Crusader in a weakened state, the bribe delivered the final and foreseeable blow.  *See United States v. Brown*, No. 11 Cr. 449, 2016 WL 11263165, at *6 (E.D.N.Y. Dec. 2, 2016), *report and recommendation adopted* 2018 WL 418900 (E.D.N.Y. Jan. 16, 2018) ("[T]he defendant's conduct need not be the sole cause of the loss.").

Second, Defendant argues that it is too speculative to hypothesize what would have happened to Crusader's business had it prevailed in the lawsuit and obtained damages and that to calculate the value of the loss would require "a complex assessment."  This argument is rejected because Plaintiff's expert has offered such an assessment, based on a reasonable methodology and reasonable assumptions as discussed below.  For these reasons, Claimants have established by a

preponderance of the evidence both direct and proximate causation necessary to recover for the loss of its residual business.

b.   **Value of Crusader's Residual Business**

Claimants have submitted the expert testimony of a valuation expert Gene B. Phillips.  He opines that, if Crusader had received the $16 Million, the company would have had a value of $13,606,609 as of September 30, 2022.  Defendant has not offered its own expert testimony, nor has Defendant criticized or even commented on Mr. Phillips' opinion.  Because the opinion is clearly explained and appears to be based on a reasonable methodology and reasonable assumptions, Claimants have sustained their burden of proving the value of their lost property, Crusader's residual business.  *See United States v. Scott*, 321 F. App'x 71, 72 (2d Cir. 2009) (summary order) ("The primary purpose of the MVRA is to make victims of crime whole by fully compensating them for their losses.  Accordingly, when determining the appropriate amount of restitution, district courts must choose a valuation method that best accomplishes this purpose." (citation omitted)).

In brief, Mr. Phillips' analysis constructs a "but-for" world in which Crusader received the $16 Million.  His approach was to determine the value of Crusader as of September 30, 2022, based on its projected revenue as of that date.  The first step was to determine the company's revenue as of that date.  The second step was to determine the value of the company based on a multiplier derived from the value of comparable companies based on their revenue.

For the first step -- projecting Crusader's revenue as of September 30, 2022 -- he began with the company's revenues at the end of Q1 2010 before the termination of the DCP and KOL contracts, when the company was profitable and growing.  He then reduced those earnings by 78.4% to account for the loss of the two contracts.  He then projected earnings growth year by year using two multipliers -- a 4% "inflation-like" adjustment, reflecting a contractual provision that assumed a 4% annual increase in Crusader's fee; and an annual growth rate that mirrors the growth

rate of personnel of three mining companies in the relevant area of the DRC in each year, because Crusader's revenue model was based on its customers' headcounts.  These multipliers differed from year to year, and were usually positive numbers, though in two years were negative numbers.  This resulted in projected annual earnings as of September 30, 2022, of approximately $4.5 million.

For the second step, he applied what he explained to be a conservative multiple to the revenues to determine the value of the company.  To determine the multiple, he began with the most recent available multiple for private equity transactions in Africa (excluding South Africa), and then reduced it to account for the small size of Crusader and to reflect downward movements in the market since those private equity transactions.  This resulted in reducing a multiple of 6.49 to 3.  He explained that the multiple is conservative because other sources suggest higher multiples.  Applying the multiple of 3 to revenues of $4,535,536, he arrived at a so-called Enterprise Value of $13,606,609.

The assumptions that are the basis for Mr. Phillips' analysis are clearly explained and appear to be reasonable, including reducing projected earnings at the outset to reflect the terminated contracts, assuming a growth rate based on annual increases from actual contracts, and based on the actual growth rate of mining personnel (when mining personnel were the ultimate consumers of Crusader's services) in the same geographic area where Crusader operated, and adopting an earnings multiplier that appeared to be conservative.  Although other valuation methodologies and other comparables at least in theory might have been used, this one had the benefit of being based on available data.  Particularly, since Defendant had no criticism of Mr. Phillips' estimate or his analysis, his expert opinion is sufficient to establish by a preponderance of the evidence that, but for Defendant's unlawful bribe, Crusader's residual business would have survived and had a value of $13,606,609 as of September 30, 2022.  *See, e.g.*, *id.* at 72 ("Accordingly, the actual value of the

stolen property, the funds in the retirement accounts, at the time of sentencing was the nominal value of the stolen funds plus the subsequent investment gains lost as a result of the theft.").

Defendant's only argument to the contrary is to rely on 18 U.S.C. § 3663A(c)(3), which states that the mandatory restitution provision of the MVRA does not apply "if the court finds, from facts on the record, that . . . determining complex issues of facts related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." This exception does not apply because the complexities here have not and will not complicate or prolong the sentencing, which is imminent. Moreover, Defendant does not propose any weighing of "the need to provide restitution" against any "burden on the sentencing process."

Crusader is entitled to $13,606,609 as of September 30, 2022, for the lost value of Crusader's business, which was caused by Defendant's unlawful bribe.

### D. Attorneys' Fees

Crusader is not entitled to restitution for $3,198,800 of attorneys' fees it incurred pursuing its breach of contract claim in the DRC after the dismissal of the 2010 Lawsuit. Attorneys' fees in ancillary civil proceedings are not recoverable. In addition to compensating the victim for the value of property lost or damaged, the MVRA also requires defendants to "reimburse the victim for lost income and necessary child care, transportation, and *other expenses incurred during participation in the investigation or prosecution of the offense* or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4) (emphasis added). In *Lagos v. United States*, the Supreme Court held that the words "investigation" and "proceedings" in § 3663A(b)(4) of the MVRA "refer to government investigations and criminal proceedings." *Lagos*, 138 S. Ct. 1684, 1690 (2018). In *United States v. Afriyie*, 27 F.4th 161 (2d Cir. 2022), the Second Circuit narrowly construed the MVRA to "hold that restitution is appropriate only for expenses associated with criminal matters.

Civil matters -- including SEC investigations, even if closely related to a criminal case -- do not qualify." *Afriyie*, 27 F.4th at 163.  Here the fees are not recoverable for the additional reason that they were not incurred "for the investigation or the prosecution of the [bribe]," but rather to pursue the breach of contract claim.

Claimants argue that, when the defendant's criminal conduct includes illegal acts that impact a legal proceeding and cause the victim to pay attorneys' fees as a result, that loss is directly related to the crime of conviction and is recoverable under the MVRA.  That is, Claimants suggest that their legal fees should be compensated as loss of property under § 3663A(b)(1), rather than as expenses "incurred in the investigation or prosecution of the offense" under § 3663A(b)(4), the latter approach being expressly barred by *Lagos*.  The argument is unpersuasive, and Claimants offer no binding authority in support of their position.  The statute's express provision for the reimbursement of only certain specified expenses in § 3663A(b)(4), dictates that the "loss of property" provision not be read to include all other expenses incurred as a result of the crime. Otherwise, § 3663A(b)(4) would be meaningless, a result that is barred by basic principles of statutory construction.  *N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 217 (2d Cir. 2021) ("[T]he canon against superfluity . . . instructs courts to interpret a statute to effectuate all its provisions, so that no part is rendered superfluous." (internal quotation marks omitted)); *see also Maynard*, 743 F.3d at 379 (2d Cir. 2014) ("If Congress intended to include all harms directly and proximately caused by a defendant's offense, it could have done so with wording more simple and categorical.").  The requested restitution for attorneys' fees is denied.

### E.  Retrenchment Costs

Crusader is not entitled to restitution for the $57,294 in retrenchment / severance payments to employees that Crusader was forced to terminate.  These payments are not recoverable because they were not caused by Defendant's illegal conduct -- the bribe; they were caused by the

17

termination of the DCP and KOL contracts.  The retrenchment payments cannot have been caused by Defendant's bribe because the entire amount of retrenchment costs Claimants seek were incurred in 2010, which was before bribe.  Plaintiff's effort to broaden the scope of Defendant's unlawful conduct beyond the bribe is unavailing; Defendant's illegal conduct is circumscribed by the Statement of Facts.  Restitution for the retrenchment costs is denied.

### F.  Prejudgment Interest

Prejudgment interest at an annual rate of 5.0425% is awarded on (1) $16,084,556 as the amount Crusader sought in the 2010 Lawsuit from January 11, 2011, and (2) $13,606,609 from September 30, 2022, for the lost value of Crusader's residual business.

"[T]he MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation in the full amount of each victim's losses." *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011) (internal quotation marks omitted); *accord United States v. Smerling*, No. 21 Cr. 317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).  The purpose of prejudgment interest is to compensate a victim for the "deprivation of the victim's ability to put its money to productive use." *Qurashi*, 634 F.3d at 703; *accord Smerling*, 2022 WL 1806300, at *2.  "[P]rejudgment interest stands in to provide a rough but fair approximation of such losses." *Qurashi*, 634 F.3d at 703

"The Second Circuit has not provided guidance regarding the interest rate at which prejudgment interest should be awarded." *Smerling,* 2022 WL 1806300, at *2.  Federal law provides for post-judgment interest on a restitution award, however, at a rate "equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the first day on which the defendant is liable for interest." 18 U.S.C. § 3612(f)(2)(B); *see also* 28 U.S.C. § 1961(a) (prescribing the same rate for pre-judgment interest on civil judgments).  That rate is currently 5.0425%. *See Selected Interest Rates (Daily)*, Board of Governors of the Federal Reserve System,

https://www.federalreserve.gov/releases/h15/ (last visited February 27, 2023).  The Court adopts

this rate as the applicable rate for prejudgment interest on the restitution award to Claimants.

Claimants contend that a simple prejudgment interest rate of 8% to 9% is appropriate.  They

advance two principal arguments in support of their request.  First, they argue that Crusader had the

right under DRC law to request a standard prejudgment and post-judgment simple interest rate of

between 8% and 10% on their claim in the DRC, and that the same rate is needed here to fully

compensate Crusader for its injuries.  The argument is unavailing.  Although Claimants asked the

DRC court to impose interest at a rate of "8% per year from the request until payment is complete,"

the DRC court did not grant Crusader's request.

Second, Claimants argue that where, as here, a federal statute is silent as to the applicable

prejudgment interest rate, New York State's statutory rate of 9% should apply.  But courts in this

Circuit have rejected applications of the state statutory rate of 9%, noting, for instance, that New

York's statutory rate was last modified in 1981.  *See, e.g.*, *United States v. Qurashi*, No. Cr. 5498,

2009 WL 10677000, at *40 (E.D.N.Y. Sept. 1, 2009), *report and recommendation adopted*, No. 5

Cr. 498, 2009 WL 10677129 (E.D.N.Y. Sept. 30, 2009); *see also United States v. Vilar*, 729 F.3d

62, 97 n.38 (2d Cir. 2013) ("In fact, there is some doubt as to whether it is ever appropriate to award

interest at the state rate on federal claims.").

Defendant proposes applying the annual interest rate for market yield on U.S. Treasury

securities at one-year constant maturity to calculate the interest year-over-year.  For example, in

2011, the average interest rate based on the market yield on U.S. Treasury securities at one-year

constant maturity was 0.18%.  In 2016, it was 0.61%, and in 2022, it was 2.51%.  Defendant,

however, offers no authority for this approach and merely concludes that it would "most closely

approximate the return Crusader could have obtained had it received the funds in 2011."

Defendant's proposal is therefore unpersuasive as well.

### G.  Withdrawal of Crusader's Claim in the DRC Courts

Defendant requests that any order of restitution should be conditioned on Crusader's withdrawing its claim in the DRC and a requirement that Crusader seek no further relief in the DRC to avoid the risk of double compensation for the same conduct.  For the reasons below, the request is granted in part.

The MVRA states that "the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source" should not be considered in "determining the amount of restitution."  18 U.S.C. § 3664(f)(1)(B).  The statute also states that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim."  18 U.S.C. § 3664(j)(2). Although the "text and structure of the MVRA provides some confusion about the proper scope of a restitution order when a victim has already been compensated by another source," *United States v. Dharia*, 284 F. Supp. 3d 262, 270 (E.D.N.Y. 2018), it is clear that the MVRA "does not entitle the victim to a double recovery" as the "goal of the statute is to provide crime victims with full compensation, but not with a windfall," *United States v. Yalincak*, 30 F.4th 115, 122 (2d Cir. 2022). *See also Dharia*, 284 F. Supp. 3d at 270 ("The case law can be restated in a simple principle: 'restitution may not result in double recovery.'").

Here, Defendant does not ask the Court to decrease the amount of restitution because of an outstanding judgment in the DRC.  Rather, Defendant asks the Court to ensure that Crusader does not receive double compensation.  In response, Claimants argue that 18 U.S.C. § 3664(f)(1)(B) prohibits such relief, and that they are entitled to restitution from Defendant without regard to any other proceedings that may be pending.  Claimants' reliance on § 3664(f)(1)(B), however, is inapposite.  Granting the relief requested by Defendant would not affect the total amount of restitution awarded.  *See United States v. Stevens*, 739 F. App'x 44, 47 (2d Cir. 2018) (shifting

payments of the restitution amount between the victim and third party, without affecting the "total restitution" awarded, is consistent with 18 U.S.C. § 3664(f)(1)(B)).

To minimize the risk of double recovery and later jurisdictional issues, Defendant's payment of restitution pursuant to this order is subject to the condition that Crusader withdraw its $10,860,000 judgment in the DRC.  Crusader -- and by extension, Claimants -- shall seek no further relief in the DRC for the categories of restitution awarded in this order -- i.e., the value of the 2010 Lawsuit, the value of Crusader's residual business, and prejudgment interest on the same.  Crusader and Claimants are not precluded from seeking relief in the DRC for any alleged harm not included in the restitution award.

## IV.    CONCLUSION

For the foregoing reasons, the application for restitution is **GRANTED** in part.  Defendant is hereby ordered to pay restitution to Claimants on behalf of Crusader in the amount of $29,691,165, comprised of (1) $16,084,556 for the value of the 2010 Lawsuit as of the date the action was dismissed and (2) $13,606,609 for the value of Crusader's residual business as of September 30, 2022.  Crusader is also awarded prejudgment interest at a rate of 5.0425%, payable to Claimants.

Defendant's payment of restitution pursuant to this Order is subject to the condition that Crusader withdraw its $10,860,000 judgment in the DRC.  Crusader, and anyone on its behalf, shall seek no further relief in the DRC for the categories of restitution awarded in this Order.  For clarity, Crusader and Claimants are not precluded from seeking relief in the DRC for any alleged harm not included in the restitution award.

Dated: February 27, 2023
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE